DOCUMENTS  ENCLOSED

1- Decl. for mailing  the  C.R. Motio.& Appx (1-pg)

2-The Mot. for Comp. Rel. (p. 1- 49 w/ Tab. of cont.)

3-The  Appendex; p. 1-to- 174 (incl. defendant's Decl.
   at 148-73; (p. (1)-(26) ).

RECEIVED
DEC - 4, 2024
S.D.N.Y.

EXH: 1

Declaration For Mailing the C.R. Motion & Appx:

I, Khalfan Kh. Mohamed hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

Pursuant to this court's order of Oct. 15, 2024, I've, on Nov. 5, 2024, mailed my motion for Compassionate Release along with the attached Supporting Appendix. The Motion and my declaration attached within the Appx. still carry the same, original date; Sept. 25, 2024, for, I didn't change any thing other than those things this court had ordered to be changed/ redacted. My motion is submitted as a legal mail and I've attached enough amount of the postage stamps for the first class mail. Moreover, I've mailed it as a certified mail to ensure its arrival to the court. I've addressed the legal mail to the Court, Addressed: United States District Court, Chambers of Lewis A. Kaplan, 500 Pearl Street, New York, NY 10007.

Dated; Nov. 5, 2024
Khalfan Kh. Mohamed
U.S.P. Florence, P.O.Box 7000
Florence, CO 81226                    s/kh.mohamad.

by
Tak
MOHA
37581
Lot #:

cicam 7.5
10/
*State law prohibits sms*

# TABLE OF CONTENTS

# MOTION FOR COMPASSIONATE RELEASE

Administrative Remedy ......................................................... 1
Standard of Review .............................................................. 3
Introduction ........................................................................ 3
Argument ............................................................................ 3

Victim Of Abuse

I    The Abuses of 2000 & 2008
A    The August 2018 Physical Abuse As Detailed in Mohamed v. Jones et .... 4
B    al No.1:20-cv-02516-RBJ-MDB. Amend. Compl. Doc.64 ..................... 4
     1. The Administrative Proceedings .................................................. 5
     2. The Court's Proceedings So far ................................................. 6
     3. The Defendants' Answer & Admissions to the Amend. Compl. Doc.155
     4. The Decision Not to contest Mohamed's Battery claims was... Due
        to the Government's recognition that... it could Not Escape From .... 6
        Liability under the Colorado Law.
C    The April 2020 Physical Abuse As Detailed in Mohamed v. U. States .... 7
     No.1:21-cv-02676-NYW-MDB, Amend. Compl. Doc.174. ...................... 8
     1. The Administrative Proceedings ................................................. 8
     2. The Court's Proceedings So far. ................................................. 9
     3. The Government's Answer & Admissions to the Amend. Compl. Doc.140
     4. The Decision Not to contest Mohamed's Battery claims was... Due to the
        Government's Recognition that..., it could Not Escape From Liability .... 9
        under the Colorado Law.
D    The current status of the Two Cases Sufficiently Establishes That:
     (1) the BOP staff Physically Abused Mohamed and coused Serious Bodily
     Injuries ; (2) The BOP and its staff Are Liable ; Therefore, The Court
     Should Exercise its Discretion to Grant this Motion, Because
     the waiting of Additional... Proceedings Will Result in to the Unduly
     Delay caustioned by the 18 U.S.S.G. § 1B1.13
     1. The BOP staff Physically Abused & Seriously Injured Mohamed
     2. The BOP & Its staff Are Liable.
     3. Therefore, the Court should... Grant this Motion.
E    Courts Have Already Started Granting Motions for C.R. Based on
     VOA provision Even Where the Injuries Involved Are Less severe
     and Even Absent Administrative & court's Findings
     ✱ Two Related Issues:
        First: The Provision? VOA Was created by the DOJ itself...
        Second: This Court and other Reduce Sentences of Prisoners who Help Saving
        Lives of the BOP staff..., it's... logical then to Reduce sentences of the Abused Priso

F  Courts in This District Often Grant Motions For C.R. BY
   Defendants Like Mohamed; Convicted of serious Crimes and
   Originally sentenced to Life Without Parole. But Who're Also,    13
   Unlike Mohamed; Leaders of Their Respective Organizations

II  Mohamed's Medical & Health Circumstances                        14
                                                                    14
A  Physical Circumstances                                           14
   1. Excruciating and Constant Pain from His Right Ankle           15
   2. An Eye & Vision Problem                                       16
   3. Hypertension & High Blood Pressure That's steadily Increasing 16
   4. Chronic & Longtime Constipation                               17
   5. Swelling & Painful legs                                       18
   6. Extreme & Constant Headache                                   18
   7. Extreme Pain in the Back, Legs, Wrists, and Jaws.             19
   8. Alopecia Or An Unusual Hair Loss                              19
   9. Passing Urine Uncontrollably                                  20

B  Emotional Circumstances
C  The Impacts of the Above shown Physical & Emotional Circumsta-
   nces on Mohamed; Rendering His Incarceration Far Harsher
   and More Punitive Than This Court Had Anticipated While Sente-   20
   ncing Him in 2001.

D  Courts in this District and Others Often Grant Motions For C.R.
   At least Partly, Based on the Defendants' Medical Conditions as-
   Well as on the Harsher and More Punitive Nature of the Incar-
   ceration Than That was Anticipated By the Court While Sentencing 22
   Those Defendants

III  Unusually Long Sentence, Especially Compaired to the Sentence
     Given to Some of Mohamed's Co-defendants, Who're, Inspite of
     Their Bigger Roles in the Conspiracy, Already Been Released From-  23
     Custody

A  The Three Co-defendants Who've Been Already Released ... And Their   23
   Respective Roles in the Conspiracy...                                23
   1. Ali Mohamed                                                       25
   2. Adel Abdel Bary                                                   26
   3. Mohamed Suleiman Al Nalfi

B  The Government's Reasons for the lenient Sentence for Bary and the
   Court's Legitimate Concerns Regarding That which should be Equally
   Expressed in Relation to Other Lenient sentences Given to Other Mo-  28
   hamed's co-defendants Including A. Mohamed and Al N'alfi

II

C   The Jury's Findings and the Courts observation, At least Implicitly Indicated That other Defendants, Likely Including the Three at Issue Here,"Had Equal or Even Greater Culpability" Than Mohamed ... 30

D   The Government Never Extended the Pleadeal Offer to Mohamed ... 31

E   Courts in this District and others often Reduce Sentences Through C.R. Motions to Avoid Gross Disparity in Sentencing ... 31

IV   Mohamed's Rehabilitation Efforts ... 33

   ... 33

A   Regret & Remorsefulness ... 33

B   Almost Completely clean Disciplinary Record ... 35

C   Successfully Participating in Various Programs ... 36

D   Low Recidivism status

E   Strong Family Bond, Excellent Reputation within the Family, and the Family's Readiness to Help Mohamed Recover and Restart His Life ... 36

F   Courts, Including in this District, Have Favourably Considered Defendants' Post Conviction Rehabilitation as a Relevant Factor Supporting Motion for Compassionate Release ... 37

   ... 38

V   Other (seven Additional) Reasons

A   The BOP's Failure to, or, Adequately Treat Mohamed's Injuries Following the staff's Physical Abuses on Him in Aug. 2018 & Apr. 2020 ... 38

B   The BOP's Malicious Distruction of Mohamed's Personal Materials; Manuscripts, Journals, Notes... etc; Aug. 2018 ... 38

C   Lack of Relief, otherwise, For the Above Mentioned Damages & Injuries Regardless of Mohamed's Ability to Establish that the BOP staff Have Factually; Deliberately and Maliciously Caused These Damages & Injuries ... 39

D   Prolonged & Harsh Condetions Under 20+ Years of solitary Confinement ... 41

1.   The Brief of Mohamed's own Experience in the Solitary Confinement ... 41

2.   Court's Critical View of the solitary confinement ... 41
   ... 43

E   Family Circumstances

F   Lack of Secured Environment For Mohamed Due to the BOP Failure to "Provide for the Safekeeping, care, and subsistence." ... 44

G   If this Motion is Granted, Mohamed will be Immediately Deported to Tanzania. ... 45

*   Under the Above Presented ECRs, the § 3553 (a) Factors Should Weigh in Favor of Granting Mohamed's Motion for C.R. ... 46
   ... 48

*   Conclusion

iii

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA V. KHALFAN KH. MOHAMED, 98 cr-1023 (LAK)

## DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Defendant, Khalfan Kh. Mohamed ("Mohamed") files this motion for compassionate release ("C.R.") or, alternatively, for sentence reduction ("S.R.") pursuant to 18-U.S.S.G. § 1B1.13. Under either standard, however, Mohamed respectfully asks the court to reduce his sentence to time served.

### Administrative Remedy
On May 3, 2024 Mohamed submitted to the warden of the U.S.P. Florence his request for the C.R. See the Appx at . The warden denied the request, apparantly on June 14, 2024, dat . Mohamed received the response on July 25, 2024.

### Standard Of Review:
"The First step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motion for compassionate release". United States V. Brooker, 976 F.3d 228, 237 (2nd Cir. 2020); "From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion...to consider all relevant information at an initial sentencing hearing...That discretion also carries forward to later proceedings that may modify an original sentence". Concepcion V. United States, 597 U.S. , 142 Sct. (2022) at p. 743. Moreover, "It is well established that the submissions of a pro se litigant must be construed liberally and interpreted "to raise the strongest arguments that they may suggest" Triestman V. Fed. Bureau of Prisons, 470 F.3d 471, 474-5 (2nd Cir. 2006).

### Introduction
Mohamed has been incarcerated since 1999. IN 2001, Mohamed, along with some of his co-defendants, were sentenced in this court to life plus 40-years after being convicted on terrorism charged related to the bombing of the U.S. Embassies in Kenya, and Tanzania in 1998. Mohamed now 51, has served 25-years; roughly, a half of his entire life, of that sentence so far.

Below, Mohamed presents a total of 11-extraordinary and compelling reasons (ECR's) for this court's consideration here. The first four reasons (I through IV are an independant ECRs that are argued for in the first four sections of this motion. The rest, however, all seven are listed under the last and fifth section (V) titled as "Other Reasons".

The first four independant ECRs, are:

**First: Victim of Abuse:** Mohamed argues that on different occassions under the BOP custudy, he has been a victim of abuse. The abuses, in addition, are serious enough to cause serious bodily injuries, many of which continue to the present time... Thus, even under this ECR alone, Mohamed is entitled to C.R.

**Second: Medical & Health Circumstances:** Additionally, Mohamed shows and argues that he has several ongoing serious medical conditions that the BOP has either completely failed to treat or did so inadequately and untimely. Moreover, unlike in most cases where prisoners present medical conditions: Mohamed's conditions mostly are direct result of BOP's own abuses against Mohamed.

**Third: Unusually Long Sentence:** That's, given to Mohamed. And that's especially when his sentence is compared to sentences given to some of his co-defendants. Several of Mohamed's co-defendants have been already released from prison, besides the fact that virtually each of them, per the available records, held much higher position in the organization and had much longer history within it than Mohamed.

**Fourth: Rehabilitation Efforts:** That's, besides his reckognition and regreting of his past mistakes, Mohamed actively and regardless of the harsh conditions he's been in, spent every available opportunity to elevate himself for better... In so doing, he has maintained almost spotless disciplinary history participated in 100's of hours in educational courses..., and maintained good records both with staff and fellow prisoners...

As to the last seven ECRs, under the "Other Reasons", fourth and last section of this motion, those are:

**One:** The BOP's failure to, or adequately provide Mohamed with necessary medical treatment for his serious injuries that he received following the staff's malicious assaults on him.

**Two:** Destruction of Mohamed's close to 20-years worth of personal materials that include; Journals, manuscripts, notes...etc.

**Three:** Lack of relief, otherwise, for the above mentioned damages and injuries. That's Even though there's enough evidence pointing into BOP staff's deliberate and malicious causing of damages and injuries to Mohamed; yet, there's No cause of action under which Mohamed may recover his losses. But this court can and should provide that relief

**Four:** Prolonged and harsh prison conditions under over 20-years of solitary conf-nement... Most of that period of time were also under SAMs restrictions... at the ADX-Flore-

**Five: Family Circumstances...** That include the critically poor health of his mother.

**Six: Lack of Sucurity...** Due to the BOP's failure to provide Mohamed with "safe-k-ping, care, and protection" as required by the law. AND:

**Seven:** If this motion is granted, Mohamed will be subject of an immediate dep-tation to his country, Tanzania.

2

Argument

1- Victim of Abuse:

The U.S.S.G. § 1B1.13(b)(4) provides in its relevant part that the EOcs exist when:

"The defendant, while in custody serving the time of imprisonment sought to be reduced was victim of... physical abuse resulting in serious bodily injury... that was committed by... a correctional officer, an employee or... any other individual who had custody or control over the defendant"

Since 1990 to 2020, the BOP staff have maliciously physically abused Mohamed in at least four different occassions, each of which causing him serious bodily injury. Those abuses were committed in: 2000, 2008, 2018, and 2020. In revealing these abuses below, Mohamed first and briefly talks about the first two abuses and in doing so, he respectfully asks the court to take judicial Notice from and construe the argument based on "victim of abuse" (VOA) within the context of all of these abuses, disregarding the fact that Mohamed could Not bring suits in the court against those officers who abused him in those two occassions. After that summary of the first two abuses, Mohamed in more details will lay down the other two abuses of 2018 and 2020 along with their relevant proceedings... and status.

A- The Abuses of 2000& 2008:

IN 2000 while waiting for the trial at Metropolitan Correctional Center (MCC), New York, the BOP staff, after another prisoner assaulted and seriously injured a prison guard, maliciously assaulted Mohamed within the 10-south unit in the way to the medical unit, and More critically within the Medical unit. The BOP staff, led by senior M.C.C officials that included captain Aponte, Lt. Carrine, and counselor Santiago, tied Mohamed naked on four points and spent perhaps 5-6 hours torturing and abusing him. Mohamed was seriously injured. The X-Ray result showed, among many injuries, a broken Nose and fractured eye socket. During the abuse, the M.C.C staff targeted Mohamed eyes, Nose, and the rest of his face more than any other part of his body. He was hospitalized for 10 or 11-days, as a result. For details, See Mohamed declaration, App x at 148 at 1-9.

(1) Mohamed has always maintained that he had No involvement whatsoever in the assault. The BOP however, in the effort to cover up their crimes against Mohamed, issued him a serious "infraction report" because of which he lost his phone, commissary...etc, privileges for two+ years. App x [illegible] Mohamed respectfully asks the court that, should it per its own initiative or per the government request, consider the 2000 events and Mohamed's alleged involvement; the court then would review the court conclusion and take judicial notice therefrom in U.States v.Salim 287 F.supp.2d 250, 294-6 N.Y, 2003), Mohamed was not a party in that court, Nor was he represented in any way.

3  3

In January 2008 again, the BOP staff maliciously assaulted Mohamed in H-unit, ADx-Florence. This time, using the handcuffs as a tool of punishment contrary to the BOP's own relevant regulations, the staff seriously cut, injured and bloded Mohamed's wrist. Appx:149:10

Mohamed did not file an administrative remedy or any other grievance in relation to the 2008 assault mainly because of his serious fear from death with which the MCC staff repeatedly threatened him both during the assault and following it. Appx at: 149:9. Mohamed did, however, filed a grievance related to the 2008 assault. He does not however, as he writes, remember what the BOP's response said. He could not manage to go to the court.

Those are the first two physical abuses against Mohamed from which, as stated above, he requests the Court to take judicial notice from. Now;

## B- The August 2018 Physical Abuse As Detailed in Mohamed v. Jones et al No:1:20-cv-02516-RBJ-MDB, Amend. Compl. Doc. 64.

In this violent abuse, committed in G-unit, ADx Florence, Mohamed was once again seriously injured. The injuries were virtually all over his body. However, the most serious injury was the fracture on his right ankle which was eventually diag-nosed as an "acute fracture, Doc.64 ¶. at 118. For ever two months; from 9-3-2018 to 11-16-2018, Mohamed was forced to remain on splint, cast, and a wheelchair. Id at 121-122. Today, six years later, Mohamed continue to suffer from both physical and emotional agony caused by that maliciously motivated abuse against him. Moreover, beside experiencing extreme pain in his fractured ankle, Mohamed also experiences pain on his legs, wrists, jaws, back...etc. Since 2019. Mohamed has been on different pain medications. Currently he's on meloxicam 15 mg tab. and Acetaminophen 325 mg tab; the second being added in this year. Appx 151, at 20. Mohamed incorporates by reference here the relevant sections and documents from his case Mohamed v. Jones Id, for the court's own reviewal.

## 1- Administrative Proceedings:

Following the August 23, 2018 physical assault against him, Mohamed submit three different complaints and appeal within the BOP. However, the BOP either failed to respond or where it did, the responses were contradicting one another. Mohamed first sent his complaint to the Office of Inspector General, with the BOP. That was on 9-3-2018. See Appx at; 6-16. (Mohamed's complaining letter. The OIG received Mohamed's complaint, forwarded it to the office of the Internal Affairs, (OIA), and informed Mohamed of the above actions. See Id at ___ (the OIG's letter to Mohamed dated 10.1.2018. Mohamed never heard any thing else s___

4

Next, Mohamed filed grievance under the BOP's administrative remedy program pursuant to 28 CFR § 501.3. The central office, the last level of the three levels BOP's grievance process, as the two lower levels before it, failed to provide Mohamed with any meaningful, definitive response, however. It stated to Mohamed in its 3.19.2019 "response":

Although review will be conducted and proper action will be taken..., a decision to personally press criminal charges is one which is yours to make". See Response dated 3.29.2019, and Mohamed's B.P.11 complaint, dated: 12.19.2018, Appx at    . The court may notice here; the referenced response's language is in the future tense "will be... And that's over eight months after Mohamed was physically assaulted in August 23, 2018.

Finally, Mohamed filed damages claim pursuant to Federal Tort claims Act 28 CFR § 50.172. After about a year and half, however, the regional counsel denied the claim, telling Mohamed: "Investigation of ... claim did Not reveal" that Mohamed had "suffered any personal injury as a result of the Negligent acts or ommissions of prison employees acting within the scope of their employment: See the Regional counsel's response, dated 1.26.201, and Mohamed's complaint, dated, 4.8.2019, Appx at

**2- The Court's Proceedings, so far**

The case Mohamed V. Jones et al Id currently, following the parties' briefings and the district court's ruling on the motion to dismiss, contains a total of 12 claims. Nine of the twelve claims are based on allegations under violation of the Eighth Amendment: three claims under each the three theories: uses of deliberate indifference to Mohamed's Necessary needs of medical care...; uses of excessive forces against him, and; failure to intervene to stop others from such alleged violations. The three remaining claims are Battery, state claims (FTCA) based on the Colorado law. The BOP's defendants and the government did not contest the three Battery claims in their motion to dismiss. See Doc. 150, Id the court's order adopting magistrate judge's Recommendation on the motion to dismiss. See also the 10th Circuit's judgment dismissing the BOP's appeal; Mohamed v. Jones et al, D.C. No. 1:20-CV-02516-RBJ-MDB; App. No. 22-1453 (May 7, 2024).

In other words, the court's findings so far do establish that the BOP and its staff are liable of injuries and damages alleged by Mohamed... More relevant here: including the serious bodily injuries such as the fracturing of his right ankle... This court's finding, more over, is not only reasonable, but is also highly supported by at least two equally important facts; one; the defendants' own admissions, and two; the government's decision Not to contest the battery claims in the motion to dismiss

5 5

3. The Defendants' Answer & Admissions to the Complaint: Doc. 155. There, even though on 12-20-22, the defendants filed their Answer: Doc. 155. There, even though, Mohamed, the such answer came over four years after the BOP's staff abused Mohamed, the defendants extensively refused to honestly provide answers. Thus, they repeatedly claims "Lack of information" as if Mohamed, and not the BOP itself, possess and maintains the relevant records. However even with such an extraordinary claim of the lack of information, the defendants presented far enough admissions that render the avoidance from liability on their part almost certainly impossible. And that unavoidable liability is even more apparent when these admissions are construed within the three Battery claims which the government has never contested, at least yet.

These few, but important, admissions include:

◊ At the time of the alleged physical abuse, Mohamed "was calm". Id at 16.

◊ Mohamed was "cuffed" and was not released from the cuffs while he was escorted". Id at 20, 22.

◊ After he was put on the ground, Mohamed's legs were restrained" as well. Id at 30.

◊ Mohamed "was wearing open-toe slippers... that at some point during the use of force... slippers fell off". Id at 35.

◊ The staff used forces against Mohamed. Id: 35, 39, 40, 48, 56, 114, 115.

◊ Mohamed "began limping" while escorted to the observation cell". Id at 41.

◊ After the use of force" Mohamed's was injured. Id at 114.

◊ Mohamed "had swelling in his right ankle after the uses of force" Id at 115.

◊ After the x-ray was taken, an orthopedic specialist Noted that" Mohamed "had a Nondisplaced fracture of the right distal tibia". Id at 118.

◊ Eventually, Mohamed "was provided with a splint and wheelchair... and on September 12, 2018 Dr. O'a placed a short leg cast on" Mohamed's "right leg". Id at 119.

◊ "The cast was not changed", and "was removed on November 16, 2018", while "the wheelchair was removed from" Mohamed's "cell on or about this" same" date. Id at 121.

4. The Decision Not to Contest Mohamed's Battery claims Was Most Likely Due to the Government's Recognition that, Based on the Available Record, It Could Not Escape From Liability Under the Colorado Law: Mohamed, respectfully, asks the court once again to take judicial Notice from the fact. The government could but didn't ask the dismissal of Battery claims in Mohamed V. Jones et al as well as in Mohamed's second case; Mohamed v. U. States No: 1:21-CV-02676-NYW-MDB. See Id. doc. 177; Government, again, partial Motion to dismiss that doesn't contest the battery claims.

6

That decision was only based, Mohamed argues, on government's recognition allegations, serious recorded that based on the record that includes: Mohamed sworn injuries... and the BOP's unavoidable admissions..., the U.S. government under the Colorado law cannot avoid liability here. That relevant record establishes more than what's necessary to adequately state and prove Battery claim in Colorado. As the Tenth Circuit stated:

"Under the colorado Common law of Battery, one who intentionally inflicts upon another an offensive, although Nonharmful, bodily contact, is liable therefore even though the act committed was not done with intent to cause actual harm". Trujillo v. Goodman, 825 F.2d 1453, 1461, C10th. Circ. 1987). See also Abdo v. United States, 2019 U.S. Dist. LEXIS 213654, Dist. Colo, Dec. 11, 2019. Stating:

"In Colorado, to establish a tort claim of battery, a plaintiff must show: (1) the defendant intended to make physical contact with the plaintiff, or to put the plaintiff in apprehension of immediate physical contact; (2) immediate physical contact of the plaintiff resulted; and (3) the contact was harmful or offensive").

As stated above Mohamed's allegations, injuries and the defendant's own admissions easily establish government's liability in both cases. (For details on Mohamed v. U.States Id see infra at C", s-4, p.7-9). Mohamed's earlier efforts to obtain the relevant records related to these two cases were all successfully hindered by the BOP and the government. [2]

### C. The April 2020 Physical Abuse as Detailed in Mohamed v.U.States No.1:21-CV-02676-NYW-MDB: Doc.174:

As detailed therein, on 4-15-2020 while housed in D-unit, ADX Florence. Mohamed was again subjected to malicious physical abuse that caused him serious bodily injuries. The April 15. 2020 abuse was committed in less than two years from the above detailed abuse that was carried out on August 23, 2018 in C-unit. The ADX staff now led by correctional officer Santisteven; by unnecessarily and maliciously pushing Mohamed, excessively tightening handcuffs that they applied on him, jerking him up through those excessively tighten cuffs and the chain around his waist and by lifting him up and aggressively dropping him on a bed... all while Mohamed was in two week long hunger strike, sick, and extremely malnourished; seriously

[2] Besides few pages related to the x-Ray of Mohamed broken ankle..., the BOP refused to provide to Mohamed any and all relevant medical and other records in connection to the 2018 and 2020 assaults and accompanying events... Mohamed also filed FOIA as well as an early discovery requests but all event un responded to... In sum, the government while claims' lack of information, it denied Mohamed any access to relevant record...

= 7

injured Mohamed. See Doc. 174 at 143-70, 190-92. The physical injuries and pain lasted up to a month. Id. The ADX-BOP staff then, as they did after the assault of August 2018, refused to provide Mohamed any medical treatments related to the injuries he suffered from the above described excessive force. Id: 169-7, 190. As detailed therein, Mohamed had been on hunger strike that the staff deliberately ignored, when he was subjected to these violent acts. Mohamed incorporates here by reference the above referenced and other relevant sections of his third amended complaint. Doc. 174.

### 1-Administrative Proceedings:

Once more, after the April 15, 2020 abuse Mohamed submitted three complaints and appeals within the BOP. But again, like in 2018, there was no meaningful response.

On May 19, 2020, Mohamed sent his complaint to the office of the Internal Affairs. See Appx at ___. However, the OIA neither responded to Mohamed's complaint nor acknowledged its reception.

Next, Mohamed filed the BOP administrative remedy grievance. The Central office stated in its 1-25-2021 "response" to Mohamed that:

"We have reviewed documentantion relevant to your appeal... The Bureau of Prisons takes allegations of staff misconduct seriously. You were previously informed your complaint was forwarded to the appropriate component of the agency for review. No inmate is entitled to be apprised of the progress, outcome, or disposition of any review of alleged staff misconduct". See the Response and Mohamed's appeal dated 8-18-20. Appx

Finally, on June 29, 2020 Mohamed sent his FTCA based claim related to the abuses of 4-15-2020. Appx at ___. The regional counsel denied this second complaint as well. See the Counsel's response dated 8-24-2020. Appx at ___

### 2-The Court's Proceedings So Far:

In Mohamed v. U. states (previously; Mohamed v. Santisteven) Id. following the parties briefings on the defendants motion to dismiss Mohamed's second amended complaint, the court dismissed all of Mohamed's claims but the two Battery claims which the government chose not to seek their dismissal. See Doc. 123 at 26-27. E court's order dismissing all but the two Battery claims. Mohamed then sought to amend his claims once more. Eventually, the Court allowed a total of six claims including the two Battery claims, all under the FTCA, subject to government's motion to dismiss. See Doc. 173. Id. (Adopting the Magistrate judge's recommendation in only allowing the six FTCA based claims including the two Battery claims. Recently, the government again file motion to dismiss, but not the Battery claims. Id. doc. 177

8

3- The Government's Answer & Admissions to the Second Amended Complaint. Doc-140: Before Mohamed's filing of his New operative third amended complaint, doc. 170, the government filed its answer directed to the two Mohamed's Battery claims; Answer, doc.140. (The rest of claims have been already dismissed). As it was the case with Mohamed v. Jones Id; the government again excessively claimed lack of knowledge. However as it was argued there, see supra p. 6, at 3", even with these few selected admissions; Mohamed should easely establish government's liability based on colorado Battery law. That's; when these admissions are coupled with Mohamed's sworn allegations and his injuries; such liability is easely established.

The government admitted, among other things, that:

◊ At the time Mohamed alleges he was abused, he " was restrained using full restraints which include handcuffs, a blackbox covering the handcuffs, and a chain around" Mohamed's "waist." Doc. 140 at 126.

◊ Officer Santisteven whom Mohamed alleged led the uses of excessive force against him and seriously injured him; was one of the staff members escorted "Mohamed" to the... medical room" Id at 133.

◊ In the medical room, Santisteven "lifted up" Mohamed. Id at 136.

◊ At the moment alleged by Mohamed that the uses of unnecessary force occurred, Mohamed "Mohamed was fully restrained." Id at 137.

◊ In the medical room, Mohamed complained to the Nurse "of... burning pain" in his epigastrium that radiates up his mid deep chest to his throat." Id at 140.

◊ Officer Santisteven was also among the "staff... escorted" Mohamed" back to his cell..on April 15, 2020. Id at 142.

4- The Decision Not to Contest Mohamed Battery claims Was Most Likely Due to the Government's Recognition that Based on the Available Record the Government could Not Escape Liabity Under the colorado Law:

As Mohamed argued earlier, supra             the available record makes almost impossible for the government to avoid liability under the colorado law. Mohamed respectfully encorporates by reference here his previously made argument at 4, p. 6-7.

D- The Current Status Of the Two cases Suffeciently Establishes That: (1) the BOP staff Physically Abused Mohamed and caused Him serious Bodily Injury; (2) The BOP and its staff Are Liable; Therefore This Court Should Exercise its Disretion to Grant this Motion Because the waiting of Additional court's or Administrative Proceedings Will Result in to the unduly Delay caustioned by the 18 U.S.S.G.

The above cited sentencing policy states in the relevant part when it comes

9

to ECRs based on the physical abuse: "The misconduct must be established by a conviction in criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceedings unless such proceedings are unduly delayed or the defendant is in imminent danger." Mohamed respectfully argues that the present state of his two ongoing civil cases, detailed above, meets the necessary requirements here. Thus, this court should favorably consider the status of `the two cases... That's because any additional condition requiring further proceedings will cause unduly delay cautioned against by the sentencing policy...

1- The BOP staff physically abused & seriously injured Mohamed:

As it has been shown earlier the court found, among other things; the BOP defendants used an excessive force against Mohamed while others failed to intervine to stop such forces... See Supra p.5 on Mohamed v. Jones et al. Id. At the same time, the government chose not to contest the three Battery claims..., which only endicates Mohamed argues, the government acknowledges that it cannot avoid the liability based on its employees' uses of unnecessary forces against Mohamed.... Id. p. 6-7. Moreover, the government in Mohamed v. U. States... Id. p. not to contest the two Battery claims in Mohamed v. U. States... Id. p.

As for the injuries: Mohamed argued and the government admitted that Mohameds ankle was fractured in 8-23-2018..., and as a result Mohamed was put on splint, a cast, and wheel chair... from September 12, 2016 to November 16, 2016. Id. p. 6 (Injuries caused in 8-23-2018). In 4-15-2020 also Mohamed was seriously injured. See Supra of "B" p. 7-8. (Mohamed v. states). For the ongoing injuries see Infra "A"

2- The BOP & its staff are liable:

That is, the government and its employees. That liability was established in Mohamed v. Jones et al Id. by the court, as stated above, at 1 p.10. Additionally, the decision by the government not to challenge the battery claims in both cases also strongly suggest that the government knew it cannot avoid the liability based on battery claims under Colorado law. Id. Therefore, the government and its employees are liable for the damages and injuries they caused to Mohamed under both; federal law (the U.S. constitution) as the court found, and under the Colorado law pursuant to the FTCA. Even if the excessive force claims in Mohamed v. Jones Id, that survived motion to dismiss will eventually fail to proceed due to lack of Bivens cause of action as the government has always argued especially after the supreme court's ruling in Egbert v. Boule, 142 Sct 1793 (2022) and the Tenth Circuit's in Silva v. U. States 45 F4th (2022) the liability under FTCA is unavoidable.

10

**3- Therefore, The Court Should Exercise its Discretion to Grant This Motion..**

The court has unquestionable descretion to grant this motion based on the already existing record from the two cases. It should do so. That's because requiring additional findings from the court and BOP itself Not only will be prejudice to Mohamed but more importantly, will be to contravene the sentencing policy itself that clearly warned against the unduly delay.

Mohamed filed the two cases at issue here in 2020 and 2021 respectively. In other words; the existing status and findings of the cases came about six and four years after the abuses. To demand additional judicial proceedings might means delaying the consideration of this motion for another four to six additional years... That's clearly both, prejudice to Mohamed and contradictory to the policy itself. Moreover, the sentencing policy does not appear to have intended such interpretation here. The relevant part merely states that the sole requirement is "a finding of liability in a civil case." Id. It does Not state that such liability must be found at the last stage or appeal of the litigation... Therefore the existing findings are sufficient here.

As for the BOP administrative proceedings; this also should not be allowed to hinder this court's descretion to grant this motion. As it has been shown earlier; following the two abuses and Mohamed's complaints and appeals within the BOP; the BOP's response was both; ambiguous and contradictory of each other. See supra p. 3-4 & p. 6. Additionally, the government for at least five years now has been denging Mohamed any access of the relevant records. See Supra p. 7, N. 2.

Finally here; the few courts records, accessible to Mohamed that have considered the physical abuse as an ECP have done so favorably to defendant even though the findings and records there were less established. And that follow below:

**F- Courts Have Already Started Granting Motions for C.R. Based on VOA Provision Even Where the Injuries Involved Are Less Severe and Even Absent Administrative & Court's Findings:**

The case on point here is U. States of America V. Ras Matta, 2024 U.S. Dist. LEXIS 51657 CR-21-22-BLG-SPW. Dist. Court of Montana Billings Division March 22, 2024). In this case the defendant file motion for C.R. after his finger was broken either by fellow inmates incited by prison guards or by guards own attacks on the inmate. In any event, however, as the court stated "the record does not demonstrate that BOP officers broke" the inmate's finger. at LEXIS 4. Id. The court started its analysis by quoting the new provision in U. SG § 1B1.13(b)(4)(B), related to "victim of abuse". Id at 3. The government, as the court observed "taken no position on the appli- cation of this provision because" the BOP was still "investigating these claims". The government also added "that its decision to take no position "is not an

11 11

admission that the defendant's claims have merit." Id at 5. Based on that clearly
incomplete record the court, favorably to the defendant, stated:
"In the absence of any evidence or information to contrary, the court finds
the abuse suffered by the defendant constitutes an extraordinary and compe-
lling reason for early release. As the defendant's BOP medical records elucidate,
he clearly suffered injuries that required medical intervention." Id at 5. Eve-
ntually, and based on the above facts and court's conclusion, the prisoner
was released.

Because of his conditions of confinement and pose status, Mohamed could-
not locate additional cases on point. However, that's not necessary here because
the relevant law is clear and unambiguous. See Bueno v. Tyco Fire Prods. 78 Fourth
490, at Lexis 9 (2nd Circ. 2023)(we begin with the language of the statute itself
and that is also where the enquiry should end for the statute's language is plain");
Hartford Underwriters Ins. Co. v. Germain. 503 U.S. 249, 254 (1992) ("when the
words of a statute are unambiguous... the judicial enquiry is complete").
And so should be here. As the Matta court did, so this court should do since
the statutes is so clear. As it was noted above, Mohamed's presented record here
is far more complete than that of Matta. So his injuries; while he cannot
dare minimizing Matta's or any other prisoner's injuries suffered from the
violent BOP's staff, yet it's unquestionable that Mohamed injuries were much severe than
Matta's.

* <u>Two Related Issues</u>:
     First: The provision "VOA" was created by the DOJ itself; so it must be Applied.
As the Amendments to the Sentencing Guideline "(effective Nov.1, 2023, p. 9-10), indicated
that the new subsection(b)(6) victim of Abuse is based on:
     the Department of Justice... suggestion that a sentence reduction may be appropri-
     ate when an individual in BOP custody has been... the victim of sexual assault
     perpetrated by BOP personnel...
Thus, any granting of this will simply mean approving of an act that the
DOJ itself proposed and created. This reality also should deprive the government
of any opportunity to oppose this motion.
     Second: This court and others reduce sentences of prisoners who help serving
The lives of BOP staff; Thus, it's entirely logical to reduce the sentence of a
prisoner who was subjected to the BOP staff's Abuses.
In v. States V. Richard, 2024 U.S. Dist. Lexis 42,815. No. 13-CR-0818 (LAK)(S.D.N.Y.
March 12, 2024; this court reduced the sentence of a prisoner "who stopped a fellow inmate
from... assaulting a staff member...", At Lexis 12. See also v. States V. Ramos, 2023 U.S. Dist.
Lexis 18,718. No. 03-CR-315 (E.D.N.Y, Feb.2, 2022) (same). In both cases, the courts found
the acts of the prisoners constituted ECRs to deserve sentence reduction... The opposite of
event should result in to the same; when staff abuses prisoner, prisoner's sentence should be reduced, the

12

F- Courts In This District Often Grant Motions For C.R. By Defendants Like Mohamed; Convicted Of Serious Crimes And Originally Sentenced to Life Without Parole, But Who're Also Unlike Mohamed; Leaders Of Their Respective Organizations

It's true that Mohamed was convicted of serious crimes to which he's sincerely regretful. It's also true that he was sentenced to life without parole. However, these two realities are not unique to Mohamed. This district's and others' records show that many defendants convicted of serious crimes and sentenced to life have been granted compassionate release under different ECRs, especially in the past few years. Moreover, a simple observation of those defendants' cases and Mohamed. And show one important difference between those defendants and Mohamed. And that's; many of these prisoners are or used to be leaders or the leaders of their respective criminal organizations and Networks. That's not the case with Mohamed, however. The Government has never acused Mohamed, let alone presented evidence, that he has ever been a leader of any criminal organization.

Few among many of those examples include; v. states v. Quiñones, 2021 U.S. Dist. LEXIS 37628, 00-CR-761 (JSR) (S.D.N.Y. Feb. 27, 2021) (The court granting C.R. Motion under 3582 based on medical circumstances to a defendant sentenced to life without parole and who's the leader who ran a racketeering enterprise focused on the distribution of cocaine and heroin... "id at Lexis); v. states v. Rodrigues, 492 F. supp. 3d 306, 308 (S.D.N.Y. 2020) (Again, the court granting the similar Motion to the defendant who served as "the chief Lieutenant" to his codefendant boss Quiñones, id. And who, like Quiñones, was sentenced to life with parole); v. states v. Russo, 643 F. supp. 3d 325, 331 (S.D.N.Y. 2022) (Granting the same Motion who's a captain of Colombo family Criminal gang, and who was originally sentenced to life without parole...); v. states v. Mansonto, 2021 U.S. Dist. LEXIS 19636 (S.D.N.Y. Feb. 2, 2021) (Granting similar Motion to "the leader of a heroin distribution Network" that known by the defendant himself "Mansonto Crew"); v. states v. Tollier, 2022 U.S. Dist. LEXIS 84489, 92-CR-CLGS) (S.D.N.Y. May 10, 2022) (Granting similar motion to the defendant who "was the primary leader of a criminal organization known by his name "Tollier Organization; and who was serving life for murder and other serious crimes..."; v. states v. White, 2020 U.S. Dist. LEXIS 221701, 96-CR-1123 (SHS) (S.D.N.Y. Dec. 8, 2022) (Granting the motion to a defendant convicted of murder and other crimes... originally, almost similar to Mohamed; sentenced to life + 25 years (As oppose to Mohamed's; life + 40), And at 56, who'd "spent nearly half of his life in prison (Again; close to Mohamed; 51, already spent roughly half of that in prison... Since 1999.).

These are just few from so many similar examples. It's true that some of the defendants were much older then Mohamed's now; the defendants in Russo and Mansonto, were in their early 70's; for example; however it's also true that those defendants committed their crimes while they were much older than Mohamed was at the time of the crime

13

## II- Mohamed's Medical & Health Circumstances

The U.S.S.G. § 1B1.1(b)(c) also provides in the relevant part while listing the ECR's:

"The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not provided and without which the defendant is at risk of deterioration in health or death."

The above provision is perfectly relevant to Mohamed's case. For many years, Mohamed is been suffering from numerous health conditions to which the BOP either failed to address completely, or it tried to do so but in untimely and inadequate manner. Besides, most of Mohamed's conditions listed bellow are a direct result of the BOP's decades-long abuses accompanied by deliberate indifference. In sum; most of Mohamed's medical conditions are directly caused by the staff's malicious assaults and other abuses in the first place. And in the second; the staff's deliberate failure to address those injuries they have maliciously caused. The below listed medical conditions therefore, are very different from other conditions usually presented by defendants seeking compassionate release... The Covid-19 pandemic, various type of cancer and diabetes... for example, can hardly be said that are the BOP-created conditions... But Mohamed's are.

Moreover, the BOP long time and repeated abuses against Mohamed are not without serious and long time emotional and mental effects on Mohamed and his daily life in prison. Therefore, this section includes both physical and emotional circumstances.

### A- Physical Circumstances

Mohamed suffers from at least nine following physical medical conditions;

1- Excruciating and constant pain from his right ankle fractured by the Adx staff in August 2018. As stated earlier; supra; B:1-4, p.4-7, and as detailed in Mohamed v. Jones Id. Doc. 64, at 114-128 the staff maliciously assaulted Mohamed in 8-23-2018. Among the injuries caused by the assault, was the fracturing of his right ankle. Even though he was told that the fracture had healed; he was also informed that the pain may never go away from him. Doc. 64 at 123. Currently, Mohamed is on Meloxicam 15 mg tab. for pain of his ankle, see Appx: 51, 20. The pain medication however, only partially and occationally help. Mohamed's pain, otherwise, never left him since August 2018. Because of the excruciating pain, Mohamed has not been able to do any physical exercise for almost a year now, after his previous attempts to do so only increased the level of his pain. In Mohamed v. Jones Id; the court concluded that the BOP staff have been deliberate indifferent in relation to their failure to treat Mohamed here... And that he adequately pled for injunctive including the surgery of his leg. Doc. 120 at 11-12. However, BOP failed to do any thing.

It's therefore, only granting of this motion would ensure relieve to Mohamed. His family is more than willing to provide him all of his medical needs. Appx. at 89, 95-96, 104

2- AN EYE & VISION Problem that the BOP failed to Timely Treat: As stated earlier; in the 2000 malicious assault against Mohamed; the BOP staff made special efforts to target Mohamed's eyes, nose, and the rest of his face. [supra at "A", p.3. See Appx; 148, ¶-17.] His both eyes were badly damaged while the right eye's socket was also fractured as his Nose. Id. After been examined by the eye doctor in ADx; he was told that he was lucky that he didn't lose his vision in that assault that among other damages, resulted low to lose his vision on his right eye socket. Id, at.3. From that time (2002 or 2003) he was told that he needed surgery to remove cataract. For the next 20-years or so, there was no such surgery however. Finally in early 2023 Mohamed received surgery for the removal of his right eye cataract. But he was only told. Id, 152; 13. The next eye could only be fixed after the healing of the first one. Mohamed agreed on that plan. Id.

Meanwhile following the removal of the right side cataract. Mohamed's eye glasses had to be replaced; at least based on the new condition of his right eye. However, the BOP would only replace the eyeglasses with the proper one; after the left eye had been already fixed. So several months after the removal of the right side cataract staff told Mohamed that he'll be taken again for the left side cataract removal. Mohamed again agreed, But he asked to be provided with the necessary glasses that may help him in his daily functionings. Mohamed can't see in writing, reading... without the glasses... besides his daily acts of worships such as reading the Holy Qur'an and other religious leteratures; Mohamed by 2023 has three active ongoing lawsuits; see Id; Mohamed v. Jones etal; Mohamed v. Vi States and Mohamed v. English et al; N:22-cv-03213. The BOP declined to provide such glasses They informed Mohamed that, after his left eye has been fixed, then he'll be given an eye exam for both eye. However, the BOP takes between. 8 and 12 months to deliver New glasses. That would've ment that; in order to receive the necessary surgery, Mohamed Not only would've been deprived of his daily acts of worships, leasure activities... etc: but would've certainly and unnecessarily lost all of his three cases for failure to prosecute since he had No way to convince the court to stay the relevant proceedings indefi-tely. Thus, Mohamed was forced to decline the second strip for the removal of his second cataract... But he only declined for the above reasons. Id, 152; 28. Meanwhile his vision in the left eye continue to deteriorate. Id.

Therefore similar to his ankle problem, Mohamed can only get his eyes timely fixed after he's released from prison. The BOP had almost 20-years to do just that but failed. only after Mohamed enitiated and advanced in his lawsuits, the BOP pretended to come forth for treatment... possibly to sabotage Mohamed's litigation

3- Hypertensions High Blood Pressure that's steadily increasing: Mohamed was initially diagnosed with this problem sometime in 2014 or 2015. From the time of the diagnosis up to early 2020, the problem was treated with a single medications. Id. However following the BoP staff prolonged deliberate indifference that led to total failure to provide Mohamed with any necessary medical needs and attention during his hunger strike in April 2020; this problem worsen more and more. Just few months after the hunger strike, the previous dosage had to be increased and then another medication had to be added. See Mohamed v. U. States Id. Doc. 174 at 88-199, 190-92. Since then, the problem only increased. Currently, Mohamed is on Lisonopil 40 mg tab; amL odipine 10 mg tab; and Terazosin HCl 1mg cap, all for his high blood pressure.         . Yet, the blood pressure is still high.

All of Mohamed's efforts to get this problem resolved and it's root cause revealed to him have failed. IN his case cited above; Mohamed requested an injunction that, among other reliefs, would've provided him proper treatment and the cause of this problem. Id. Doc. 174; C. claims one through three at: 22-139: p.30 (request for relief). However the BoP and the government successfully blocked any further treatment... Consequently, the Court, agreeing with the government, dismissed the three official capaty claims whose sole objective was to obtain an adequate treatment of this condition and others resulted from the above mentioned deliberate indifference in 2020. See the Court's order dismissing the three claims. Id. doc. 173.

In sum, as with the other two conditions mentioned previously, this one as well can only be resolved outside after this court grant this motion. In several occassions, the medical staff have expressed concerns that Mohamed high blood pressures, often found to be over 145 or even 150, may cause him heart attack, stroke... or other much serious and even fatal consequences. Appx; 15, 29.


4- Chronic & Longtime Constipation that the BoP failed to treat: Mohamed has been suffering from chronic constipation for over 15 years now, but not before his incarceration. In the years before 2015 the BoP provided Mohamed with several and different medications and food supplement. For example: at some point, he was provided with prone and raisin that to some extent did help. However, the BoP then decided that no such supplement could be provided any more. At the same time, all medication provided to Mohamed either failed to alleviate this problem, or did so in the beginning and stop shortly afterward. Id. But even with that hardship, Mohamed benefitted from a single fiber, powdery supplement that the prison commissary used to sell and Mohamed used to purchase. But some time in 2014 or so the commissary stopped from selling that supplement. Mohamed complaints under administrative remedy grievance on that were denied. He continued to suffer.

Finally some times in 2016 or so, the BoP agreed to take Mohamed to an outside medical facility for colonoscopy to examine his insides. The results

16

however were inconclusive. That was because, as the doctor told Mohamed in the hospital, Mohamed's insides wouldn't allow clear view since there weren't cleaned adequately. Id. 153; 32. It was another BOP's indifference. The relevant medical staff should've earlier informed Mohamed of upcoming colonoscopy much earlier in advance and provided him with the necessary laxative substance for cleansing his system than she did. Because she failed to do so, the examination repeated and fruitless. Id. 32-34. Mohamed further efforts to get the examination fruitless since then. Consequently, he continue getting further treatments have all failed for Mohamed to go four to six days without been able to use the rest room... which results among many impacts, to suffer especially after 2020. It's normal for Mohamed to suffer especially into an excessive intestinal gasses.

Mohamed's constipation were even further worsen by the BOP's deliberate indifference during Mohamed hunger strike in 2020. Following that event and the stated indifference, the problem only kept exceeding. See Mohamed v. U.States doc. 174 at 191. Mohamed's final effort to get injunction for treatment of this problem and others failed after government's opposition and the court's agreement with that opposition and its subsequent dismissal of those claims. Doc. 74.

Therefore, as with other three previously listed medical problems, Mohamed constipation can only be adequately treated outside prison after the court granting of this motion.

5- Swelling & Painful legs: [3] Since 2020 and due to the BOP negligence toward Mohamed's necessary substantial medical needs at the time, both of his legs have been swelling and extremely painful. As he's shown in his third amended complaint; initially the swelling included his face as well as his arms. Doc. 174 at 115, 121-140. The BOP medical staff told Mohamed that the problem might've been caused by lack of protein at the hunger strike at the time. Id at 125. An outside medical source stated that, however the problem, medically called "Edema" or fluid retention is caused by blood pressure or kidney and liver disease. Id; 153; 35. The BOP medical staff prescribed Mohamed with hydrochlorothiazide 25 mg tab. Id. Doc. 174 at 127, 137. He was also provided with a compression sock. These treatm only partially provide some relief... The pain and swellings still unbearable, every time Mohamed sits for long period of time.

The BOP declined to provide any further treatment. And Mohamed's efforts to get tion have recently been opposed by the government, and thus, failed. Id. Doc. 193. Thus only the granting of this motion will ensure an adequate treatment for Mohamed.

[3] Several of Mohamed's conditions aggravated or worsen from and by the negligence at the 2020 hunger strike. hunger striking however, especially like Mohamed's here, is protected under the 1st Amendment. See Smith state U.S. Dist. LEXIS 230648 CN-D.N. V. 10-20-2019); thus, cannot be used to justify negligence against...

17 **17**

6- Extreame Constant Headache: This problem became constant since 2022 when Mohamed along with almost every prisoner in his range (C-Range, upper, D-unit, ADX-Florence) was infected with the covid-19. Id; 154; 36. Because of the covid-19, Mohamed seriously ill for over two weeks. The staff did nothing to help Mohamed and other prisoners. The only thing the medical staff did was taking of prisoners' temprature.. Id.. Among several of physical and emotional impacts left by the covid-19; was the extreame headache.. Mohamed also lost perhaps 90% of his ability to smell and 50% of his taste to this day. The staff informed Mohamed that these and other physical and emotional conditions he was experiencing after he caught covid-19 were possibly related to what they said "Long covid". Sometimes in 2023 Mohamed was afforded an MRI to see whether something wrong could be found in his brain. Id at 38. He was told that the result were normal. however. The extreame headach on daily basis, continued. After renewing his complaint and been seen by another medical staff, Mohamed was told that his headache might be the one, the staff called "tentional headache", which he said based on his knowledge of Mohamed's other ongoing medical conditions, is caused by other pain and issues in the body. He said, in particular Mohamed back, jaws, legs, ankle... pain may cause the headache he's experiencing. The staff prescribed Mohamed with Acetaminophe-N 325 mg tab, for pain. Appx; 154; 39. The medication even though has minimally helped some other pains in his body, the actual headache is continue, so far. Id whether is a tentional or other type of headache, it's still here. Two years or more have passed since the problem first occurred; yet, the Bop appears to lack even the knowledge of what the problem is. That's because, besides the ordering of the MRI; it did nothing to help Mohamed's condition. Only the grant-ing of this Motion may ensure Mohamed adequate treatment.

7- Extreame Pain in the Back, legs, Wrists, and Jaws: Mohamed is been suffering from these areas since August 2018 following the BOP staff malicious attack against him. See Mohamed v. Jones et al. Id. doc. 64. at 114-118. The staff deliberately delayed the X-Ray of Mohamed's jaws and wrists for almost two months. and then when the did the X-Ray, they told Mohamed the result were normal. Id at 117. No X-Ray was taken from his back or legs. The back and jaws pain often intrefere with Mohamed already little sleep he may have. Appx; 154. See also. Infra at "8"; p. 21. The jaws pain also deprives Mohamed of ability to consume hard food items such as Nuts except with extra hardship... Even chewing an apple sometimes is difficult. Id; 154; 42. The pain in legs and waists prevent Mohamed from many simple physical excercise that he did before Aug. 2018.

(A) Mohamed was not vaccinated; After learning a prisoner vaccinated in the unit got serious medical complications as a result, plus the then confusing reports and opinions in the media about the be-fits and harms of the vaccine; Mohamed had to decline the vaccination.

18

The staff finally provided Mohamed with Lidocaine Patch 5% for his lower and upper back pain, and knee brace for one of his legs. The brace helps on making the walking less painful. However, the patch doesn't elevate his back pain.

As with the rest of previously mentioned conditions, the BOP proved unwilling or incapable of treating Mohamed from these sufferings; over six-years after the staff themselves maliciously caused them. With the granting of this motion, the court will allow Mohamed to seek and receive the adequate treatments.

8- Allopecia OR An Unusual hair loss: Mohamed experiences this problem for perhaps 15-years now. But he never had it before his incarceration. He tends to lose hair from different spots of his beard while the blank spots aggressively etch. On occassions some spots grow back the hair while the new onces appear. For the past 15-years or so; at any given time Mohamed's beard has maintained an empty spots. The BOP medical staff advised Mohamed to shave his beard as often as he can. He does that, even though, religiously he's not comfortable doing so. That's because he belief that his religion does not encourage, rather, discourages him from frequent shaving... The constant itching, the bad, unusual appedrances, frequent shaving, and religious effects caused by such shaving..., all of these result into high level of disconfort, negative emotions...etc to Mohamed. Appx. 155: 43-44 before 2016.

The BOP medical staff on two or three different occassions all injected Mohamed's skull, on effected areas with steroids. That improoved the conditions for sometime. Since then however, the staff refused to provide any further injections or any other type of treatments. Mohamed's effots to be examined by dermatologist also were denied. The BOP basically stated that the condition is not medical one, but is a mere cosmetic! disregarding all of its physical and emotional impacts on Mohamed, for the past 15-plus years. 1d

As with other conditions Mohamed can only receive an adequate treatment of this problem if the court grants this motion.

9- Passing Urine Uncontrollably: This problem started during Mohamed's hunger strike on April 2020 as a result of BOP's indifference to Mohamed's medical needs at the time. See Mohamed V. U. States 1d. dec. 174 at 191, & p.30 (request for relief). The problem does not cause physical pain. However, bring an extra ordinary hardship to Mohamed's religious life and activities as a sincere Muslim. Islamically speaking, urine is an unclean subtance; must be completely avoided. Appx. 155:45 Mohamed daily five obligatory plus many other prayers, in addition to many daily, weekly, monthly, and annually retuals and acts of worship require him to remain absolutely clean, 1d at The uncleanness as a result also brings emotional issues. The government blocked Mohamed's efforts to get court's injunction for treatment of this and other conditions. Id. dec. 173. Thus, only the granting of this motion by this court will ensure Mohamed's necessary treatments.

## B- Emotional Circumstances

Besides those physical conditions listed above Mohamed suffers from as many emotional conditions. But there's some small but meaningful difference between the physical and emotional conditions when it comes to the origin, source and their respective causes. All of Mohamed's emotional and mental problems that he's been suffering from 2018 to the present are explicitely caused by the staff's repeated physical and other abuses against Mohamed. Most of these conditions are well documented by the relevant BOP staff as well as by Mohamed's sworn civil complaints.

For example the 5-13-2022 "Resolve Psychosocial Assessment" ("Assessment") observed that "Mohamed was diagnosed with depressive disorder in 2019, and further diagnoses followed in 2020..." See the Assessment at App. (p.1 of 3). Consequently, several medications were prescribed to Mohamed... Id. Mohamed then in 2020 was diagnosed with posttraumatic Stress Disorder (PTSD). Id. Mohamed incorporates the assessment here by reference.

The assessment further listed close to 20 conditions found with Mohamed Id. Appx (p.2 of 3), which are incorporated here by reference.

As for the reason and causation of these conditions the assessment concluded that, were due to Mohamed "experiencing and witnessing multiple traumatic events while incarcerated that have caused him significant distress..." Id. Based on the above referenced assessment and conclusion, Mohamed was qualified to participate in Resolve program... whose primary purposes include helping prisoners who suffer from trauma. Id (p.3 of 3).

Moreover, Mohamed's two civil complaints also account Mohamed emotional sufferings. See Mohamed v. Jones, et al Id, Doc. 64 at 126-128. also Mohamed v. U. states Id doc-174 at 192. Mohamed incorporates those paragraphs here by reference.

Currently, Mohamed is on buspirone 15 mg tab, and Escitalopram oxale 10 mg tab and mirtazpine 15 mg tab. for his depressive and other related conditions Appx; 15i; 20.

## c- The Impacts Of the Above Shown Physical & Emotional Circumstances on Mohamed; Rendering His Incarceration Far Harsher and More Punitive Than This Court Had Anticipated While sentencing Him in 2001

The combination of the physical and emotional conditions listed above resulted into an extraordinary hardship on Mohamed's daily life in prison. That combination of conditions work perfectly together into creating such harshness and punitive level of conditions of confinement that this court did not and could not anticipated when sentencing Mohamed in 2001 Appx; 155-157; 46-53

For example; the constant and extreame pain from his ankle, legs, back... and headache only increase Mohamed's depressive moods Appx at;155-56.Similarly his freequent decision to stay in bed or otherwise remain in his cell so to

because of his physical pain, or his excessive fears from the staff; see Doc 64 Id at 126. also App. at Appx at 40(p.2of3)or both; this only increases his constipation which's based on his own experience, worsen by lack of physical movement and activities.Id at156;The opposite is also true; per his own experience the more he's physically active, the better he mentally functions. but in order to be physically active, he needs be pain free.Id.

A typical Mohamed's day since 2018 looks like this: he goes to bed after his last daily prayer; say 8:00 P.M. He then would spend two to three hours before he's abble to fall asleep. At any given night he'd sleep about four hours and on rare days, five. However within those four hours he'd wake up in every 25-40 minutes due to several extreame pains, such as on his jaws, or back...etc, and the terrifying and violent dreams, often dipicting similar assaults and abuses against him by the BOP staff. When Mohamed "officially wake up" in the morning for his first prayer for the day; he's almost always; physically tired and mentally terrified.       Because of the regular hardship associated with sleeping; he considers sleeping it self as one of his toughest tasks. He's afraid of sleeping. see Id.   If Mohamed then physically able to leave his cell and overcomes his fear from the staff, whom he's just seen perhaps beating or even 'killing him in the dreams, he'd leave the cell. Otherwise, he'd remain in the cell sometime for days without leaving it. During the day, Mohamed always is on high alert. When he hears staff working, talking, making noises from their kees...etc; Mohamed cannot stop remembering the traumatic, violent event carried out by staff against him...The mere appearance of staff is by it self a terrifying sciene to Mohamed.Id;157;60 Even though realistically he does not believe that all staff at all times are plotting against him and coming to once more get him; yet, when he hears or sees them he can't stop himself thinking that it may be this time that they'll kill him, as they've repeatedly threatened him during the attacks.Id 157;60   In sum, Mohamed is living in terrifying world, day and night, awake or asleep.     It's because of this briefly decaited hardship and the many terrible impacts   caused by it (such as the feeling of constant fear, guilt, shame...loss of interest in positive activities...etc. See Appx at 40(p.2of3) Mohamed has seriously considered the option of ending his own life. Id ;157;51 See also Doc. 64, Id. at 127.

It's true that, due to his traumatic history in prison Mohamed qualified for and successfully completed the Resolve Program". See Appx at 42-43 (Tret Summ)It's also true that he did learn and benefited from the Resolve especially as he was completing it and at the time immediately following its completion. However, the Resolve didn't resolve all Mohamed's emotional issues...While his perceptions toward the staff has largelly changed after Resolve, his fears, anxiety, nightmares...as well as all physical conditions remained in fact. Id: 52-53. Moreover, since he was transferred from Adx in Sept.2023, he's almost with no psychology treatments. Even Adjusting his medications takes several months.

D- Courts in this District and Others often Grant Motions For C.R.
At least partly, Based on the Defendants' Medical conditions As
Well As on the Harsher And More Punitive Nature of the Incarceration
Than That Was Anticipated by the court while sentencing the Defendants
And that's so even though these cases involved no facts or allegations that the
BOP staff themselves maliciously and deliberately created those medical conditions
and harshnesses on the first place; as it's the case in Mohamed's case. See for ex-
ample, u. states v. Auenones, id at LEXIS   (Granting the C.R. motion, partly
because of the defendants' there, as Mohamed's here° high blood pressure and hyper-
tention); u. states v. Gluzman                                    , ²ⁿᵈ
            The court Granting C.R. motion  because the BoP failed
to adequately and timely treat the defendant who, among other issues and
similar to Mohamed here, needed cataract removal); u. states v. Patel, 2022
u.s. Dist. LEXIS 150764 (S.D.N.Y. Aug. 12, 2022) (In Granting the defendant's
motion for reconsideration the court listens his "various physical and mental
ailments); u. states v. Tallier, id at LEXIS 11 (same; the court considers combina-
tion of medical conditions in Granting C.R. motion); u. states v. Freeman, 2023
u.s. Dist. LEXIS 180166 (E.D.N.Y. Oct. 5, 2023 (same; the court concludes that
"in combination with other factors" the motion should be Granted).
     While it's true that most of these cases involved factors, argument, or
consideration related to the Covid-19 pandemic, yet; it's similarly true that
the Covid-19 pandemic, as virtually all courts to  have considered it As
a factor... agreed that; it didn't only presented serious medical complications
and even death, but also it brought about unusual and severe hardship
to the defendants involved. And that reality is at the center of Mohamed's
argument here... The combination of his physical and mental conditions, almost
all maliciously and deliberately caused by the BoP, rendered Mohamed's incarcera-
tion far harsher and more punitive than it was anticipated. See for example
Auenones Id. at LEXIS 5-6 (concluding that the pandemic and the severe condit-
ions it caused° has rendered Auenones' incarceration far harsher and more punitive
than the court had anticipated at sentencing), Tallier Id. at LEXIS 5 (stating
that °courts have recognized that the pandemic has made incarceration harsher
and more punitive than would otherwise been the case." (collecting cases), Russo
643 F. supp. 3d 1 at 333, (concluding that "conditions... during the pandemic have
made" Russo's °time incarcerated more punitive than anticipated at the time of
sentencing").
     That's exactly the case here. Since 2018 Mohamed has been forced by repeated
BoP's physical abuses  and deliberate indifference against him to remain in above shown
punitive and torturous conditions... Unlike the covid-19 though, Mohamed's conditions are BoP's
created and are permanent... This court didn't sentence Mohamed to this kind of incarceration.

22

III- Unusually Long Sentence, Especially Compaired to the Sentence Given to Some of Mohamed's Co-defendants Who're Inspite of Their Bigger Roles in the Conspiracy, Already Been Released From Custody.

The U.S.S.G. § 1B1.13 (b)(6) provide in the relevant part. If a defendant received an unusually long sentence and has served at least 10-years of the term of imprisonment, a change in the law... may be considered in determining whether the defendant presents an extra-ordinary and compelling reason.." See also Id at "Reason for Amendment" under "Revisions to" Extraordinary and Compelling Reasons", p. 10-13. Explaining that: "if the court determines that the combination of the other two factors constitutes an extraordinary and compelling reason, the chang in law is among the broad array of factors that may be properly be considered.." Id p. 12-13. The Commission then stated:" This aspect of the amendment is fully consistent with Concepcion V. United states, 142 S. Ct. 2398. (2022). In the Concepcion, Id at * 750 the supreme court held "that the first step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act" (emphases added).

As an initial matter here, Mohamed respectfully argues that since he was sentenced by this court in 2001; there've been some important intervening changes of both; the law and the facts. By that he means; after he was sentenced, several of his codefendants were sentenced as well. However, even though each of these codefendants, per the government's own assertion and evidence; played much bigger role in the conspiracy than Mohamed; received much lower and lenient sentence than Mohamed. Infact, each of these (three) defendants, has been since long released from prison. This change of fact and law here, Mohamed argues, does qualify as an ECR to be favourably considered by the court if not alone and independantly, then together with other ECRs listed in this motion.

Mohamed is aware of three codefendants who've been already released, regardless of their long history within the organization and their bigger role in the conspiracy, as detailed by the government it self. Those three codefendants are; Ali Mohamed; Adel Abdel Bary; and; Mohamed Suleiman Al Nalfi. Below, some details related to each of them according to the indictment that carry this court's stamp of Mar.12,2009, and other relevant records.

A- The Three Co-defendants Who've Been Already Released... And Their Respective Roles in the Conspiracy...

1- Ali Mohamed: (" A.M") The above referenced indictment of Mar.12,2001 only listing and mentioning A.M as co-conspirator and Not as a defendant. That however most likely because by that time the government and A.M has already agreed on their

23-22

plea deal; the deal that was Not extended to Mohamed. Otherwise the record shows that just few months prior to the stamping of the above referenced Indictment, A.M. was still referred to as defendant. For example, In A.M's actual plea, Oct. 24, 2000, the record referred him as "the defendant". Similarly the caption on "U. States v. Bin Laden, 126 F. Supp. 2d 1023 (2000)(Jan. 2, 2001), had his name listed with other co-defendants including Mohamed.

The indictment reveal A.M. as one of the most highest, longest and deepest involved individuals in the organization and the conspiracy itself. According the indictment:

◊ From at least as early as 1991, A.M. and others provided military and intelligence training in various areas including Afghanistan, Pakistan, and the Sudan, for the use of al Qaeda and its affiliates groups including the Egyptian Islamic Jihad. Id. p. 12.

◊ In or about 1991, A.M. and others... arranged for the secure transportation of Usama Bin Laden from Peshawar, Pakistan, to the Sudan... Id at 14.

◊ While in Afghanistan, in or about 1991 and 1992, A.M...trained members of al Qaeda... in various military techniques including urban fighting, guerilla fighting, and evasion of surveillance. Id at 17.

◊ Beginning in the later part of 1993, Anas Alliby... and other members of al Qaeda discussed with A.M. "a possible attack against the united states Embassy in Nairobi, Kenya, in retaliation for the united states participation... in operation Restore hope in Somalia." Id at 21.

◊ "In or about... 1993 defendant Anas Alliby and A.M...conducted visual and photographic surveillance of the united states Embassy in Nairobi, Kenya, Id at 21.

◊ On... september 10, 1998, in the Southern District of New York," A.M... made false statement to a federal grand jury conducting an investigation of al Qaeda... and Islamic Jihad, and the August 1998 bombings in Africa. Id at 47-48.

Moreover the Court's transcript, dated 24 Oct. 2000 "from an appearance by Ali Mohamed before Judge Sand, where A.M. confessed his crimes... provides much more details... There, among many things, he confessed that he was involved in the confessed activities since early 1980's. Id. p. 25, at 22. And he provides the details of his crimes at length... Id p. 26-32. Mohamed respectfully incorporates by reference A.M's plea, as well as the entire available transcripts, here.

Additionally, the government there told the court, among other things, that absent A.M's plea; the government would've to prove that, his conspiracy (Count Five) included the bombing of "United States embassies and kill united states Government employees..." Id p. 24. As Mohamed will further assert below; he was only charged in relation to the crimes connected to the bombing of Dare Salam, U. states Embassy.

As for the sentence; the court made clear that those "Five Counts" carried "a total maximum sentence of incarceration of life imprisonment plus any term of years" Id p. 18-19. After he pled, the court accepted the plea. Id p. 31-32.

24

Further More, the 9th Commission Report (2011?) provided some A.M.'s back ground, not mentioned in the two aboved referenced sources:

"Ali Mohamed.." is "a former Egyptian army officer who had moved to the United States in the mid-1980s, enlisted in the United States army, and became an instructor at Fort Bragg. He had provided guidance and training to extremists at the Farruq Mosque in Brooklyn, including some who were subsequently convicted in the February 1993 attack on the World Trade Center." Id. p. 68.

These are just few details concerning A.M. his relevant role, history and activitees. Mohamed does not know the exact length of sentence A.M. got. But, based on information and belief, he has been released from prison perhaps several years ago.

As it's clearly obvious A.M. was not only involved even in much more and more serious crimes than Mohamed, but also; he was at the top of the organization. And he so was since early 1980s (Mohamed here was born in 1973). Holding "two bachelor degrees and one master's degree" transcript Id at p. 11; A.M. is presented in government's own records as military leader, trainer, an organizer... While Mohamed here is convicted of very serious crimes, the government has never alleged that Mohamed ever held a leadership position...


2- Adel Abdel Bary (Bary) Per this court's records: Bary, at least until october 2013. was facing victually the same criminal charges that Mohamed faced and convicted of. See U. States V. Bary, 978 F. Supp. 2nd 356, 359-60 (S.D.N.Y. 2013). Not only that, but per the 2001 endictment referenced above and shortly below Bary, similar to A.M's records showed above; he was charged with crimes related to both bombings, in which over 220 people were killed. Mohamed here, was charged of the crimes related to Dares salam bombing above. There, 11- people were killed. The murder of 11- people is a very serious crime, period. But the difference here is obvious.

Virtually similar to A.M; the indictment presented Bary as some one holding a very high position in the organization along with long history within it, and deep involvement in the conspiracy. For example, the indictment reveals:

◇ In...May 1996... Ayman Alzawahiri appointed...Bary to be the leader of the London cell of Islamic Jihad. Id at 24.

◇ On september 4, 1997 defendant "Al Fawwaz leased the office in London that was witnessed by Bary" Id at 29.

◇ On... october 29, 1997... Al Zawahiri "in Afghanistan" was asked to call the number 95637892, a mobile phone belonging to the defendant Bary" Id at 31.

◇ On...February 20, 1998... Bary leased the Beethnaven street office, which he maintained until... on september 23, 1998" Id at 32.

◇ In June 1998, the defendants Eidarous and Bary made efforts to facilitate the delivery of fake travel documents to co-conspirators who were members of Egyptian Islamic Jihad in Holland and Albania. Id at 35.

◇ In July 1998 Bary reaffirmed his commitment to objective of the Islamic Jihad and to follow all orders. Id at 38.

◇ On August 4, 1998 Bary received the threat by Islamic Jihad to retaliate against the United States. Id at 38.

◇ In the early hours of August 7, 1998, fascimiles were sent to London England, claiming responsibility for the embassy bombings in the name of the "Islamic Army for the liberation of the Holly Places, for further distribution by co-conspirators". Id at 42.

◇ On August 7 and 8, 1998, the defendants Bary and Eidarous participated in the dissemination of claims of responsibility for the bombings of the American embassies in the name of Islamic Army for the liberation of the Holy Places" to media organisation in Paris, France, Doha, Qatar, and Dubai United Arab Emirates. Id at 45.

These are some of the areas within the 2001 indictment describing some of Bary's activities from May 1996 up to the time of the bombings of the embassies. The indictment presents Bary, like it does with Ajm; as a high rank individual who was in direct connection with the most top leaders of the organization; learning and receiving informations of the upcoming bombings before they occurred, and entrusted to disseminate the claim of responsibility after their occurrence. Once again, there's no evidence of such deeper and longer involvement in the conspiracy was presented against Mohamed.

After detailing on the remaining third co-defendant, this argument will return to the next part of this section that includes this court's concerns during its sentencing of Bary. See infra at "B" p. 28-30

### 3- Mohamed Suleman Al Nalfi ("Al Nalfi") The indictment states that:

◇ In 1989, Abu ubaidah al Banshiri advised Al Nalfi to form Jihad group that would be based on the principles of al Qaeda and would be used to recruit Sudanese Nationals. Al Nalfi thereafter formed this group and acted as its emir or leader. Id p. 12-13.

◇ In 1990 and 1991, Al Nalfi conducted studies concerning the feasibility of moving Usama Bin Laden from Afghanistan and Pakistan to the Sudan. Id at 13.

◇ Following al Qaeda move to the Sudan in 1991, Usama Bin Laden established a serious of businesses in the Sudan. The defendant Al Nalfi helped to establish Taba Investment in the Sudan on behalf of Usama Bin Laden Id at 14.

◊ In 1992 or 1993, Al Nalfi was instructed by Abu Ubaidah Al Banshiri, to arrange to have members of his Sudanese Jihad group to travel to Somalia on short notice to assist in the effort to expel United States and United Nations troops from that country." Id at 17-18.

Those are just some of the areas on which the indictment describes the leadership and deeper role and involvement in the organization and the conspiracy.

Moreover, Court's records also provide additional relevant information regarding Al Nalfi and his involvement in the group and the conspiracy. See for example U. States V. Bin Laden, 397 F. Supp. 2d 465 (S.D.N.Y. 2005). Per the court's record from the above cited ruling:

◊ On certain terms, Al Nalfi had conversation with al-Fadl (former al Qaeda man himself, now cooperating with the U.S. Government) concerning the death of Abu Ubaidah Al Banshiri, al Qaeda's military commander. Id at 501.

◊ Al Fadl testify or otherwise answers government's question regarding as to why Al Nalfi was so involved with Jihad, Jihad group, stating that "Abu Ubaidah... and Abu Hafs... always try Sudanese people to help Jihad group. Because other nationality like Jordan, Saudi, it's a little far from Egypt. But, Sudan Port, it's big port, and it's easier... to do it through Sudanese people." Id at 502.

◊ Al Fadl tells the government or the grand jury about "his own prior involvement with Al Nalfi in smuggling weapons, via camels, from the Sudan into Egypt. Id at 503.

◊ Al Fadl testify that "Al Nalfi knew El-Hage (another codefendant like Mohamed sentenced to life)... very well. He knew him from Afghanistan..." Id at 504.

◊ Al Fadl informing of the report from Al Nalfi and others "about al Qaeda sending personnel to Somalia to attack international relief operations involving members of the United States military." Id at 504-505.

In sum, Al Nalfi, just similar with A.M. and Gary, is presented by the government's own records to have had long history and deep involvement within the relevant groups and the conspiracy. The above cited records show his early history in the organization...; since at least 1989, when Mohamed was barely 16 years old boy... He's further presented as the leader forming his own Jihad group, planning, moving Bin Laden to the Sudan, there, assisting establishing his investments, then putting fighters together to send them to Somalia against the U.S. and U.N. troops,... shipping arms from Sudan to Egypt...etc. As stated earlier, there was no evidence presented that Mohamed has any leadership position or such long history in the organization and the conspiracy.

B- The Government's Reasons for the Lenient Sentence for Bary and the Court's Legitimate Concerns Regarding That which should Be Equally Expressed in Relation to Other Lenient Sentences Given to other Mohamed's co-defendants Including A.M. And Al-Natfi

In the v. states v. Bary 57 F.supp.3d 300, Id at 304 the Court here expressed its "principal... concern with respect to the plea agreement" offered to Bary, "that would limit... Bary's... term of imprisonment to twenty five years which... may be too lenient...." The Court then addressed government's reasons for such leniency. Before turning to those reasons Mohamed notes that; the court's concerns here should be equally and rightly applied within the context of other shorter sentences offered by the government to other Codefendants. These include A.M. And Al-Natfi. Mohamed does not know whether similar concerns were expressed by the court when sentencing those two codefendants or not but he argues that there's no reason why the same concerns were not appropriate in those two cases. More over, before going to the government's reasons... Mohamed makes clear here that he does not oppose court's decision to accept the plea deal given to Bary... or other codefendants. Nor is he asking the court to resentence any of those codefendants. He, however, asks this court to use its descretion to reduce his sentence based, at least in part, on the fact these three codefendants were offered by the government and sentenced by the court to much lenient sentences than that Mohamed was sentenced to... And that, as it has been shown above, regardless of the fact that these codefendants possessed much longer history in the organization and played much bigger rules in the conspiracy.

The court noted, while listing the government's reasons in offering Bary the lenient sentence term of 25 years that;

**First:** the government "Now has conceded that it is not aware of any evidence that... Bary assisted in planning for or in carrying out the bombings themselves." Id at 305. This government's rationale should not prevent this court from exercising its discretion to grant this motion...The government only cameforth with this reason after 15-years of alleging otherwise against Bary; Moreover; other defendants such as Fawwaz, El-Hage... and others were not accused of "planning... the bombings themselves", the condition that would've been hardly met even in the context of the most highist leaders of the organization themselves, yet, All were sentenced to life..., similar to Mohamed. That was because all were "conspirators". As this court perfectly articulates that point;

Conspirators are criminally liable for all acts of their co-conspirators in furtherance of the goals of the conspiracy. Moreover, a sentence of life imprisonment for participation in a terrorism conspiracy, particularly one that causes death does not require an operational role". Id at 306.

28

**Second:** accepting Abdel Bary plea agreement... would result in a considerably shorter trial, thus conserving prosecutorial and judicial reasources". Id. This reason also should not restrict the court's descretion to grant Mohamed's Motion here. Resources are resources. The government could've easily offer Mohamed and even other codefendants who went to trial with him... the same or similar plea deal so to "conserver[?] prosecutorial and judicial reasoces" But it didn't. See infra III, at p. 31

**Third:** Bary, then 54, "sentence of twenty five years imprisonment world result in his remaining in custody at least until he reaches his early sixties. By that time, he will have spent a substantial amount of his adult life in prison". Id. Correct. However, this same rationality is even truer in Mohamed's case... The court should favourably use the reason for Mohamed here who has already spent roughly half of his entire life in prison. (Born 1973; in prison since 1999, almost all of that time under solitary confinement; see infra at V.D. p. 41-42, and maliciously physically assaulted at least three times; see supra at I. A-C. p. 4-9).

**Fourth:** "unlike many others", Bary "forthrightly has admitted his guilt and criminal responsibility to kill United States Nationals... Id at 306. This reason should not favor the leniency given to Bary and then been used here to deny his motion. As stated in the "first" reason...; the government made selective decision to extend the plea deal to these three, and perhaps, more, defendants but not to Mohamed and others who were tried and convicted with him. More over, Bary admission came 15 years after he was first imprisoned..., and only after his failure to suppress vital evidence against him. See V. states V. Bary 978 F.Supp.2d 356, (S.D.N.Y.2013). Thus, barely one year earlier before the plea deal was accepted, Bary was aggressively fighting in court to preserve his position and even to get this court strike out from the indictment phrase such "extremist interpretation of Islam". See Id at 360. And;

**Fifth:** the plea deal "should be accepted because Abdel Bary... his now admitted commitment to the murderous goal of Al-Qaeda and Egyptian Islamic Jihad and he "never received military tracning or... "played any operational rule... Id. As its shown above, this court observed in the same opinion, that "a sentence of life imprisonment" here did not require an operational rule. Additionally, by the time of the acceptance of Bary's plea deal; other two defendants who also got lengthy sentence; A.M. and Al-Nalfi; both were already sentenced, and probably released from custody... Yet; both of them received military tracning and in the case of A.M; he was trainer and cnstructor him self... As well.

In sum, None of the reasons listed above should be used to restrict the court from excising its authority to grant this motion. These reasons were only valid because the government selected Bary for plea deal; thus selected the reasons accordingly. If the government ch

to be fair and unselective it could've extended the plea deal to Mohamed. And certainly could then have located a lot of reasons; honest reason for such a deal and the lenient sentence attached with it. But the government decided to be selective. And that decision led to the extraordinarily low sentence given to Mohamed especially, in comparison to these three codefendants' sentences. That extraordinary length of Mohamed's sentence along with the gross disparity between his sentence and his codefendants', constitutes the necessary ECR here to justify the granting of this motion.

C- The Jury's Findings and the Court's Observation, At Least Implicitly, Indicated That Other Defendants, Likely Including the Three At Issue Here, Had Equal or Even Greater Culpability Than Mohamed...

As it's obvious throughout this motion, Mohamed lacks access to many relevant records. Those include court's records, except the published case law... Hence, he's forced to rely on whatever court's opinions available to him. Concerning this point titled above the court's ruling on U. states v. Bin Laden, 156 F.supp.2d 359 (S.D.N.Y. 2001) is highly, useful. The court there allowed Mohamed, who was facing death penalty, to inform the jury at the relevant moment that other defendants in the case, including A.M. and Bary who're "equally culpable" will not face death penalty. Id at 370-371 & n.14. Moreover, 11 out of 12 jurors indicated "on the special verdict form" of their finding and reason as to why Mohamed shouldn't sentenced to death that" others of equal or greater culpability in the murderous will not be sentenced to death", Id at 371 (Emphases added). Finally, the same jury also wrote in the special verdict form that ( this is per Mohamed's recollection, not included in the court's opinion cited above; and this court can easily confirm this) that Mohamed had a minor participation in the crime.

Mohamed need not emphasize the high level of relevance connected to this issue. Judge Sand allowed Mohamed to make such pleas to the jury only after and based on his years-long observations of the case, the charges against each defendant, and the evidence presented... The same is with the jury. For many months witnessed all kind of evidence against the defendance including the three mentioned above... In sum, their conclusion was an informed one... Mohamed does not down play the seriousness of the crime he was convicted of. However, it's not that hard to conclude, as the jury did, that he played a minor role... Even the indictment itself it only connect Mohamed to the crime at barely four months before the bombings. See Indictment at p.35 . The same indictment however, reveals that A.M., Bary, and Al-Nalfi were deeply involved up to 10 years earlier... on different continents and countries around the globe.

(5) Based on the evidence it presented against Mohamed; the government could offer him the same deal and honestly reasoned; Mohamed had no planning or financial role; he was extremely poor, uneducated, had no prior crime history; never met any of organization leaders; he's only charged for Daresalam bombing etc.

30

**D- The Government Never Extended the Plea deal Offer to Mohamed**

As it was argued above; the government's decision to get the above listed three codefendants plea guilty in return for the leniency in sentence was selective one. Mohamed never received through his attorneys or otherwise any indication from the government that it was offering any kind of plea deal under any condition. See Appx. at 15 & On the contrary, from the time Mohamed arrived in the U.S. following his extradition from South Africa, Mohamed was informed by his attorney that the government will almost certainly seek death penalty against him. Shortly after, Mohamed was told by his attorneys that the government didn't want anything than seeing him sentenced to death. Id at 54. And consequently, the government extravagantly utilized its unlimited resources to achieve that goal... It's an ironic then for the same government to argue before the same court that accepting other defendants' deal plea; Brucy's, for example, will conserve the government's resources. See U=states V. Bary 57 F. Supp. 3d 300, Id at 306. Mohamed was more than looking forward for such plea deal offered to other defendants but the government never extended it to him. Id

But even if the government did actually offered and Mohamed declined to accepted the plea deal; by so choosing, he would only have exercised his constitutional right to jury trial, and the government could Not've rightly used such Mohamed's decision to punish him more... See for example: Irvin V. Dowd, 366 U.S. 717, 722 (1961)("the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial indifferent jurors); Rodrigues V. Kaplan No. 9:11-CV-0132 (NAM/RFT) U.S. Dist. LEXIS 64198 (N.D.N.Y, may 9, 2014)("A sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as the right to jury trial"); Russo, 643 F.Supp.3d Id at 335; the court explaining that:

the sentencing disparity between defendants who chose to exercise their constitutional right to trial and those who took plea deal - even though they were also indicted ON murder charges - is Not only a factor worthy of consideration as an extraordinary circumstance; but also is a powerful § 3553 (a) Factor. If the government in offering its plea deals did not believe that all those indicted on murder charges should be sentenced to life, why should the court? (Emphases added).

**E- Courts in This District (and Others) Often Reduce Sentences Through C.R. Motions to Avoid Gross Disparity in Sentencing:**

That's well established within the district. Thus, does not need lengthy case citations. See for example Russo Id at 334-35. (the court noting in granting the defendant's motion for C.R. that the wide sentencing disparity that resulted to much longer sentence ON Russo for choosing to exercise his... right to trial compared to the sentences given to his codefendants who took the plea deal

" does not reflect the goals of sentencing. And while the government's argument that accepting responsibility for one's crimes should result in a lower sentence is well taken, it is often dispropartionately reflected in how codefendants are charged and sentenced"). That's very true here. As stated above, the government selectively used its authority in to whom the plea deal should be given. And because it favored some defendants over the others; that resulted to the vast disparity in sentencing... See also U.States V. Ballard 552 F.Supp.3d 461,465 (S.D.N.Y. 2021) (the Court concluding in granting C.R. motion that § 3553 (a)(6) requires the Court to "avoid unwarranted sentecing disparity among defendants with similar records..."); U.States V. Ramsay, 338 F.Supp.3d 407,428 (S.D.N.Y, 2021) (also observing, in granting a similar Motion, that "Congress requires the Court to avoid unwarranted sentence disparity); and U.States V. Seabrook, 2023 U.S.Dist. LEXIS 30691 (S.D.N.Y. Feb. 22, 2023) at 9 (stating, while granting another C.R. motion, that "the First Step Act enables" the court "to consider an unreasonab l disparity in sentencing between coconspirators as part of the extraordinary and compelling circumstances that justify lowering" the defendant's "sentence).

That's what Mohamed asks the court to do here. As stated earlier, Mohamed was sentenced to life without parole... That was almost 25-years ago. And as for A.M. he was most likely sentenced to much shorter sentence. under any event, he's been released from custody long time ago. Allegedly. Adel Abdul Bary was sentenced to 25-years. He was released in 2020 after only serving 21-years or so. See U.States V. Bary, 2020 U.S.Dist. LEXIS 186310 (S.D.N.Y. Oct. 7, 2020) (this court granting Bary's C.R. Motion). Finally, Al Vaifi was sentenced to 121-months.

As this court correctly noted, while accepting the government - Bary pleadeal in 2014, Bary, as a conspirator... didn't have to participate in any particular operation... for him to be sentenced to life of imprisonment. U.States V. Ba 51 F.Supp.3d 300, Id at 306. That truth is also true with A.M. and Al Vaifi who this court accepted the above referenced pleadeal did not do so because Bary was not criminal..., committed no crimes. See Id at 304 (noting that "is difficult...to ima the horror wrought... this defendant has pleaded guilty - a conspiracy to kill United States Nationals...). Six years later, the court again recognized Bary's serious crimes w also granting his C.R. motion, see Id (Oct.7,2020), at 7: (observing, Bary played a r in a terrorist enterprise... The bombing of two United States embassies"). Yet, with these r a court's recognition of Bary's crimes, it accepted the pleadeal and granted his C.R. Motion. excercised it descretion there. It still maintains it here. Mohamed asks, it should do the s Even if Mohamed is released today, still he will've served much longer sentence than A.M., Bar

32

## IV- Mohamed's Rehabilitation Efforts:

Even with and under harsh conditions of confinement, Mohamed's incarceration record in the almost quarter century contains remarkable evidence of his rehabilitation efforts, as detailed below. And while the rehabilitation alone may not be enough to support the granting of this Motion, Mohamed's rehabilitation here qualify for an ECR since it's to be considered along with other ECR's detailed above as well as those come here after. This section is devided into the five sections (A through E) listed below:

### A- Regret & Remorsefulness:
Mohamed is sincerely regret his mistakes and actions that contributed to the suffering of so many. At the time of the crime he was barely 25. Looking back, he realized his mistakes and commit himself to be much better person going forward. One can, if so wishes, challenge or question Mohamed's level or sincerety of his remorse. However, such questioning will certainly lack any supporting record that may in any way advise otherwise; for the roughly a quarter century in prison, Mohamed has never been desciplive for any act or correspondence for supporting or encouraging terrorism or any kind of violence. On the contrary, Mohamed's correspondence with his family and relative is nothing short of peaceful and tolerant experience. See Mohamed's family letters of support. Appx. 85-126. In fact, several member of Mohamed's family have expressed in their letters about Mohamed's communications with them regarding his regret and remorse. Appx. 95-46, 118-119.

In sum, Mohamed's regret is unquitionable established... His words, his 25-years records..., and his closest family members' experience all are indicating nothing than but a sincere regret and preparation and readiness for changing into better Muslim and person.

### B- Almost Completely Clean Disciplinary Record:
Since his initial encarceration, 1999, to this day, Mohamed has only been desciplined four times, and not five as same Bop's records indicate. But all of those four infractions [6] except one, were purely malicious and retaliatory motivated. Following the Bop's last

[6] Among these four infractions, two were serious; related to fabricated allegations that mohamed assaulted a prison guard in 2000. See supra p.3.0-1, and attempted to assault another in 2018. The second one is and with the staff own assault, as detailed supra. At p-4. In both of these instances the Bop had to fabricate the infractions in attempt to cover up their own malicious crimes against Mohamed. Appx 48-50. The other two infractions occured in Dec. 2001 or Jan. 2002 for failure to provide urine sample that the staff

333

issuance of the most recent two, fabricated, infractions in August 2018, Mohamed remained clean and free of any policy violation since. See the unit Manager's at Appx.

That almost perfectly clean records is not often maintainable in prison setting especially when it comes to a prisoner like Mohamed, who's serving life sentence and doesn't have much to gain from such incident free life style, nor much to lose from behaving otherwise. One court in this district correctly responded to the government's argument that appeared to down play the defendant's similar clean record there. The Court correctly noted that such government's argument was a mere discounting the realities of prison life where infractions may be issued for matters as small as a "messy cell" the court then noted there, as this could should here that "such a record is rare especially for a defendant who, serving a life without parole ..., has no motivation to earn good time credit by avoiding inappropriate conduct": U. States V. Tellier, 2022 U.S. Dist. LEXIS 84489 (S.D.N.Y., May 10, 2022, at 14).

Several of the BOP staff members as well as fellow prisoners provide positive character reference based on their experiences with Mohamed. For example, C. Huber, a senior officer describes Mohamed based on his many years of supervising him as "always... respectful..." and as "a model inmate". Appx at    ; Chaplain Shunyb (formally the chaplain & Imam at the ADx Florence at which he experienced Mohamed), knows Mohamed as a person "demonstrates a sincere commitment towards preparing himself for re-entry...". "He has stayed incident free, applying himself to education and programming such as the Challenge program as well as religious courses in Arabic and Islamic studies". Chaplain Shunyb knows Mohamed as "quiet, intelligent, and respectful person". Appx at    . Chaplain R. Rall also describes Mohamed as "always respectful", with "a quiet demeanor, cordial, polite", and he never saw Mohamed "caused an issue or made things difficult" Id at    ; Finally here, D. Lazaruk, Mohamed's unit manager stated among other things "Mohamed continues to follow recommendations of the unit team and has a good rapport with staff" Id at    .

Moreover, fellow prisoner S. Shabazz knows Mohamed as "the most earnest person" he know when it comes to protecting the rights of incarcerated people" and "he is a quiet, thoughtful, and peaceful man". Id at    . Another prisoner M. Duncan, describing

demanded from Mohamed in a late evening, after he had abstain from food and water for about 14-15 hours as he was fasting. Id at 149;11. This is the only infraction that might've at least some legitimacy in it. The last one was issued in Aug. 2018 for Mohamed's failure to drink nutrition resources during hunger strike. It was purely malicious since the BOP has no policy that forces striking prisoners to voluntarily drink or eat any thing. Id at 150;14 . Otherwise, Mohamed remained clean from at least Jan. 2002 - Aug. 2018 (16 years) and now, from 8/2018 to this day (6 years); Jamal Kabel

Mohamed as "one the most polite and courteous men" Duncan & have ever met in prison. He keeps to himself... and... moves with purpose..., always or out of prison. He keeps to himself... and... moves with purpose..., always available to others who are purpose driven...; Id at ___; W. Alwaan knows Mohamed as a person who "likes to help other people... often help" Alwaan to write "his" requests to staff.; and saw "Mohamed" helping other prisoners to file their remedies" Id at ___; D. Morgan, Mohamed's cell-mate states his experience with Mohamed that he's not only "hold himself to the best standards, morals, ethics, but he encouraged others to do so as well, Id at ___; and; Mohamed Al Owhali describes Mohamed as a person defined by care and love... to... his family, and the respect to fellow prisoners and staff; Id at ___. These are just few statements by staff and prisoners on Mohamed's character. Mohamed incorporates by reference here those letters.

**C- Successfully Participating In Various Programs:**
   Over the years, Mohamed has successfully participated in many institutional programs. See Appx at ___. Co. Lazoriuk, the unit manager, stating that Mohamed completed some 42 programs. In doing so, Mohamed has spent a total of 1747 coursing hours (the number comes from adding the number of hours together; see the relevant number along with the respective classes. Appx 73-76). Among of the recent courses taken by Mohamed is "Resolve" that its three phases combined together took almost a year to complete. See the certificates of completion at Appx 44-47, and Dr. Mach's Assessments and report at Id per Dr. Mach, the BoP instructor; Mohamed is one of only five inmates who participated and successfully completed from Resolve program in the entire ADX, Florence. Id at ___. Resolve program is one of the BoP's longest programs run under the First Step Act. The purposes of the Resolve program, including; improving prisoner's functioning by decreasing mental health symptoms result from trauma; increasing the effectiveness of other treatment programs; Reducing misconducts..., and; Reducing recidivism. See the First Step Act Approved programs Guide; Re Entry Service Devision, posted JAN. 20, 2024. Meanwhile, Mohamed is on waiting list to complete his GED exams. He's been ready for taking them since while. Appx. 158-st
   Moreover, Mohamed has participated in various programs offered by the BoP's religious service. See Appx at 49 (chaplain shvaig's letter stating of Mohamed's participation in such courses) while also, frequently, educates himself via religious literatures all available from the religious service. Appx at ___ (chaplain's Raw letter). Additionally

[5] The Adx-Florence Psychology Dept, under Dr. Mach, run multiple Resolve classes simultaneously when Mohamed was there... Each class usually was made of 6 prisoners, as Mohamed's own was. All classes were either dismissed or their participants drop out before completion except 4 from Mohamed's +s

35 35

through his own means, Mohamed completed two long courses on creative language and Geography. Id at

Furthermore, over the years Mohamed learned from others and educated himself in Islam and other relevant issues. He did so so to be better person than that of 1998. Due to his success toward that end; he was able to prepare several of his own manuscripts... See infra at V; B; p. 38-39 (Id).

Moreover, legal wise, Mohamed taught himself some areas of civil law as well as relevant policies and regulations. That helped him and fellow prisoners in appropriately defend their rights while also avoiding violating the BOP's policies. Appx; 58, 57

Because of Mohamed's serious programming, the authority here at U.S.P. Florence recommended for his transfer to slower BOP setting where he could also participate in the Challenge program; another program under the F.S.A. See Appx. at 49 (Chapl. Shaub's However, other BOP's authority has so far denied Mohamed's transfer. Appx at 84 (U. Manager's Resp. on the BOP; denial to approve transfer).

**D-Low Recidivism Status:**

The BOP "FSA Recidivism Risk Assessment shows Mohamed's risk level, general level, and violent level all to be low... Appx at _____. In other words, his recidivism is low. Because Mohamed is still incarcerated in the high security facility, however, his "security level" is necessarily remains high, accordingly. As stated in the previous section (C), the BOP so far hasn't approved the U.S.P. Florence's recommendation for Mohamed's transfer. And Mohamed, as a prisoner, cannot change that status.

**E-Strong Family Bond, Excellent Reputation Within the Family and the Family's Readiness to Help Mohamed Recover and Restart His Life**

Per the BOP's records Mohamed maintains "good" relationship with his family. Appx at 72 ("from" custody class(ification). Mohamed has tried his best to achieve that record regardless of his harsh conditions of Confinement. See infra at V; D; 1-2, p. 41-42.

Within the Appendix attached with this Motion, are at least 33- letters of support from Mohamed's family members that include his siblings, nephews, nieces, in-laws...etc. These letters, individually and collectively, reveal an excellent, positive Mohamed's reputation in the family as a family member. See for example, Appx 85-128. Moreover, the whole family expresses its readiness to help Mohamed obtain his medical and all other needs he needs and that he might need for recovering in his health and reestablish his life. See e.g. Id at 89, 95-96, 104, 116-17. Mohamed respectfully incorporates a judicial notice from the fact that by reference. Here, Mohamed maintained this strong family bond, as it's encouraged by the BOP policies, despite of hardship caused by communication restructions, lack of visit due to the poverty, lengthy distance between

36

F- Courts, Including in this District, Have Favorably Considered Defendants' Past Conviction Rehabilitation as a Relevant Factor Supporting Motion for Compassionate Release

It's true that per U.S.S.G. § 1B.13-B. "Rehabilitation... is Not by itself, an extraordinary and compelling reason..." Yet, "Evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) Factors that Congress has expressly instructed district court to consider at sentencing," Pepper V. U.States, 562 U.S. 479, 491 (2011). See also Concepcion V. U.States, 597 U.S. ___ 142 S.ct. ___ (2022) at 745 N.8 (" Federal courts resentencing individuals... regularly consider evidence of rehabilitation developed after the initial sentencing"); U.States V. Rodrigues, 492 F.supp.3d, 306, 311 (S.D.N.Y, 2020)(stating while granting the C.L motion that "while rehabilitation alone is insufficient, it can interact... to create an extraordinary and compelling reason for a sentence reduction" citing Brooker 993 F.3d 228 (2d Cir. 2020); Monsanto Id. at LEXIS 3, ("listing favourably, for the leader of a criminal gang with extensive prior criminal history,"Numerous... programs, show to reduce recidivism", and his maintainance of "clear conduct since...2011"); U.States V. White, 2022 U.S.Dist.LEXIS 221701 (S.D.N.Y, Dec.8, 2022)(again in favourably considering prisoner's rehabilitation in ruling on C.L motion the court said: "the history and characteristics" of the defendant" did Not freeze on the day of his arrest and incarceration"); Russo, 643 F.supp 327, Id at 332 (same); Overnoes Id. at LEXIS 6-7 (same). Sometimes the courts grant C.L motions based partly, on the defendants' rehabilitation even though such rehabilitation came after or along with Negative disciplinary records. See forexample: U.States V. Ramsay, 338 F.supp.3d 407, 428 (S.D.N.Y, 2021)(granting the C.L Motion by the defendant who was previously enrolled in serious incidents); U.States V. Ballard, 552 F.supp.3d Id at 468 (the court favourably considers the defendant's rehabilitation in 2021, even though the defendant, since 2008 had "twenty-one infractions).

In sum, even though Mohamed's rehabilitation presented above may not be 100% perfect, the rehabilitation should contribute positively in the court's decision to grant this motion. As stated earlier, Mohamed strived in accomplishing the [8] above detailed rehabilitative success while both; he's incarcerated in extremely harsh condition of confinement; mostly under solitary confinement... with various physical and emotional issues..., and secondly; he did And is doing so even though such achievement wouldn't result into shortening his sentence via the good-time credit available for inmates serving NonLife sentences.

[8] It's noted here that; per the ADX-Florence Setting/Solitary confinement; it's impossible for an inmate to complete any sizable rehab, and educational achievements than that Mohamed presented here. Inmates spend 22-24 hrs in solitary; any external school or course need a lengthty approval, often then denied...,in gist, level of matting restrictions...

## V- Other (Seven Additional) Reasons:

The U.S.S.G. § 1B1.13 also provides that:

"The defendant" may present any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

Below, Mohamed presents a total of seven additional reasons or ECRs that asks the Court to consider them along with previously listed four ECRs.

### A-The BOP's Failure to, or, Adequately Treat Mohamed's Injuries Following the Staff's Physical Abuses on Him in August 2018 & April 2020

When the staff physically abuse a prisoner and seriously injuring him but then adequately provide the necessary medical treatments for such injury... Here there's one wrong: the assault resulted in to serious injury. However, when these staff seriously injure a prisoner and then deliberately fail to provide the necessary treatment for the injuries they've maliciously caused... Here there're two different wrongs. And that's what the BOP staff did against Mohamed on August 2018 and April 2020. See supra at 1; B-C; at p. 4-9.   In 2018, after breaking Mohamed's ankle the staff took nine days before seriously looking to the injury and providing an x-ray, and 14-days before diagnosing the injury. See Mohamed v. Jones Id. doc. 64 at 138-39. For almost two weeks, prior to the diagnosis, disregarding Mohamed's painful cry, staff forced Mohamed to walk with restraints on the injured areas, tied him tightly on chair...and without any pain medication. Id at 129-57. For almost two months the staff refused to x-ray Mohamed's injured jaws and wrists. Id at 117. Finally, with exception of 14 ibuprofen tablets, Mohamed was never provided with pain medication, despite of his repeated cries, until 4-23-2018 (over seven months later). Id at 125. Mohamed incorporate by reference here his relevant allegations from his complaint doc.64, Id. as well as the Court's finding on motion to dismiss doc. 120.

That indifferent failure to treat Mohamed's injury was repeated again in April 2020. See Mohamed v. U. States Id. Doc. 174. After injuring Mohamed, the BOP staff deliberately ignored his serious injuries. Id at 167-170, 190, 192, as they disregarded the rest of Mohamed serious medical needs at the time. Mohamed respectfully incorporates here by reference the relevant parts of his third amended complaint doc. 174.

### B-The BOP's Malicious Destruction of Mohamed's Personal Materials; Manuscripts, Journal, Notes....etc; August 2018

Besides their maliciously motivated physical abuses on Mohamed followed by their deliberate indifference toward his serious medical needs for the injury they've caused

to him, the BOP staff at the Anx-Florence, they simultaneously confiscated and destroyed large number of Mohamed's almost two decades worth of personal materials; all, maliciously and in violation of even the BOP's own relevant regulations. See Mohamed v. Jones Id, doc.64, at 95-97, 105.

Among the materials confiscated and destroyed:
◇· Personal journal in 12-Notes books with entries from 2001 through August 2018. Doc.64 at 88.
◇· Three large manuscripts including Qur'an (Islamic Holy book) translation from Arabic to Swahili, Mohamed's native language, that Mohamed had translated. Id at 89-92.
◇· Personal Notes... comprising summary of up to 150-books that Mohamed read and took Notes from previously. Id at 94.
◇· Seven to Eight religious personal books... Id at 94.
In short, the BOP staff virtually destroyed every thing that Mohamed had been working for since 2001. Worst, the BOP has no remedy for such intentional, maliciously motivated loss. Id at 104. The loss is irreparable, and in no condition is less damaging to Mohamed than the breaking of his leg also maliciously        by the same BOP staff. As Mohamed alleged in his sworn complaint; those materials:

were the result of many years of (Mohamed's) reading, studying, and collecting. The manuscripts along with (the) journals... were the most important and the only material achievement that (Mohamed) worked so hard and so long to acquire in (his) entire life. They are irreplaceable. Id at 92.

C-Lack of Relief. Otherwise, For the Above Mentioned Damages& injuries Regardless of Mohamed's Ability to Establish That the BOP staff Have Factually, Deliberately, and Maliciously Caused These Damages& Injuries:
In this third additional reason and circumstance relevant for the C.R. motion that's extraordinary and compelling reason and indifferently failed to provide Mohamed with the prison staff deliberately and indifferently failed to provide Mohamed with the necessary medical care after maliciously injuring him (supra "A"), And then maliciously destroying his almost 20-years worth of precious materials... (supra "A") and then even after Mohamed factually showing that, in fact, the staff committed both wrongs as alleged, but yet; Mohamed cannot recover any damages, not because; he fail to prove the alleged violation but simply because there's no recognizable cause of action for the alleged violation against these federal officials. That's exactly what happened in both cases when the court ruled on the motion to dismiss. As the District Judge wrote in Mohamed v. Jones et al. while adopting the magistrate judge's dismissal of Mohamed's First Amendment claim

39

the destruction of his personal material: for lack of Bivens cause of Action.
Plaintiff's seventh claim, seeks a Bivens remedy for BOP officials
allegedly taking and destroying (1) [his] daily journals or diaries,
comprising 12-Notebooks, with entries from 2001 through August 2018,
(2) three manuscripts written by plaintiff... I do not down play the
mental and emotional impact of the sudden and irrecoverable loss
of one's life work. In my opinion, needlessly and unjustifiably dest-
roying 20 years of work would be, in the colloquial sence, cruel.
But i agree with and adopt the Magistrate Judges recommendation
dismissing this claim for lack of a Bivens remedy." Id. doc. 120, N.1
at p-3 [Emphasis added].
   As stated above; that's an extraordinary... In a country like this one,
a person maliciously destroys 20-years of hard working without any relief
for the victim and no legal consequences for such perpetrator!
   And the court stated, in Mohamed V. U. States (formally, Mohamed v. Santistevan)
Id, while adopting another magistrate judge's recommendation dismissing constituti-
nal claims under the theories of deliberate indifference, Failure to intervene,
and excessive force, for lack of Bivens remedy after the supreme courts
decision in Egbert v. Boule, 142 s.ct. 1792 (2022), and the Tenth circuit's
decision in Silva V. U. States, 45 F.4th 1134 (10th Cir. 2022). The court said:
"In so concluding, the court joins other courts in this disrict upon the
fact that had the alleged events in this case occured in state correction
facility, Mr. Mohamed would have at least a cognizable claim to pursue
   The court pauses to voice its concern that broad application of Egbert
and Silva will insulate virtually all misconduct within prison walls by
federal Actors from liability for damages... A federal prison official may
sadistically beat an inmate to within an inch of his life and that inmate will
not have a civil remedy against that prison official... Id doc.123 p. 23
[Emphases added].
   And thus; per these two courts' conclusion; Mohamed has adequately pled
his claims... under the first Amendment (Mohamed v. Jones), and the Eighth
Amendment (Mohamed v.U. states), however, there's no law under which these courts
could've held the BOP reliable for damages and injuries they caused to Moham-
med... That's because the congress hasn't given that authority to these court.
   However, the Congress, certainly, has given this present court to favourably
consider this E.C.F. and thus release Mohamed from the hands of government's officials who
are apparently beyond and above, of all law... per this status que; the BOP staff are
free to sadistically assault and even murder Mohamed and destroy whatever he may possess
at any time... That's an extraordinary circumstance. This court should consider it favourably,

b- Prolonged & Harsh Conditions Under 20+ Years of Solitary Confinement:
Mohamed has been in prison since 1999. From the first day of his imprisonment to the last year (April 2023) Mohames was solitarily confined. This reason or ECL is in two following sections:

1. The Brief of Mohamed's own Experience in the solitary confinement:
In his declaration, at Appx 158-170 Mohamed provide briefly, his own experience on the solitary confinement (S.C.) as he himself lived it and as he saw fellow prisoners lived on it. Mohamed incorporates by reference his statement references above herein.

2- Courts' critical view of the solitary confinement:
The courts understandably, treat the housing of prisoners for a lengthy under solitary confinement very seriously... to the extent that such lengthy confinement trigger the Due Process. See for example U.S. V. Kach, 714 F.3d 99, 106 (2nd Cir 2013) ("we have held that a prisoner has a liberty interest that implicated by SHU confinement of it imposes an atypical and significant hardship on the inmate... In the absence of factual findings to the contrary, confinement of 188 days is a significant enough hardship to trigger Sandin".
Mohamed should note from the start here; he didn't remain in S.C. for 188 days, but rather 23-years. That makes about 8395 days (365 x 23). And that's not in any regular prison; but in the ADX-Florence. Moreover, up to 2015 Mohamed was held under both; special Administrative Measures (SAMs) as well as under the solitary confinement. See Appx 158-170
The Courts are, virtually, unanimously, critical of the prolonged S.C. And that's for very good reasons; the negative impacts of the s.c. See for example Gallina v. Wilkinson 988 F.3d. at 148-49 (2nd Cir. 2021) (Judge Pooler dissenting;)
Prolong solitary confinement is one of the true horrors of the modern day penal system... Studies have shown that prolong solitary confinement can result in paranoia, hallucinations, suicidal ideation..., decline in mental functioning, insomnia, nightmares... PTSD, self-mutilation... There is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10-days failed to result in negative psychological effects. (citations omitted).
Regarding the super-max confinement specifically; see People v. Annucci 1, 2016 U.S. Dist. Lexis 43556, (S.D.N.Y, March 31, 2016;)
Indeed, the literature is virtually unanimous in its conclusion: prolonged super-max solitary confinement can and does lead to significant psychological harm... After even relatively brief periods of solitary confinement, inmates have exhibited symptoms such as hypersensitivity to stimuli, perceptual distortions... increased anxiety, lack of impulse control, severe and chronic

depression."

As for the SAMs restrictions; they've been found to be even more severer than the usual s.c. See U.States v. Schulte 2021 U.S. Dist. LEXIS 193001 3 (S.D.N.Y. Oct. 6. 2021, at LEXIS 3b.n.3b. "SAMs create isolation that even more extreme than solitary confinement", and "inflict the most severe form of isolation found in United States federal prisons".)

It's not hard to understand why sams are worse than the normal sor.; while the regular s.c. usually strictly confines a prissoner alone, isolating him from the rest of prison population... The sams does that as well. But they go so much further; they reduce the world populations, including the prisoner's own family to some thing merely called: "immediate family"; parents, spouse, and children of the prisoner... And in so many instances the government for so many or without any rational reason; excludes from the "immediate family" even some of those whom originally qualified by the definition of the term... As they did with Mohamed Appx 163:76, and did and do to so many other prisoners... So while the regular s.c. usually limit prisoner's functioning within the prison itself...; and other wise allows him to communicate with outside world; the sams target both sides of prisoner's life..., and as Mohamed experienced them; they even, occassionally, determine things like; which kind of food items... a prisoner can purchase and consume from the commissary... Appx 160:64

Now it's true that when this court sentenced Mohamed in 2001 SAMs restrictions were already controlling his confinement..., and this court, presumably knew of that fact. However, that court's knowledge back then does not disqualify this reason or ECR to be a relevant for  consideration of this motion right now. See U.S.S.G. 1B1.13(e):

"For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment".

Finally here; the extraordinary nature of the s.c. especially that also includes SAMs restrictions, can be easily determined by the shere number of prisoners held under those draconian restrictions. Around the time where Mohamed was still under sams (this sams were removed in Nov. 2015), as the Schulte's court noted in 2013; during perhaps 200,000 inmates in the BOP custody; only 54 of them were held under sams for verious reasons; Schult id. n.3. In his almost 25-years in prison; Mohamed has never been descipllined for any violations regarding his correspondence and communications... Appx 166:100. The fact that may show that the sams restrictions were not necessary to control or limit his ability to correspond with others since there's no evidence that he'd use the correspondence for any ilegal or inappropriate purpose.

E-Family Circumstances

Another reason or ECR, Mohamed argues, is the circumstances surrounding himself and his family. Briefly: Mohamed is from Tanzania, East Africa. Virtually all of his family members and relatives live there. Currently, Mohamed has a mother, seven siblings, 40-50 nephews, nieces, several cousins, an uncle... among other relatives. Meanwhile, Mohamed's family is poor, and ever since he was sentenced, Mohamed has never have any visit from his family and relatives. Actually, since 1998, Mohamed had just visited with his family once. That was in 2001 when his mother along with four siblings were brought via court's expense as a part of his defense. Mohamed visited with them for very short period of time behind wires separating the two sides. Appx at 171:26 — Since then Mohamed's family failed to visit him since they couldn't afford the expense necessarily needed. Id.

Through mail, phone, and recently, E-mail, Mohamed tried his best to maintain him strong relationship with his family and relatives. But these available means cannot do every thing... Thus, for the past quarter century, Mohamed missed every good and bad event in the family...

Since he's been incarcerated, several member of the family and relatives have died. Within that period of time, Mohamed had last five uncles, an aunt, grandmother, five cousins. And his twin sister who died in February 2020. Id at 171:130

For almost two decades now, the health of Mohamed's mother has been rapidly in declining. Currently, Mohamed's mother is completely immobilized by several physical conditions. Potentially, she's demented. Because of her serious physical and mental deficiencies, she needs at least two grown, capable persons to care for her at any given time. Id:172:138. While Mohamed's siblings have been taking care of the mother for almost 20-years now, religiously as well as morally, Mohamed's required to share that burden as well. That's so, especially when is considered with the fact that Mohamed, at 51, is the second last among the siblings, and several of his siblings themselves have medical conditions related to their advanced ages. Appx...

Mohamed couldn't attend his twin sister's or any other family member's funeral. However it's within this court's discretion to enable Mohamed at least see his mom again for the last time and attend her funeral when she dies. As it has been shown above (at D), the fact that the court was aware of the family circumstances detailed here at the sentencing time, does not mean that the reason cannot be an ECR. Indeed, it is.

It's clear from the above briefed circumstances, both Mohamed as well as his family, as the supporting letters express themselves, Appx 85-178, have been extraordinarily impacted with the past quarter century of Mohamed's incarceration... Not so many prisoners in this country face such hardship, and that should be favourably considered by the court here.

43

The Courts favorably consider circumstances surrounding prisoners and their families in ruling on C.R. motions. See for example: Conceperui Id 597 U.S. at 7A9 (citing a lower court's statement, approvingly, in its consideration to the fact that "the defendant had not seen his children in eight years); Tellier, he had not seen his family in 19 months 2022 U.S. Dist. LEXIS 84489 (S.D.N.Y., May 10, 2022) at I (counting the hardship caused by the Covid-19 that included; the defendant was limited to one-ten minute phone call per day", and "has not seen his family in 19 months due to visitor restrictions); U.states v. Patel, 2022 U.S. Dist. LEXIS 150764 (S.D. N.Y., Aug. 12, 2022) at A-5 (considering, favorably, in granting the motion for reconsideration, among other factors, the defendant's "mother's declining health")

**F. Lack of Secured Environment For Mohamed Due to the BOP Failure to "provide for the safekeeping, care, and Subsistence"**

As it was shown above, the BOP staff have maliciously physically assaulted Mohamed at least on four occasions, each resulting in to serious injuries, supra; at I; A-C, p. 4-9 At the same time, the BOP has been completely deliberate and indifferent toward all Mohamed's substantive medical needs that arisen from those malicious assault or otherwise supra at II; A.1-9, p.14-19 . Moreover, the BOP also maliciously have been confiscating and destroying Mohamed's decades-long worth of personal materials... Supra at V; B, p. 38.

In Sum, the past 25-years of Mohamed's incarceration prove that the BOP fail to fulfill its statutorily embosed obligations to provide Mohamed the necessary safety and cares... Mohamed's personal; physical as well as mental wellbeing... As it was shown above, Mohamed is forced to remain in continuing forever fears... Supra; II; B, p.2?; positiveness and protectees are in constant maliciously motivated danger... As it was a "failure" the BOP, by statute, has the duty to "provide for the safe keeping, care, and subsistence" of all inmates and detainees in its custody. 18 U.S.C.§ 4042 (a)(2). See Rivera v. Fed. Bureau of Prisons, 2018 U.S. Dist. LEXIS 21223, (S.D.N.Y. Dec. 14, 2018) (citing V.states V. MuNi2, 374 U.S. 150, 164-65 (1963).

Mohamed argues that; this is an ECD. Not so many prisoners are so often maliciously subjected to violent acts by the BOP staffs... Moreover the BOP can never do otherwise with Mohamed. That's so because; the BOP has never once acknowledged the staff's violence against Mohamed. Without acknowledgement, there's no accountability. And that means; the staff are at will. They abuse Mohamed when they want and where they want.

In doing so, the BOP allow its staff to violate not only the written regulations and laws, but the Courts' orders themselves. And that include the order of this Court as well. The Case Mohamed v. English et al No.22-cv-03213, is an on point example; as Mohamed has alleged there, due to the ADX staff's retaliatory and provocative purposes and motivation, they demanded that Mohamed Must pay $50.00 monthly— demand was not only beyond Mohamed's ability, but even more importantly, it was to

44

in violation of this court's sentencing order. This court hard explicitly indicated that Mohamed is to pay $25. courtely if he receives over $75 monthly. The Adx staff knew of that order serve at least 2009 or so... when Mohamed informed the staff about such order, the staff made clear that he didn't care of what this court had ordered... id. doc. 59. at 5, 27-28.

In short, the BOP not only fails to fulfill its duty required by the statute toward Mohamed safekeeping..., but it actively time and again encourages its staff to do the opposite by defending and even justifying those repeated abuses.

G- If this Motion is Granted, Mohamed will be Immediately Deported to Tanzania.

Because Mohamed is not a citizen nor a legal resident of this country, he must be deported to his country, Tanzania, soon after he's released.

Courts in this district and others consider this type of deportation in favour of the defendants seeking C.R. while also expecting to be deported. See for example; v. states v. Salazar-Espinoza, 2023 U.S. Dist. LEXIS 161431, No. 5-CR-517 (LAK)(S.D.N.Y. Sept.12, 2022) at -9 (this court granting C.R. motion and ordering "the transfer of the defendant to the... (ICE); v. states v. Bary, 2020 U.S. Dist. LEXIS 186310, No. 98-CR-1023, (LAK) (S.D.N.Y, Oct. 7, 2020) (the court again granting Mohamed's (a defendant's C.R. motion, ordering that he should be released "subject of an immigration detainer that will result in his removal to the United Kingdom..); v. states v. Russ, id (S.D.N.Y. 2020) at 325. (the court concludes that within the §3553 (a) analysis, the defendant "will not pose a danger to any persons... because he was to be removed upon release); Patel, id. at LEXIS 5-6 (in granting the motion for reconsideration, the court states that it overlooked the fact that the defendant will be deported pursuant to an ICE detainer" (collecting large number of cases on that precedent).

These cases, some implicitly, as many others show that the court view the deportation as a factor supporting the granting of C.R. motion. That's because, once a defendant is deported to his country, the American public faces no danger from that defendant. That's very true in Mohamed's case...

The Government may argue that the deportation of Mohamed to his country will not necessary keep American public or others safe from his crimes. That's because the government may potentially argue; Mohamed's past crimes were committed there; in Tanzania, not in America... The court should reject such argument, however. That's because Mohamed now 51, as oppose to the age of 25 when the previous crimes occurred, is regretful of his past mistakes and has no intention of repeating them. Moreover, the government has never accused Mohamed, let alone presenting evidence, that in his 25 years in prison had ever attempted or tried    to attempt participating in terrorism or any other illegal activity in Tanzania or any where else in the world.

45

\* - Under the Above Presented ECRs, the § 3553(a) Factors should weigh in favor of Granting Mohamed's Motion for compassionate release

Mohamed argues that based on the above presented record which listed a total of 11 relevant ECRs, this court should conclude that the § 3553 (a) factors are satisfied and met.

§ 3553 Factors

(a)(1) The Nature and circumstances of the offense and the history and character-istic of the defendant: It's true that the crime here is very serious. However, beside that truth, the rest of the provision (a)(1) favors the granting of this Motion. Mohamed has No criminal history... His past pre-1998 bombing, is undisputably clean. The Government Never shown otherwise. Moreover, Mohamed family's letters of support emphasize the same. Additionally, Mohamed has recognized his past mistakes, expressed his sincere regret, and has No intention to do them again. This district's record shows that, defendants with virtually similar magnitude of crimes are granted their C.R. Motions. See for example: Tellier. 2023 U.S. Dist. LEXIS 189994, 92-cr-869 (S.D.N.Y. Aug. 25, 2023) at LEXIS 15-16 (The Court in rejecting government's argument and granting the defendant's Motion whose crime included multiple murders states that: "courts have granted such motions where defenda-nts' rehabilitation was extraordinary, even when the underlying conviction invol-ved multiple or particularly violent murders") (collecting cases)(emphases added). Moreover, the § 3553 (a)(1) doesn't only deal with Mohamed past, or, his crime. It also talks of "his characteristic... Id. And that's highly relevant here. As Another court in this district pointed out "There is no minimizing the severity of "Mohamed crimes, which were of the utmost seriousness. However, "the history and charac-teristics of the defendant "ded not freeze on the day of his arrest and incapacita-tion... Indeed, the U.S. Supreme court has made clear that "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congre-ss has expressely instructed district courts to consider, including" placidly the hister-and characteristics of the defendant") v. state v white. 2012 U.S. Dist. LEXIS 92171 ci, 96-cr-N23 (S.D.N.Y. Dec 8, 2022)(citing " Pepper v. states. 562 U.S. 476 (2011) (emphases added). Mohamed's rehabilitation record as well other relevant factors shown above overcome the 3553 (a)(1), especially, when these factors are conside- along with other provisions under 3553 such as "the need of the sentence imposed, and "the need to avoid unwarranted ...disparities... Id. at (2)(6) As it's detailed below.

(a)(2) The Need for the sentence imposed... (A)-(B) Both of these su-jections are met here. Mohamed's 25-years prison term (certainly "reflects) the seriousness of the offense... promote(s) respect for the law... and "affor(ds) det-nice to [the] criminal conduct" (a)(2) (A) (B). Id.

46

Both the Court as well as the government have previously expressed their position that 25-years prison term was sufficient and fair for Mohamed's co-defendant; Bary. As stated earlier Bary faced virtually same charges as Mohamed did. Supra at p.25-26. As is been shown previously; Bary was charged and pleaded guilt of crimes based on bombings of both Nairobi and Daresalaam bombings... while Mohamed was only charged and convicted of the crimes related to Daresalaam bombing. IN accepting the government - Bary plea deal the Court correctly noted:

To be sure, any twenty-five years sentence is a severe penalty. It's severity surely is difficult fully to imagine if one has not been imprisoned and not facing such imprisonment" Bary, 57 F.Supp.2d 300, 18 at 304. And the government stated:
"Abdel Bary has been incarcerated... since July 1999 and now is 54-years of age. A sentence of "25-years... would result in his remaining in custody at least until he reaches his early sixties. By that time, he will have spent a substantial amount of his adult life in prison" Id.

That same rationale should be applied here in Mohamed's case. Mohamed has already spent 25-years or, roughly half of his entire life in prison. Even if for the sake of argument, it'll be said that Mohamed's crimes are more serious than that of Bary as well as AM's, and Al Nalfa's, still, the existing disparity of the sentence between Mohamed's sentence and those three co-defendants' sentences is Excessively gross. While each of the three has long been released from prison. Mohamed is serving life without parole. That's too gross. See U.States v. Ballard, 552 F.Supp.3d 461, 470 (S.D.N.Y. 2021) [stating that "§3553(a)(6) requires the courts to avoid unwarranted sentence disparities..." and even though "Ballard's crimes were more serious than" that of his co-defendant" still "Not so much more serious as to warrant a sentence four times the length of" his co-defendants.)

The subsection (C) "to protect the public... This's also in favor of granting of this motion. As stated earlier; Mohamed will be deported immediately.

The subsection (D); also favoring Mohamed's release. The BOP has failed to treat Mohamed's conditions. If he'll be released, he'll get the treatment then.

(a)(6) " The need to avoid unwarranted sentence disparities..." This subsection speaks for itself, and it's already shown above that; there's huge disparity here. Co-defendants: A. M. Chief rank member of the organization, U.S. military senior officer, a trainer... Bary (long time member, organizer, cell-leader, charged, like A. M. of both bombings) and; Al Nalfa (another cell-leader, involved in the group since 1989, at least... when Mohamed was in CFi (another cell-leader, involved in the group since 1989, at least... when Mohamed was in his teens) All've been released from prison. Yet, Mohamed is on life sentence coupled with repeated physical abuses, deprivation of all medical needs, 20+ years solitary confinement...etc.

47

**❋ Conclusion**

Based on the above elaborated facts, law, and the supporting argument, the court should grant this Motion, releasing Mohamed on time served.

◆I. Under the "Victim of Abuse" section it's shown that on multiple occassions the BOP staff maliciously assaulted Mohamed and caused him serious bodily injuries. Moreover, as stated, supra p.11 (first issue); this newly added provision couldn't be more relevant; it was created from the DOJ's own recommendation... In other words; the same Governmental office that prosecuted Mohamed 25-years ago saw it perfectly fit that of the BOP's staff abuse him and seriously injured him, he's entitled to be released.

◆II. Under the "Medical Circumstances"; it's shown that Mohamed also suffers from several physical and emotional conditions, whose combination makes his incarceration much harsher and more punitive than this court had anticipated when sentenced him... Furthermore, the conditions here are mostly created by the staff's malicious abuses on Mohamed in the first place, followed by the staff's deliberate indifference towards those serious medical needs, in the second place... Thus, unlike natural conditions such the COVID-19; Mohamed's conditions are BOP's creation originally, followed by BOP's deliberate indifference subsequently.

◆III. Under the "Unusually Long Sentence"; it's shown that Mohamed, without prior criminal history, was sentenced to life + 40 years. However, and more importantly; there're at least three of Mohamed's codefendant who've been already released... Two of those codefendants not only possess much longer history in the organization and deeper involvement in the conspiracy itself; but where involved in and pleaded guilty for the both bombings in Kenya and Tanzania... Yet, Mohamed who was charged and convicted for only Tanzania bombing, get life... while those two plus the third one got much lenient sentences.

◆IV. Under the "Rehabilitation Efforts"; it's shown that despites of the reported abuses against him, Mohamed maintains largely clean and clear disciplinary Records. Moreover, he used every opportunity available in programming, and maintains good reputation among the staff, fellow prisoners, and even more so, with his family.

◆V. Under the "Other Reasons"; seven additional ECRs are briefly listed. The fact that these seven reasons are all collected under one last section of this Motion should not be seen as indicating of their least relevancy... They're all relevant, and deserve the court's consideration.

Finally, the argument about the §3553 Factors shows that the factors should not hinder the granting of this motion. They should support such granting. This district is full of cases in which the courts grant similar motions by defendants convicted of very serious crimes and originally sentenced to life... Moreover, Mohamed's 25-years of incarceration is long and serious enough to meet all

relevant purposes... Additionial time of incarceration is completely unnecessary and will result in to even much gross sentence disparity between Mohamed and his co defendants who've been released years ago.

Dated: Sept. 25, 2024

Khalfan Kh. Mohamed
U.S.P. High, P.O. Box 7000
Florence, CO 81226

Khalfan Kh. Mohamed
s/mohammed

CERTIFICATE OF SERVICE

I, Khalfan Kh. Mohamed hereby certify that on 9.25.24 have mailed my motion for Compassionate Release along with the attached Appx., addressed to the court;
Office of the clerk,
United States District Court, 500 Pearl Street, New York, NY 10009

Khalfan Kh. Mohamed
U.S.P. High, P.O. Box 7000
Florence, CO 81226

Khalfan Kh. Mohamed
s/muhammed.

## THE DOCUMENTS INCLUDED IN THE APPENDIX
## ATTACHED WITH THE MOTION FOR C.R:

1- Defendants Req./Ail. to the warden for C.R. + Resp.    1 - 5

2- Defendant's Complaint to OIG + Resp. Regard. the 2018 Assault. 6-16

3- Defendants' Compl. + Response for the Tort claim (FTCA)
Regarding to the 2018's Injuries & Damages    17-20

4- Defendant's Ad. Rem. Grievance & Respon. ON 2018 Assault. 21-22

5- Defendant's Compl. to the OIG. ON 2020 Assault.    23-31

6- Defendant's Ad. Rem. Grievance & Respon. ON 2020 Assault 32-34

7- Defendant's Comp. & Respon. under FTCA for 2020 Injuries 35-38

8- The ADX/BOP. Psychology Assess./Diagno. & Certificates of
Completion of Resolve Program under the FSA    39-47

9- BOP staff's Letter of Support/character...    48-51

10- Letters of Support/charact. Refere. from fellow prisoners
and a Friend    52-69

11- BOP Records on the defendant's Recidivism Assess.
Discipl. Hist. & program Perticipation...    70-81

12- Defendant's Certificates of Comp. Educ. Cour. From Outside... 82-83

13- Staff's Responce on BOP's Denial to Transfer the Defend from... 84

14- Letters of Supports From the Defendant's Famil. 85-128

15- SAMs Restrictions-Document. Last to be Issued
to the Defendant... Dated. Dec. 8, 2014    129-47

16- Defendant: Kh. Kh. Mohamed's Declaration made pursu-
ant to 28 U.S.C § 1746 IN support to his motion.
for C.R.    148-73

17- Defendant's Letter to the Judge    174

TO: A. Ciolli, the Warden
U.S.P. Florence High, P.O.Box 7000

May 30, 2024

From: Khalfan Kh. Mohamed # 44623-054, Unit B/A, Cell #100

RE: Request For the B.O.P. to bring the Motion
For Compassionate Release on my behalf Pursuant
to 18 USC § 3582 (C)(1)A.

Dear Warden:

Pursuant to 28 CFR § 571.61, I sends this request asking that the BOP files on my behalf the Motion for Compassionate Release ("C.R.") or alternatively, for Reduction of Sentence (R.S.) pursuant to the recently amended 18 U.S.C. § 3582 (effective date, Nov 1, 2023).

There're Extraordinary and Compelling Circumstances and Reason here that should justify the granting of C.R. to me.

Some of Extraordinary and Compelling Circumstances

The below list of the circumstances may not reflect to the all relevant reasons:

1- The Victim of Abuse: Per 18 U.S.C § 3582(b)(4)(B), I should be qualify for the C.R or R.S. because I've been the victim of abuse that resulted in "serious bodily injury" committed by "correctional officers... and employees of the Bureau of Prisons". Id. That abuse occurred on several occassions

1

that include but not limited to; staff malicious assault on me in 2000 at the MCC N.York that resulted, among other serious injuries, into breaking of my nose, and my eye circuit, and forced me to over 10-days of hospilization... The injuries and their effects continue to this day.

Additionally, the ADx staff also maliciously assaulted me in 2018, at C-unit where among other injuries, they broke my right ankle and forced me into the wheel chair for almost two months. Moreover, staff repeated to assault me in 2020 at D-unit, also resulting into serious injuries that continue to this day. For the injuries and fully detail of the assault related to 2018 & 2020, see my two cases: Mohamed V.Jones et al.1:20-cv-02566-RBJ-MDB; Mohamed V.Santisteven et al.1:21-cv-02676-NYW-MDB.

The above three listed malicious assault on me left me with several serious physical and emotional injuries that continue to this day and will likely remain with me for the rest of my life. See at "B" below.

2-Medical Circumstances: Per 18 U.S.C.§ 3582(b)(1)(A) I should also be granted the C.R. because of my many serious and ongoing medical and emotional circumstances. Those include but not limited to, (a) Ongoing serious pain on my ankle, as well as serious pain on my leggs, feets, wrists, back, and jaws; all of which resulting from the above mentioned repeated attacks; (b) Chronic and

2-

serious high blood pressure; (C) chronic constipation; (d) excruciating pain and swelling of my legs and feets; (e) serious headache...etc.

Besides those physical and body on going injuries and medical circumstances I've several serious mental and emotional circumstances, virtually all originated from the above mentioned attacks. Those included: depression, anxiety, poor concentration, lack of proper sleeping...and many other issues related to PTSD.

3- <u>Family Circumstances</u>: Per 18 U.S.C.§(C)(5) I should as well be granted the C.R. or R.S. because of my unique, unusual family circumstances. That include the need to meet with my deteriorantingly illing mother. My mother, as well the rest of my immediate family and relative cannot visit me. Virtually all of them are in Tanzania, E. Africa. I've never have family visit since 2001, I will never have one again. My mother is over 80-years old, very sick. I need to attend my mother funeral. Recently, my twine sister, and previously as well as since then, several of my family members died but I couldn't attend no funeral.

4- <u>Un Usually Long Sentence</u>: Per 18 U.S.C.§ 3582(b)(6)I should be granted the C.R. or R.S. based on the unusually long sentences imposed on me (life + 40 years). That unusuality factor is obvious especially when it's considered with my young iage at the time of crime, change of facts and law, and disparity of sentence between

3

me and some of my co-defendants/co-conspirators....etc.

5- **Other Reasons & Circumstances**: per 18 U.S.C §3582(b)
(6), I should be granted the C.R or R.S based on other rele-
vant reasons. Those reasons include but not limited to:
(a) My rehabilitation efforts and records: That include:
my virtually clear and clean disciplinary records; participa-
ting and completing various programs...include RESOLVE
program, and my assignment on CHALLENGE programs, both
under the FSA; Taking various pschology and Educati-
onal programs...etc.
(b) The Extra ordinarily, unusually harsh conditions of
Confinement: that's because of repeated staff abuses on
me that are accompanied with many physical and mental
impacts/injuries... My unique life and survival in prison
has become much harsher and harder than the court and the
law imposed on me...
(c) Sentence Desparity Between me and some of co-defendants; While
I serve life + 40-years, many of my co-defendants/conspirators served less
or even none of sentence...

   Release Plan: When I am released, I'll go to Zanzibar;
Tanzania to work and live with my siblings; R. Kh. Mohamed, S. Kh.
Mohamed; and 2- Kh. Mohamed. The warden, BOP, and the governmen
can reach my siblings at any time for confirmation. If any letter
of confirmation need from them, I'll provide it. if so I'll be advised.
   Thank you.

                              4-



**U.S. Department of Justice**
Federal Bureau of Prisons

Federal Correctional Complex
Florence, Colorado

*5880 State Highway 67 South*
*P.O. Box 8500*
*Florence, CO 81226*

June 14, 2024

Khalfan Khamis Mohamed
Register Number 44623-054

Dear Inmate Mohamed,

You requested a reduction in sentence (RIS) based on being the victim of abuse, multiple medical and emotional circumstances, wanting to care for your elderly mother, your unusually long sentence and your rehabilitation and programming efforts. After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances which present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

Your noted concerns do not meet the criteria for extraordinary or compelling circumstances which would warrant consideration under Program Statement 5050.50. Medical staff have completed a Reduction in Sentence Eligibility Review and have determined you do not qualify for a RIS based upon on a medical condition. Additionally, you have not provided a verifiable release plan or information on how you will support yourself upon release. Accordingly, your RIS request is denied.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

Sincerely,

A. Ciolli
Complex Warden

5

From: Khalfan Kh. Mohamed, prisoner # 44623-054
at ADX-super max                    Sept. 3, 2018

TO: The office of the Inspector General:

REF: COMPLAINT AND REQUESTS FROM KHALFAN KH MOHAM-
ED TO THE OFFICE OF THE INSPECTOR GENERAL RES-
ARDING THE ASSAULT AND BEATINGS ON ME OF AUG.
23, 2018 AT C-UNIT, ADX SUPER MAX

Dear the office of the Inspector General:
I'am writing this to your office following the above menti-
oned assault on me, asking among other things a fully and
free investigation of what really happened and on that day
and the days that followed... !

A- A BRIEF BACK GROUND:
1- I'am a prisoner in the BOP since 1999. In late 200_
I was tranferred to the ADX-Florence after my trial in N-
Y. And I have been under 9AMs (Special Administrative Me-
sures) Restrictions from 1999 up to Nov. 2015. For almost all
the time since 2001 arrival to the ADX-up to Nov. 201_
I was housed at the H-unit here at ADX.

2- MY RECORDS AT THE ADX: Since I arrived at ADX- I ha_
hold almost perfect records in terms of committing prohi_
tted acts. My last and only prohibited act happened i_
in late 2001, (the fasiure of providing urine sample). That _
only prohibited act committed at ADX. Other wise, I ha_
tried to stay clean ever since until August 23, 2018
a new incident report. (Please see "F", p.graph: 35-37, p.8)
officer BRUSH assaulted me and on top of that issu_

3- In Nov. 2015 after my SAMs removal, I was m_
from the H-unit to E-unit where I was housed up
August 14, 2018 when again I was moved to this C-u_
I was first housed on A-range, Lower, cell # 108. And on Au_
2018 I was moved to B-range, cell# 406, upper.

2-

B- MY CURRENT H. STRIKE AND THE ASSAULT ON ME...

4- On August 20, 2018 I started my peaceful and legally permitted protest in the shape of hunger strike in the protest to staff's decision to deprive me of some of my fundemental rights and items. On Tuesday, August 21, 2018 I wrote to at least four (4) senior Anx-staff to inform them on my decision of hunger strike. This includes a member of the unit team, two superior medical staffs and the S.I.S.

5- On Wedsday, August 22, 2018 at the dinner tray, I completed the 9th. meal in my refused to eat which according to the Program statement should have prompted the first medical assessment. But no assessment was contacted until Sunday of August 26, 2018 after my refusal of at least 19-meals (trays).

6- On Thursday, August 23, 2018 after my refusal of the lunch trays (11th meal) the unit officer led by officer BRUSH asked me to submit to be hand cuffed which I did without any protest or saying a single word.

7- Officer BRUSH along with his two fellow officers that let me to the law library near to my cell and at the same time officer BRUSH started to take and collect every thing from my cell from few commissary. I had to my few books, clothes, religious and legal materials, medications, comestic + everything. He left only 2-blankets, a pillow, khaki shirt and a single khaki trouser (pant).

8- Officer BRUSH then with his collegues came to the law library and asked me to strip off my clothes and change to institutional clothes but I mentioned to him the statement that does not require a prisoner while in hunger strike to have no personal clothes, legal and religious. I asked. But he said I had to do it any way. I asked in what direction? He said the Lieutent (I can't remember his name, He's a Hispanic-American lit in the unit, male). And I said I want to speak to the Lit. BRUSH said : okay, and he

7

9- Little moment later, officer BRUSH and his fellow officers come back to the law library and he said to me; he but want to talk to me in his office. I said "I dont want to go to Lit's office, he may come here or put me in my cell and let him come there to speak with me. Officer BRUSH then told me; okay, we take you to your cell. C# L08 C-unit, range A- Lower). I said; I think you are trying to trick me; he said; No we take you to your cell.

10- Officer BRUSH then handcuffed me and he and his friends led me out of the law library. This was some time after 1:00 P.m and after remaining in the law library for almost an hour or so.

11- When we arrived to my cell door (cell #L08) thinking that I am going into my cell, I stop and look at my cell while talking to officer BRUSH; here's my cell, you toldme you are going to put me in my cell. But officer BRUSH immediately and without any warning he smashed my head forcefully and aggressively against the wall while at the same time beating me and shouting "stop resisting, stop resisting", I said loudly, "I am not resisting any thing I never resisted any thing ... you told me you are going to put me in my cell..."

12 After that I found my self on the ground face down, my head again was pushed and squeezed against the floor while too many officers now sharing in beating me in every way they could.

13- While on the ground face down, officer BRUSH tried very hard to BREAK MY FOUR LIMBS. He, with a huge efforts targeted my legs and hands to break them. Seeing what he was doing, I cried out loudly that he was breaking my legs and hands... Last I also cried out that he/or they, were trying to kill me... I never resisted. All I said is that I dont want to go to Lit's office... I believe th prisoners in the A-Range lower have heard my crying and statements.

8

A-
14- I was then led towards the entrance of the A-range, C-m'd at the same time each officer was taking his part in beating me.

15- Among the staff I saw them after I was removed from the whole way of A-range, is Lieutent MURTON along with the other Lit mentioned ealier, Hispanic-American Lt (pg# tied) in ordering From here, Lit MURTON took the full charge in ordering and directing the beating and assaulting on me.

16- I was finally pushed to the "Observation cell", and here under Lit MURTON's orders and supervision I was beaten like never before. In all these I was still crying out that: I have never resisted any thing. I have had many years of clear and clean records. But Lit MURTON apart from abusing me verbally, he was telling me that I must shut my mouth, not say any thing at as long as I say any thing "we are going to beat you more". And they did, because I couldn't stay silence.

17- At the Observation cell among the staff who were here was at least one senior medical staff whom I have known since about 2001 at the ADX. I cried out to him too when I heard his voice saying "Is he still resisting?", I'm not resisting". I never resisted any thing, are you also witnessing this, see how they beat me...."

18 Finally, when I could hardly breath and I had no energy to cry out and after the officers had their beating enough the beatings come down. My clothes were cutt of my body, I was placed in chains and left with a piece of t-shirt and of short-boxer.

19- After Lit MURTON stop giving his orders to beat me now the CAMERA was brought for the first time at this N.C.U with a medical staff (not the same mentioned above at p...) The medical staff asked me few quick questions whate... any nots that I observed

A

20- MY BODY especially my legs, hands, (that were especially targeted by officer BRUSH my face, head and my back, all was fully of pains. I mentioned this to the medical staff but I got no help to date.

21- During the beating and after it, different officers, such as officer ESPENOSA (or ESPANOZA ) who took a leading role in assaulting me, repeatedly told me that they are going to KILL ME, and that this's not H-UNIT, Officer BRUSH himself after the beating and the camera gone off, he came to the observation cell door and told me that he's not finish with me, and "I am going to kill you"

22- When I was in the observation cell, the Hispanic-American Lt mentioned previously (P.graphe 8, 14) along with officers opened the cell and talked to me briefly, when he asked about what happened, I told him the summary of the story, how it started, that officer BRUSH told me that he the Lt wants to talk to me in his office which I refused. But the Lt said, I don't know any thing about that. I just came here now. I said, "that's not right, I So you standing while I was brought from the A-Range, you witnessed the beatings. He told me that he takes my statements as an "insaults"!

23- At about 6:30 P.M, or so I was escorted back from the observation cell to my cell #108 – C-unit, range A, Lower.

6/-

E- INJURIES AND THE DEPRAVATION OF ANY MEDICATE ATTENSION:

24- I don't know for sure the extent of my injuries since no report was made that I know of. But as started above (paragh 20) my body was fully of pain. The second day after the attack, friday August 24, 2018 I found that my face and too my right leg and hand were all very swollen. My body apart from the terrible pain, had lot of bloody-redish spots. And when I shaved my head on that friday (August 24,2018) I found that my head too received lot of bruises and have those bloody spots and many bumps.

25- The second day, friday also I asked for medical staff to examine me especially my leg and my hand. I talked to a member of the unit team, since I had no paper or pen to write my behalf. At least One other prisoner also wrote to medical on to get me to be examined. But no medical attention came.

26- During the first week after I was beaten I couldn't sleep at night even though I tried hard to remain on the bed. The pain was so terrible, especially on my right leg, which I still experience till now.

27- Finally, on August 31, 2018, 8-days after I was att I was allowed to have an ex-ray of my leg. I Dont the result of that ex-ray as at the time of mailing h Complains and requests.

28- In each of the assesment for hunger strike, I have ment my injuries good pains to the medical staff, but no aid came that ex-ray mentioned on top.

11

## G- MY REQUESTS TO THE OFFICE OF THE INSPECTOR

GENERAL...

38- Based on the complain started above (p-graph : 1-37)

I'am respectfully requesting this office to:

First: Conduct a fully and free from the ADX-hands investigation of the whole events that took place on August 23,2018. reviewal of the Cameras/videos This is including the preservation and reviewal of the Cameras/videos, of that day in the ranges and places I was moved through from the moment I was moved from my cell #108 to the Law library the assault...etc up to the moment I was taken back to my cell. The camera of the following days also may be helpful since I believe they must show my broken movements as a direct result of the injuries and pains I received.

The investigation also should including questioning the prisoners at the A-range I was housed and my self too if necessary. I'am prepared to answer all questions regarding the events.

Second: Conduct a fully reviewal and background check of the officer BRUSH's conducts/history and his treatment to prisoners. Apparently, officer BRUSH has well known reputation of beating/assaulting prisoners and then fabricating charges against them.

And Third: This office, I request directe my jailers to provide me a safe living conditions that are free from death threats and other threats whether I'am in hunger strike no hunger strike. The U.S. Government and its entities including the BOP have yet to create a law that criminalize the hunger strike and/or justifies beating and killing prisoners even if the prisoners happened to be foreigners and non U.S. citizens alike.

And Fourth: the office of Inspector General Investigate all ritys ADX-conducts towards me that started after my starting of hunger strikes... up to this day. This including the Deprivation of my rights as stated above (Section C.D.E.p.graph: 29-34). Also this office must take any other appropriate measures to secure my security/rights and also the remaining prisoner's.

PS-
Thank you very much, for your time and reviewed of this complain and requests.

Since the staff wouldn't give me a carbon papers to make copies of this and I couldn't know if they will make me a photo copy, I had to write 2- identical and similar thing, so I can have one for my attorneys and my own records.

Submitted for mailing, Monday night, ~~August~~ sept 3, 2018.

Khayfan Ph. Mohamed
Reg # 44623-054
AMX Florence.

1.5



U.S. Department of Justice
Office of the Inspector General

*Investigations Division*
1425 New York Avenue, N.W., Suite 7100
Washington, DC 20530

October 1, 2018

Khalfan Mohamed, Reg. No. 44623-054
USP Florence
PO Box 8500
Florence, CO 81226-8500

Dear Mr. Mohamed:

Thank you for your correspondence dated September 3, 2018. The U.S. Department of Justice (DOJ), Office of the Inspector General, investigates allegations of misconduct by employees and contractors of DOJ, as well as waste, fraud and abuse affecting DOJ programs and operations. After reviewing your complaint, we have determined that the matters that you raised are more appropriate for review by another office within the DOJ.  Therefore, we have forwarded your correspondence to:

> Bureau of Prisons
> Office of Internal Affairs
> ATTN: Beth Reese, Chief
> 320 First Street, NW, Room 600
> Washington, DC 20534

Please direct any further correspondence regarding this matter to that office.

Of course, if you have information that involves other allegations or issues regarding DOJ employees, contractors, programs or operations, please feel free to submit that information to us.

Thank you for giving us the opportunity to review your concerns.

Sincerely,

Office of the Inspector General
Investigations Division

16



**U.S. Department of Justice**
Federal Bureau of Prisons

North Central Regional Office

Office of the Regional Counsel

400 State Avenue
Tower II, Suite 800
Kansas City, KS 66101

January 26, 2021

Khalfan Khamis Mohamed, #44623-054
United States Penitentiary Administrative Maximum - ADX
P.O. Box 8500
Florence, CO 81226

RE:    Tort Claim TRT-NCR-2019-04561
       Amount of Claim: $2,000,000.00

       Certified Mail Receipt No: ____ 7018 0360 0002 2080 7585

Dear Claimant:

Your above referenced tort claim has been considered for administrative review pursuant to 28 C.F.R. § 0.172, Authority: Federal Tort Claims and 28 C.F.R. Part 14, Administrative Claims under Federal Tort Claims Act. Investigation of your claim did not reveal that you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.

As a result of this investigation, your claim is denied. This memorandum serves as a notification of final denial under 28 C.F.R. § 14.9, Final Denial of Claim. If you are dissatisfied with our agency's action, you may file suit in an appropriate U.S. District Court no later than 6 months after the date of mailing of this notification.

Sincerely,

Richard M. Winter
Regional Counsel

17



Page1

| 1. Submit To Appropriate Federal Agency: The Regional Director, Federal Bureau of Prisons. North Central Regional Office Gateway Complex, Tower II, 8th Floor 400 State Avenue, Kansas City, Kansas 66101-2492 | 2. Name Address of Claimant, etc... Khalfan Khamis Mohamed, Reg# 44673-054 U.S. Penitentiary max, PO Box 8500 Florence, CO 81226-8500 |
|---|---|
| 3. Type of Employ. N/A | 4. Date of Birth 7-25-1973 | 5. Marital Status | 6. Date and Day of Accident 8.23.2018 F-Unit ADX Florence CO | 7. Time N/A |

8. BASIS OF CLAIM ... I was severly beaten, punched, kicked by large number of officers/prison guards in retaliation for my hunger strike. The beatings took place when I was already restrained and handcuffed and while I was weak in hunger strike.

Over the course of the beating my ankle was fractured and my other limbs were aggressively twisted in attempt to break them and I received bruces in my entire upper body. My face, head, hands and legs all were swollen. Eventually I had to be put in leg cast and on wheel chair for more than 2 months.

Over the next several months I was given neglegent medical treatment. This includes the delay examination on my injuries and delay of diagnoses. CONTINUE

9.                    PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER...
N/A

BRIEFLY DESCRIBE THE PROPERTY...
N/A

PERSONAL INJURY/WRONGFUL DEATH

STATE NATURE AND EXTENT OF EACH INJ... Severly fractured ankle cut in seveal parts on my right leg especially when standing and walking, also inability to walk normally ......... exercising.
The pain on my ankle and my right wrist prevent me up to this day to pray normally while my wrist is producing pains while writing = CONTINUE

11.                    WITNESSES

| NAME | ADDRESS |
|---|---|
| Mr. R. Osaagie | N/A |
| | |
| | |
| | |

| 12.a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12.d. TOTAL |
|---|---|---|---|
| N/A | 2,000,000 Two million dollars | N/A | 2,000,000 Two million dollars |

| 13a. SIGNATURE OF CLAIMANT M. Ihamed | 13b. Phone number of ... N/A | 14. DATE OF CLAIM April 8, 2019 |

Page 2.

8. BASIS OF CLAIM (CONTINUES)
diagnoses, refusal to provide treadment, pain medication and
even an ice bag. except on one occation.
   I still cant walk normally today, 3+ moths after, I was attacked and
I may never walk properly again. At the same time I still have regular pain
on my ankle, wrists, back and on my jaws.
   The staff intentionally broke my bones and then refused me proper medical treatment

PERSONAL INJURY - CONTINUES
10. writing and I can't write continuassly at a single seating as I used
to do before I was attacked. I have to stop in every few minutes
   Also I still have pains in other parts of my body including
on my jaws, back and my left wrist.
   Also till this day I have imofional and mental distress including
the fear of being beaten again and being killed, as the off
had told me that they will kill me... I have dreams and strange
night mare of being attacked ...etc.

Page 3

PRIVACY ACT NOTICE

INSURANCE COVERAGE

15. Do you carry fire & Insur.
X

16. Have you filed claim on your insurance carrier.
NONE

17. If deductive, stat. amount
NONE

18. If claim has been filed with your carrier.
NONE

Administrative Remedy No. 955144-A1
Part B - Response

This is in response to your Central Office Administrative Remedy Appeal where you allege on August 23, 2018, staff members at the ADX physically assaulted you without provocation. You also claim a false incident report was prepared to cover staff's actions. You request the incident report be expunged and the responsible staff members held criminally responsible for their alleged actions.

As indicated by the Warden and Regional Director, your allegation of physical assault by staff members at the ADX was forwarded to the appropriate authority for review. A thorough review will be conducted and proper action will be taken as deemed necessary. However, a decision to personally press criminal charges is one which is yours to make. You may contact whichever prosecutorial entity or legal advisor you believe is appropriate to assist you with this matter.

In addition, you have the ability to file a remedy appealing any sustained disciplinary action. Therefore, the incident report you received on August 23, 2018, will not be addressed in this response.

This response is provided for informational purposes.

_____3/29/19_____
Date

Ian Connors, Administrator
National Inmate Appeals

RECEIVED
APR 24 2019
ADX Wardens Office

21

Central Office Administrative Remedy Appeal

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

REG. NO. 44623-054    UNIT D    INSTITUTION ADX

From: Mohammed Khalfan K
LAST NAME, FIRST, MIDDLE INITIAL

**Part A - REASON FOR APPEAL** I'm asking the expunge of Inc. report # 224 issued by C.O. BRUSH on 8/23/18. Also asking that C.O. BRUSH and his associates be held criminally responsible for their crimes against me. The ADX authority also responsible. The Reg. Director failed to respond.
- C.O BRUSH lied in the inc. report, claiming that he asked me to be moved to the holding cell. Infact, all what he said was to move me to my cell # 108, C-Unit. This claim was then rejected. I declined to go to see Lt. Armihu, as he first didn't know any thing about that.
by the Lt. him self, who said to me; he didn't know any thing about that.
- C.O BRUSH also lied when he claimed that I turned from him and became combatirs (See #1) The Reg. Director wrote me that I must appeal to the warden the DHO finding but I'm forced into this without never received the DHO Report. Also incorrect the appeal was used to punish me even more,
- I'm asking also that BRUSH and his collegues including Lt. MURTON, C.O ESPANOZA and C.O MILLER, among other, be held responsible along with the top ADX-authority
- On 8/23/18 C.O BRUSH, Lt MURTON, Co. ESPANOZA, CO MILLER etc, committed a serious crimes against me without any provocation. C.O BRUSH, possibly with help from others broke my right ankle intentionally and without any provocation, lago received my other injury. He was there to give.
- Lt MURTON, supervised and led the assault and, beating on me. He was there to give orders in these crimes especially the one that day. Only I refused to go to Lt office.
- I have never assaulted or harmed no one that day in the holding cell.
- The ADX and BOP in general, can't be an investigative agency in these crimes and each damage that was made to receive unprovoked the crime and while the defendants were... Mohamed

SIGNATURE OF REQUESTER

DATE 12-19-18

**Part B - RESPONSE**

DATE

ORIGINAL: RETURN TO INMATE

**Part C - RECEIPT**

GENERAL COUNSEL    CASE NUMBER: 955144 A

CASE NUMBER:

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITU

SUBJECT:

22

Page: 1 of 8

From: Khalfan Kh. Mohamed   Reg # 44623-054
      U.S.P Florence, P.O.Box 8500
      Florence, Co 81226-8500              May 10 2020

To: Bureau of Prisons Office of Internal Affairs
    ATTN: Beth Reese Chief
    320 First Street, NW. Room 600
    Washington, DC 20534.

RE: COMPLAINT AND ALLEGATIONS CONCERNING THE ADX-STAFFS
    INTENTIONAL MISCONDUCTS DURING MY MOST RECENT
    HUNGER STRIKE, AND REQUEST FOR ALL APPROPRIATE
    STEPS TO STOP THE ADX-STAFF FROM COMITTING THESE
    AND ALL OTHER MISCONDUCTS AND VIOLATIONS OF MY RIGHTS.

Dear the Office of Internal Affair (OIA):
    I'am writing this request for the above addressed complaint and
allegation and stating the following in summarizing the said misconducts
and violations:

    A- MY DECISION TO GO HUNGER STRIKE AND THE REASONS BEHIND
    1- I was forced to declare H-strike on March 29,2020 by the
constant hardship and restrictions imposed on me since the start
of the year 2019 or so... These includes or officially blocking
my social mail, N-papers, books, and finally officially removing
some of my phone numbers including my mother's and my two sister's
numbers from my phone list... please see doc.#1 attached herein
my request of March 10,2020 to the OIG detailing some of the
restrictions and hardships... please also see doc.#2, my cop-out
to the ADX warder dated: March 30,2020 informing him of my H-strike
and the reasons behind it (page:3).

    2- Before I decided to go H-strike, I had filed a grievance
on each violation, but as usual, each Adm. Remedy was denied or even
rejected... And after and always the warden's office, the Region and
the Central office relied on the same staff who originally committed
these violations... These staff often fabricated the records and or
lies while provide these three offices a response to my complaint

Page: 2 of 8

3- On March 29.2020 with the lunch tray. I started and declared my H-strike as a last resort. In doing that I made sure that the staff knows about my hunger strike reasons behind it and the fact that my H-strike was a peaceful protest... I had no intention to assault, harm or insult any one... I also asked that all movements/assessments in my H-strike be videotaped with the hand held cameras... to avoid any claim by officers that they assaulted me after I refused order or otherwise resisted... etc.

4- So apart from my cop-out to the warden (doc. #2) I also send cop-out at the same time to several high level staff including: Mr. Haovey, the D-unit v.manager. Doctor Garber. the psychologist. the ABX- Medical Director etc.
I also on march 29.2020 I verbally and in writing informed the unit officers that: I was starting H-strike or lunch trays that Sunday. Please see doc. #3: copy of my 3 cop-outs: to unit officers. dated march 29.2020. and to: mr. Haovey (v.manager) Doctor Garber and Doctor Stocett/medical Director. all 3 -dated: march 30, 2020 and submitted the night of Sunday march 29.2020.

5- One of the main reason of sending these cop-outs was to make sure that not only I was serious, but also: I was expecting that enough number of high level ABX-staff knows of my H-strike so I can get all necessary medical attention and assessments as required by the program statements....etc.

Page: 3 of. 8

## B- SOME OF THE STAFF's MISCONDUCTS AND VIOLATIONS OF MY RIGHTS

6- FALSIFICATION OF MY TRAY RECORDS: As stated above: I started H-strike on lunch tray of sunday march 29.2020 with knowlegde of every appropriate staff. But the unit-officers along with at least one Lt. decided to force me out of H-strike by way of falsifying and fabricating the records of my trays:

According to Dr. statement: after 9-meals a prisoner should get medical assessment... I missed/refused my 9th meal on wednesday. April 1 2020 at Breakfast tray. But that day, at lunch tray after I missed the 10th tray a Lt. and 2-unit officers came and claimed that: I have been eating from the trays all along... I was shaked down. but the officers with Lt. took few old food items from food-services that I had spaced before I started my H-strike... Some of these items like powder milk were from 2019. Ramadan... these 3-staff used those items as a prove that: I take food from the trays... and rejected my explanation:

- On that morning I had blocked the area/bar in my cell where the officers places the trays by putting 2-rolls of T-paper in it. the officer had to place the B-fast tray on the floor. on lunch tray, the officer #1. Sant steven push the T.paper violently into my cell, and place the trays on the bars instead

- On picking up the lunch trays, I saw the #1. officer Sant steven opening the hot-tray (HHAAI) inside my sallyport. he then claimed that: I opened it...

- As they returns me back to my cell, I heard one of them saying that: I'm going to get what I got before (i.e: assaulted, beaten, denial of medical treatments... and loss of all of my properties...).

- I asked them to take out my commissary items... but they refused...

- I later learned from the warden's BP.9. response that: the falsified records shows: I missed the first 9-meals and ate the next 2-meals... which is a total lie...

- That night. I wrote to the warden informing of what has just happened and request other measures to ensure my safety, and my well bei please see my April 1, 2020 cop-out to the warden with the doc. #A-1at

On April 2, 2020 I mailed a 'supplement' to OIG. explaining these violations an and asking appropriate measures... Please see a copy of the supplie due #A

On April 3 2020 I mailed a cop-out via medical staff unit 'sick call' to the doctor explaining my deteriorated condition asking an assessment and

Page: 4 of 8

7- OFFICERS' USING OF UNNECESSARY FORCES AND MAKING OF
AN ADDITIONAL THREATS ON ME AND MY LIFE... : On Wesday of
April 15, 2020, he medical "assessed" me for the second time. I was
extremly weak and could barely walk or speak... But that day
the officers. especifically officer #1 Santsteve used unnecessary
and accessive force... To start with:
- He put the hand-cuff with black box very tietly in a way to
cause extreme pain... He then as was astuting me from my
cell, D-unit, cell # 204. A range upper he literally dragged and jacked
me to he medical room down stair... Leves leaves me with extreme
pain on my wrists and other parts of my body. I could hardly
walk...
- In the medical room, he again used accessive forces to get me
on the bed, thereby enrcrease the pain in my body that I had due
to the H-strive and pain on my extremely tied H-cuffs + black box...
- The L-t. kept quit on all these. Only medical staff intervened and
told the officer that what he was doing was not needed...
- I asked the Lt in the medical room to assign another officer
to lead the escot in any way to my cell... the Lt. refused.
- THREATS: When I was escorted back into my cell, Officer
Santsteve threatened me of more harshness and even of death...
He indicated that: he is the #1, he favored the feedings, and likes
killing terrorists... He indicated he was going to show me... etc...
- He made all these and other threats while the camera was behind
him and me. So no camera could see him... But when I arrived to
my cell and after removal of the cuff + black box. I turned to the
camera and him and forced my self to speak toutdly of what he said
he was saying to me secretely... And I said some of what he said
- In the medical room. I had no doubt that I was going to be assault
again. the feeling I started to have ever since they place the
hands-cuffs + black box in so painful way...
- I found out that my right wrist suffered a serious crases and bleede
as a result of the tretened cuff + black box and the door dragging
by the officer... reeborted these violations to at least 2-different
- Per policy, medical staff required to check the restraints before the
assessment starts... But no medical staff did this in this regard. H is
- The Lt. also required to make sure a prisoner is safely
ed. But on that day, Lt. never did that. this same Lt. is the one
came into my cell with the same violent officer on April 1, 202...

Page 5 of 8

8- THE CONFISCATION OF MY PROPERTY: On April 13, 2020 the officer led by #1, Santisteven came to my cell and took out every thing including my clothes, my Relig. materials my cosmetics my legal materials... etc.. and even pen and pencils, writing papers: all were taken from my cell. The food items, which I never consumed since me start of H.strike were removed the previous night per my request, which was at least third request to take the items out.

9- OTHER VIOLATIONS: there are many of them, I cant list them here. During my H.strike I for example, heard many statements that indicats that the staff were intentionally trying to starve me to death and too were ingoing my H.strike to get me out of it. The statements shows they knew what was really going on but they did it on purpose... The C.O #, Santisteven, I believe took charge or these... He at least twice told me that: he falsifid no records to destrupt me from my H.strike because I was trying to destrup his unit... He also said ones that: he wasn't the only officer who was fabricating the records...
— Before the H.strike officer Santisteven and his #2-collegue seemed to me as professional officer... I had no complaint toward them till the H.strike came...

Page-6-of:

C- SOME OF NEGATIVE IMPACTS OF THE OFFICERS'
FALSIFICATION OF MY MEAL-RECORDS:

10- THE DELAY OF THE MEDICAL ASSESSMENT: As stated above
I started H. strike on Lunch tray of March 29.2020. My 9th meal
was or breakfast tray of April.2.2020.
— But I was left with no medical attention up to April 13.2020
after I missed 48-consecutive trays. This is un precidented in
my 15+ of in and out of Histrike in Adx.
— As a result I was too weak. My weight on the first assessment
was 114-pounds. Which only prove the fact that: I have never
been eating since I declared my H.strike even though I still
had some commissary food items in my cell which I reque-
sted the officers to remove but they refused.
— The records will clearly show that: I have never started
hunger strike with 114-pounds. In previous H. strike of August-
October 2018. I was given my first assessment after 18-
meals or so, and my weight was around 138 or 136-pounds.
— On my third assessment of April 17.2020. my weight was
114-pounds. While in 2018 after 40-days of H. strike and almost
10-feedings for voluntarily drinking, I was 114 or 113- pounds. Again
all these shows that: the staff (officers with full knowledge of
the warden's office and the Adx-medical director (doctor)
were fabricating the records when they were recording that I was
eating from the trays.
— The records also will show: that is never been my way
of H.strike to steal from the trays. I don't enjoy H. strike. I try
always hard to avoid it. But when I'm forced to do it. I always
make sure I do it properly as a man... The long-time Adx
staff who knows me. knows that fact...

11- SOME OF MEDICAL ISSUES (PROBLEMS...I was going through...
THAT DEMANDED IMMEDIATE MEDICAL ATTENTION...I was extrem-
ly physically weak and sick... And on April.2.2020 I sent an
emergency sick call along with (cup-out to the doctor. (please see
a copy of my cup-out to the doctor in the doc.#4). explaining some
of medical issue I was going through. But the medical never
responded to my sick call nor the cup-out I sent to the doctor.

78

page 7 of 8

- The medical continued to ignore me and so the rest of the staff.
My body was so weak to an extent I never experienced in any of previous
also experiencing issues that I never experienced before. I was
H. strike.

- After missing 45 consecutive trays/meals without any medical
assessment/attention. I had an extreme pain on my back and chest.
hard headache, stomach pain, constant dizness and fatigue, extreme
pain while urinates, urine passing uncontrollably, cramps on my
legs, etc. I eventually lost the sense of smelling and my mouth became
very bitter, also had difficulty in breathing...etc.

- I explained these and others to both the warden and the medical
in my cop-outs of April 12, 2020 (I forgot to make copies of
these cop-outs, so are not enclosed here but the records must
have them)

- Some of these medical issues happened for the first time. I never
experienced before. But the medical possibly because of my trays-
records falsification, continued to ignore my sick-calls requests and
cop-out asking for medical assessment/attention.

- During and after H. strike I submitted at least 3 sick calls+
cop-out but the medical never responded over.

- It has been a month since I started eating again, but still
some issues remain, such as pain during urinating, passing urine
unintentionally, some hardship in breathing, swelling of my feets and
arms...etc

- For at least a week after H. strike, I couldn't eat any meaningful
quantity of food or drink a drink. I lost my appetite, my mouth was tasting
I lost my food feeling of taste and smelling...etc.

- On April 24, 2020, the doctor came to my cell for the annual
exam race followup. I explained to her my conditions after H. strike
showed her my swelling feets and arms. But she said: she only
came for the regular annual visit and told me: I didn't have an answer
to my issues, even though she said: the swelling might be caused
by the lack of protein...

- Again these records will show that: I never have these kinds of
complaints/issues in any previous H. strikes. This was the first time I
se... I believe I was treated with such amount of brutality and neg-
- Apart from the physical-medical issues I was forced to go through. These
psychological ones... my depression were at the highs...having fears of the office
were increased by the brutality I was shown... my nightmare of seeing assa...

Page: 8-of-8

D- CONCLUSION AND REQUEST:

12- Those are the summary of my complain to this office. As can be seen, the staff, all appropriate staff, knew what was going on. But all were ready to indanger my life or even seeing my death, just to get rid of my H-strike.

13- Back in August 23, 2018, ADx staff chosed to assaulte me, breaking my leg & destroy my property...etc. to get rid of my legitimate and peaceful way of protest: H-strike. This time, the ADx used another way in attempt of reaching the same goal.

14- I am RESPECTFULLY asking this office to conduct a proper investigation on this matter and take all appropriate measures needed to insure that those who allowed these violations and carried them out including the unit officers, led by officer Santisteven are held accountable... Also to make sure that those and other violations, such as the 27 8/2020 assault against me and destruction of my property are not to be repeated.

15- THIS OFFICE KNOWS that: H-strike is no violation of any law regulation or policy. Therefore, there is no need to treat me with that kind of brutality.

16- The BEST of getting rid of H-strike I believe is to avoid provoking me by the way of violating my rights. But ADx staff I believe, carefully have doing exactly the same thing: they knew and knows that: by blocking my social mail publications...and removing my phone #s from my phone list, they'll force me to H-strike. And that's what they intentionally did so to justify ever more cruelty possibly to get rid of me.

17- Repeatedly officers told me they'll kill me. I believe they tried again by falsyfing the record of my trays and medical staff ignoring my complains...

I hope that this office can and will stop these violations. Thank you.

Respectfully submitted for mailing on May 14 2020.

DECLARATION UNDER PENALTY OF PERJURY

I, Khalfan Kh. Mohamed Reg # 44623-054 declare under penalty of perjury that the information in this "complaint and Allegations concerning the ADX-staffs' Intentional misconducts During my most Recent hunger strike, And Request for All appropriate steps to stop the ADX-staff from comitting these And All other misconducts And violation of my Rights" (p. 1-8, pgraph: 1-17) along with attached documents with this "complaint" are true and correct.

Executed and submitted for the mailbag on: May 19, 2020.
Mohamed.

31

Administrative Remedy No. 1017717-A1
Part B - Response

This is in response to your Central Office Administrative Remedy Appeal, wherein you allege staff misconduct. Specifically, you claim staff placed you in restraints that were too tight. For relief, you request this matter be investigated, monetary compensation and the preservation of all evidence, including range and hand-held cameras.

We have reviewed documentation relevant to your appeal and, based on the information gathered, concur with the manner in which the Warden and Regional Director addressed your concerns at the time of your Request for Administrative Remedy and subsequent appeal. The Bureau of Prisons takes allegations of staff misconduct seriously. You were previously informed your complaint was forwarded to the appropriate component of the agency for review. No inmate is entitled to be apprised of the progress, outcome, or disposition of any review of alleged staff misconduct.

The Administrative Remedy Program does not provide for monetary relief. Your request for monetary compensation should be pursued through the appropriate statutorily mandated procedure to resolve this issue. You can obtain the proper forms from your Unit Team.

Accordingly, this response is for informational purposes only.

_____1/25/21_____
Date

Ian Connors, Administrator
National Inmate Appeals

32

**Central Office Administrative Remedy Appeal**

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MOHAMED KHALAN K.    REG. NO. 44623-054    UNIT D-502    INSTITUTION ADX
LAST NAME, FIRST, MIDDLE INITIAL

Part A - REASON FOR APPEAL The region also failed to respond.
- THE USE OF A QXESSIVE FORCE AQAINST ME: On 4.15.2020, while I was very weak, after missing at least 54 meals, in 18 days H. strike, the ADX's officers led by D-unit #1, Santi steven maliciously, sadistically, un-reasonably, unnecessarily and qxessively used forces against me, while the Lieutenant and other staff were acting in total deliberate and indifferent, at the time I was in full restraints.
- C.o Santi steven and his associates started these violations by placing H. cuffs + black box so tightly, and then Santisteven and his associates took me to medical room by Jerking and dragging me by the chain, forcing me to walk on my toe points... And in doing so, cause me to suffer from an extreme, excruciating and unbeable pain... while I was already sick physc. weak and I wasn't resisting culture... apart from physc. and emot. pain, my right wrist was cut open and bloodied... at
- IN THE MEDICAL ROOM: Santisteven again used the prev. described forces by grabbing me forcefully on to the bed by my side, and gives me another extreme and excruciating-
                                                                    S f mohammed
                                                                    SIGNATURE OF REQUESTER

08.18.2020
DATE

Part B - RESPONSE

RECEIVED
AUG 2 8 2020
Administrative Remedy Section
Federal Bureau of Prisons

GENERAL COUNSEL

_____    CASE NUMBER: 1017717-A1
DATE

ORIGINAL: RETURN TO INMATE    CASE NUMBER: _____

Part C - RECEIPT

Return to: _____    _____    _____    _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

33

- CONTINUATION: Page: 2
= excruciating pain on my back, side...etc. at a time I was already
excemely physcally weak and sick.

THREATS: Officer Santisteven also told me hiding from
the camera that he intended to harm and even kill me... that
like killing terrorist, he will get rid of me... He said: he was going
gos to to use his position as co#1 in the force feedings to
achieve his plans... He also said: he is glad that I said I feel
safer in my cell... He also called me names such as: dirty
muslim... etc. These statements and acts, indicates Santisteven
melicious and sadistic intents.

Santistevens' violent acts, statements and threats brought to
me extreme and excruciating physicall and emotional pains and
injuries ... on top of the pervers pains and injuries that I have
suffered as a result of melicious attaks on me in 08.13.2018.

OTHER STAFFS: Including the Lt and other officers all were
deliberate and indifferent... Lt and other officers could have
stopped Santistevene but chosed to let him torturing me...
Only the medical staff, an a nurse tried to intervene but only
only after I have already suffered from the above mentioned torture

THE FORCES, THREATS AND THE RACIAL SLURS: were all
melicious, sadistic, unnecessary and un reasonable... I never resisted,
Nor refusing an order, with full restraints, physically weak, posing no threat

I'm ASKING: an independent investigation, proper monetary Compen-
sation to me, preservation of all evidence including range-cameras,
and hand-held cameras... and immidiate stop of using forces and threats
against me and forcing me to leve in constant fears
I'm Holding the BOP, FBI, C.O. Santisteven, the Lt. that day and
all other BOP/AFN. appropiate staff responsible for all damages...etc.



INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

FORM APPROVED
OMB NO.
1105-0008
EXPIRES 3-31-91

# CLAIM FOR DAMAGE, INJURY, OR DEATH

**1. Submit To Appropriate Federal Agency:** TO: The Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower 11, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

**2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.)** (Number, street, city, State and Zip Code) Khalfan Khi Mohamed, Reg# 44623-054, U.S.P-max, P.O.Box 8500, Florence, CO 81226-8500

**3. TYPE OF EMPLOYMENT**
☐ MILITARY  ☐ CIVILIAN
N/A

**4. DATE OF BIRTH** 7-25-1973

**5. MARITAL STATUS**

**6. DATE AND DAY OF ACCIDENT** April 15 2020

**7. TIME (A.M. OR P.M.)** Betw. 8-10 A.M. Apprx.

**8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)** On 4-15-2020, when I was physically extremely weak, on my 16th day of H-strike after missing at least 54 consecutive trays, the officers here at D-Unit, A&x used an excessive, unnecessary force against me that resulted to an excruciating, extreme pain and an a bodily injury and longer emotional pains and suffering. In the morning of 4-15-2020, staff, led by C.O #1, officer Santisteven, along with a Lt (whose name I didn't know) used an excessive force, without no provocation from me. Officers led by Santisteven, started by putting me an in very tht full restraint; chent black box, that was so tiet and caused an excruciating pain as they move me from my cell, cell# 208, D-unit A-range upper, and then escorting me to medical in south stair (CONTINUE NEXT)

## PROPERTY DAMAGE

**9. NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT** (Number, street, city, State, and Zip Code) **(See instructions on reverse side.)**
N/A

**BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)**
N/A

## PERSONAL INJURY/WRONGFUL DEATH

**10. STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.** As a direct of the excessive unnecessary forces + verbal threats by Santisteven on 4-15-20, I suffer an excruciating physical and immotiople injuries and pain... While I was already in a very weak states due to the H-strike. The forces was used highly increased my previous pain and state of illness that prolonged the healing period... The pain remained long after Jmy H-strike ended.

## WITNESSES

**11. NAME**
N/A

**ADDRESS (Number, street, city, State, and Zip Code)**
N/A

## AMOUNT OF CLAIM (In dollars)

**12a. PROPERTY DAMAGE**
N/A

**12b. PERSONAL INJURY**

**12c. WRONGFUL DEATH**
N/A

**12d. TOTAL (Failure to specify may cause forfeiture of your rights.)** (100,000) One hundred thousand dolle

**12. (See instructions on reverse)**

**I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAI AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.**

**13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.)** Mohammed

**13b. Phone number of signatory** N/A

**14. DATE OF CLAIM** June 29, 2020

**CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM**
The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.)

**CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS**
Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.)

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUST
28 CFR 14.2

95-108
Previous editions not usable.

2-

__8- BASIS OF CLAIM (CONTINUE FROM PAGE :1)__

Down stairs, these officers, they used forces by lifting me by the chair and so forced me to walk with my toe tips while at the same time causing unbarable pain on my waists and other parts of my already weak body, full of pain due to me H-strike.
- In the medical room, again, C.o. Santisteven used unnecessary, on excessive forces by grabbing me forcifully and laying me on the medical body for an assessment, thereby, causing me to suffer more an execuiting and extreme pains on my already weck, full of pain body due to H-stike.
- In the medical room, I asked the L-t to assign another officer to led me escort because C.O. Santistiven is using forces, but the L.t. refused. The L-t. and the rest of offices, also stood by as Santisteven was touching me, only the medical staff attempted to inteadue.
- As I was escorted back to my cell, officer #1, Santisteven continue to proove his meliciously, sadistically and to deliberately indiffer motivated cruelty intents : here, as the CO. was leading me escort back to my cell, he repeatedly and intentionally verbally threatened me and my life. He meliciously and sadistically indicated that he's going to use his position as Co. #1, to harm and even "get rid of me". that will used the anticipated force feeding to achieve his goals, that he liked to kill terrorists, he it was glad that I feel safer in my cell. He also used language that further proove his melicious and sadistic intent like calling me "dirty muslim..etc..
- Apart from the physically pain, the forces used coursed an obrious injug on my right wrist. The excessively tied Handcuff + the forced used by Santi Steven..etc, left my skin opened and blooded. I reported the injug to at least 2 - L-t + other staffs. Also I reported to medical staff who told me to use warm water to clean the injug but declined to tread me...even after I showed him my injug twice...
- Apart from the physical pain and injug, the accessive forces and the serious life threats...etc of A-15-2020, coursed a great deal of immotional pain and injug... on top of what was there as the result of 8-23-2018 assault on me... The events of A-15-20 only prove that was done and said to me on 8-23-20 and said by Santisteven o's his colleques on A-1-20... As a result my fears of CO's that want kill me increases... I feel no safety. The ADX/BOP state

3-

<u>10 - PERSONAL INJURY (CONTINUES FROM PAGE:1)</u>
= my H.strike.

The injury on my wrist took weeks because was healed. After the actual physical injury healed, the pain continue on my waist up to this very day...

The forces used against me maliciously and sadistically... by excessively tietening the hand cuff+chein+b.box, by dragging and lifting me by the chain to an extent forcing me to walk with my toe tips, and the an excessive forces used inside the medical room...etc all of which used after more than 2-weeks of H.strike with at least 54-med consecutive trays-missed..., all these forces caused me to suffer and excrutiating, extreme and long time physical and psychological pain and injury...

- The an excessive forces and the serious malicious and sadistic threats committed on me on 4.15.20, only came to prove and repeat the previous assaults of 8.23.18 that took place on C-unit while I was in my previous H.strike. On that day and days that followed, C.O.s used an excessive forces and threats on my life... Only to be repeated on 4.15.20. The two (2) events are related, connected.

- In immotional side, I have no + doubt after 4.15.20 violation that the BOP/ADX is after my life with full knowledge and even approval or co-opiration of the highets office at ADXa...

- The warden and other top ADX/BOP's officials knew of the potential use of forcess... I had informed that. They failed to ensure my safety intentionally, all are responsible...

- my diffression and related mental issues increase for period of time as a result of the above mentioned and other violetions that committed against me during my hunger strike.

- I'm very fearful of officers I can hardly afford to go out of my cell; they repeatedly told me that will harm and even kill me... and tried did and tried so repeatedly, my night mares deficting the 8.23.20 and now 4.15.20 + other violent and brutal acts by officers against me... there no fear of fellow prisoners I'm able to defend my self from prisoners... But my fears are of prison staff who have supports form their superiors coordinating crimes and legal defence +s me.



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

_____

*Office of the Regional Counsel*                          400 State Avenue
                                                        Tower II, Suite 800
                                                        *Kansas City, KS  66101*

AUG 2 4 2021

Khalfan Khamis Mohamed
Register No. 44623-054
United States Penitentiary – ADMAX
P.O. Box 8500
Florence, CO  81226

Re:   Administrative Claim Number TRT-NCR-2020-05797 (Reconsideration)

CERTIFIED NUMBER 7018 3090 0002 2626 3036

Dear Mr. Mohamed:

        Your claim has been reconsidered for administrative settlement pursuant to 28 U.S.C. § 2672 et seq., and authority granted by 28 C.F.R. § 0.172, <u>Authority: Federal Tort Claims</u> and 28 C.F.R. Part 14, <u>Administrative Claims Under Federal Tort Claims Act</u>. You claim government liability in the amount of one-hundred-thousand dollars ($100,000.00).

        Further review of your claim has been completed. We find no new evidence to indicate you sustained any loss or injury caused by the negligent or wrongful act or omission of any Bureau of Prisons employee acting within the scope of his or her employment. Accordingly, we will not change our original decision in this matter as we have determined the denial to be appropriate under the facts and information available to us.

        If you are dissatisfied with our agency's determination in this matter, you may file suit in an appropriate U.S. District Court no later than six months after the date of mailing of this notification.

                                        Sincerely,

                                        Richard M. Winter
                                        Regional Counsel

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

## Bureau of Prisons
## Psychology Services
## Resolve - Psychosocial Assessment/Evaluation

Reg #:    44623-054
Unit Team:    D

| | | | |
|---|---|---|---|
| Inmate Name: | MOHAMED, KHALFAN KHAMIS | Sex: M | Facility: FLM |
| Date of Birth: | 07/25/1973 | | Provider: Mach, J. PhD, Resolve |
| Date: | 05/13/2022 08:50 | | |

### Identifying Information

Inmate MOHAMED was interviewed to determine the presence of a diagnosable trauma-related disorder for the purpose of participation in the RESOLVE Program. This determination was based on a number of sources including PDS-BEMR records, Pre-Sentence Investigation Report, assessment data (from PCL-5, GAD-7, BDI-2), and a clinical interview. Inmate MOHAMED is a 48-year-old, African American male. He is currently currently serving a LIFE sentence for MRD/ATMPT MRD;USE/ATMPT WPNS OF MASS DEST;BOMB US EMB;DAM/DEST US PROP;CAR EXPL;CAR DNG DEVICE.

### Psychosocial History

Inmate MOHAMED was raised on the island of Pemba in Tanzania and reports being raised primarily by his mother and older siblings. He was raised in the home with ten siblings. He reported his father passed away in 1980 from a long-term illness. He described his upbringing positively but reported his family was quite poor but "made it work." Inmate MOHAMED reports he currently has close relationships with his family members; however, he reported his mother was diagnosed with dementia and her condition has impacted their relationship. He indicates experiencing the following adverse experience as a child: extreme poverty. He denied any other issues including verbal abuse, physical abuse, sexual abuse, neglect, or having caregivers with substance abuse or mental health issues. Inmate MOHAMED denied having a spouse or significant other. He further denied having any children.

In regard to educational background, inmate MOHAMED reports he withdrew from school when he was approximately 17 years old. He stated prior to withdrawing, his grades were normal and his attendance was good. He recalls he was not diagnosed with a learning disorder and did not require specialized assistance during his school years. He reported his behavior in school was exemplary and that he did not have a history of suspension.

Inmate MOHAMED received seven months of military training in 1994 in Afghanistan and reportedly stayed in the camp for approximately seven months. He reported he was gainfully employed for most of his adult life. Inmate MOHAMED was employed in the kitchen at Burger World in Cape Town, South Africa in 1998. He was employed at the restaurant until his arrest in October 1999. Between 1996 and September 1998, he traveled amongst family members and religious "camps" (military missions). Also during his adult life, he was employed at his brother's store in Dar es Salaam, Tanzania.

### Criminality

Inmate MOHAMED denied an extensive history of criminal behavior. His reported his index offense was "participating in blowing up the embassy in 1998." Inmate MOHAMED is serving a life sentence for USE/ATMPT WPNS OF MASS DEST;BOMB US EMB;DAM/DEST US PROP;CAR EXPL;CAR DNG DEVICE. In regard to his behavior while incarcerated, he has received multiple incident reports for violent behavior. In 2000, inmate MOHAMED received incident reports for attempted killing, possessing a dangerous weapon, taking hostages, interfering with security devices, and assaulting without serious injury. He stated he believed he was "wrongly accused" of this behavior. Inmate MOHAMED was also sanctioned for assaulting without serious injury in 2018. He was placed at the ADX due to his previous history of attempted murder while incarcerated.

### Substance Abuse

Inmate MOHAMED has no reported history of substance abuse or substance abuse treatment. He reports he was not exposed to substance use by his caregivers.

### Mental Health

Records indicate the inmate MOHAMED has previous psychological treatment and has taken psychotropic medication to treat symptoms of depression. Specifically, the inmate has two diagnoses noted in his past BEMR records including: Depressive Disorder NOS and Major Depressive Disorder in 2009, both of which are listed as resolved. Inmate was diagnosed with Other Specified Depressive Disorder in 2019 after reporting depressed mood, difficulty concentrating, and negative ruminative thoughts. He was diagnosed with Unspecified Mood Disorder by Health Services in 2020. He endorses a history of suicidal ideation but Inmate MOHAMED is currently prescribed Buspar, Celexa, and Remeron.

Bureau of Prisons - FLF

Generated 05/17/2022 08:57 by Mach, J. PhD, Resolve

| | | | | | Reg #:     44623-054 |
| | | | | | Unit Team:  D |

| Inmate Name: | MOHAMED, KHALFAN KHAMIS | M | Facility: FLM | |
| Date of Birth: | 07/25/1973 | Sex: | | |
| Date: | 05/13/2022 08:50 | Provider: | Mach, J. PhD, Resolve | |

has not required placement on Suicide Watch while incarcerated. He reported he did not experience mental illness while in the community but indicated his symptoms began while incarcerated. Inmate MOHAMED denied a history of mental illness in his family.

TRAUMA ASSESSMENT: Inmate MOHAMED completed a series of assessments to include the Posttraumatic Stress Disorder Checklist for DSM-5 (PCL-5), Generalized Anxiety Disorder-7 item scale (GAD-7), and the Beck Depression Inventory-2nd Edition (BDI-2) following his completion of the Traumatic Stress and Resilience workshop. These assessments reflect the following:

1) Posttraumatic Stress Disorder Checklist for DSM-5 (PCL-5): Inmate MOHAMED received a score of 51 on this measure. He endorsed experiencing the following diagnostic criteria for PTSD: repeated, disturbing, and unwanted memories of the stressful experience; feeling as if the stressful experience was happening again; feeling very upset when reminded of the stressful experience; repeated disturbing dreams of the stressful experience; avoiding memories, thoughts, or feelings related to the stressful experience; avoiding external reminders of the stressful experience; trouble remembering important parts of the stressful experience; having strong negative beliefs about yourself, other people, or the world; having strong negative feelings such as fear, horror, anger, guilt or shame; loss of interest in activities that you used to enjoy; feeling distant or cut off from other people; trouble experiencing positive feelings; irritable behavior; being "superalert" or watchful; feeling jumpy or easily startled; having difficulty concentrating; and having trouble falling or staying asleep.

2) Generalized Anxiety Disorder-7 item scale (GAD-7): Inmate MOHAMED received a score of 16 on this measure which is typically suggests an individual is experiencing severe anxiety. He reported frequent worrying, trouble relaxing, becoming easily irritated, and feeling as if something bad may happen.

3) Beck Depression Inventory-2nd Edition (BDI-2): Inmate MOHAMED received a score of 34 on the BDI-2 which is typically suggests an individual is experiencing severe depression. Inmate MOHAMED reported primarily experiencing loss of pleasure, indecisiveness, and changes in sleep pattern and appetite. Several of his responses on this measure appeared to overlap with his scores on the PCL-5.

4) MENTAL STATUS (Face to Face Clinical Interview): Inmate MONHAMED was interviewed for the current assessment. He presented as stable with fair overall adjustment and functioning. Today, his mood was euthymic with congruent affect. He did not exhibit any signs of psychosis or mania. He reported a history of suicidal ideation (over the past two weeks) and an SRA was completed (see SRA dated 5/13/2022 for additional information). He denied current or suicidal ideation, intent, or plan and was not placed on suicide watch. He did not present with any overt distress.

IMPACT OF TRAUMA: Inmate MOHAMED reported experiencing multiple traumas while in prison and stated these traumas impact his daily functioning.

DIAGNOSTIC IMPRESSIONS: Based on the clinical interview and assessment data inmateMOHAMED meets the criteria for the following diagnoses:

309.81 (F43.10) Posttraumatic Stress Disorder (PTSD)

311 (F32.89) Other Specified Depressive Disorder, Depressive Episode with Insufficient Symptoms

Posttraumatic Stress Disorder is characterized by exposure to actual or threatened death, serious injury, or sexual violence in at least one way, presence of at least one intrusive symptom associated with the traumatic event, persistent avoidance of stimuli associated with the traumatic event which begins after the trauma, negative altercations in cognitions and mood associated with the traumatic event, and marked alterations in arousal and reactivity associated with the event. Further, the duration of the experience is longer than a month, causes clinically significant distress or impairment in social, occupational, or other important areas of functioning, and the disturbance is not attributable to the physiological effects of a substance or another medical condition. Inmate MOHAMED has reported experiencing and witnessing multiple traumatic events while incarcerated that have caused him significant distress. Based on his interview and review of the above measures, inmate MOHAMED meets diagnostic criteria for PTSD.

Generated 05/17/2022 08:57 by Mach, J. PhD, Resolve                Bureau of Prisons - FLF

| | | | | Reg #: | 44623-054 |
|---|---|---|---|---|---|
| | | | | Unit Team: | D |

| Inmate Name: | MOHAMED, KHALFAN KHAMIS | Sex: | M | Facility: | FLM |
|---|---|---|---|---|---|
| Date of Birth: | 07/25/1973 | Provider: | Mach, J. PhD, Resolve | | |
| Date: | 05/13/2022 08:50 | | | | |

Inmate MOHAMED was previously diagnosed with Other Depressive Episodes. This diagnosis appears to remain appropriate. Inmate MOHAMED reported experiencing loss of pleasure, indecisiveness, and changes in sleep pattern and appetite. Several of the symptoms he endorsed on this measure also overlap with PTSD. Need for a further depressive disorder diagnosis will continue to be monitored. It should be noted that mental health diagnoses are a fluid concept and may change in the future based on presenting clinical information.

**Goals**

Inmate MOHAMED had difficulty coming up with goals for treatment. However, he stated, "I want to be able to accomplish something mentally and physically while in prison." He indicated he wanted to become more hopeful about his future. When asked about his personal strengths, he reported he was a good family member to his siblings and mother. He was unable to think of additional strengths despite this writer listing many options. He reported he was unsure of how he could describe himself as a whole person and stated, "I'm just in prison." Again, he struggled to come up with additional ideas although he was prompted. When he participated in the Traumatic Stress & Resilience workshop he reported he learned some skills he could use to try to manage distress (i.e., deep breathing). His current belief is that he will know treatment has been effective for him if his mood and concentration improve and he experiences fewer nightmares.

**Comments**

Inmate MOHAMED is considered QUALIFIED for the Resolve Program, as he has met all criteria for entry. He has: 1) Successfully completed the "Traumatic Stress & Resilience Workshop;" (2) "Requested to participate in the Resolve Program;" (3) Reports a history of trauma; (4) Expresses motivation to improve coping skills and address identified trauma(s); (5) Completed the Psychosocial History Interview; (6) Completed testing, which indicates a current DSM-V diagnosis related to past trauma; and, (7) he is in agreement with the goals and expectations of the Resolve Program.

PLAN: He will be given an "RP1 Wait" code in Sentry. Inmate MOHAMED is a Care2-Mh. He will continue to be seen by his primary care psychologist until he can be placed in the next available group. He agreed to seek out assistance from Psychology Services as needed while awaiting Resolve.

Completed by Mach, J. PhD, Resolve Coordinator on 05/17/2022 08:57

Generated 05/17/2022 08:57 by Mach, J. PhD, Resolve

**SENSITIVE BUT UNCLASSIFIED**

8/2024
Don't
...

## Bureau of Prisons
## Psychology Services
## Resolve - Treatment Summary

Reg #:    44623-054
Unit Team:  J/A

| | | | |
|---|---|---|---|
| Inmate Name: | MOHAMED, KHALFAN KHAMIS | Sex: | M    Facility: FLM |
| Date of Birth: | 07/25/1973 | Provider: | Mach, J. PhD, Resolve |
| Date: | 08/14/2023 09:43 | | |

### Identifying Information and Diagnosis

Inmate MOHAMED is a 50-year-old male. He is currently serving a LIFE sentence for MRD/ATMPT MRD;USE/ATMPT WPNS OF MASS DEST;BOMB US EMB;DAM/DEST US PROP;CAR EXPL;CAR DNG DEVICE.

### Psychosocial History

Inmate MOHAMED was raised on the island of Pemba in Tanzania and reports being raised primarily by his mother and older siblings. He reported his father passed away in 1980 from a long-term illness. He was raised in the home with ten siblings. He reported his family was quite poor but reported his family was quite poor but reported his family was quite poor but "made it work." Inmate MOHAMED reports he currently has close relationships with his family members; however, he reported his mother was diagnosed with dementia and her condition has impacted their relationship. He indicates experiencing the following adverse experience as a child: extreme poverty. He denied any other issues including verbal abuse, physical abuse, sexual abuse, neglect, or having caregivers with substance abuse or mental health issues. Inmate MOHAMED denied having a spouse or significant other. He further denied having any children.

In regard to educational background, inmate MOHAMED reports he withdrew from school when he was approximately 17 years old. He stated prior to withdrawing, his grades were normal and his attendance was good. He recalls he was not diagnosed with a learning disorder and did not require specialized assistance during his school years. He reported his behavior in school was exemplary and that he did not have a history of suspension.

Inmate MOHAMED received seven months of military training in 1994 in Afghanistan and reportedly stayed in the camp for approximately seven months. He reported he was gainfully employed for most of his adult life. Inmate MOHAMED was employed in the kitchen at Burger World in Cape Town, South Africa in 1998. He was employed at the restaurant until his arrest in October 1999. Between 1996 and September 1998, he traveled amongst family members and religious "camps" (military missions). He was also employed at his brother's store in Dar es Salaam, Tanzania.

### Course of Treatment

During his Resolve clinical interview, Mr. MOHAMED indicated that his treatment goals to work on prior to re-entry included accomplishing something mentally and physically while in prison and reducing his experience of nightmares related to trauma.

Mr. MOHAMED completed the Traumatic Stress and Resilience psychoeducational workshop on December 3, 2020. He completed Phase I: Seeking Safety/Strength of the Resolve Program on January 18, 2023. He completed Phase II: DBT on May 10, 2023. He completed Phase II: CPT on August 9, 2023.

In Phase I, Mr. MOHAMED developed an understanding of the connection between trauma and substance abuse. Through developing this understanding, he had the opportunity to learn healthier coping strategies to manage trauma symptoms and triggers. Additionally, Mr. MOHAMED learned about grounding strategies (i.e., mental, physical, and soothing grounding), and changing his thinking. He learned about healthy boundaries in relationships, explored healthy and unhealthy relationship beliefs, and also explored his anger and the connection between anger and recovery.

At the time of his first progress review, Mr. MOHAMED was participating in Phase I. It was noted that he attended scheduled group sessions but minimally participated in group. At the time of his last progress review for Phase I, it was noted he regularly completed weekly commitments and participated when promoted. He reported having some difficulty applying coping skills and believed the program was more relevant for individuals releasing from prison in the near future. Despite this, he continued to attend programming.

In Phase II: DBT, Mr. MOHAMED learned about mindfulness skills, distress tolerance skills, emotion regulation skills, and interpersonal effectiveness skills. He was also provided opportunities to practice some of the skills in group session.

While participating in Phase II: DBT, it was noted that Mr. MOHAMED increased his overall participation in group. He

Page 1 of

| | | | | Reg #: | 44623-054 |
| --- | --- | --- | --- | --- | --- |
| | | | | Unit Team: | J/A |

| Inmate Name: | MOHAMED, KHALFAN KHAMIS | Sex: | M | Facility: | FLM |
| Date of Birth: | 07/25/1973 | Provider: | Mach, J. PhD, Resolve | | |
| Date: | 08/14/2023 09:43 | | | | |

appeared interested in the topics of mindfulness and distress tolerance. At the end of DBT, it was noted he had demonstrated improvements in distress tolerance and regulating emotions.

In Phase II: CPT, Mr. MOHAMED received education about PTSD and the nature of symptoms and explored the impact of traumatic events on daily life. Mr. MOHAMED learned about connections between his trauma-related thoughts, feelings, and behaviors. He was encouraged to remember the traumatic event and experience the emotions associated with it. He also increased his ability to challenge maladaptive thoughts about his trauma history. Furthermore, he increased his understanding of unhelpful thinking patterns and learned new, healthier ways of thinking.

While participating in Phase II: CPT, it was noted in Mr. MOHAMED's progress reviews that he arrived for all scheduled group sessions and consistently completed his practice assignments. It should be noted he made significant progress in CPT. He was able to identify stuck points about himself, others, and the world. He has made significant improvements in examining the connection between his trauma-related thoughts, feeling, and behaviors, and was able to challenge these thoughts. He has been able to understand how his history of trauma impacted his sense of safety, trust, power/control, self-esteem and intimacy. His overall beliefs have become less extreme. Much of his reported trauma occurred during his incarceration; as such, many of his extreme beliefs were related to his perceptions of staff members. He has made improvements in this area and is able to see that on most days, he has a reasonable level of safety and can reasonably trust others.

## Current Functioning

Mr. MOHAMED presented with a significant reduction in trauma-related symptoms, specifically related to beliefs about safety, trust, and power and control. He engaged in less avoidance related to his trauma and demonstrated improvement in his ability to challenge maladaptive beliefs. He also improved his participation, specifically increasing appropriate self-disclosure, and engagement in the treatment process.

## Strengths and Weaknesses

Mr. MOHAMED demonstrated skills in interpersonal effectiveness and commitment to the program as evidenced by reliable attendance, participation, and completion of CPT practice assignments. He was very forthcoming on CPT practice assignments and regularly shared in group. Mr. MOHAMED also demonstrated increased openness to feedback from the Resolve Coordinator. He will benefit from continuing to examine how his trauma has impacted his ability to trust others.

## Recommendations

Mr. MOHAMED would benefit from continuing to challenge his stuck points through Challenging Beliefs Worksheets and reading through completed Challenging Beliefs Worksheets, so his new alternative thoughts become more comfortable and automatic. Since his beliefs about safety and trust are so engrained, it will take time and practice to maintain new beliefs.

## Prognosis

Mr. MOHAMED presents with a significant reduction in trauma-related symptoms and appears to have addressed his avoidance. As previously noted, it will be important for him to continue addressing his stuck points and reviewing his completed Challenging Beliefs Worksheets to maintain cognitive changes. If he is able to maintain cognitive change, this will likely improve his relationships with others.

Completed by Mach, J. PhD, Resolve Coordinator on 08/15/2023 08:58

# Certificate of Completion

Presented to:

## Khalfan Mohamed

For Completion of the Resolve/Trauma Program's

### SEEKING STRENGTH

FCC Florence
January 18, 2022

Dr. Mach
Resolve Program Coordinator

44



# Certificate of Completion

Presented to:

## Kalfan Mohamed

For Completion of the Resolve/Trauma Program's

## Dialectical Behavior Therapy

FCC Florence
May 10, 2023

Dr. Mach

Resolve Program Coordinator

45



# Certificate of Completion

Presented to:

## Khalfan Mohamed

For Completion of the Resolve/Trauma Program's

## Cognitive Processing Therapy

FCC Florence
August 9, 2023

Dr. Maeb
Resolve Program Coordinator

46



# Certificate of Completion

Presented to:

## Khalfan Mohamed

For Completion of the Resolve/Trauma Program's

## Resolve Program

FCC Florence
August 9, 2023

Dr. Mach
Resolve Program Coordinator



**U.S. Department of Justice**
Federal Bureau of Prisons

Federal Correctional Complex
Florence, Colorado
☐ *Administrative Maximum Security Institution*
☑ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

June 27, 2024

MEMORANDUM FOR:    CONCERENED PARTIES

FROM:    C. HUBER, SENIOR OFFICER SPECIALIST

SUBJECT:    **INMATE MOHAMMED, KHALFAN #44623-054**

INMATE MOHAMMED #44623-054 has informed me that he is applying for a compassionate release with the courts and has asked that I write a character letter for him. I have no interest in whether a release is granted or not. I have supervised Inmate Mohammed for many years, and he has always been a respectful inmate in my presence. I have never seen him become angry in any way. As far as inmates go, Inmate Mohammed has always been a model inmate when I have supervised him and I have nothing bad to say about him.

48

POSITIVE DECISION REPORT     FEDERAL BUREAU OF PRISONS

U.S. DEPARTMENT OF JUSTICE

Justification Report

| 1. Institution: FCI Fort Dix, NJ | 3. Register Number 44623-054 | 4. Date of Incident 06/11/2024 | 5. Time 12 noon |
|---|---|---|---|
| 2. Inmate's Name Khalfan K. Mohamed | | 8. Unit | |
| 6. Place of Incident FCI FT. Dix | 7. Assignment | | |

| 9. Positive Behavior Demonstrated in Institution Related to ISDS: | |
|---|---|
| Daily Living Skills | Cognitive Skills |
| Mental Health Skills | Vocational/Career Skills |
| Wellness Skills | Leisure Time Skills |
| Interpersonal Skills | Character Skills |
| Academic Skills | |

**10. Justification (Description of Positive Behavior)**

Mr. Khalfan K. Mohamed demonstrates a sincere commitment towards preparing himself for re-entry. He has earned points, which transferred him to a step-down unit in the USP at FCC Florence, CO. He is a devoted practioner of his faith, which has contributed positively to his overall mental and spiritual wellness. He has also stayed incident-free, applying himself to educational programming, such as the "Challenge Program" as well as religious courses in Arabic and Islamic Studies that I taught him at the ADX. I know Mr. Mohamed to be a quiet, intelligent and respectful person, trusting, that this recommendation on his behalf is useful in his application for compassionate release and helpful in re-uniting with his family.

| 11. Printed Name/Signature of Reporting Employee FIAZUDDIN SHUAYB | 12. Date 06/11/2024 |
|---|---|
| 13. Approved by (Signature and title) _[signature]_ Chaplain | 14. Date 06/11/2024 |

## Demonstrated Reentry Skills

This certificate is awarded in recognition of demonstrating notable reentry skills at the Federal Correctional Institution, Fort Dix, New Jersey.

49



**U.S. Department of Justice**
Federal Bureau of Prisons

Federal Correctional Complex
☑ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

*Florence, CO 81226*

July 9, 2024

MEMORANDUM TO: WHOM IT MAY CONCERN

DAVID LAZARIUK  Digitally signed by DAVID LAZARIUK
Date: 2024.07.09 10:04:57 -06'00'

D. Lazariuk, Control Unit Manager

FROM:

SUBJECT:    Inmate Mohamed, Khalfan Khamis
Register No.: 44623-054

The above referenced individual has been incarcerated at ADX
Florence since November 19, 2001.  Inmate Mohamed has maintained
clear conduct since August 23, 2018.  Inmate Mohamed has
completed multiple courses to include Anger Management, K2
Awareness, Resolve, and 42 education courses.  Inmate Mohamed
continues to follow recommendations of the Unit Team and has a
good rapport with staff.  He progressed to the ADX Step-Down
Unit.  Inmate Mohamed has since completed the ADX Program and
has been recommended for transfer to an appropriate institution
commensurate with his security level.

51

TRULINCS 41119086 - SHABAZZ, SABIR - Unit: FLP-B-A

---------------------------------------------------------------------------

FROM: 41119086
TO:
SUBJECT: Letter of Support
DATE: 05/27/2024 12:20:57 PM

To whom it may concern:
My name is Sabir Shabazz. I am here with Khalfan Mohamed at Florence Penitentiary.
Prior to this I was at Florence ADX with Mr. Khalfan.

I am familiar with prison litigation because of the many times I've had to seek
vindication of my own rights. Mr. Khalfan is the most earnest person I know when it
comes to protecting the rights of incarcerated people, including his own.

But unlike some who may view accountability from a onesided perspective, Mr. Khalfan
holds himself to the same standard. He is a quiet, thoughtful, and peaceful man. His
selfrespect is reflected in the kindness he extends to his neighbors. What I appreciate
about Mr. Khalfan most is that our conversations are always positive and whenever he
speaks, his words are meaningful.

Mr. Khalfan understands that God has given us two ears and one tongue, and I am
grateful to him for providing me a safe space to share my personal struggles with prison
life and family matters.

I served 11 years in solitary confinement, and it took everything in me not to succumb to
the negativity of the prison environment. The fact that Mr. Khalfan has a Life sentence, has
served 24 years in solitary and has been beaten by ADX staff on different occasions , but he
still remains so hopeful-- participating in rehabilitative programs and being a positive
presence in the incarcerated community-- I believe Mr. Khalfan should be granted
compassionate release.

Thank You,

Sabir Shabazz
Reg. No. 41119086
U.S. Penitentiary Florence
PO Box 7000
Florence, CO 81226

52

May 25, 2024

Re: Letter of Support

Dear Court:

I Marco D. Duncan write this letter of support on behalf of Khalfan Kh. Mohamed, (herein after Mr. Mohamed). I met Mr. Mohamed several years ago while housed at the Florence ADX. During that time I witnessed Mr. Mohamed being subjected to blasphemous disrespect from racist and religiously bias inmates. He further endured routine mistreatment from BOP staff whom were indifferent to his religion and customs. Through it all Mr. Mohamed kept himself composed, and remained respectful towards those who refused to respect him. Because Mr. Mohamed is soft spoken and not physically imposing, I believe it was a huge contributor to the treatment he has endured.

Mr. Mohamed and I do not share the same religion, however, our shared environment allowed us to learn more about each other as men. It was his lack of bitterness, that moved me to want to know him better. Although Mr. Mohamed grew up in poverty and received poor schooling, he is steadfastly committed to learning and bettering himself. Mr. Mohamed has patiently helped me with learning his native language (Swahili). In return, I have helped him to expand his legal aptitude.

Page 1 of 2
53

Mr. Mohamed is determined not to let his environment or circumstances compromise his humanity, and he is easily one of the most polite and courteous men I have ever met in or out of prison. He keeps to himself and always moves with purpose, yet he's always available to others who are purpose driven. His conversation and outlook on life is always positive. (emphasis added). He does not engage in gossip, nor does he entertain nonsense, unproductive conversation, or unproductive people. Yet, Mr. Mohamed is always 100% intellectually available for most things positive.

Admittedly, I do not know the specifics of Mr. Mohamed's crime. I only know what he has shown me consistently, and that is a positive man of impeccable character. Based on what I have personally observed, there is absolutely nothing negative I can say about Mr. Mohamed. I hope that he is returned back to his country and ultimately home to his family. Thank you for consideration of my support letter.

Sincerely,

MARCO D. DUNCAN
# 37679-048
USP Florence
P.O. Box 7500
Florence, CO. 81226

(1)

TO: the Judge

From: Waad R. Alwan, Reg.# 13523-033

RE: Letter of Support for K.K. Mohamed #44623-054

Dear Judge:

I writes this letter in support to Khalfan Kh. Mohamed request for Compassionate Release or Reduction of Sentence to this court.

I have known Mohamed for over 4-years now. In that period of time, I've been housed with him in different units - first at ADx-Florence and now here, U.S.P. Florence. For the past a year and half or so, I've been interacting with Mohamed even more often. In doing so, I've been able to experience, and observe him from the first-hand level what I describes here about Mohamed, therefore, is his character as I've known him since I've met him 4-years ago, and certainly, as he is now.

TO my personal experience in prison (I've been incarcerated since 2011), Mohamed represents a rare character in prison. That is even truer considering Mohamed's rough experience within the prison walls. I've learned early on, even before meeting with him, that he was wrongly beaten and badly unjured several times in prison. Because of those repeated mistreatment, Mohamed has been suffering from different serious physical and mental injuries. Mohamed told me personally, as his younger brother-in-faith that as a result of

55

(2)

the abuses he received from BOP staff, he has been forced to live with excruciating pain on several parts of his body. He also told me that he developed extreme sense of fear and distrust towards the officers and the staff. In addition, I've learned from Mohamed's cell mate that Mohamed has many other problems that he feel uncomfortable to talk to people about. For example when he sleeps he see bad dreams that showing him like the officers beating him again. He's also, most of times feels upset and don't like to speak to people. He forgets alot of things. And because he's afraid from officers, he's alot of times decide to remain in the cell.

I believe Mohamed's life is much harder in prison more than any one's else I've known in my past 13-years in prison.

But even with all that hard life, Mohamed try and I think successfully so. to maintain his examplary character. After multipple assaults against him by the staff, Mohamed is always respectfully with the staff. I've never seen or hard Mohamed raising his voice to any officer. He also keeps the same level of respect with other inmates.

Mohamed also likes to help other people in many different ways. For example, Mohamed often helping me to writes my requests

56

(3)

to staff like medical and Unit Team staff.
He also helping me to write my administra-
tive remedy. Sometimes I also ask Mohamed
to explain to me staff responses to me
and other papers. That is because my English
is not good. I also saw Mohamed helping
other prisoners to file their remedies and
right their legal papers. Mohamed do all that
without asking or taking any payment. Most
prisoners only helping other inmates if they get pay-
ment.

Mohamed also take lot of programs. He always
encourage me to do that. He recently encouraged
me and my celly to request to perticipate in
"CHALLENGE" program under the FIRST STEP ACT
(CFSA) that Mohamed himself he already signed up
for. I know that back in ADX-Florence, Mohamed
did the entire "RESOLVE" program, also under the
FSA. I don't know any one who completed RESOLVE
program almost one year long) beside Mohamed.

Mohamed also like his family and relatives. He
always maintain close contact and relationship. He
also encourages me to do the same.

In my 4-years of knowing Mohamed I've never
seen or heard him supporting violent acts nor
saying any thing to that regard. I haven't even heard
Mohamed raising his voice to any one.

According to my own personal experience with Moha

57

(4)
the person I see in him is examplary inmate
to which I've never come accross with in my past
13+ years in prison.
  I know that Mohamed wants sincerely to go
back to his family in Tanzania and live with his
family peacefully. I respectfully asks the court
to give Mohamed second chance after he
already stayed in prison for 25-years.

June 1, 2024

Waad R Alwan # 135 23033
U.S.P. Florence, Box 7000
Florence, CO 81226.

A-58

Letter of Support for Khalfan Mohamed

My name is Donald Morgan, and I have known Khalfan
Mohamed in the ADX Florence almost 2 years.
Offering a character reference or letter of support is not
something that I take lightly nor done often.
However, when Khalfan approached me for such a
letter I didn't hesitate to do so. Therefore, may this
court accept this letter as a testament and sincere
statement regarding Khalfan Mohamed, his character
and an appeal to grant him compassionate relief.
   My ability to speak with confidence and certainty about
Khalfan is rooted our close and personal interactions
since arriving at the "step down" program of ADX.
From the moment I met him until now, he has shown
consistency in his behaviour and character. I can
state he is a genuinely humble, kind, generous
and caring man. We both are devout, practicing
Muslims, and his sincerity in faith is unmatched.
Not only does he hold himself to the best standards of
morals ! ethics, but he encourages others to do so
as well. During our first 8-9 months together, we
were housed in solitary cells. However, as we both
progressed in the program to transition from ADX
to a general population setting, we are required to
have a cellmate. Khalfan and I have lived side by
side approaching 4 months now. At times, we are
in the cell together 24 hours, 21 hours, which makes

1 of 4 59

hiding our true character, nature and faults impossible.
Therefore, Khalfan has spent 25 years in solitary
confinement and I have spent almost 8 1/2 years
isolated also. Being cellmates we both have the best
position to observe and measure each other.
Khalfan has only proven to be more true to the
character I had observe before. I only grew
in my love, respect and understanding of Khalfan.
On one hand, I was able to see his genuine love for
his family back in Zanzibar whom he maintains
regular contact with now through access to phone
calls and emails. I witnessed a man who cares
deeply for his ailing mother siblings, cousins etc,
and I enjoyed his care and concern for me and
Son, who is the only family that have. Khalfan
demonstrate sincere empathy towards me and
other, ready to offer a shoulder to lean on or
a kind word.
On the other hand, I got an up close, personal insight
into the suffering that now has become a part
of his life. Since his arrest and incarceration over
25 years ago, he has experienced countless bias,
harassment and verbal abuses from staff. More
importantly, he has been the victim of vicious
assaults and beatings by staff as recent as
a beating in 2018 by ADX officers which left him
with severe physical injuries including a broken

~~26 of 4~~ 60

ankle. However, over time physical injuries can heal completely or almost completely, but psychological traumas typically last the rest of a victims life. Khalfan is no exception, and I have observed his struggle with nightmares, insomnia, PTSD, fear of being attacked or killed by staff. I am there with him as he is waken by fear and nightmares in the middle of the night. I, certainly I hope this court agrees, do not believe his sentence was to include beatings, injuries, psychological trauma or a life of fear. Khalfan has suffered fractured facial bones, broken nose, broken ankle, and many of these incidents occurred while he, a 5'6" 135 lb man, was in restraints. Needless to say, he struggles now with acute PTSD and trauma which I witness first hand as his cell mate. It was due to his trauma and assaults that he was enrolled into the FSA program called RESOLVE. A nine month psychology group that attempts to heal wounds of trauma etc. Despite his successful completion the effects of trauma and abuse even with medication may exist for the rest of his life. So Khalfan's reality is no safe space exists for him, but in spite of all the aforementioned Khalfan keeps his head up, being as positive as possible, never unleashing an angry word only seeking justice. He always has kind words and offers sincere guidance to others. Many of us would find it a

struggle to follow those manners in the face of the same adversities and injustices.

Currently, Khalfan was accepted to another FSA program, CHALLENGE, and he is awaiting transfer to a reduced security institution to begin the CHALLENGE program despite not being "qualified" to benefit from most of the incentives other inmates will enjoy. Khalfan simply is on a mission of healing and self-improvement.

Perhaps his abuse, his rehabilitation efforts, his trauma etc alone is not reason for relief, but when his experiences and sufferings are taken in totality then relief is warranted. I believe he deserves compassionate release and reduction in sentence. I can only pray this Court agrees and weighs him in light of who he is today, his extraordinary and compelling reasons and not for his past.

I thank this Court for its time and consideration.

Sincerely,                            Date: 28 May 24

Donald Morgan 80886053
USP Florence ADX
Po Box 7000
Florence, Co 81226

4 of 4 62

The Court:

From Mohamed R. Alowhali, Reg. #42371-054

Re: Letter of Support for Khalfan Mohamed ("Mohamad")

Dear Judge,

    I am a codefendant of Mohamed and I respectfully writing this letter of support in reference to his request for compassionate release before this court.

## My Long Familiarity With Mohamed

    I first knew and been incarcerated with Mohamed in 1999. Following our conviction and sentence, we were then transferred to Florence ADX in 2001. We continued to be housed in the same unit and had continuing interactions until 2014. At that time I was moved to another unit and eventually to another prison while Mohamed remained at the ADX. So I was with Mohamed all years from 1999 to 2014. And for about 6 months of those years we were cellmates.

    After almost eight years of seperation, I met Mohamed again at Florence ADX in one of GP's units D-unit. However, in about December of that year, were once more briefly seperated and moved to different units. Finally, in May or June 2023, I met Mohamed again in the Step Down unit within the ADX where we were both in transition to be transferred out to a lesser restrictive BOP prison. As I write this letter, we're still waiting for our transfer from here, Florence Penitentiary.

## Mohamed as a Muslim, Prisoner and Member of His Family

    Mohamed and I were charged and convicted of serious

63

crimes. However, Mohamed's character isn't merely defined by his convictions. Mohamed, as I've saw and experienced him for many years, is a person defined by the care and love he gives to his family and the respect he shows fellow prisoners and staff.

Within all my years with Mohamed he deeply expressed care and love for his family. He always stayed in close relationship, as the circumstances allowed him, not only with his elderly ailing mother, but all of his many siblings, in laws and their many children (his nephews and nieces). Due to his unlimited love and care for his family, Mohamed spent several years in litigation to be provided meaningful communication with his family. SEE Mohamed v Holder, No. 07-cv-02697

Though Mohamed is indigent with very limited financial means, he preferred to go hungry from lack of enough food and instead spend the little money he occasionally received to call and write his family. Up until 2020, BOP prisoners had to pay for all social phone calls. A 15 minute call used to cost Mohamed and I about $15 per call.

In his correspondence with family, especially his siblings and their children, Mohamed trys to ensure the children are properly taken care of with the best nurturing, discipline and education his family can afford. He wants them to be the most productive members of their society.

It's my understanding that Mohamed calls every one from his family that the BOP allows. He has 30 approved numbers. Except two numbers for his attorneys, the rest are all his family and relatives. On several occasions I've heard Mohamed ask for authorization of additional numbers. There are still some relatives he can't call because of the BOP's 30 phone number limitation.

On the other hand, Mohamed shows respect to staff and

64

he cares about his fellow inmates, muslim or non-muslim.
He has never got into a verbal or physical fight with
any inmate. Rather, he spends substantial amounts of
time helping inmates who need his help. I have saw
Mohamed teach other prisoners how to properly read
the Quran, help draft their administrative remedies and
other requests, and even help them with court papers.
Unlike most prisoners, I've saw him do all that without
asking or expecting any payment in return.

   Finally, Mohamed is respectful with officers and staff.
He neither uses any bad language nor is he disobedient
with staff. To my knowledge, Mohamed has only been
disciplined a few times in almost 25 years. It's my
understanding that almost all of those incident reports
were fabricated to justify previously committed assaults
on Mohamed by staff.


## How Mohamed Spent His Time

   Mohamed tried his best to benefit from his time in prison.
Especially after our arrival to the ADX in 2001. Being a
primarily Swahili-speaking muslim, he learned the Arabic
language and various Islamic sciences from myself and others
to properly understand his religion. He also made great
advancements in his English. He taught himself different
subjects concerning the contemporary world. Later, when
it became necessary for him to start filing law suits he
learned some areas of civil law and how prison regulations
work or should work.

   After acquiring a reasonable knowledge in Arabic language
and relevant subjects, Mohamed began to translate the Holy
Quran into his own native tongue, Swahili. Before we were
seperated in 2014, Mohamed had been working on his translation
for a number of years. I can remember that when it was
necessary, back in ADX's H-Unit, he would ask other muslims
and I for clarification in certain areas.

                    3-65

In addition to working on his quranic translation, Mohamed worked on other projects too. After the Quran, his most significant project was his daily journals. He kept daily journals from the time he got to the ADX in 2001. Over the years, I saw him write and he would show me his collection. When I left him in 2014, he already had a lot of journals. His most valuable possessions in prison were those two projects, and he intended to someday have his family get them published. Also, Mohamed would often purchase books from other people and check out books from the prison library. He would then take important notes that he wanted to use in ongoing and future projects. He valued these projects so dearly.

Even though we were housed in the most restrictive conditions of confinement - Special Administrative Measures ("SAM" restrictions) - Mohamed tried hard to benefit from his time in prison. He was hopeful and optimistic and that was something I rarely saw in the ADX. I believe Mohamed used his time appropriately and it allowed him to develop a positive attitude despite having a life sentence and living under SAM restrictions. Mohamed still worked hard for himself, his family, and the betterment of his community.

## The Current Mohamed As I See Him

When I met Mohamed again in 2022, I immediately knew he was no longer the same person I left in 2014. Outside at recreation he was no longer t as hopeful, optimistic and positive as I remembered. He would hardly speak to me or anyone else. He was physically with us but his thoughts and concentration appeared to be completely absent. He didn't smile much and almost never laughed. I spoke to him three or four times at the rec yard and then he wouldn't come out anymore unless I begged him.

Because I had known Mohamed for such a long time, I knew something was seriously wrong with him, so I decided to ask him about it. He hesitated to respond, then with a

66

clear sense of shame and humiliation, expressed that ADX staff had physically assaulted and seriously injured him in 2018 and 2022. He told me that after the 2018 assault he fell into a deep depression and other emotional issues. He said he'd made sincere efforts to recover but there was just no way to get better.

Among many things I've learned from Mohamed is that though he shows the utmost courtesy to prison staff here, he now has a continuing fear and mistrust of them. He said the reason he didn't come out the cell more often is both his depression which makes it very difficult for him to do meaningful group activities or socialize, and his fear of being assaulted again.

When I asked Mohamed about his projects, my question brought tears to his eyes. He told me the projects I was aware of and the one he began after I left him¹ were all confiscated and destroyed at the times he was attacked by staff. He would later reveal to me that after he lost everything in 2018, he thought about ending his life. He shared with me that along with suffering physical and mental injuries he had lost his lifework of 20 years and felt there was no way to recovery.

That is Mohamed today. Though he works as hard as he can, participating in long psychology courses in hopes of finding relief from his trauma, he still suffers. We are presently in B/A Unit over at Florence Penitentiary. The Unit houses about 40 inmates. Mohamed spends most of his time in the cell. If he is not talking on the phone to his family, using the law library computer or taking a shower, he isolates himself in the cell because he feels he's secure from the officers there.

For years Mohamed has been taking several pain and antidepressant medications. I can see that he is not alright. I believe he is now discouraged, vulnerable, full of shame and somewhat pessimistic. He tells me that recurring nightmares and distress about the staff assault hinder him

67

from recovery. He is constantly triggered by the appearance of officers, the noises of keys and seeing the shape of handcuffs.

Mohamed has made me aware of his intent to request this court grant him Compassionate Release. I don't believe 25 years ago this court sentenced Mohamed to be repeatedly assaulted and subjected to torture. I respectfully ask that Mohamed be provided relief from the punishments described above, in the form of compassionate release.

Mohamed R. Alowhali,
U.S. Penitentiary Florence
PO Box 7000
Florence, CO 81226

June 4, 2024

s/ Al 'Owhali Mohamed

68

From: Jon Michael
Freedom Ministry (Pen pal ministry)
Westgate Chapel
22901 Edmonds Way
Edmonds, WA 98020

Re: Khalfan K Mohamed
#44623-054
USP Florence AMAX
P.O. BOX 8500
Florence Colorado, 81226-8500

July 19, 2024

To Whom it may concern:

This is a letter of support for Khalfan K. Mohamed. It is written from my perspective after corresponding with Khalfan since April 2021. We have exchanged thirty-two letters over this thirty-nine month period. Our backgrounds and life experiences are extremely different. Khalfan comes from Zanzibar a third world country in East Africa. I've lived in Seattle WA for forty + years. For 25 years I was active in jail ministry at the King County Correction Center, twelve of those years I was privileged to serve as a volunteer lead chaplain. Khalfan has seen incarceration from the inside for over half of his life. I've been blessed to have a formalized education with several degrees and certifications. Khalfan has not been granted these opportunities, and yet I have found him to be an intelligent and avid learner seeking always to better himself. He is diligent, hand writing letters up to 14 pages. Every question asked of him gets a full answer. He is an observer and thinker. He is multi-lingual which I am not. I consider him a person of noble character who strives to do what he has been taught is right. We differ significantly in our spiritual practices as he is Muslim and I am a follower of Jesus. We have shared our faiths over the years and find many beliefs in common: God is the Great Creator, God wants us to know his will and speaks to all people through prophets revealing right and wrong, God calls us to be obedient, to show charity, to fellowship with other followers and be loyal and caring toward family. Khalfan deeply desires to return home and take care of his ageing mother. Khalfan has never pressed me to provide him with anything other than honesty in communicating. We have had differences in opinions and perspectives regarding politics, and yet we communicate respectfully and learn from each other. I pray for Khalfan and he prays for me. Khalfan is resilient, intelligent and moral from my vantage point.

I hope you can consider his request.

Jon Michael

69

## FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:44623-054, Last Name:MOHAMED

**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 44623-054 | Risk Level Inmate....: R-LW |
| Inmate Name |   General Level......: R-LW (9) |
|   Last.........: MOHAMED |   Violent Level......: R-LW (21) |
|   First........: KHALFAN | Security Level Inmate: HIGH |
|   Middle.......: KHAMIS | Security Level Facl..: HIGH |
|   Suffix.......: | Responsible Facility.: FLM |
| Gender.........: MALE | Start Incarceration..: 10/18/2001 |

### PATTERN Worksheet Summary

| Item | – Value | – General Score | – Violent Score |
|---|---|---|---|
| Current Age | 49 | 14 | 8 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | TRUE | 5 | 7 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 5 | 5 | 10 |
| Education Score | NotEnrolled | 0 | 0 |
| Drug Program Status | NoNeed | –6 | –3 |
| All Incident Reports (120 Months) | 2 | 2 | 2 |
| Serious Incident Reports (120 Months) | 1 | 1 | 1 |
| Time Since Last Incident Report | 58 | 0 | 0 |
| Time Since Last Serious Incident Report | 59 | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 38 | –12 | –4 |
| Work Programs | 0 | 0 | 0 |
| | Total | 9 | 21 |

### PATTERN Worksheet Details

Item: Programs Completed, Value: 38
General Score: -12, Violent Score: -4
Risk Item Data

| Category – Assignment | – Start | – Stop |
|---|---|---|
| EDC    PARENT 2 | 03/13/2006 00:01 | 03/13/2006 00:01 |
| EDC    AMERICA RV | 03/16/2006 00:01 | 03/16/2006 00:01 |
| EDC    COSMOS | 05/17/2006 00:01 | 05/17/2006 00:01 |
| EDC    NATURL LAW | 11/23/2006 00:01 | 11/23/2006 00:01 |
| EDC    TWO WARS | 01/24/2007 00:01 | 01/24/2007 00:01 |
| EDC    PHYS LIF 1 | 02/15/2007 00:01 | 02/15/2007 00:01 |
| EDC    AM EXP 2 | 04/04/2007 00:01 | 04/04/2007 00:01 |
| EDC    PHYS LIF 2 | 04/19/2007 00:01 | 04/19/2007 00:01 |
| EDC    HIST IMP | 06/21/2007 00:01 | 06/21/2007 00:01 |
| EDC    FAM GREEKS | 09/13/2007 00:01 | 09/13/2007 00:01 |

70

FSA Recidivism Risk Assessment (PATTERN 01.03.00)
Register Number:44623-054, Last Name:MOHAMED

FEDERAL BUREAU OF PRISONS

U.S. DEPARTMENT OF JUSTICE

| | | | |
|---|---|---|---|
| | | 11/14/2007 00:01 | 11/14/2007 00:01 |
| EDC | BIOGRAPHY | 11/14/2007 00:01 | 11/14/2007 00:01 |
| EDC | FAM ROMANS | 12/06/2007 00:01 | 12/06/2007 00:01 |
| EDC | TEN DAYS | 02/20/2008 00:01 | 02/20/2008 00:01 |
| EDC | VIKINGS 1 | 02/28/2008 00:01 | 02/28/2008 00:01 |
| EDC | AM EXP 3 | 04/30/2008 00:01 | 04/30/2008 00:01 |
| EDC | VIKINGS 2 | 05/01/2008 00:01 | 05/01/2008 00:01 |
| EDC | 1812 & HIT | 07/23/2008 00:01 | 07/23/2008 00:01 |
| EDC | EUR ART 1 | 09/25/2008 00:01 | 09/25/2008 00:01 |
| EDC | AM EXP 4 | 10/01/2008 00:01 | 10/01/2008 00:01 |
| EDC | ARCH WOND | 12/24/2008 00:01 | 12/24/2008 00:01 |
| EDC | HIST WW II | 02/18/2009 00:01 | 02/18/2009 00:01 |
| EDC | NOVA | 04/29/2009 00:01 | 04/29/2009 00:01 |
| EDC | BIOL BEHV | 06/04/2009 00:01 | 06/04/2009 00:01 |
| EDC | ENG EMPIRE | 07/22/2009 00:01 | 07/22/2009 00:01 |
| EDC | HIST SCI 1 | 08/27/2009 00:01 | 08/27/2009 00:01 |
| EDC | BATTLES | 10/14/2009 00:01 | 10/14/2009 00:01 |
| EDC | HIST SCI 2 | 10/29/2009 00:01 | 10/29/2009 00:01 |
| EDC | BITS HIST | 12/09/2009 00:01 | 12/09/2009 00:01 |
| EDC | PELP WAR 1 | 12/31/2009 00:01 | 12/31/2009 00:01 |
| EDC | UNIVERSE 1 | 03/03/2010 00:01 | 03/03/2010 00:01 |
| EDC | PELP WAR 2 | 03/04/2010 00:01 | 03/04/2010 00:01 |
| EDC | BOOK HIST1 | 05/06/2010 00:01 | 05/06/2010 00:01 |
| EDC | AM WAR 1 | 05/26/2010 00:01 | 05/26/2010 00:01 |
| EDC | BOOK HIST2 | 07/08/2010 00:01 | 07/08/2010 00:01 |
| EDC | PASSIONS | 05/25/2020 00:01 | 05/25/2020 00:01 |
| EDC | FORENSIC H | 10/03/2022 00:01 | 10/03/2022 00:01 |
| EDC | GRAMMAR | 01/02/2023 00:01 | 01/02/2023 00:01 |
| EDC | AMER WEST | 04/03/2023 00:01 | 04/03/2023 00:01 |

Item: Work Programs, Value: 0
General Score: 0, Violent Score: 0
Risk Item Data
   No Data

71

Assessment# R-21466

Assessment Date: 07/23/2023

```
FLMHX  606.00 *        MALE CUSTODY CLASSIFICATION FORM      *    01-15-2024
PAGE 001 OF 001                                                   10:37:58

                              (A) IDENTIFYING DATA
REG NO..: 44623-054          FORM DATE: 02-10-2023          ORG: FLM
NAME....: MOHAMED, KHALFAN KHAMIS
                                         MGTV: NONE
                                         MVED:

                          (B) BASE SCORING
                                SEVERITY.......: (7) GREATEST
DETAINER: (0) NONE              CRIM HIST SCORE: (00) 0 POINTS
MOS REL.: 540                   VIOLENCE.......: (5) < 5 YRS MINOR
ESCAPES.: (0) NONE             AGE CATEGORY...: (2) 36 THROUGH 54
VOL SURR: (0) N/A              DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
EDUC LEV: (2) NO VERFD HS/ NO GED
                          (C) CUSTODY SCORING
                                PROG PARTICIPAT: (1) AVERAGE
TIME SERVED.....: (3) 0-25%     TYPE DISCIP RPT: (5) NONE
LIVING SKILLS...: (1) AVERAGE   FAMILY/COMMUN..: (4) GOOD
FREQ DISCIP RPT.: (3) NONE

                  --- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE  SEC TOTAL  SCORED LEV MGMT SEC LEVEL  CUSTODY  CONSIDER
+16  +17    0         +16       HIGH       N/A              MAX      SAME


G0005     TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

72

```
FLMHX              *         INMATE EDUCATION DATA        *   01-15-2024
PAGE 001           *              TRANSCRIPT             *   10:38:14

                                                             FUNC: PRT
REGISTER NO: 44623-054        NAME..: MOHAMED
FORMAT.....: TRANSCRIPT       RSP OF: FLP-FLORENCE HIGH USP
```

------------------------------------ EDUCATION INFORMATION ------------------------------------

| FACL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|------|-----------|-------------|-----------------|----------------|
| FLP | ESL HAS | ENGLISH PROFICIENT | 02-28-2002 0821 | CURRENT |
| FLP | GED SAT | GED PROGRESS SATISFACTORY | 05-13-2022 0001 | CURRENT |
| FLP | GED XN | EXEMPT GED NON-PROMOTABLE | 02-28-2002 0821 | CURRENT |

-------------------------------------- EDUCATION COURSES --------------------------------------

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|----------|-------------|------------|-----------|------|----|----|-----|
| FLP STPD | B/A GED CLASS 12:30 TO 2:30PM | 09-28-2023 | CURRENT | P | C | P | 6 |
| FLP STPD | HISTORY OF THE MID-EAST | 11-06-2023 | 11-20-2023 | P | C | P | 6 |
| FLP STPD | HISTORY OF HALLOWEEN | 10-13-2023 | 10-26-2023 | P | W | I | 564 |
| FLM | GED PROGRAM | 05-10-2021 | 09-27-2023 | P | C | P | 12 |
| FLM | THE AMERICAN WEST ACE CLASS | 04-03-2023 | 07-01-2023 | P | C | P | 12 |
| FLM | ACE - ENGLISH GRAMMAR BOOTCAMP | 01-02-2023 | 04-01-2023 | P | C | P | 12 |
| FLM | FORENSIC HISTORY ACE | 10-03-2022 | 12-31-2022 | P | C | P | 12 |
| FLM | THE PASSIONS :PHILOSOPHY | 05-25-2020 | 08-15-2020 | P | W | V | 15 |
| FLM | 500 NATIONS | 08-18-2010 | 10-12-2010 | P | C | P | 27 |
| FLM | BOOKS THAT MADE HISTORY 2 | 07-08-2010 | 09-08-2010 | P | C | P | 36 |
| FLM | AMERICA AT WAR - PART 1 | 05-26-2010 | 08-17-2010 | P | C | P | 27 |
| FLM | BOOKS THAT MADE HISTORY 1 | 05-06-2010 | 07-07-2010 | P | C | P | 36 |
| FLM | THE UNIVERSE - PART 1 | 03-03-2010 | 05-25-2010 | P | C | P | 27 |
| FLM | PELOPONNESIAN WAR - PART 2 | 03-04-2010 | 05-05-2010 | P | C | P | 27 |
| FLM | PELOPONNESIAN WAR - PART 1 | 12-31-2009 | 03-03-2010 | P | C | P | 36 |
| FLM | BITS OF HISTORY | 12-09-2009 | 03-02-2010 | P | C | P | 27 |
| FLM | HISTORY OF SCIENCE - PART 2 | 10-29-2009 | 12-30-2009 | P | C | P | 24 |
| FLM | BATTLES OF THE ANCIENT WORLD | 10-14-2009 | 12-08-2009 | P | C | P | 27 |
| FLM | HISTORY OF SCIENCE - PART 1 | 08-27-2009 | 10-28-2009 | P | C | P | 36 |
| FLM | ENGINEERING AN EMPIRE | 07-22-2009 | 10-13-2009 | P | C | P | 36 |
| FLM | BIOLOGY & HUMAN BEHAVIOR | 06-04-2009 | 08-26-2009 | P | C | P | 36 |
| FLM | NOVA | 04-29-2009 | 07-21-2009 | P | C | P | 30 |
| FLM | HISTORY OF WORLD WAR II | 02-18-2009 | 04-28-2009 | P | C | P | 24 |
| FLM | ARCHITECTURAL WONDERS | 12-24-2008 | 02-17-2009 | P | C | P | 36 |
| FLM | HISTORY OF EUROPEAN ART PART 1 | 09-25-2008 | 12-17-2008 | P | C | P | 36 |
| FLM | AMERICAN EXPERIENCE PART 4 | 10-01-2008 | 12-23-2008 | P | C | P | 30 |
| FLM | WAR OF 1812 & LIFE OF HITLER | 07-23-2008 | 10-01-2008 | P | C | P | 36 |
| FLM | AMERICAN EXPERIENCE - PART 3 | 04-30-2008 | 07-22-2008 | P | C | P | 27 |
| FLM | THE VIKINGS - PART 2 | 05-01-2008 | 07-02-2008 | P | C | P | 27 |
| FLM | THE VIKINGS - PART 1 | 02-28-2008 | 04-30-2008 | P | C | P | 30 |
| FLM | TEN DAYS THAT CHANGED AMERICA | 02-20-2008 | 04-29-2008 | P | C | P | 36 |
| FLM | FAMOUS ROMANS | 12-06-2007 | 02-27-2008 | P | C | P | 42 |
| FLM | BIOG: EXPLORERS & EARLY AMERIC | 11-14-2007 | 02-19-2008 | P | C | P | 36 |
| FLM | FAMOUS GREEKS | 09-13-2007 | 12-05-2007 | P | C | P | 36 |
| FLM | A HISTORY OF IMPRESSIONISM | 06-21-2007 | 09-12-2007 | P | C | P | 27 |
| FLM | PHYSICS IN YOUR LIFE - PART 2 | 04-19-2007 | 06-20-2007 | P | C | P | 36 |
| FLM | THE AMERICAN EXPERIENCE-PART 2 | 04-04-2007 | 06-26-2007 | P | C | P | 27 |
| FLM | PHYSICS IN YOUR LIFE - PART 1 | 02-15-2007 | 04-18-2007 | P | C | P | 27 |
| FLM | AMER. REVL. + US MEXICAN WAR | 01-24-2007 | 04-03-2007 | P | C | P | 30 |

```
G0002      MORE PAGES TO FOLLOW . . .
```

```
                                      INMATE EDUCATION DATA           *    01-15-2024
                                          TRANSCRIPT                   *    10:38:14
   FLMHX            *
PAGE 002 OF 002   *                                                   FUNC: PRT
                                    NAME..: MOHAMED
REGISTER NO: 44623-054              RSP OF: FLP-FLORENCE HIGH USP
FORMAT.....: TRANSCRIPT
------------------------------ EDUCATION COURSES ----------------------------------
                                      START DATE  STOP DATE  EVNT AC LV  HRS
SUB-FACL   DESCRIPTION
FLM        NATURAL LAW & HUMAN NATURE  11-23-2006 02-14-2007  P   C  P   36
FLM        COSMOS                      05-17-2006 08-08-2006  P   C  P   36
FLM        THE AMERICAS IN REVOLUTION  03-16-2006 06-01-2006  P   C  P   36
FLM        PARENTING 2 PROGRAM         03-13-2006 05-19-2006  P   C  P   16

------------------------------ HIGH TEST SCORES -----------------------------------
                           SCORE    TEST DATE      TEST FACL   FORM      STATE
TEST       SUBTEST
TABE M     BATTERY         7.6      05-06-2021     FLM          10
           LANG MECH       0.0      05-06-2021     FLM          10
           LANGUAGE        7.8      05-06-2021     FLM          10
           MATH APPL       9.0      05-06-2021     FLM          10
           MATH COMP       4.8      05-06-2021     FLM          10
           READING         8.0      05-06-2021     FLM          10
           SPELLING        0.0      05-06-2021     FLM          10
           TOTAL MATH      6.9      05-06-2021     FLM          10
           VOCABULARY      0.0      05-06-2021     FLM
```

G0000          TRANSACTION SUCCESSFULLY COMPLETED

74

```
   FLMHX  531.01 *              INMATE HISTORY              *    01-15-2024
   PAGE 001 OF 001 *              PT OTHER                  *    10:38:51


   REG NO..: 44623-054 NAME....: MOHAMED, KHALFAN KHAMIS
   CATEGORY:           FUNCTION: DIS      FORMAT:
```

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|-----------|-------------|-----------------|----------------|
| FLP | ANGMINCOMP | ANGER MANAGEMENT INCOMPLETE | 09-28-2023 1153 | CURRENT |
| FLP | COG PRC W | NONRESLV COG PRC TRAUMA WAIT | 11-30-2021 0841 | CURRENT |
| FLP | CR TH WAIT | CRIMINAL THINKING WAIT | 11-30-2021 0839 | CURRENT |
| FLP | DIAL BEH W | NON-RESOLVE DIAL BEH TX WAIT | 11-30-2021 0903 | CURRENT |
| FLP | EM SR WAIT | EMOTIONAL SELF-REG CBT WAIT | 11-30-2021 0903 | CURRENT |
| FLP | IL MG WAIT | ILLNESS MGMT AND RECOVERY WAIT | 11-30-2021 0840 | CURRENT |
| FLP | INSOM W | CBT FOR INSOMNIA WAIT | 07-22-2022 1329 | CURRENT |
| FLP | M COG TH W | MIND BASE COGNTV THERPY WAIT | 07-22-2022 1329 | CURRENT |
| FLP | SST WAIT | SST SCHIZOPHRENIA CBT WAIT | 07-22-2022 1330 | CURRENT |
| FLP | WELL REC W | WELLNESS RECOVERY ACT PL WAIT | 07-22-2022 1329 | CURRENT |
| FLP | K2 AWARE C | K2 AWARENESS COMP | 10-26-2023 1253 | 10-26-2023 1253 |
| FLP | K2 AWARE P | K2 AWARENESS PART | 10-10-2023 0941 | 10-26-2023 1253 |
| FLP | ANG M PART | ANGER MANAGEMENT CBT PART | 08-31-2023 1000 | 09-28-2023 1153 |
| FLM | ANG M WAIT | ANGER MANAGEMENT CBT WAIT | 11-30-2021 0839 | 08-31-2023 1000 |

```
   G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

75

```
FLMHX  531.01 *              INMATE HISTORY              *   01-15-2024
                            PSYCH TRMT                 *   10:38:56
PAGE 001 OF 001 *


REG NO..: 44623-054 NAME....: MOHAMED, KHALFAN KHAMIS
                    FUNCTION: DIS      FORMAT:
CATEGORY:
                                       START DATE/TIME STOP  DATE/TIME
FCL   ASSIGNMENT DESCRIPTION
FLP   CHG SCREEN CHALLENGE SCREENING       01-08-2024 0825 CURRENT
FLP   RCPTCOMP   RESOLVE PHASE 2 CPT COMPLETE   08-09-2023 0945 CURRENT
FLP   RDBTCOMP   RESOLVE PHASE 2 DBT COMPLETE   05-10-2023 1036 CURRENT
FLP   RP1 COMP   RESOLVE PHASE ONE COMPLETED    01-18-2023 1214 CURRENT
FLP   RSOL COMP  RESOLVE PROGRAM COMPLETED      08-09-2023 0945 CURRENT
FLP   RSW COMP   RESOLVE WORKSHOP COMPLETED     12-03-2020 0836 CURRENT
FLM   RCPTPART   RESOLVE PHASE 2 CPT PARTICPATE 05-10-2023 1037 08-09-2023 0945
FLM   RDBTPART   RESOLVE PHASE 2 DBT PARTICPATE 01-18-2023 1215 05-10-2023 1036
FLM   RP1 PART   RESOLVE PHASE ONE PARTICIPANT  10-05-2022 0846 01-18-2023 1214
FLM   RP1 WAIT   RESOLVE PHASE ONE WAITING      05-13-2022 0902 10-05-2022 0846
FLM   RP1 TEST   RESOLVE PHASE ONE SCREENING    12-03-2020 0837 05-13-2022 0902
FLM   RSW PART   RESOLVE WORKSHOP PARTICIPANT   10-21-2020 0630 12-03-2020 0836
FLM   RSW WAIT   RESOLVE WORKSHOP WAITING       02-25-2020 0651 10-21-2020 0630


             TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
G0005
```

76

FSA Recidivism Risk Assessment (PATTERN 01.03.00)
Register Number:44623-054, Last Name:MOHAMED

**U.S. DEPARTMENT OF JUSTICE**                                **FEDERAL BUREAU OF PRISONS**

Register Number: 44623-054

Inmate Name:
  Last.........: MOHAMED
  First........: KHALFAN
  Middle.......: KHAMIS
  Suffix.......:
Gender.........: MALE

Risk Level Inmate....: R-LW
  General Level......: R-LW (7)
  Violent Level......: R-LW (17)
Security Level Inmate: HIGH
Security Level Facl..: HIGH
Responsible Facility.: FLP
Start Incarceration..: 10/18/2001

### PATTERN Worksheet Summary

| Item | Value | General Score | Violent Score |
|------|-------|---------------|---------------|
| Current Age | 50 | 14 | 8 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | TRUE | 5 | 7 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 3 | 3 | 6 |
| Education Score | NotEnrolled | 0 | 0 |
| Drug Program Status | NoNeed | -6 | -3 |
| All Incident Reports (120 Months) | 2 | 2 | 2 |
| Serious Incident Reports (120 Months) | 1 | 1 | 1 |
| Time Since Last Incident Report | 70 | 0 | 0 |
| Time Since Last Serious Incident Report | 70 | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 40 | -12 | -4 |
| Work Programs | 0 | 0 | 0 |
| | | Total  7 | 17 |

### PATTERN Worksheet Details
Item: Programs Completed, Value: 40
General Score: -12, Violent Score: -4

Risk Item Data

| Category | Assignment | Start | Stop |
|----------|------------|-------|------|
| EDC | PARENT 2 | 03/13/2006 00:01 | 03/13/2006 00:01 |
| EDC | AMERICA RV | 03/16/2006 00:01 | 05/17/2006 00:01 |
| EDC | COSMOS | 05/17/2006 00:01 | 11/23/2006 00:01 |
| EDC | NATURL LAW | 11/23/2006 00:01 | 01/24/2007 00:01 |
| EDC | TWO WARS | 01/24/2007 00:01 | 02/15/2007 00:01 |
| EDC | PHYS LIF 1 | 02/15/2007 00:01 | 04/04/2007 00:01 |
| EDC | AM EXP 2 | 04/04/2007 00:01 | 04/19/2007 00:01 |
| EDC | PHYS LIF 2 | 04/19/2007 00:01 | 06/21/2007 00:01 |
| EDC | HIST IMP | 06/21/2007 00:01 | 09/13/2007 00:01 |
| EDC | FAM GREEKS | 09/13/2007 00:01 | |

77

Assessment# R-214626

Assessment Date: 07/21/2024

FSA Recidivism Risk Assessment (PATTERN 01.03.00)
Register Number:44623-054, Last Name:MOHAMED

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| EDC | BIOGRAPHY    | 11/14/2007 00:01 | 11/14/2007 00:01 |
| EDC | FAM ROMANS   | 12/06/2007 00:01 | 12/06/2007 00:01 |
| EDC | TEN DAYS     | 02/20/2008 00:01 | 02/20/2008 00:01 |
| EDC | VIKINGS 1    | 02/28/2008 00:01 | 02/28/2008 00:01 |
| EDC | AM EXP 3     | 04/30/2008 00:01 | 04/30/2008 00:01 |
| EDC | VIKINGS 2    | 05/01/2008 00:01 | 05/01/2008 00:01 |
| EDC | 1812 & HIT   | 07/23/2008 00:01 | 07/23/2008 00:01 |
| EDC | EUR ART 1    | 09/25/2008 00:01 | 09/25/2008 00:01 |
| EDC | AM EXP 4     | 10/01/2008 00:01 | 10/01/2008 00:01 |
| EDC | ARCH WOND    | 12/24/2008 00:01 | 12/24/2008 00:01 |
| EDC | HIST WW II   | 02/18/2009 00:01 | 02/18/2009 00:01 |
| EDC | NOVA         | 04/29/2009 00:01 | 04/29/2009 00:01 |
| EDC | BIOL BEHV    | 06/04/2009 00:01 | 06/04/2009 00:01 |
| EDC | ENG EMPIRE   | 07/22/2009 00:01 | 07/22/2009 00:01 |
| EDC | HIST SCI 1   | 08/27/2009 00:01 | 08/27/2009 00:01 |
| EDC | BATTLES      | 10/14/2009 00:01 | 10/14/2009 00:01 |
| EDC | HIST SCI 2   | 10/29/2009 00:01 | 10/29/2009 00:01 |
| EDC | BITS HIST    | 12/09/2009 00:01 | 12/09/2009 00:01 |
| EDC | PELP WAR 1   | 12/31/2009 00:01 | 12/31/2009 00:01 |
| EDC | UNIVERSE 1   | 03/03/2010 00:01 | 03/03/2010 00:01 |
| EDC | PELP WAR 2   | 03/04/2010 00:01 | 03/04/2010 00:01 |
| EDC | BOOK HIST1   | 05/06/2010 00:01 | 05/06/2010 00:01 |
| EDC | AM WAR 1     | 05/26/2010 00:01 | 05/26/2010 00:01 |
| EDC | BOOK HIST2   | 07/08/2010 00:01 | 07/08/2010 00:01 |
| EDC | PASSIONS     | 05/25/2020 00:01 | 05/25/2020 00:01 |
| EDC | FORENSIC H   | 10/03/2022 00:01 | 10/03/2022 00:01 |
| EDC | GRAMMAR      | 01/02/2023 00:01 | 01/02/2023 00:01 |
| EDC | AMER WEST    | 04/03/2023 00:01 | 04/03/2023 00:01 |
| EDC | LD HALLO     | 10/13/2023 14:13 | 10/13/2023 14:13 |
| EDC | LD MIDEAST   | 11/06/2023 14:27 | 11/06/2023 14:27 |

Item: Work Programs, Value: 0
General Score: 0, Violent Score: 0

Risk Item Data
    No Data

78

Assessment# R-21462607

Assessment Date: 07/21/2024



**Individualized Needs Plan - Program Review    (Inmate Copy)**

SEQUENCE: 00855573
Team Date: 09-23-2024

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: MOHAMED, KHALFAN KHAMIS  44623-054

| | |
|---|---|
| Facility: FLP FLORENCE HIGH USP | Proj. Rel. Date: UNKNOWN |
| Name: MOHAMED, KHALFAN KHAMIS | Proj. Rel. Mthd: LIFE |
| Register No.: 44623-054 | DNA Status: FLM01989 / 09-10-2010 |
| Age: 51 | |
| Date of Birth: 07-25-1973 | |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| ICE | POSSIBLE DEPORTATION |

## Pending Charges

DETAINER NO..: 001
DATE LODGED..: 11-29-2001
AGENCY.......: IMMIGRATION & CUSTOMS ENFORCE
AUTHORITY....: U.S. IMMIGRATION & NATURALIZATION SERVICE
CHARGES......: POSSIBLE DEPORTATION

## Inmate Photo ID Status

Full status incomplete - Expiration: null

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FLP | B/A UNASSG | UNIT B/A UNASSIGNED | 09-27-2023 |

## Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FLP | ESL HAS | ENGLISH PROFICIENT | 02-28-2002 |
| FLP | GED SAT | GED PROGRESS SATISFACTORY | 05-13-2022 |
| FLP | GED XN | EXEMPT GED NON-PROMOTABLE | 02-28-2002 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| FLP | | B/A GED CLASS 12:30 TO 2:30PM | 09-28-2023 | CURRENT |
| FLP | | VITAMINS A-Z: A, B12 & C | 07-12-2024 | 07-30-2024 |
| FLP STPD | C | CROCHET SELF STUDY | 06-19-2024 | 07-31-2024 |
| FLP STPD | C | HISTORY OF THE MID-EAST | 11-06-2023 | 11-20-2023 |
| FLP STPD | C | HISTORY OF HALLOWEEN | 10-13-2023 | 10-26-2023 |
| FLP STPD | C | GED PROGRAM | 05-10-2021 | 09-27-2023 |
| FLM | W | THE AMERICAN WEST ACE CLASS | 04-03-2023 | 07-01-2023 |
| FLM | C | ACE - ENGLISH GRAMMAR | 01-02-2023 | 04-01-2023 |
| FLM | C | FORENSIC HISTORY ACE | 10-03-2022 | 12-31-2022 |
| FLM | C | THE PASSIONS :PHILOSOPHY | 05-25-2020 | 08-15-2020 |
| FLM | C | 500 NATIONS | 08-18-2010 | 10-12-2010 |
| FLM | W | BOOKS THAT MADE HISTORY 2 | 07-08-2010 | 09-08-2010 |
| FLM | C | AMERICA AT WAR - PART 1 | 05-26-2010 | 08-17-2010 |
| FLM | C | BOOKS THAT MADE HISTORY 1 | 05-06-2010 | 07-07-2010 |
| FLM | C | THE UNIVERSE - PART 1 | 03-03-2010 | 05-25-2010 |
| FLM | C | PELOPONNESIAN WAR - PART 2 | 03-04-2010 | 05-05-2010 |
| FLM | C | PELOPONNESIAN WAR - PART 1 | 12-31-2009 | 03-03-2010 |
| FLM | C | BITS OF HISTORY | 12-09-2009 | 03-02-2010 |
| FLM | C | HISTORY OF SCIENCE - PART 2 | 10-29-2009 | 12-30-2009 |
| FLM | C | BATTLES OF THE ANCIENT WORLD | 10-14-2009 | 12-08-2009 |
| FLM | C | HISTORY OF SCIENCE - PART 1 | 08-27-2009 | 10-28-2009 |
| FLM | C | ENGINEERING AN EMPIRE | 07-22-2009 | 10-13-2009 |
| FLM | C | BIOLOGY & HUMAN BEHAVIOR | 06-04-2009 | 08-26-2009 |
| FLM | C | NOVA | 04-29-2009 | 07-21-2009 |
| FLM | C | HISTORY OF WORLD WAR II | 02-18-2009 | 04-28-2009 |
| FLM | C | ARCHITECTURAL WONDERS | 12-24-2008 | 02-17-2009 |
| FLM | C | HISTORY OF EUROPEAN ART PART 1 | 09-25-2008 | 12-17-2008 |

Sentry Data as of 09-16-2024

79

SEQUENCE: 00855573
Team Date: 09-23-2024

## Individualized Needs Plan - Program Review    (Inmate Copy)
Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: MOHAMED, KHALFAN KHAMIS 44623-054

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| FLM | C | AMERICAN EXPERIENCE PART 4 | 10-01-2008 | 12-23-2008 |
| FLM | C | WAR OF 1812 & LIFE OF HITLER | 07-23-2008 | 10-01-2008 |
| FLM | C | AMERICAN EXPERIENCE - PART 3 | 04-30-2008 | 07-22-2008 |
| FLM | C | THE VIKINGS - PART 2 | 05-01-2008 | 07-02-2008 |
| FLM | C | THE VIKINGS - PART 1 | 02-28-2008 | 04-30-2008 |
| FLM | C | TEN DAYS THAT CHANGED AMERICA | 02-20-2008 | 04-29-2008 |
| FLM | C | FAMOUS ROMANS | 12-06-2007 | 02-27-2008 |
| FLM | C | BIOG: EXPLORERS & EARLY AMERIC | 11-14-2007 | 02-19-2008 |
| FLM | C | FAMOUS GREEKS | 09-13-2007 | 12-05-2007 |
| FLM | C | A HISTORY OF IMPRESSIONISM | 06-21-2007 | 09-12-2007 |
| FLM | C | PHYSICS IN YOUR LIFE - PART 2 | 04-19-2007 | 06-20-2007 |
| FLM | C | THE AMERICAN EXPERIENCE-PART 2 | 04-04-2007 | 06-26-2007 |
| FLM | C | PHYSICS IN YOUR LIFE - PART 1 | 02-15-2007 | 04-18-2007 |
| FLM | C | AMER. REVL. + US MEXICAN WAR | 01-24-2007 | 04-03-2007 |
| FLM | C | NATURAL LAW & HUMAN NATURE | 11-23-2006 | 02-14-2007 |
| FLM | C | COSMOS | 05-17-2006 | 08-08-2006 |
| FLM | C | THE AMERICAS IN REVOLUTION | 03-16-2006 | 06-01-2006 |
| FLM | C | PARENTING 2 PROGRAM | 03-13-2006 | 05-19-2006 |

## Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|
| ** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

## Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 12-21-2004 |
| CARE2-MH | CARE2-MENTAL HEALTH | 03-02-2021 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 05-23-2000 |

## Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DRG I NONE | NO DRUG INTERVIEW REQUIRED | 12-21-2001 |

## FRP Payment Plan

Most Recent Payment Plan

FRP Assignment:   PART   FINANC RESP-PARTICIPATES   Start: 11-29-2022

Inmate Decision:   AGREED   $25.00   Frequency:  QUARTERLY

Payments past 6 months:   $50.00   Obligation Balance: $33,816,141.75

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $2,300.00 | $2,275.00 | IMMEDIATE | EXPIRED |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | REST CV | $33,816,561.75 | $33,816,141.75 | IMMEDIATE | AGREED |

| | Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|---|
| | | 09-12-2024 | FLP | PAYMENT | INSIDE PMT | $25.00 |
| | | 06-12-2024 | FLP | PAYMENT | INSIDE PMT | $25.00 |

Payments commensurate ?   N

## FRP Deposits

Trust Fund Deposits - Past 6 months:   $300.00

New Payment Plan:   Per court order, to pay $25.00 quarterly.

## Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|

Sentry Data as of 09-16-2024    Individualized Needs Plan - Program Review   (Inmate Copy)

80

SEQUENCE: 00855573
Team Date: 09-23-2024

## Individualized Needs Plan - Program Review   (Inmate Copy)
### Dept. of Justice / Federal Bureau of Prisons



Plan is for inmate: MOHAMED, KHALFAN KHAMIS  44623-054

| Assignment | Description | Start |
|---|---|---|
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 10-12-2020 |
| INELIG AUT | FTC-INELIGIBLE OFF CODE - AUTO | 12-17-2019 |
| N-ANGER Y | NEED - ANGER/HOSTILITY YES | 07-21-2024 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 07-21-2024 |
| N-COGNTV N | NEED - COGNITIONS NO | 05-28-2021 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 07-21-2024 |
| N-EDUC Y | NEED - EDUCATION YES | 07-21-2024 |
| N-FIN PV Y | NEED - FINANCE/POVERTY YES | 07-21-2024 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 07-21-2024 |
| N-M HLTH Y | NEED - MENTAL HEALTH YES | 07-21-2024 |
| N-MEDICL N | NEED - MEDICAL NO | 07-21-2024 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 07-21-2024 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 07-21-2024 |
| N-TRAUMA N | NEED - TRAUMA NO | 07-21-2024 |
| N-WORK Y | NEED - WORK YES | 07-21-2024 |
| R-LW | LOW RISK RECIDIVISM LEVEL | |

### Progress since last review

Clear Conduct
Still enrolled in GED
Saved $163.43
Completed Vitamins A-Z, and Crochet
No current enrollment in Anger-Mgmt (incomplete)

### Next Program Review Goals

Continue GED
Enroll in 1-2 ACE Classes
Participate in next available Insomnia Program (on wait list)
Continue saving $5-10 monthly

### Long Term Goals

Complete GED by 04-2025
Complete Insomnia by 08-2025
Save $250.00 by 08-2025
Complete 2 ACE classes by 10-2025

### RRC/HC Placement

No.
Management decision - Life.
Consideration has been given for Five Factor Review (Second Chance Act):
- Facility Resources
- Offense
- Prisoner
- Court Statement
- Sentencing Commission

N/A - LIFE SENTENCE

### Comments

** No notes entered **

Sentry Data as of 09-16-2024          Individualized Needs Plan - Program Review   (Inmate Copy)

81

# College Guild

P. O. Box 696

Brunswick, Maine 04011

## Certifies that Khalfan Mohamed

## Has completed the College Guild course

### Creative Language

This 28th Day of March 2023

_Julie Zimmerman, College Guild Dean of Students_

_Mary Malia, Executive Director_

College Guild is a 501c3 organization based in Brunswick, ME serving incarcerated.

82



College Guild

P. O. Box 696
Brunswick, Maine 04011

Certifies that Khalfan Mohamed

Has completed the College Guild course

Biography

This 12th day of March 2024

Julie Zimmerman, College Guild Founder

Mary Malia, Executive Director

College Guild is a 501c3 organization based in Brunswick, ME serving incarcerated.



## RESPONSE TO INMATE REQUEST FOR INFORMAL RESOLUTION (BP-8)

NAME: Mohamed, K.                                          UNIT: B/A

REGISTER NUMBER: 44623-054

This is in response to your BP-8 in which you state you completed the Step-Down program and are being denied transfer from your current facility to a Challenge Program. As relief, you request to be transferred.

A review of the issue revealed you were transferred to the second phase of the Step-Down program on September 27, 2023. On December 7, 2023, you completed this phase of this phase of Step-Down and were placed in the third phase of the Step-Down program. You completed the Step-Down program, and the Unit Team submitted you for transfer; however, this request was denied by the Designation and Sentence Computation Center (DSCC) on July 15, 2024. If you maintain clear conduct and continue to program, your transfer will be reevaluated in January 2025.

I trust this addresses your concerns.

_____                    _____
D. Lazariuk, Control Unit Manager             Date

84

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: SALMA KHAMIS MOHAMED
DATE: 09/02/2024 07:18:27 AM

TO: THE JUDGE
FROM : SALMA KHAMIS MOHAMED
RE: LETTER OF SUPPORT

I am Salma Mohamed Khamis , I am currently sixty years old and Khalfan Khamis Mohamed Is my young brother, I want to express that my young brother was a hard working young man, he never argued nor fought with anyone, he went to school and madrasa, and was obedient to his parents, teachers and elders. Khalfan was a smart young men, with the best of manners, he loved his family very much.

Personally Khalfan was always advising me to emphasize and to be strict to my children so that they can study,  he was not wealthy but he helped me by giving counsel to me regarding different matters, he respected every one young and old alike. Whenever he calls he asks regarding my health, and he asks regarding our mother who is ill and most of the time resides at my house. She is currently suffering from Alzheimer's before she had this disease whenever she spoke with Khalfan she used to cry deeply such that it even caused her blood pressure to rise. Right now she can't speak with Khalfan due to illness but sometimes memories of him come back to her and it is a sad sight seeing how she always suffer with pain reliving his arrest over and over.

Khalfan also asks regarding my children and grandchildren, he asks about their health, academic progress and career progress. When my late husband was alive he always used to ask about him also. He used to give me advice regarding my children's education, since before he was arrested, I remember him speaking to me regarding my second born son Khamis, he used to tell me, " sister lets take Khalfan to Dar es salaam so that he can get bettter education there", but this was not fullfilled because he was arrested before he could accomplish this. Also, whenever he heard news regarding my daughters education and that they passed from one level to another you can feel how excited he is due to the news. Indeed he loves the development of all my children and always prays for them when we speak.

My young brother Khalfan has never told me, and I have never heard him telling anyone encouraging them to do any type of evil or injustice. Khalfan has never even slightly praised or defended the actions that led to his arrest. Not only that but he neve encouraged anyone to do acts of terror or things that will destabilize the safety of the society.

I really love my brother Khalfan, and I am deeply concerned about him, I wish that he can be with us in our family and we can cooperate together in hardships and happiness, and all other matters as a family. And I really wish that he can be here so that he can spend the remaining days with our mother.

I offer my unwaivered support to him in the event of his release, together with all my children we are ready to support him in every possible way. And we will include him in all our family matters. We will help him find a job and means to start his own family. We will help him find a good wife so that he can have his own children, because he greatly wishes to have his own children. We will welcome him with tremendous joy and our hearts will be filled with happiness by his presence, we believe he will greatly contribute to all matters that can strengthen our family and help our family in general.

We are ready to help our young brother Khalfan, we will help him financially and we will treat him if he has any medical condition, We love him and always miss him. We wish that he is forgiven and set free, we are afraid and we don't like for him die in prison. We plead to the judge to forgive him and release him so that he can start his life.

Please Honorable judge, I urge you and beg you to give my young brother a second chance, so that he can come and start life and that he can come and see his mom in her final days. And so that hopefully my mothers health can be better.

I thank the Honorable judge for taking time in his busy schedule to read my letter, and I hope you will consider my petition f his compassionate release.
SALMA KHAMIS MOHAMED

Amari Mohamed Khamis
Signed: Salma Khamis Mohamed

85

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: ASHA SAID KHALIFA
DATE: 09/02/2024 07:18:31 AM

TO: THE JUDGE
FROM: ASHA KHALIFA
RE: LETTER OF SUPPORT

My name is Asha Khalifa, I am the daughter of Salma Khamis Mohamed, Mr. Khamis is my beloved uncle. Currently I am thirty seven years old. I was already born before his arrest and I have many memories of him.

My uncle Khalfan he is a very exceptional person because he cares for his family and people and all those who surrounded him, and he is a god fearing person.

His absence in our lives, makes us always miss him and remember him, he used to care about us and to love us. At least now we can speak with hijm on the phone, and whenever we speak he asks about my health, he ask how I am?, and how is the family in general?. I am married, hence whenever I speak with him he asks about my husband, and my mother in law and he always asks me to send his reagards and greetings to them.

I have not heard my uncle Khalfan telling me anything regarding terrorism and destroying public safety. I really need his presence because he is among our parents, and also our Uncle needs to be able to come and live however small the remaining part of his life. He needs to come and meet his sick mom, and maybe tend to her before she passes away. Uncle Khalfan is broken hearted and loses hope sometime whenever he hears about things that happen here,  he was especially affected when he heard that his twin ( Fatma Khamis) had a stroke and died. He never got to say his goodbye, he never got to see her one last time, he never got to hold her again.

I can say that I really respect and love my Uncle Khalfan as I did love my own father, I really wish that he can one day be a fre man, and we will get many benefits by his presence.

I plead to you dear judge to give my uncle a second chance, so that he can restart his life as a different man, a better man, s that he can come, find a partner, get married and have children of his own. And most importantly so that he can hold his mor again in his hands before her time on this earth is over.

Yours sincerely
Asha Said Khalifa

Amari Mohamed Khamis
Signed: Asha Said Khalifa

86

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: HIDAYA SAID KHALIFA
DATE: 09/02/2024 07:18:30 AM

TO: THE JUDGE
FROM: HIDAYA SAID KHALIFA
RE: LETTER OF SUPPORT
My name is Hidaya said Khalifa, I am Khalfan Khamis niece, my mother is his elder sister. I was already born born during the time of his arrest and I have memories of my uncle, he loved and cared for me very much.

He is a good person, whenever we speaks he is concerned regarding me and my health, the health and well being of my siblings, children, husband and my in laws. I can confidently say that he played a fathers role during his presence here in Zanzibar. He used to play with me, teach me how to read and bring me gifts whenever he visited.

When ever I speak with him, he always encourages me to give great importance on education, and to love and respect other members of the family. And he even reminds me of religeous matters such as praying, fasting and giving in charity and volunteering in good non violent courses..

My uncle gets depressed due to the hardships both psychologically and physically that he is going through while he is there in prison. He suffered an even greater blow when he heard regarding the death of his sister and twin Fatma Khamis Mohammed. He was deeply saddened because he couldn't even see her one last time, hence, I urge that he is released, I believe he conducts himself well in prison, atleast his goodconduct among other things can be considered for his release.

I love my uncle very much and respect him, and I know that he feels the same way about me and my siblings, relatives and family. And when he is released we will welcome him with open hearts full of joy and saddness. As I am a mother, I have acquired happiness through my childrens and family, I wish the same that if he is freed, he can also find his own happiness by starting his own family. And also he can get to have the chance that he missed with his twin, by being there for his mother in her remaining days. And he can get to watch his many grand children from our children and those that he will have on his own grow up. We are all willing to support him financially and take care of his health as one of us. And he will be taken care of and surrounded with a friendly and loving environment.

I plead to the judge and the justice system of the united stated of america to forgive my uncle and let him be free, to give him a second chanceso that he can be with his family and especially his mother. And so that he can be an ambassador for peace and tolerance once he is freed.

Thank you, your honor, for taking time to read this letter, and I hope that you will consider my plea fo rmy uncle and the plea of my family.

Yours faithfully
Hidaya said Khalifa

Amari Mohamed Khamis
Signed: Hidaya said Khalifa

87

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: HAMIDA SAID KHALIFA
DATE: 09/02/2024 07:18:32 AM

TO: THE HONORABLE JUDGE
FROM: HAMIDA SAID KHALIFA

RE: SUPPORTING LETTER

Mr. Khalfan Khamis Mohamed is my uncle, He is a very important person to us, he is like a father in our family.. At the time of his arrest I was just seven years old, he was and currently he still is a very important person to us. I remember him as a person who loves us and we relied on him in many sectors. I remember him because I physically interacted with him and I had many interesting and fun memories of him.

He was a polite man, honest and an active person my family, he was very nice and close to me. He always asks regaring my health, although I know longer study, I am now married, I always seek advice from him regarding my problems. And also I share my successes with him.

My uncle Khalfan, when I speak with him most of the time, he says to me that he doen't do bad things and asks god to make him patient. And it never happened when I speak with him that he praised someone who is a terrorist or likes violence and also he never convince anyone to succumb to such temptations of violence and terror.

We will be so glad to see him come back again to our family and every day we pray for him. Our family will be in a very good situation when we go to pick him up. Also our souls will be calmed and we will finally be at peace by his presence, we will not b worried all the time about what can happen to him in prison.

We all love and respect him too much due to his good behaviour, kindness and cooperation in our family, infact he is like a biological father to me, we all love him and do not like the actions that made him to be arrested.

Yours sincerely

Hamida Said Khalifa

Amari Mohamed Khamis
Signed: Hamida Said Khalifa

88

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: MUHAMED KHAMIS MUHAMED
DATE: 09/02/2024 07:18:29 AM

TO: THE JUDGE
FROM: MUHAMED KHAMIS MUHAMED
RE: LETTER OF SUPPORT FOR KHALFAN KHAMIS MUHAMED

Khalfan Muhamed Khamis is my blood brother, from both mother and father, to him I am a brother, but since I was the eldest when our father died, I had to be as a father to him. He was always behaving well, respectful and shy person who loved everybody young and old alike.

In my absence Khalfan helped me to take care of my family, he treated and respected them as his own family. He has always been a great teacher to my family, he always gives advice to me and my family, he always gets extremely worried whenever he hears news of burial (death) or any calamity which afflict any family members.

In general Khalfan likes to see people develop, he likes to see that the children are getting appropriate education and upbringing, in terms of secular and religious knowledge according to the curriculums set by the Tanzanian government. To show the extent of his thirst for development for everyone in the family, especially the development of the children in education, he has emphasized to me for a very long time and encouraged me to place great care in education. This is evident in the outcomes that my three children achieved, Sumayya, usama and ammar, as follows
1. Sumayyah has studied from the top university in teaching education studies, known as Dar es salaam university college of education(DUCE), and she is now a teacher
2. Usama  has graduated from the Institute of Finance and Management (IFM) and is now an account in amsons group of companies a large business conglomerate
3. Ammar has graduated from China Pharmaceutical university (CPU), the second best pharmacy university in China and is now a pharmacist.
The above three are just few of the outcomes of his influence, there are many other in different family members.

On another hand, Khalfan is always saddened by his condition of being convicted for a very long time, almost a quarter cent and he regrets what has made him convicted, and he dislikes hearing matters of violence and hates those who encourage violence and terrorism..

To us Khalfan is a beloved brother and uncle to our children, we love him whole heatedly. We all hate and condemn all wha led for Khalfan to be convicted, we condemn all of it and we are far from it. I would also like to take this chance to ask forgiveness for what my brother is alleged to have done, and I ask forgiveness to all those who were afflicted by the events led to his arrest.

I plead to the judge, with all my heart,  to please consider my request for his compassionate release, also to consider the l time that he has spent in prison, and all the hardships and harm that he has suffered through his incarceration by being attacked and injured several times, to consider releasing him.

We are very much wishing for the day that Khalfan will be among us again, Our happiness will be of no measure , becau have not seen our brother for a very long time. Many in the family do not know him well for who he is, because they were when he was arrested and some of them were not even born. Khalfan's mother( my mother) has suffered a great deal of sadness, it went on to cause her to get many health problems due to the sadness she gets when she misses her child. I due to our mothers old age it will really help for them to atleast meet once more before she passes.

As a brother and as the one who played the role of a father to him, I am ready to assist him in every possible way to he have a great and peaceful life in the event of his release. I am ready to provide him with financial, emotional and health And he will never be a burden rather he will be a blessing and a miracle from god.

I am grateful to the judge for taking time to read this letter, I hope it can add value and that my support and petition for for the compassionate release of Khalfan Khamis Muhamed will be taken into consideration.

Muhamed Khamis Muhamed
(+
(+

89

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------

Amari Mohamed Khamis
Signed: Muhamed Khamis Muhamed

90

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: SUMAYYA MUHAMED KHAMIS
DATE: 09/02/2024 07:18:23 AM

TO : THE JUDGE
FROM: SUMAYYA. M. KHAMIS
RE: LETTER OF SUPPORT

I am the daughter of Mohamed Khamis the eldest brother of Khalfan Khamis Mohamed, I am thirty one years old. I am connected to uncle Khalfan since from birth, he was there and he was the one who named me and my two younger brothers ( usama and Ammar). He played a father role through out my life, and both my parents gave him the respect of naming their children. I remember him to be an active person and he was never lazy, he even used to help out with home chores. He was not an illiterate person, he always busied himself with studying and learning.

Uncle khalfan, was and still is a very important person to us, because he has never stopped playing his role as a father, and we accept him as such full heatedly, he is the father that we never got to be with. I still have memories of him teaching me gymnastics and inspiring me to be active, keep fit and stay healthy, Indeed I became the best in gymnastics in my childhood, and until now after having four children, and having another on the way, I exercise and value my health. When he was arrested I was five years old, it was a very hard and tough time for me and my young brother Usama, since our guardian was taken away. And it was even more painful to my mother because she lost the person who supported her most during my fathers absence. He treated her as her own biological sister. Among his great attributes, Uncle was beloved by everyone  including neighbours and family friends.  He always helped everyone regardless of religion or ethnicity. His conviction affected everyone around him, and all of us could not believe that he was really convicted.

All thanks to the american government and justice system for allowing him to communicate with us, we received and replied letters from uncle, our mother helped us to answer them, and he helped us to understand him better. In his letters, he insisted on us to respect people, to love and sympathize everyone, he encouraged us to study hard and to attain success. He's not only an uncle but also he is a councellor to all of us, personally he always councelled me to protect my self and my dignity, so as I could reach my goals and also get a descent husband, thanks to god I got married to a wonderful man. And even now he councells me regarding the upbringing of my children, and how to to care of my family, and balance work life and family life. Not just that but he is also concerned about extended family members, friends and neighbours, he tries to protect and support us even though he is far away. Now days we are allowed to communicate through mobile phone, he asks about everyone even old friends whom we might have forgotten. He is a people person and always like to see or hear about development in the society.

When he calls he speaks with my husband, he asks him about many issues such as work and career development, challenges in the family, and my husband really enjoys talking with him. Uncle loves and cares about everyone, and he never had and still doesn't have any speck of discrimination. He always speak with my children ( Aisha, Suleiman and muhamed) his grand children, all my kids know him through phone calls, and recently they were extremely excited when I showed them the recent photos of their grand father, I can't imagine their happiness when they get to see him face to face, dear judge please we ask fo you to consider his release.

A vivid example of his care and love to the family, is that whenever he hears that a family member is sick, he will always make follow up phone calls asking about the persons health and development. And when he hears about a person who is pregnant, he always asks until he hears the birth of the child. Dear judge, we don't want to lose this very important person to us. He has been in solitary confinement for years and still his behaviour towards us has been the best and he never lashed on us or shouted to any of us. Its amazing how the roles are reversed, although he is alone and he is sentenced to life in prison, he is the one who we depend on support and advice. We highly respect him and admire this character.

Uncle Khalfan, has a huge influence in our schooling and success, he is the one that inspired me to become a teacher, a job that I love and enjoy. Even now he is highly concerned and asks me regarding his grandchildren school development, and suggest ways to help them get better.
In all my conversations with him he never mentioned the source for his conviction, I see regret and remorse in some of the conversations we have with him. If he has done mistakes in the past, I am sure that he has learned his lesson, and he is mu older now and wiser, I believe if given a second chance he will never repeat, or even commit another mistake.  Please dear judge consider his release.  He has never ever suggested any acts of violence or acts that will endanger public security.

I always imagine, dream and yearn for his release, and to be able to live with him again , we all wish that one day we can ge chance to be with him. As I have expressed before he is a father to us, his like a missing organ in our body without him we a

91

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------

incomplete. I do not support any actions that led to his conviction, but I have always and will always maintain a positive attitude about him.

I am ready to help him and give him finacial, medical and emotional support, my Uncle khalfan will not live alone we will live with him, help him find a job. Please your Honor consider releasing him, give him a second chance, let him use his positive potential to help our family and society. Please, we have recently lost his twin sister, please don't let him miss the opportunity to be with his remaining siblings and children, and please . don't...let him die in jail.  Please give him a chance to come and start a family of his own.
Thank you for taking your time to read this letter, and I hope you will take my letter into consideration, and I am willing to provide any further support whenever needed. Thank you and may god bless you.

Sumayya Mohamed Khamis

m

28th June 2024
Amari Mohamed Khamis
Signed: Sumayya Mohamed Khamis

92

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: RAHMA AHMED KHAMIS
DATE: 09/02/2024 07:18:26 AM

TO: THE JUDGE
FROM: RAHMA AHMED KHAMIS
RE: LETTER OF SUPPORT

I am Rahma Ahmed Khamis, I am one among the sister in laws to Khalfan, and I am married to his brother Mohamed Khamis Mohamed, I have lived with Khalfan, since my marriage to his brother in 1993 until when he was arrested, he used to assist me at home with important necessities, and I also used to help him with his important necessities at home, we lived like biological brother and a sister.

I know him well, since we lived in one house, I highly respected him and he also respected me, Mr. Khalfan was a very generous and respectful man to people of all ages, young and small. He loved volunteering to assist people, such that whenever he saw a person in need of help, he offered his help even without being asked to do so.

Personally together with my children whom I gave birth to at the time we suffered a great loss after his arrest, we miss him endlessly and whenever we remember the sweet memories and hardships that we went through together, the pain intensifies more and more. Khalfan always gave sound advice and has shown deep interest in the wellbeing of my children, since before his arrest until now.  He was a great help and a rope that held us together. And we plead to the honorable judge that he considers releasing him.

We missed him a lot at first, especially when we were unable to contact him, one of the things that shows his love and care to the family, is his endless efforts in fighting for permission to stay incontact with us through letters and later through phone calls, Indeed he did all the efforts to make this possible, he exhausted all his resources and used all his will to be able to stay incontact with us, and I know he did this becausae he needed to lessen our pain, although he never told me so and from how I know him he will never mentions it to me due to his humility.

In his contact and correspondence with us he has never been selfish or discriminating, not only he asks about my children, but also he always asks about my family ( my sisters and brothers and mother) , he asks who is ill, who died and who is born, who is married and who is divorced, and always prays for the wellfare of the family. And he has never encouraged nor praised the events that has led to his arrest. When he speaks with my children he guides and advises them to use their time wisely, do what is beneficial,  help the community and most importantly to have fun and to choose a job that they will enjoy while benefiting the community.

My first three children, have largely been influenced by his advise, and all of them have graduated and are working as a teacher, a pharmacist and an accountant, its all thanks to his guidance because me and my husband we are not well educated. And for the remaining children they are still discussing their academic affairs lengthly with him.

Khalfan's arrest has affected deeply the whole family, especially my mother in law( khalfan's mother) has suffered the most, from the time of his arrest, her health has detiriorated greatly  day by day, due to the absence of her son. Khalfan had a twin sister, her name was Fatma Khamis, she died a year and a half ago, her death together with Khalfan's arrest made her heal conditions worsen, and now she is sick and bed ridden. Please honorable judge, consider this when taking into consideratio the compassionate release of Khalfan. As a parent of seven children, I understand greatly a mothers pain yearning for their children, it is indeed great.

Personally, together with other family members we are not happy, nor do we praise the actions that led to Khalfan's arrest, From we were greatly shocked by the news that he was suspected to be responsible in a way in the events that occurred. From understanding we believe that if he really did participate he was brainwashed by extremist groups, because in the islamic religion we are prohibited from taking innocent lives, we ask for forgiveness on his behalf and ask for the forgiveness from whose relatives were affected by the incident that occurred. And we all know that our realtive Khalfan deeply regrets this a deeply wishes to be with his familiy. We plead to the judge to consider his compassionate release, and believe that he wil do the same mistakes again.
We express our thanks the american government, the judges and the lawyers and other government officers, because al he is imprisoned we can still speak and communicate with him and we know that in a way he is safe. And we believe that the time that he has served please considre his compassionate release..

93

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

--------------------------------------------------------------------------------

His return will bring tremendous joy and happiness to all of us, it will open a chapter that could not be opened between the family members and him. It will strengthen our bond, and it will be a lesson to anyone else not to waste and disregard the blessing of freedom, and that we will all cherish and enjoy the freedom we have. Most importantly his mother will be able to see him again, and maybe spend her last remaining years with him.

Rahma Ahmed Khamis

Amari Mohamed Khamis
Signed: Rahma Ahmed Khamis

94

To: The Honorable Judge

From: Usama Mohamed Khamis,
P. O. Box
Dar es salaam, Tanzania,

20/06/2024.

RE: Letter of Support

Dear Judge

I hope this letter finds you well. My name is Usama Mohamed Khamis an elder son of Mr. Mohamed Khalfan's brother, and I am writing to you with a heartfelt plea regarding my uncle, Mr. Mohamed Khalfan Khamis, inmate number 44623054, who has been incarcerated since I was a toddler. Now, at 28 years old, I feel compelled to speak about the profound impact my uncle has had on my life and the lives of our family members.

My earliest memories of my uncle are filled with joy and warmth. He used to lift me onto his shoulders and shower me with gifts, creating cherished moments that I still hold dear. Despite his imprisonment, he has never wavered in his love, support, and guidance for us. He has been a pillar of strength, offering emotional support and caring for us with unwavering dedication. His presence, even from behind bars, has shaped my values and provided me with a moral compass to navigate life's challenges.

Growing up without his physical presence has been difficult, yet he has remained a constant source of wisdom and encouragement through his letters and occasional phone calls. His words have been a source of comfort during tough times and a reminder of the importance of resilience and hope.

My uncle has consistently shown himself to be a caring, respectful, and supportive individual. He has always prioritized the well-being of everyone not only his family members. He regularly asks about the health and happiness of my siblings, nieces, nephews, and even his childhood friends. I remember vividly how delighted he was to learn that his childhood friend had married and had grown-up children of their own.

It is important to emphasize that my uncle has never sought to justify or glorify the actions that led to his incarceration. In fact, we have never discussed those events, and he has always emphasized the importance of good deeds and abiding by the law, advocating strongly against violence. While I do not condone the actions that led to his conviction, I am certain that he has undergone profound personal growth during his time in prison.

Additionally we can't ignore the fact that he has also faced severe injustices during his time in custody, including physical assaults by police officers on multiple occasions. These incidents have not only violated his rights but have also endangered his physical well-being. Such actions by law enforcement officials are in clear contravention of established laws designed to protect individuals in custody.

According to the United States Constitution, specifically under the Fourth Amendment, all individuals are entitled to be free from unreasonable searches and seizures. Additionally, the Eighth Amendment prohibits cruel and unusual punishment, which includes physical abuse or assaults by law enforcement officers.

It is deeply concerning to our family that despite these protections, my uncle has been subjected to repeated assaults while in custody. These incidents not only undermine his physical health but also erode his trust in the justice system.

His return to our family would mean everything to us, particularly to his mother, who is currently in declining health. She has continually expressed her longing to see him again and often reminisces about the cherished memories they shared. The prospect of his return fills us all with hope and happiness.

I urge Your Honor to consider these circumstances as you review his case for possible release. My uncle is not a threat to society; rather, he is a beloved member of our family who has been unjustly treated. His release would allow him to seek the necessary medical attention and recover from the trauma he has endured.

Personally, I am prepared to offer my uncle all necessary support upon his release. As an accountant with my own home, I am financially stable and willing to provide him with a place to stay, as well as assistance with any medical needs he may have.

I firmly believe that my uncle has transformed into a profoundly different person during his incarceration. He has shown remorse and a sincere desire to make positive contributions to society. He deserves a second chance to lead a fulfilling life.

I appreciate your attention to this matter and trust that you will consider the facts and circumstances surrounding my uncle's case with the utmost fairness and compassion. Should you require any further information or documentation to support this request, please do not hesitate to contact me at +255658695339 or usamalsharjy@gmail.com.

Thank you for your time and consideration.


Sincerely,

Usama Mohamed Khamis

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: AMARI MOHAMED KHAMIS
DATE: 09/02/2024 07:18:22 AM

TO THE : JUDGE
FROM: AMMAR MOHAMED KHAMIS
RE: LETTER OF SUPPORT

I am Ammar Mohamed Khamis, the son of Mr. Khamis brother, this year I turned 26 years old, I have lived with my Uncle Khalfan Khamis for the first two years of my life, but I have no physical memory of him, since by the time of his incarceration I was just two yeas of age. Nevertherless my parents used to tell me about him. He took care of me since before I was born, because my father migrated to another country insearch of work. Among the unforgattable things that my mom told me is that he was the one who helped her attending hospital maternity clinic, he took her to the hospital when it was time for my delivery. Attendend hospital every day during the two weeks which I was kept at the hospital due to illness. Due to his expression of great assistance, care and love my father decided to let him choose a name for me. And the same happened for the names of my elder sister and brother. This shows his critical position in the family.

There is a close and extremely friendly relationship between me and Uncle Khalfan, I really appreciate and admire the fact that he always keeps in touch with me, whenever we speak either through email or phone calls he asks about my health, academic progress and career progress. Infact he is the one who inspired me to enter the health sciences,whenever we spoke with me or my parents he intuited me on the importance of serving the community, its benefits and the personal satisfaction that a one can get by being a health care worker. He was actively involved in my marriage, adviced me in many important things whenever we spoke I brainstormed with him on relationship advice, I am comfortable to speak with him things that I couldn't speak even with my dad. He has a very good relationship with my wife and he always asks regarding her welfare and health whenever he calls me, and he speaks with her regularly. One of the special thing that I like is the way he makes her laugh with his funny jokes whenever they speak. He only gets limited chances to make phone calls, so whenever he hears that I am sick or any of my family members are sick, he makes effort to call us as soon as possible to follow up on our conditions.

In islam we believe that the name a person chooses for a child can impact their lives, since just after birth, my uncle has placed great care in selecting names for his nieces and nephews, for example my name is Ammar, my sister is sumayyah, and my brother is Usamah. The people behind these names are brave peoples such as Ammar and sumayyah their family where among the first to accept islam, Sumayyah was the first woman to die for her belief (not in an extremist way rather she was opressed by the Quraishi). The arabic meaning of the name Ammar means a builder, it inspired me in a way to grow up wanting to make things better and to create peace and harmony and development in my family and society. Furthermore, his inspirations on me to persue the health sciences led me to study and enter the field of pharmaceutics and pharmaceutical research, I am now an intern pharmacist and soon to be registered pharmacist in Tanzania. My sister and brother were both also inspired by him and now my sister is a passionate teacher and my brother is a successful competent accountant.

One of the things I really appreciate about my uncle is his insistance on me to be patient and hardworking. He has never even once praised or in any way show any admiration regarding the actions that led for his incarceration nor any form of violence for that matter. Even his speech is soft and warm. The best thing that he does is his display for positivity, although he is imprisoned and going through a tough time in prison, he only makes us smile and shows care and love to us. Although sometimes he might sound sad, but never has he took out his anger on us by shouting or any such irrational behaviour. The most I hear in his conversation with him is his emphasis to use the chances and opportunities that we have positively and efficiently and never let us do anything that will cause us to regret.

Its not easy to express my love and affection for my uncle, but in simple words, I love him as a son loves his uncle, I highly respect him, and I don't judge him for what he is allegedly accused to have done in the past, rather I believe he is a nice person and deserves a chance to be a productive member of the community. As a muslim I believe its unlawful to hurt innocent lives and to go against the ruler and those to whom power has been entrusted in the community. And I practice the words of the prophet which say " invite( with calmness, facts and tolerence) and do not disperse people(with violence and harshness) , simplify matters and do not make them complex"

Just the ability to speak with him brings us joy and happiness, but still it saddens our hearts that for the past quarter century he was not able to attend our weddings, our childrens birthdays, and spend holidays with us together. Its even heavier in our hearts when he is not able to attend his sisters funerals and other family members burial ceremonies. With this indeed it will fill great joy that even though we missed these moments with us, if he is released we can spend and create many new memories

97

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------

and also he will be able to raise his grandchildren and be with us in future happy and sad moments. And most importantly he can start a family of his own, and get an opportunity to do things right and redeem himself.

I can say with confidence that upon his release we are willing and ready to support him in every possible way such as financially and emotionally. We are financially stable enough to support him by providing housing and all necessary resources required for his positive integration into the society in the most positive way possible.. He will never be a burden to us, rather his return will be a blessing to us.

I want to express my thanks and gratitude to the honorable judge for taking time to go through my letter and I hope that It will be taken into consideration in my Uncle Khalfan's case.

Sincerely,
Amari Mohamed Khamis

Signed: Amari Mohamed Khamis

98

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: I _____ ____ KHAMIS
DATE: 09/02/2024 07:18:28 AM

TO: THE JUDGE
FROM: I_____ ___ KHAMIS
RE: LETTER OF SUPPORT TO MY UNCLE

I am the daughter of the brother of Khalfan Khamis , I am twelve years old

I know Khalfan khamis by hearing his voice on the phone, and from what I know Khalfan is a good person, he is caring, loving and respectful. He is pious to his religion and believes and fears his lord.

When he was arrested  I was not yet born, We will be very happy to see our uncle again with our own two eyes, and both my parents have told me his history.

Although he is far away , yet he always advises us well in our studies and our lives in general.  When he is freed we will love to see him, and we regard him with same respect that we regard our father and mother, and as a relative of the family, and we will let him continue with his activities in his home country.

I                    I Khamis

Amari Mohamed Khamis
Signed: I       ___   I Khamis

99

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

-----------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT.                    ED KHAMIS
DATE: 09/02/2024 07:18:26 AM

TO: THE JUDGE
FROM: R                     KHAMIS
RE: LETTER OF SUPPORT

My name            and I am the third daughter of the eldest brother of Khalfan. I am currently eleven years old

I know Khalfan by speaking with him on the phone, by hearing his voice and seeing his pictures. Also, my parents have narrated to me regarding him, when he was arrested I was not yet born. He is a good person, and he is very important to me, because whenever he calss, he asks about us and regarding our school studies and religious studies, and whenever he calls he always asks about us.

He is very important in the family because he has never ordered me or adviced me to do something bad, and he just wishes us well.

We love him, we respect him and we really wish to be with him.

l                    ed Khamis

Amari Mohamed Khamis
Signed: l           nmed Khamis

100

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

-------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: AZZA HILAL
DATE: 09/02/2024 07:18:31 AM

TO:THE HONORABLE JUDGE
FROM: AZZA HILAL MOHAMMED
DAR ES SALAAM
TANZANIA

RE: LETTER OF SUPPORT

Dear judge,
I hope this letter will find you well. I am the wife of the brother of Khalfan Khamis Mohamed, and also I am his cousin, our grandmother and his father shared the same father.

During the time of his arrest I was nine years old, and I was not yet married to his brother. But my husband Nassor Khamis Mohamed who is the brother of Mr. Khamis informed me that he was a polite, caring to his family and merciful person. He was hard working and he lived well with all the neighbours, When they were working together in their shop, he explained that Khalfan had an amaizing customer service, he adored the way he was warm and welcoming.

Now I know him more through the frequent calls that we have whenever he gets a chance, he asks me regarding my childrens health and my health also. He asks about the childrens development in school, and he always insists me to raise the children upon good manners so that they grow up with the best manners. Not only that he even asks about my mom, sisters, brothers and their inlaws for the ones that he knew them before being imprisoned. He asks about all of them regarding their health and the developments in their lives and their childrens lives.

He is a very polite an merciful person who cares about other peoples lives, in our conversation he has never informed me about any violence acts or even try to do any harmful acts. I adore and love him as a brother because he shows me and my family great respect and he maintains ties with us, something most people fail, even some children cut ties with their parents and relatives, but Khalfan doesn't give up on family, and I will not give up on him.

When he returns I will be very happy but my children will be happier than me, because they have not seen him except on photos, and they adore and love him. Khalfan willl be able to rejoin the family and he will be able to meet his mother again, whom has suffered from missing him for a very long time.

I hope that the honorable judge will consider my stetement and take it in consideration in my brother in laws case

Yours Sincerely

Azza Hilal Mohamed

Amari Mohamed Khamis
Signed: Azza Hilal

101

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 446230         KHAMIS
SUBJECT: `
DATE: 09/02/2024 07:18:25 AM

TO: THE HONORABLE JUDGE
FROM:                             MIS
RE: LETTER OF SUPPORT                              hamis, an eldest daughter of Mr. Nassor Khamis, Khalfan Khamis's

I hope this letter finds you well, my name is
brother. I am thirteen years old.

I never seen my uncle, I was not born yet. But always I talk with him, for what I can describe, he is a good man, he always
makes sure he is talking with us, he never misses a month without talking with his family at home. He is cooperate with me
ideas how life is going in order to make sure our dreams come true, and he is also respectful man and he knows that I love him
so much.

I always pray for him, my dream and his dream is that one day we shall meet together . I wish that he is released so that he can
come home with physical presence

Yours sincerely
Y                       nis.

Amari Mohamed Khamis
Signed:

102

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: I                    SOR KHAMIS
DATE: 09/02/2024 07:18:28 AM

TO: THE HONORABLE JUDGE
FROM:    ......                R KHAMIS
                                                        r Khamis, I am the second daughter of Mr. Nassor Khamis the
RE: LETTER OF SUPPORT
I hope this letter will find you well, my name is I     .
brother of Khalfan Khamis,

I am eleven years old, I have never seen my uncle before, I was not yet born. I am often talking to him on the cellphone, he is
asking me how is my health and my siblings too. He is always asking me to study hard for my future, I am not that happy
because we only talking to him on the cellphone, also he had sent us his pictures before. I felt sorry for him.

I am describing him as a good respectful person, he loves us but not only us, I have heard my parents say that when he was in
Zanzibar he loved kids a lot. Its very hard living without his presence, I wish that one day he is released so that he can be
physically present at home.

He is a very kind person, I love him as my uncle, he always shares ideas on how life is, when he comes back I will be glad for
his presence.

Yours sincerely
I  .        ..... Khamis

Amari Mohamed Khamis                    his
Signed:

103

To The Judge

From Rubea Mohammed

Re: Letter of Support

My name is Rubea Mohammed. I am the brother of Khalfan Mohammed. I am Tanzanian aged about 52 years old.

I honestly speak about my blood brother, Khalfan Mohammed. I lived with him for 26 years. He was a kind bother to me. He supported me economically, social, physically and psychologically. He involved in small scale trade such as selling food stuffs and hard wares. He was peacefully, loyalty and assertive.

He never gets married but he wishes to live with his relatives. He is only my brother that I need to support my family. I have five children that are his nephews and nieces. For the time being, I have lost confidence and hope because I don't have my brother who will stand as leader of the family.

I knew my brother as a man who dislikes trouble in his life. When I talk to him he repeats several times that it was bad luck for him to be abided with criminal case. He disliked evils and violence to any one at any place.

Through his talking, he did not support criminal events or praising to be in jail. He told me that, he won't involve in any misconduct or hungry mobs. Although he feels worries with jailing condition, he is still optimistic that there is a day he will get forgiveness. Therefore, he wants me to stay away from trouble or violent engagement.

Kindly, if there will be returning of my brother, the whole family restores its happiness and achievements as he is an asset for the welfare of the family. I need his support to care the family

As his brother, I will ensure that my brother gets basic needs such as food, housing, health care and job to start new life and form family.

Please be considered with my concern

Thanks Judge for reading my letter of support

RUBEA KHAMIS Mohomed

TO THE JUDGE

FROM AMINA RAMADHAN

RE:  LETTER OF SUPPORT

My name is Amina  Ramadhan. I am the sister's in law of Khalfan Mohammed. I am 43 years old. I was born on                         hzibar.

I would like to talk about my brother in law. Before being prosecuted, he lived with me and his brother. He was not problematic person. Myself I did not have any quarrel with him. He was charming and good looking. He was cooperative, self-determinant and well committed. He helped financially to solve my economic and social challenges like food, shelter and education. He was not only a good friend but also good advisor to me.

He planned to have a good family with educated children. He loved his family members. He is now convincing my sons and daughters to study science subjects to attain good salary jobs and religious knowledge so as to live peacefully with others. He also obeyed people regardless their age, sex, ethnics and religion.

My brother in law was a good friend to me and treated me like his sibling. Before, he was sentenced to jail; I never heard bad news involving crime on him. When I talked to him he did not even say a word which is associated offensive commitment or feeling happy with violent practices. He advocates equality, justice, peace and cooperation to his friends. He was escaping criminal events.

I always remember him for his charming, faithful and humanity. My children face education, moral and economic challenges due to absence of their uncle. I wish he could return to us so as to get stable family and coaching role to my kids. His return to my family will solve the critical challenges like ill healthy to my husband to distress from losing his young brother.

I promise that in collaboration with my husband, daughter and sons, we will provide reliable support in term of finance, housing, food, job and medical care. He is very important to make our healthy family.


Please Judge, be considered with my concern

Thanks for reading my letter of support.

Yours sincerely.

AMINA  SALUM  RAMADHAN

105

TO THE JUDGE

FROM YUNUS KHAMIS

RE: LETTER OF SUPPORT

I am Yunus Khamis, the Khalfan Mohammed's nephew. My nationality is Tanzanian and I am 26 years old.

I am pleased to say that Mohammed is my uncle whom I have never seen but I only talk to him and see his picture. My uncle is honestly good person and cooperative. Before he was imprisoned, my father told me that he liked to play with his friends. He was very kind man and worked hard to find education. He taught children on moral issues. He involved in small scale trade to help his family. He is unmarred but he insists us to be obedient and studying hard so as to build good future.

When I talk to my uncle, he wants me to not to involve in any offence and behave in good manner. He encourages me to not to disappoint in my education. He wishes to live with his family so as to support in his brothers, sisters, nephews and nieces. He wishes to marry and makes family. He still loves his family and gives advice on how to live with respect to all people.

It is his advice that enabled me to study hard and completing my secondary education. Before being jailed he was much socialized and humanity. He gave our family a respect as he involved in trade activities that expanded the income of our family. He provided financial support to my father that helped to go to school.

In his talking, my uncle always refuses any form of violence and discrimination. He has been warning me not to support any criminal events or thugs since it may threaten my life. He is unhappy with position he is and condemns the situation that made him to be jailed. He rejects that he does not join hands any terrorist movement.

However, I love my uncle very much because he was strived against poverty, ignorance and laziness, I don't support those things that led him to go jail. He is now wants to establish new life. He wishes to change his bad past story into achievement and marry wife to have children.

Returning of Khalfan to the family will change life pattern of the family. Brothers, sisters, nephews and nieces will be very happy and act in good behaviors as we have learned from the experience.

YUNUS  RUBEA  KHAMIS

106

When my uncle return home, I and my father will be grant him social, economic and psychological support including giving him fund for trade, shelter, cloth, food, health care and wife to start new life when they are necessary.

Please Judge! Be considered with my letter of support. Thanks for reading and regarding my concern.

TO THE JUDGE

FROM ...........MIS

RE: LETTER OF SUPPORT

My name ............, the Khalfan's niece aged about 13 years old. I
I would like to inform you about my uncle Khalfan Mohammed. My father told me that, before his
conviction my uncle was educated, he influenced his people in education. He struggled to improve his
trade activities and provided financial aids to his brothers and sisters. Myself I have been talking to him
through phone. He convinced me to study hard as education is the key of life.

My uncle is great mobilizer to my studies. He often wants me to seek for education and not having
early marriage. He loves his kinsmen including his brothers, sisters, nieces and nephews. He wants me
to look for education so as fight against poverty and gender based abuses. He said that he wished he
could be with me so to educate me in a right way. He makes me competent to compete with other
students as he has been promised me good things from my effort.

My uncle was against criminal events, even when I talk to him he wants me to prevent myself from
violence and being sexually abused. I wish I could be with him; I will be academically and socially
grown up. He wants me to obey the adults including my teachers, parents and brothers and sisters.

My uncle return is a step forward for my academic and economic development. He will bring positive
effects in my entire life. All people in the family will get relief of long time sadness. I wish to live with
my uncle.

His return to home after decades, we are ready to give him all his necessities like social services,
economic facilities and counseling to recover his life.

Thanks.

Yours faithful

       hamis

NUSaiba RubeYa KHAMISSI



108

TO THE JUDGE

FROM THANIA MOH'D

RE:  LETTER OF SUPPORT

My name is Thania Moh'd. I am the daughter in law of Khalfan Mohammed. I am Tanzania aged about 27 years. I was born on C

I would like to inform that, Khalfan Mohammed is my father in law whom I have never seen him but I talked to him. I have heard his cases from my husband father in law that he was self-reliant who worked in small scale trade. He loved his family and all people. He liked to live with his family for economic support. He liked study and worship.

In spite of geographically distance between us, he showed love and care to my family. He loves my husband and treats him like his son. He advised my husband to marry me so as to get peace of mind. He is interested to have family including wife and children.

My father in law promised that if he is released from jail, he would not involve in crime and told us lockout or jail is not good. He wants us to be peaceful and avoid violence. He guided his nephew into right ways.

My father in law was appreciated by all people in the family. His absence has left a big gap that lead to crisis in the family. If he returns to us it will bring development in the family as he is important man to influence changes in the family. I wish he could be granted forgiveness to join us and solve our problems.

I believe that, my father in law is now becoming good person and he has learnt from his case. He will positively change and become responsible citizen in his country who obey constitution and maintain peace and order.

As family we have planned to support him when he returns home by providing with all social welfare services and job as they way improve his living standard.

Please Judge, be considered with my concern

Thanks for reading my letter of support.

Yours sincerely.

THANNIA    PArdm    MOHD

109

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: REVISED MSELLEM MSELLEM
DATE: 09/18/2024 07:14:33 AM

TO THE HONORABLE JUDGE
From: Msellem Msellem

RE: LETTER OF SUPPORT

I am a brother-in-law of Khalfan. I married his twin sister, Fatma, who passed away on Friday, 4th of February 2022.. We have five children. I have known Khalfan since he was a young boy of 10 years. He was a good boy, obedient, and respectful to everyone. He is helpful to everyone who needs help. The first time he talked to me after the death of his twin sister, he cried and didn't have the strength to talk. He told me that if there was a choice, it would be better for him to pass away and for his twin sister to be alive. He often asks about his nephew's health and how they are coping without their mother, Fatma. He also asks about my mother's and brothers' health. Khalfan never boasts about himself and does not involve himself in bad things.

I would love for Khalfan to be back in our family. My children will be happy to have their uncle, the twin of their mother. The whole family will be happy if Khalfan comes back to his family. We will deeply thank the government of America for returning Khalfan home. I hope his mother can regain her memory because she is affected by the death of her daughter Fatma and not seeing her twin son Khalfan.

Msellem Msellem

Amari Mohamed Khamis
Signed: Msellem Msellem

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: MEIYA SHINEY
DATE: 09/16/2024 09:17:59 AM

TO THE HONORABLE JUDGE
From: MEIYA SHINEY
RE: LETTER OF SUPPORT SUPPORT

I am the niece of Khalfan Khamis. I am the firstborn of my uncle's twin sister, Fatma Khamis. I know my uncle Khalfan loves his family. When he visits, he brings rewards for me and my siblings. My uncle is a good person who loves his family.. I remember him visiting often when I was eight years old and in school. He would talk to his sister Fatma, our mother, and sometimes check my books and ask me questions about my schoolwork. My uncle never boasts about himself or convinces anyone to do bad things.

I will be very happy if my uncle returns home. It will bring back memories and happiness to see him again, the twin of my mom.

Meiya Shiney
Amari Mohamed Khamis
Signed: Meiya Shiney

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: ZAID SHINEY MSELLEM
DATE: 09/16/2024 09:18:01 AM

TO THE HONORABLE JUDGE
FROM ZAID SHINEY
RE LETTER OF SUPPORT

I am the nephew of Khalfan Khamis I am the second born of my uncle late twin sister Fatma Khamis I know that my uncle Khalfan loved his family and when he came to visit to his sister Fatma Khamis he always brought different fruits like mango, guava, apples from Kidimni the place where he lived. He loved me and sometimes he looked at my books. It has been a long time he has is not here with his family. During his arrest, at that time I was seven years, but I know him more in picture and in all the time that he is not in Tanzania he has been a good uncle.  Whenever he spoke to mom or my father, he always asked them if I am nearby so that he could talk to me, he also did the same asking for my sisters and brother. He would like to see me physically and want to know what I am doing.

My uncle he never talks to me and proud himself form what he did and doesn't convince anybody to do what he did. I love him because is a part of our family. I will be very happy if my uncle returns back home it will return the memory of seeing my late mother his twin sister to see him again and again.
Zaid Shiney
Amari Mohamed Khamis
Signed: Zaid Shiney

112

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: ILHAM SHINEY
DATE: 09/16/2024 09:17:58 AM

TO: THE HONORABLE JUDGE
FROM: ILHAM SHINEY

RE: LETTER OF SUPPORT

Honorable Judge,
My name is Ilham Shiney, I am the third born and second daughter of the late Fatma Khamis, the twin sister of Mr Khalfan Khamis Mohammed, who is my uncle. I didn't visually remember my Uncle because for a very long time because during the time of his arrest I was merely five years old.  I got to know him visually through pictures of him that he managed to send to us.

Whenever  he called home he would ask my mom to give the phone to me so that he could ask many things regarding my progress. He wanted to know about my school performance and attendance. He told  me to study hard.

I believe he is a very good man, because he never encouraged me to do any act of disobedience or harm. I love him very much, and he is an important part of this family. I will be very happy if he will return so that I can experience the things I enjoy with him, and introduce him to the new world.

Ilham Shiney
Amari Mohamed Khamis
Signed: Ilham Shiney

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: SHINEY MSELLEM SHINEY LETTER OF SUPPORT
DATE: 09/16/2024 09:18:17 AM

To the Judge
From Shiney Shiney
Re: Support letter

"I am the nephew of KHALFAN KHAMIS. I am the fourth born of my uncle's twin sister, my late mother FATMA KHAMIS. I don't know my uncle physically, only through pictures and phone calls when he calls our family. I saw him in court in the USA, but I didn't remember because I was 4 years old at the time. What happened made him end up in custody. I was a newborn.

He is a good uncle because when he calls, he wants me to study hard and concentrate. My uncle has never boasted about what he did, nor convinced anyone to do the same. I love him because he is a part of our family.

I will be very happy if my uncle returns home, as it will bring back memories and we will see him again and again, as the twin of my mom."

Shiney Shiney

Amari Mohamed Khamis
Signed: Shiney Shiney

114

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: JOKHA SHINEY
DATE: 09/16/2024 09:17:58 AM

TO: THE HONORABLE JUDGE
FROM: JOKHA SHINEY

RE: LETTER OF SUPPORT

Honorable Judge,
I am the niece and last daughter the twin sister of Khalfan Khamis,  My late mother was Fatma Khamis and she passed away two and a half years ago.

I have got to know my uncle throught the photos he sent and mostly before the passing of my mom, she used to tell me many stories about his sweet tween brother. I also knew him through the phone calls whenever he called home we got to speak.

It has not happened for my uncle to tell me or to proud himself regarding the likes or the actionsthat led to his arrest. He never convinced anybody to bring harm or to act in any harmful way or perform any act of terror. I deeply love him and yern for his return.

I will be very happy if uncle returns back home, I will have time to spend with him, and I believe it will greatly help to lessen our grief, as for now we feel as if we loss both of the twins. But with his return atleast the loss will slightly be reduced.
Jokha Shiney

Amari Mohamed Khamis
Signed: Jokha Shiney

115

TRULINCS 44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: ZUHRA KHAMIS MOHAMED
DATE: 09/02/2024 07:18:24 AM

TO: THE JUDGE
FROM: ZUHRA KHAMIS MOHAMMED
RE: LETTER OF SUPPORT

My relationship to Khalfan Khamis Mohammed is that we are siblings born from the same father and mother. I know Khalfan because he is my brother whom I have lived with since childhood under the same roof and we used to do everything together. Our bond was even more special because I was born next after him. We played together, went to school together and that's why I love Khalfan so much. He's position in the family is that he is a caring person who loves his family, we really need him, we need him to be with us again so that we can cooperate together and help each other in our personal, family and society issues.

Khalfan shows great care to my family and he has done so even before he was arrested, I need him so that atleast he can be able to watch my younger children and grandchildren grow. Although he is far away and he has never been married and raised a family of his own he loves my family in an exceptional way, and this makes me wonder how great a father and a husband he will be if he gets a chance to do so. Communication between Mr Khamis and my family is great, he treats everyone equally and respects them, and this has been his behaviour even since we were young, and this is one among the many reasons that made him to be adored and loved by every one.

Whenever Khalfan (Mr. Khamis) calls he is never selfish by only talking with me alone, he asks about my husband and children so that he can speak with them and ask regarding their health, academic development and other daily matters in general.

Khalfan helps us a lot, he always counsel us on important matters example on our children and their education, Whenever we speak with him he insists on us to spend this time and provide our childrens with resources that will help them attain high levels in education, because he says there is no  goodlife without proper education and skills. He even suggested some career path to different children, and I am thankful my children listened to him and now some of them are working on their professions. To those children of mine who failed in their education, he never judges them or discriminate them, rather he encourages and motivate them in other matters. He insists on them that they must work hard and help their parents. This is just a fraction of the matters that he always helps us with. I also have an elderly mother who is ill and bed ridden, hence if Khalfan can be freed he will have a second chance and he can spend the rest of the remaining days of our mother by her side.

In our conversations with Khalfan he has not even once praised nor defend the actions that led to his arrest, and he has never praised any one who have done any similar actions, or even encourage a person to do such actions or any act that will disturb the peace in the society. On the contrary he has been sad due to all what has happened to him, and took him along time to accept what happened and forget the hardships that he went through. And as soon as he got a chance to communicate through letters he wrote to everyone who went through any hardships due to his arrest. He wrote those letters and he expressed his sadness and apologized to them. I believe if he had any means then he would have compensated all of those who suffered because of him. Even in jail, there was an act that occurred where by one of the prison worker was attacked, and Khalfan was accused to be among those who participated, but upon investigations it was found out that he didn't do it. Khalfan hates all typ of matters regarding violence, even during the national elections, a period that is notorious due to instability, he insists on us and the children to avoid doing violence and to remain in our houses and not let the children out of our sight. He insists that violence is not the solution. I know my brother Khalfan to be a calm and patient person.

We all really love and respect Khalfan, because he is my brothor who cares and values my family. My love for my brother do not allign or include in any way love for the actions that led to his arrest. I love him as he is without supporting or agreeing to actions that led to his arrest or any other acts of violence. He is very important to us we need to be with him again so that ou family can be whole again, I plead to the honorable judge, to consider and show mercy and Khalfan by releasing him.

My heart will be filled with immense joy when Khalfan will be able to return to the family after being away for almost quarter century, I believe this feeling will be equally shared among all family members. Although we are all sad that we have not be with him for all these twenty five years, he has not been with mother for all this time, I believe even my moms memory and happiness will return by his return also. Another benefit is that since I am a mother and I currently have grand children, I kn the joy of being a mother and a granny, Hence, I wish that Khalfan is freed and he comes and get married and has a gener of his own.

116

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A
--------------------------------------------------------------------------------

The whole family agrees to help Khalfan with a house and job once he is freed, and even further financial support for treatmeant if needed, until he gets back on his feet. We are even ready to live with him in our own houses and share with him everything that we eat and drink, even if it has to be so for his whole life. Each and every family members is ready to do so on a heartbeat. We will create a safe space for him, free of judgment and full of support, where he can feel that he belong.

Thank you for reading my letter and I beg you to consider releasing my dear sweet brother

Zuhra Khamis Mohamed

Amari Mohamed Khamis
Signed: Zuhra Khamis Mohamed

FROM: Salum Muslim Salum
Subject: Letter of Support

TO: Honorable Judge
This is a character letter for my Brother in Law Khalfan Khamis Moh'd. I have married his young sister Zuhra Khamis Moh'd for thirty years now.

I have always remembered him as a good person and being around my family in whatever situation we have. Also, he was a helping hand when we faced difficulties. Not only that but he was also a good brother to my wife and a good uncle to my kids, he used to play with and educate my children by narrating stories concerning good manners and how to behave toward other children.

I dare to say that he is a bridge and an important link to his family and he is the main advisor of the family before. Even after being convicted of the said offence due to his wisdom although some brothers and sisters are older than him he made a great contribution to his family, especially after losing their beloved father. At the same time, they were very young, and since then he has become stronger so stands by his family and has been a great help to her mother since then.

His conduct and behavior are compatible with the family because he was a good person since he was young, he was very understanding and respectful to people of all ages regardless of race or ethnicity. From my side, we got along well and we kept in touch regularly he respected me not because I was his brother-in-law but because he respected me as his blood brother due to our closeness and being older than him.

Even after being arrested we were in touch with him because he did not stop finding the chance to communicate with us and I have been receiving his greetings and regards through the letters written to my wife and my kids until he gets permission to use the phone that's when I got the chance to communicate

1

with him directly and that comforts me a lot after being not able to communicate with him for many years.

Most of the time we talk he emphasizes eating health, the development of the family, educational issues for my kids, and even the challenges that we face in bringing up the children and he gives me some advice and guidance concerning those issues.

His behavior made him close to many people when he got the chance to call us he always remembers greeting my brothers and sisters and even my children that I had before marring his sister, despite the passage of many years he still remembers the closeness and love that we have between us and he treats my family as own family.

Most of the time when we talk to him, he seems to be sad, lonely, and regretful about what he has done that made him imprisoned and destroyed his dignity and reputation to the community and even to the world in general which has cost him his freedom and closeness of being with his loved ones, especially his family.

This case had a negative impact it made him regret a lot and advised us to protect our freedom, stay humble, and respect the law for not participating in any criminal issues.
Since he has become very kind to us and the people around him he has become a part of our lives, being away from us has not caused us to forget the love that we have between us even though we miss his presence we still love, respect and need him in our lives because we believe he is a good man and he regrets for what he has done and we are taking it as a human he has done wrong against Good and people and he took most of his time to repent for what he has done.

We will be very relieved to have a second chance to reunite with our beloved brother especially after not being with him for a long period, we will receive him with great desire and enthusiasm, I believe that his return will unite us again, and increase the love between us. Also, his return will give us light in our lives considering that his thoughts and ideas have always been leading our lives.

2

١١٩

Honorable Judge I pray to your honorable Court to be blessed to a man who has a chance to my brother-in-law to start a new life with his family, babies, a mother who is extremely old and needs of his care, attention, and ownership of children. So it is my humble request to your honorable Court to give a passionate release to my brother-in-law since it's his first offense to be concerned and he has no other criminal record even in his homeland.

Thank you for your consideration.

Sincerely,

FROM: Kulthum Salum Muslim

TO: Judge

### Subject: Request for compassionate release for uncle Khalfan Khamis Mohamed

Your Honor,

My name is Kulthum Salum Muslim, and I am reaching out to you with a heavy heart in support of my dear uncle, Khalfan Khamis Mohamed.

Khalfan is my uncle, and I am writing now humbly requesting you to consider giving him a compassionate release. When my uncle was jailed, I was just a little child, about four to five years of age, and id do not have many memories of him. However, my mother has always shared that I held a special place in my uncle's heart and that he deeply cared for me.

I have heard countless stories of his kindness and compassion towards his family, neighbours, and teachers. His dedication to his loved ones was unwavering. Teachers at both his school and madrasa admit that he had an outstanding character, and he excelled in sports like football and basketball.

Despite the physical distance that is currently between us, we have maintained communication with my uncle through letters and phone calls. His inquiries about my well being, studies, and family life have shown me his unwavering concern for our happiness and prosperity. His absence is deeply felt, especially during family gatherings such as wedding ceremonies, funerals and when we celebrate holidays such as Eid el fitr and Eid el hajj. Where his absence is keenly felt.

121

We long for the day when he can rejoin our family, and we are more than willing to support him in every way possible, whether financially or emotionally.

Your Honor, I implore you to grant my uncle compassionate release so that he may have the opportunity to rebuild his life and reunited with his family. Your mercy and understanding in this matter would mean the world to us.

Thank you for your consideration.

Sincerely,

Kulthum Salum Muslim

122

From: Muslim Salum Muslim

Re.    Letter of support of my uncle Khalfan Khamis Mohamed

To Honorable Judge,

I am Muslim Salum a second child of Zuhra Khamis Mohame'd and khalfan khamis Mohame'd is my best uncle.

I am writing to request the release of my uncle, Khalfan Khamis. Although I have never had the chance to meet him, the stories my mother shares about his kindness and guidance resonate deeply with me. It is evident that his absence is keenly felt, and our family desperately needs him. Please find it in your heart to consider our request and reunite us with our beloved uncle.

I remember him daily through the stories my mother tells of their happy memories and through a picture my Mom shows me. I didn't see him physically, but he is my best friend. All the family loves him because not only he is our uncle but also he is very caring, charming, and a good advisor to our family

. Although I have never met him, he has always been my guiding light, advising me to help my family and take good care of my mother. I did not seen him a single time but he is my best friend, whenever we got the chance to talk he advised me good and I really appreciate it.

He has always advised me to help my family and taking good care of my mother. As a family, we need him, and we know that it is very hard for him to cope in there whenever there are problems facing his family, as when he lost his twin sister he was not there with his family.

We are fully committed to offering our unwavering assistance, including financial support and healthcare, to ensure his well-being. I urge you to consider our request and reunite us with our beloved uncle.

Thank you for your consideration.

Sincerely,

M.S.M

Muslim Salum Muslim

123

From:                 Juslim

Re.   Letter of support of my uncle Khalfan Khamis Mohamed

To Honorable Judge,

I am                 .ghter of Zuhra Khamis Mohammed I am 14 yrs old and khalfan khamis Mohame'd is my favourite uncle.

I am writing to request the release of my uncle, Khalfan Khamis. Although I have never had the chance to meet him, my mother always tells us stories that we have our uncle who faced problems when we were not born yet, my mother shares his kindness and guidance resonate deeply with me. When talk to him he always advises us to a good deed and study hard.

We love our uncle very much and it will never change. We all will be happy if he return to us. We will accept him with smiles and happiness. Whole family will adore him and it will be the end of our sorrows

I know he will need our support even though I am not old enough to be assured for financial support but I believe with the help of my family we are ready with an open heart to help and support him because we love and need him, especially my Mother she is willing to do anything that concerns my uncle. So I humbly request you to give my uncle a second chance to reunite with us.

Thank you for your consideration.
Sincerely,

S. S. M
Salma Salum Muslim

124

From: Rayyan Salum Muslim

Re: Request for Compassionate Release for Uncle Khalfan Khamis Moh'd

Honorable Judge,
My name is Rayyan Muslim, and I am writing to request a compassionate release for my uncle, Khalfan Khamis Moh'd. I am the daughter of Zuhra Khamis Moh'd. and Khalfan Khamis Moh'd is my uncle. I am 23 years old.

Since I was a child, my mother has always spoken highly of my uncle, praising him as her favorite brother. My mother told me that after I was born my uncle Khalfan is the one who give me the name of Rayyan which means the door of heaven I truly love the name that my uncle gave, so because I did not get the chance to know him personal my mum often tells me the story of how we went to America to be with him in his case a few months after I was born. I truly appreciate the sacrifices my family made to support him during difficult times, even though I was too young to remember.

Although we initially communicated through letters, we now talk regularly on the phone. From our conversation [...] to know my uncle as a caring and compassionate man with a [...] and a heart of gold. He always asks about my studies, health and [...] a genuine concern for my well being and success, even when it do [...] over the benefit him. He is also deeply sensitive to family matters, particularly in time of loss when he is unable to be with us.

Even after I got married [...] to elder care and concern for me, my husband [...] He consistently advises me on maintaining [...]

His absence deeply [...] to retain. We are willing and ready to support [...] in future financially and in matters of health. [...] to retain our family and share [...]

125

We are, therefore, reaching out to seek your consideration for granting my uncle a compassionate release. We believe that giving him a second chance to rebuild his life, manage his health, and be with his family will bring renewed hope and happiness to all of us.

Thank you for your consideration.

Sincerely,

Sincerely,

Rayyan Salum Muslim

2
126

From:                    Muslim

Re.   Letter of support of my uncle Khalfan Khamis Mohamed

To: Dear Judge,

I am .                    a child of Zuhra Khamis Mohame'd, I am the last borne in my family, I have 10 years old.

I am writing to request the release of my uncle, Khalfan Khamis. Although I have never had the chance to meet him, but I'm talking to him by phone he is lovable.

My mother shows me the pictures of my uncle, whenever we talk he encourages me to study hard and be a doctor.

I don't have many to say about him but my every day wish is to see him free, happy and to live with us in our home because we love him and he love us too.

My grandmother, my other uncle and my ant will be very happy to see him after not seeing him for so many years.

Dear Judge I request to your court to free my uncle and to give him a second chance because he is a good man and I myself and my family we will be very happy to have him in our life.

Thank you for your consideration.

Sincerely,

S. S. m
                    Muslim

TRULINCS  44623054 - MOHAMED, KHALFAN KHAMIS - Unit: FLP-B-A

---------------------------------------------------------------------------------------------------------

FROM: Mohammed, Ammaar
TO: 44623054
SUBJECT: HAMIDA HILAL MOHAMMED
DATE: 09/02/2024 07:18:32 AM

TO: THE JUDGE
FROM : HAMIDA HILAL MOHAMMED
                        /com
DAR ES SALAAM TANZANIA

RE: LETTER OF SUPPORT.

Dear judge
I hope this letter will reach you while you are in the best of health. My name is Hamida Hilal Mohammed, I am a relative of
Khalfan my mother was the sister of his father. We are cousins, I know Khalfan well as my brother and as an important person
and respectful to me. In the family he has a special position because of his exemplary characters.

In general Khalfan's behaviour was good and his interaction with all family members and friends was good. His relationship with
my family is good, he respects me and is concerned and cares about my development and well being, even when we speak on
the phone he shows that he cares and lovew his family and relatives. He is deeply concerned regarding their development in
various aspects such as health, education and economy.

In my conversations with him, he never mentioned or praised any acts of violence  because he is a peaceful and merciful
person, and cares about innocent lives.

Indeed we love and respect Khalfan because of his love, respect and care to us and his position in the family. And when he
returns to our family we will welcome him with unimaginable happiness,since we havent seen him for twenty five years,
especially his mother will be the happiest among all of us, due to her pain and suffering of being away from his son for a very
long time.

I thank you for taking time to read this letter, and I hope you will take into consideration all what I have said regarding Khalfan.

Yours faithfully,
Hamida Hilal Mohammed

Amari Mohamed Khamis
Signed: Hamida Hilal Mohammed

128



**U.S. Department of Justice**
Federal Bureau of Prisons

*United States Penitentiary –*
*Administrative Maximum*

Florence, Colorado 81226

December 8, 2014

NOTICE TO:    KHALFAN MOHAMED, REG. NO. 44623-054

FROM:    J. Oliver, Complex Warden

SUBJECT:    **Notification of Extension of Special Administrative Measures**

You were convicted of various terrorism-related crimes in conjunction with your participation in the August 1998 bombing of the United States Embassy in Dar es Salaam, Tanzania (1998 U.S. Embassy attack), and sentenced to life plus 40 years of imprisonment. The Attorney General originally placed you under Special Administrative Measures (SAM) in December 1999.

In his letter, the United States Attorney for the Southern District of New York (USA/SDNY) requests that your SAM be renewed because there is a substantial risk that your communications or contacts with others could result in death or serious bodily injury to others. According to the USA/SDNY, you present a great risk to national security because, as a trained terrorist and member of al Qaeda, skilled in explosives, any communications are potentially dangerous.

The USA/SDNY indicated that you played a central role in the 1998 U.S. Embassy attack. Prior to the bombing, you stored the bomb-making materials and equipment at your residence. You then agreed to remain in Dar es Salaam to ensure that the bomb reached its target. On the morning of August 7, 1998,[1] you and the suicide bomber left the residence with the bomb and drove to the United States Embassy in Dar es Salaam. You exited the truck before the truck reached its target. The bomb was detonated outside the United States Embassy, killing at least 11 individuals and injuring hundreds of others. The explosion destroyed not only the United States Embassy, but also the nearby embassies

---

[1] August 7, 1998, was the eighth anniversary of former President George H.W. Bush's deployment of troops to Saudi Arabia. On that day, al Qaeda carried out nearly simultaneous attacks on the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, killing 224 individuals, injuring thousands of others, and destroying numerous buildings.

**"Sensitive But Unclassified"**

129

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 2

of France, Nigeria, and Algeria. After the bombing you returned to the residence, where you removed various incriminating items and removed any traces of the al Qaeda cell. Using fraudulent identification documents, you traveled to South Africa, where you were eventually arrested.

In further support of renewal of the SAM, the USA/SDNY cites your conduct while incarcerated and subject to SAM. Specifically, the USA/SDNY points to your involvement in the November 1, 2000, plot by fellow SAM inmate, Mamdouh Mahmud Salim, to take hostages at the Metropolitan Correctional Center while you were subject to SAM. During this failed hostage attempt, Salim stabbed a corrections officer in the eye, leaving him blind and brain damaged. You covered a surveillance camera and seized a corrections officer's radio during Salim's attack on the officer.[2] The USA/SDNY also points to your continued interest in bombings in Dar es Salaam. For example, on May 2, 2011, you sent a letter to your sister noting that you had heard that an explosion at an army base in Dar es Salaam was the second one to occur at the same base in two years. This letter was not transmitted because, given your operational role in the 1998 U.S. Embassy attack, your inquiry about the explosions may have been an attempt to obtain operational intelligence. The USA/SDNY notes that in 2011 and 2012, the FBI denied your requests for contact with certain telephone numbers because of national security concerns. Additionally, the USA/SDNY notes that you attempted to circumvent the SAM during a telephone call with your sister in February 2013. During the call, you provided your sister with instructions on how to send you books in order to circumvent the ADX rule that allows inmates to receive books only if they are sent directly from the bookstore or publisher. Specifically, you said that, once your sister received four books you had already requested her to purchase, to place them into separate envelopes. Next, you advised her not to use her address as the sender, but to use the address of the bookstore where she had purchased the books.

Finally, the USA/SDNY contends that, because of your role in the 1998 U.S. Embassy attack, you became a heroic figure in al Qaeda, and are, therefore, in a strong position to influence and inspire others to commit similar attacks. According to the USA/SDNY, for this reason, your SAM must continue, especially since you have never accepted responsibility for your crimes or tried to dissociate yourself with those crimes and from al Qaeda.

---

[2] Evidence was presented in court regarding Mohamed's knowledge of the planned hostage taking/escape and his role in the November 1, 2000, incident. However, the judge pointed to conflicting statements of government witnesses when concluding that there was "little basis" to believe that he conspired with others to help advance the plot.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 3

The Federal Bureau of Investigation (FBI) agrees that your SAM should continue. In its letter to the USA/SDNY, the FBI provides further detail about your involvement in the embassy bombing, including your purchase of a scout vehicle used by the bombers, your renting of the house used as the bomb factory, and your assistance in the loading of the bomb onto the truck for eventual delivery.

During your post-arrest interview, you described Usama bin Laden as a sheikh, a scholar, and a leader. You stated that you bombed the embassy because it was your responsibility according to your study of Islam, and that your study of history and Islam made you want to kill Americans. You further stated that if you had not been caught by police, you would have done it again, and if released from custody, you would kill Americans and help with another bombing.

The FBI also points out your status within al Qaeda. The bombings in Dar es Salaam and Nairobi are some of the most important operations in al Qaeda, lending to your status within the organization. You also admitted that you attended a training camp in Afghanistan, and that you trained others in Somalia, demonstrating your status within the organization. Notably, you refused to answer questions under oath about these trainings at a recent deposition. Although you previously denied being trained in code, an al Qaeda training manual seized by the United States contains the following advice regarding communications from prison:

> Take advantage of visits to communicate with brothers outside prison and exchange information that may be helpful to them in their work outside prison. The importance of mastering the art of hiding communications is self-evident here.

This guidance demonstrates the risks associated with your communications. In conformance with other al Qaeda guidance, you have made false claims of mistreatment; you have engaged in hunger strikes; and you conspired in the brutal attack on a corrections officer. The FBI points out that based on your tradecraft experience and your affiliation with al Qaeda, you not only pose a direct threat to the national security through your actions, but are a credible voice to other individuals in the Islamic extremist community who subscribe to violent extremist ideology and are seeking to act on those beliefs.

The FBI also points out that the terrorist organization al-Shabaab, which formalized an association with al Qaeda in 2012, has a presence in Tanzania, where your family and friends reside, and that your status as an al Qaeda operative involved in the high profile 1998 U.S. Embassy attack makes your communications of particular value to al-Shabaab as a recruiting tool in Tanzania and other locations in Ease Africa where al-Shabaab

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 4

operates.  Relatedly, the FBI notes that incarceration at the ADX Florence is falsely described in some media reports as amounting to "torture," thus increasing your value as a propaganda tool for al-Shabaab and other terrorist groups.

Additionally, the FBI notes your claim that you are no longer a violent jihadist.  At a recent civil trial, however, you indicated that you would be open to engaging in violent jihadist if a Muslim scholar authorized it.  This is especially striking when compared to your post-arrest description of Usama bin Laden as a scholar.

The FBI also has concerns about the association between your family members and friends and other individuals involved in terrorism.  The FBI specifically cites its denial of your requests in 2011 and 2012 for contact with certain telephone numbers due to national security concerns, as well as the fact that several members of your family have lied to FBI agents and other investigators in connection with the investigation of the 1998 U.S. Embassy attack.  Further, you refused to disclose certain information about your family and friends during a recent deposition in connection with the aforementioned civil trial. The FBI's recommendation also cites your above-described attempt to circumvent the SAM during the February 2013 telephone call with your sister.

Based upon information provided of your proclivity for terrorism, particularly your membership within al Qaeda and your central role in al Qaeda's 1998 U.S. Embassy attack, your conduct while incarcerated and subject to SAM that demonstrates your continued threat to the safety of others and your commitment to terrorist activities, and your status as a hero due to your role in the 1998 U.S. Embassy attack, which places you in a position to influence and inspire others to commit similar attacks, it was found there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.  Therefore, pursuant to 28 C.F.R. § 501.3, we will continue to implement the SAM in order to restrict your access to the mail, the media, the telephone, and visitors.  This SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to any further direction.

1.  **General Provisions:**

   a.  **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP), and Detention Facility (DF) Policy Requirements** – In addition to the below listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc.  If there is a conflict between the USMS/BOP/DF policies

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 5

and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then the USMS/ BOP/DF policies shall control.

b.   **Interim SAM Modification Authority** – During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

   i.   Does not create a more restrictive SAM;

   ii.   Is not in conflict with the request of the USA/SDNY, FBI, or USMS/ BOP/DF, or applicable regulations; and

   iii.   Is not objected to by the USA/SDNY, FBI, or USMS/BOP/DF.

c.   **Inmate Communications Prohibitions** –

   i.   You are limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in you communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) threatening or other terrorism related information.

   ii.   The USMS/BOP/DF may permit you to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. You shall not have any physical contact with other inmates during this predesignated time and all such predesignated sessions may be monitored and/or recorded. Upon request of the FBI, a copy of the recording will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that you are attempting to pass messages, soliciting or encouraging acts of terrorism, violence, or other crimes.

"Sensitive But Unclassified"

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 6

    d.    **Use of Interpreters/Translators by the BOP** – Interpreter/translator approval requirement:

        i.    The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with you.

        ii.    No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/SDNY.

        iii.    Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you. Interpreters/translators shall not be alone with you, either in a room or on a telephone or other communications medium.

2.    **Attorney/Client Provisions:**

    a.    **Attorney[3] Affirmation of Receipt of the SAM Restrictions Document** – Your attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, your attorney and precleared staff[4]

---

[3] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

[4] "Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 7

acknowledge the restriction that they will not forward third party messages to or from you.

i.    The USA/SDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

ii.   After initiation of the SAM and prior to your attorney being permitted to have attorney/client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/SDNY.

iii.  The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D. C. and the USMS/DF/BOP.

b.  **Attorney Use of Interpreters/Translators** –

i.    Necessity Requirement – No interpreter/translator shall be utilized unless absolutely necessary where you do not speak a common language with the attorney.  Any interpreter/translator shall be precleared.[5]

ii.   Attorney Immediate Presence Requirement -- Any use of an interpreter/translator by the attorney shall be in the physical and immediate presence of the attorney, i.e., in the same room.  The attorney shall not patch through telephone calls, or any other communications, to or from you.

---

signature – to adhere to the SAM restrictions and requirements.  As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity.  A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.
[5] "Precleared," when used with regard to an interpreter, refers to an interpreter who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAMs restrictions and requirements.

**"Sensitive But Unclassified"**

135

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 8

     iii.    Translation of Inmate's Correspondence – An attorney of record may only allow a federally approved interpreter/translator to translate your correspondence as necessary for attorney/client privileged communication.

c.    **Attorney/Client Privileged Visits** – Attorney/client privileged visits may be contact or noncontact, at the discretion of the USMS/DF/BOP.

d.    **Attorney May Disseminate Inmate Conversations** – Your attorney may disseminate the contents of your communication to third parties for the sole purpose of providing necessary legal services related to your post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by your attorney, and not by the attorney's staff.

e.    **Unaccompanied Attorney's Precleared Paralegal(s) May Meet with Client** – Your attorney's precleared paralegal(s) may meet with you without the necessity of your attorney being present.  These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.

f.    **Simultaneous Multiple Legal Visitors** -- You may have multiple legal visitors provided that at least one of the multiple legal visitors is your attorney or precleared paralegal.  These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.  An investigator or interpreter/translator may not meet alone with you.

g.    **Legally Privileged Telephone Calls** – The following rules refer to all legally privileged telephone calls or communications:

     i.    Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call as well.

     ii.    Inmate's Initiation of Legally Privileged Telephone Calls – Your initiated telephone communications with your attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney.  This privilege is contingent upon the following additional restrictions:

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 9

1) Your attorney will not allow any non-precleared person to communicate with you, or to take part in and/or listen to or overhear any communications with you.

2) Your attorney must instruct his/her staff that:

   a) Your attorney and precleared staff are the only persons allowed to engage in communications with you.

   b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your calls or other communications to third parties.

3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

   a) Is to be overheard by a third party.[6]

   b) Will be patched through, or in any manner forwarded or transmitted to a third party.

   c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d above.

   d) Shall be in any manner recorded or preserved.[7] Your attorney may make written notes of attorney client privileged communications.

4) If the USMS/BOP/DF, FBI, or USA/SDNY determines that you have used or are using the opportunity to make a legal call to speak with another inmate or for any other nonlegal reason that would circumvent the intent of the SAM, your ability to contact your attorney by telephone may be suspended or eliminated.

---

[6] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client privileged communications.

[7] Except by the USMS/BOP/DF /FBI/DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client privileged communications.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 10

h.   **Documents Provided by Attorney to Inmate** – During a visit, your attorney may provide you with or review with you, documents related to your post-sentencing proceedings and/or material prepared by your attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator.  Any documents not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail review provisions of subparagraphs 2i and 3g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

   i.   None of the materials provided may include inflammatory materials, materials inciting to violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/SDNY and FBI.

   ii.  The USA/SDNY may authorize additional documents to be presented to you.  If any documents not listed or described above need to be transmitted to you, consent for the transmission of the document can be obtained from the USA/SDNY without the need to formally seek approval for an amendment to the SAM.

i.   **Legal Mail**[8] – Your attorney may not send, communicate, distribute, or divulge your mail, or any portion of its contents (legal or otherwise), to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to your post-sentencing proceedings – and not for any other reason.  In signing the SAM acknowledgement document, your attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to you, and that neither the attorney nor his/her staff will forward third party mail to and from you.

---

[8] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney.  All other mail, including that otherwise defined by the BOP as Special Mail, shall be processed as "nonlegal mail."

**"Sensitive But Unclassified"**

138

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 11

3.    **Inmate's Nonlegal Contacts:**

   a.    **Nonlegally Privileged Telephone Contacts** –

   i.    You are limited to nonlegally privileged telephone calls with your immediate family members[9] and the individuals listed in Chart A of the attached addendum.

   ii.    The quantity and duration of your nonlegal telephone calls with your immediate family members and the individuals listed in Chart A of the attached addendum shall be set by the USMS/BOP/DF, with a minimum of one call per month.

   b.    **Rules for Telephone Calls** – For all nonlegally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

   i.    Is to be overheard by a third party.

   ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

   iii.    Shall be divulged in any manner to a third party.

   iv.    Shall be in any manner recorded or preserved.[10]

   All telephone calls shall be in English unless a fluent USMS/BOP/DF or FBI approved interpreter/translator is available to contemporaneously monitor the telephone call.  Arranging for an interpreter/translator may require at least 14 days' advance notice.

   c.    **Telephone SAM Restriction Notifications** – For all nonlegal telephone calls to your immediate family members and the individuals listed in Chart A of the attached addendum:

---

[9] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI verifiable) spouse, children, parents, and siblings.  Requests for additional nonlegal contacts may be submitted on a case-by-case basis.
[10] Except for the BOP/FBI/DOJ or other duly authorized federal authorities.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 12

     i.     The USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

     ii.     The USMS/BOP/DF shall verbally inform the individual on the opposite end of your telephone communication of the SAM restrictions.  The USMS/BOP/DF is only required to notify your communication recipient in English.

     iii.     The USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring** – All calls with your immediate family members and the individuals listed in Chart A of the attached addendum, shall be:

     i.     Contemporaneously monitored by the FBI.

     ii.     Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

     iii.     A copy of each telephone call recording shall be provided by the USMS/BOP/DF to the FBI.  These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communication** – If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members for a period of time to be determined by the USMS/BOP/DF.  If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Nonlegal Visits** –

     i.     **Limited Visitors** – You shall be permitted to visit only with your immediate family members and the individuals listed in Chart B of the attached addendum.  The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 13

ii.     **English Requirement** – All communications during your nonlegal visits will be in English unless a fluent USMS/BOP/DF or FBI approved interpreter/translator is readily available to contemporaneously monitor the communication/visit.  Arranging for an interpreter/translator may require at least 14 days' advance notice.

iii.    **Visit Criteria** – All nonlegal visits shall be:

1)     Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

2)     Permitted only with a minimum of 14 calendar days' advance written notice to the USMS/BOP/DF facility where you are housed.

3)     Without any physical contact.  All such meetings shall be noncontact to protect against harm to visitors or staff.

4)     Limited to one adult visitor at a time.  However, your FBI verified children may visit with a preapproved adult visitor.

g.    **Nonlegal Mail** – Nonlegal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming and outgoing). Nonlegal mail is limited to only your immediate family and the individuals listed in Chart C of the attached addendum, U.S. courts, federal judges, U.S. Attorney's Offices, member of U.S. Congress, the BOP, and other federal law enforcement entities.

i.     **General correspondence with limitations:**  Correspondence is restricted to immediate family members and the individuals listed in Chart C of the attached addendum.  The volume and frequency of outgoing general correspondence with immediate family members and the individuals listed in Chart C of the attached addendum, may be limited to three pieces of paper (not larger than 8 ½ x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF.  The identity and your family member relationship will be confirmed by the USMS/BOP/DF and FBI.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 14

ii.    **General correspondence without limitations:** There is no volume nor frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

iii.    **All nonlegal mail will be:**

1)    **Copied** – Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which you are housed.

2)    **Forwarded** – Shall be forwarded, in copy form, to the location designated by the FBI.

3)    **Analyzed** – After government analysis and approval, if appropriate, your incoming/outgoing nonlegal mail will be forwarded to the USMS/BOP/DF for delivery to you. After FBI analysis and approval, outgoing mail may be sent in an envelope clearly designated "NONLEGAL MAIL" to your attorney, David Stern, who will then forward it to the addressee.

iv.    The federal government will forward your nonlegal mail to the USMS/BOP/DF for delivery to you (incoming) or directly to your attorney, David Stern, for forwarding to the addressee (outgoing) after a review and analysis period of:

1)    A reasonable time not to exceed 14 business days for mail which is written entirely in the English language.

2)    A reasonable time not to exceed 60 business days for any mail which includes writing in any language other than English, to allow for translation.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 15

3)  A reasonable time not to exceed 60 business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v.  **Mail Seizure** – If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussion of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action.  You shall be notified in writing of the seizure of any mail.

4.  **Communication with News Media**:  You shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, your attorney, a third party, or otherwise.

5.  **Religious Visitation**:

a.  You shall not be allowed to engage in group prayer with other inmates.

b.  If an USMS/BOP/DF or FBI approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or noncontact visit, at the discretion of the USMS/BOP/DF.

6.  **No Communal Cells and No Communication Between Cells**:

a.  You shall not be allowed to share a cell with another inmate.

b.  You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1c above.

7.  **Cellblock Procedures**:

a.  You shall be kept separated from other inmates as much as possible while in the cellblock area.

"Sensitive But Unclassified"

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 16

b.   You shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.  **Access to Mass Communications:**  To prevent you from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

a.   **Publications/Newspapers –**

    i.   You may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public.  This determination is to be made by the USMS/BOP/DF, in consultation with the USA/SDNY.

    ii.   Sections of the publication/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

    iii.  If restricted by the USMS/BOP/DF rules, access to a publication will be denied.  If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination.  If the FBI's expertise is required, the publication will be forwarded to the FBI for review.  The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make the determination.  (In these cases, the FBI shall respond to the USMS/ BOP/DF within 14 business days.)  You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with the USMS/BOP/DF policy.

    iv.   In order to avoid passing messages/information from inmate to inmate, you shall be allowed to share institutionally purchased publications/ newspapers with other SAM inmates only after each publication/ newspaper is physically screened by staff to ensure that messages cannot be passed between the SAM inmates.  Publications/newspapers individually purchased by you may not be shared with any other inmate.

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 17

b. **Television and Radio** – You are authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c. **Termination or Limitation** – If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you relating to the furtherance of terrorist or criminal activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

9. **Access to Books:**

a. You may have access to all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by you would pose a substantial threat to national security.

b. In order to avoid passing messages/information from inmate to inmate, you shall be allowed to share institutionally purchased books with other SAM inmates only after each book is physically screened by staff to ensure that messages cannot be passed between the SAM inmates. Books individually purchased by you may not be shared with any other inmate.

10. **Transfer of Custody:** In the event that you are transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for you will continue in effect, without need for any additional DOJ authorization.

11. **Inmate's Consular Contacts:** You, as a citizen of a foreign country, shall be allowed Consular communications and visits, consistent with the USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[11] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

---

[11] See, Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist The, DOS. The DOS contact: Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 18

## CONCLUSION

The SAM set forth herein, especially as they relate to attorney/client-privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability for you to aid knowingly or inadvertently, in plans that create a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM is reasonably necessary because of the high probability of calls to co-conspirators to arrange terrorist, violent, and/or criminal activities.

With respect to mail privileges, the SAM is reasonably necessary to prevent you from receiving or passing along critically timed messages. Accordingly, your interest in the timely receipt and/or submission of mail, with the possible danger the contents of the mail may pose to others, has been weighed. It was determined that delaying mail delivery to allow authorized personnel to examine a copy of the mail is the least restrictive means available to ensure that the mail is not being used to deliver requests for, or to assist in, violent threats, and/or criminal acts against government witnesses or others.

To the extent that the use of an interpreter/translator is necessary, the government has the right to make sure that the interpreter/translator given access to you is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if you advocate terrorist, criminal, and/or violent offenses, or if you make statements designed to incite such acts. Based upon your past behavior, it is believed that it would be unwise to wait until after you solicit or attempt to arrange a violent or terrorist act to justify such media restrictions.

The SAM's limitations on access to newspapers, publications, television, and radio are reasonably necessary to prevent you from receiving and acting upon critically-timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. While it is believed that limiting and/or delaying such access may interrupt communication patterns you may develop with the

(202) 736-7261 or http://travel.state.gov/law/consular/consular_753.html.

"Sensitive But Unclassified"

Notification of Extension of Special Administrative Measures
Khalfan Mohamed, Reg. No. 44623-054
December 8, 2014
Page 19

outside world, and ensure that the media is not used to communicate information that
furthers terrorist, violent, and/or criminal activities.

These conditions are imposed by the BOP at the request of the Attorney General, through
his designated agent, the Assistant Attorney General.


Received: December _____, 2014
            (19 pages)

            _____
            Khalfan Mohamed
            Reg. No. 44623-054

"Sensitive But Unclassified"

147.

# TABLE OF CONTENTS OF THE DECLARATION:
## PG (1) -(26); APPX: 148-173

| | |
|---|---|
| The Abuses of 2000, 2008 & My Disciplinary History | (1) |
| The Medical Records, Conditions & Medications | (4) |
| Eyes Problem | (5) |
| High Blood Pressure | (5) |
| Constipation | (6) |
| Swelling and Pain on My legs | (6) |
| Headache | (7) |
| Pain on My Back, Legs, Wrists, and Jaws | (7) |
| Allepecia | (8) |
| Passing urine | (8) |
| The Impacts of My Physical and Emotional Circumstances on Me | (8) |
| The Government Never Extended the Plea Deal offer to me | (10) |
| Rehabilitation Efforts | (11) |
| Remorse | (11) |
| A Brief of My Experience in the Solitary Confinement | (11) |
| The S. Confinement under the H-unit (SAMs) vs. The ADx G.P. units' | (12) |
| Few similarities shared Between the GPs and H-unit's S. Confinem' | (13) |
| The Uniqueness of the H-unit; SAMs Solitary Confinement | (14) |
| Attorney / Client Communications | (14) |
| Nonlegal / social communication, ... | (16) |
| The Phone calls | (16) |
| Visits | (17) |
| Mail | (17) |
| Publications | (18) |
| Access to the Media | (18) |
| Other Hardships unique to the H-unit under SAMs | (20) |
| Hardships and mistreatment... by the individual staff | (21) |
| The Impact of the solitary confinement | (23) |
| Family circumstances | (24) |
| My Mother & Her current condition | (24) |
| About the Letters of support | (26) |

## DECLARATION OF KHALFAN KH. MOHAMED IN SUPPORT OF HIS MOTION FOR COMPASSIONATE RELEASE

I, Khalfan Kh. Mohamed declares under penalty of perjury pursuant to 28 U.S.C § 1746 that the following statement is true and correct.

### The Abuses of 2000, 2008 & My Disciplinary History

1- In Nov.1, 2000, I was housed with another prisoner in a cell at MCC, N.York. Following his assault to a prison guard, the staff responded by maliciously assaulting me after finding me outside the cell, unarmed. The assault on me was first carried out at our housing unit, the 10-south, and in the way to the medical unit, and then within the Medical unit itself.

2- Within the medical unit, the staff led by senior officials like captain Apante, Lt. Careno, and counselor Santiago, after stripping me naked, they tied me on a bed on four points position and continuously physically and verbally assaulted me for about five to six straight hours. In doing so, they targeted my eyes, nose, and the rest of my face more than any other parts of my body. They used their legs, fists, clubs, ... and keys as weapons.

3- Badly enjured, I was then sent to a hospital outside prison where I remained for about 10 to 15 days. I entered and came out of the hospital without been able to walk due to the enjuries. I started to walk properly again after about two weeks. Among many enjuries, the BOP staff caused on me was the breaking of my nose and fracturing my eye socket.

4- Beside the breaking of my nose and fracturing my eye socket, my vision on both eyes were badly damaged. For the next 10-years or so, my eyes especially after waking up would became bloody redish, as if were about to bust and let the blood flow out. For that period of time I would experiencing things like little butterflies flying around... Additionally, the pain on my broken nose and fractured eye socket persisted for perhaps three to four years.

5- After my arrival to ADX Florence and been assessed by the eye-doctor, the doctor told me that I was lucky that I still could see and didn't lose my vision in that attack. He said so after reviewing my medical file.

6- The BOP staff physically abused me and left me with life-long damages as a result of that Nov.1, 2000, attack with no justifican what so ever. I had no envolvement or prior knowledge that the prison guard would be assaulted that day.

7- The BOP's disciplinary hearing officer (D.H.O) found me guilty of the assault on the officer and of other serious charges, however. The D.H.O, disregarded my defense that I didn't have any envolvement, as well as the courts conclusion in U. States V. Salim, 287, 294-95 (S.D.N.Y, 2003). The D.H.O, moreover, even ignored the statement of the

148

(2)

very individual who attacked the officer that; I did not participate in the assault or do any thing to help him.; recanting few of his statement that falsely claimed I had blocked a camera and grabbed the keys. The D.H.O. had to find me guilty. And he did. As a result, I lost my phone, commissary privileges for 2.5 years or so. ~~This disciplinary finding occurred some time in 2004.~~

8- Per my own 25-years experience in BOP system, the staff have almost always to fabricate charges against a victimized prisoner. Find him guilt, after the same staff maliciously assault the prisoner. The initial crime against the prisoner is like an "optional" one. But the second is mandatory. They have to falsify charges and find prisoner guilty because that justify their initial brutal act. They did this to me here, as well as after their malicious attack in 2018, see infra p. 3 at 13. I've seen so many times they do the same to other prisoners.

9- Following the staff sadistic attack on me on Nov. 2000, I didn't file administrative remedy grievance due to my serious fears of further attacks and even fear of death. Officers threatened me of death during the attack, and after it both; at the other prison where I was housed following my hospitalization, and at the M.c.c. New York following my coming back there shortly before my criminal trial began.

10- In early Aug. 2008, I was physically abused again. This time, I was housed in H-unit, ADx- Florence. An officer named Breem or Bream, maliciously used the handcuffs to seriously and deeply cut and injure my waist. He was a known violent, anti Muslim, guard. My wrist beside the serious cut, also bleeded, and the injury resulted in to excruciating pain. The staff assessed the injury and took pictures of it. I can't remember whether I was provided with treatment or any medications. I filed the grievance through the Administrative Remedy Program (A.R.P) but I cannot remember what the response was, even though I know; it wasn't granted. The circumstance of the above Aug. 2008, abuse, didn't allow the staff to fabricate charges against me. So, they didn't.

11- In Dec. 2001 or Jan. 2002 I was issued with my second infractions; "second", I say so because the charges it was based on occurred at this time... ie; after the occurrence of the Nov.1 2000 event in MCC... Otherwise, the actual incident report based on the Nov. 2000 event was issued and given to me in 2004, as stated s.pra at 7). That occurred in ADx-Florence. The reason was; the staff demanded from me to provide urine for drug test... at late evening hour after I've been fasting and thus, abstaining from food and water for perhaps 14-15 hours... I couldn't provide enough urine to satisfy the staff even after several attempts. As a result of the infraction, I lost my privileges and had to provide urine sample for the next 24-months, monthly. I did so. In my entire life I've never used any illegal drug, drank alcohol or wine... and have never been accused of doing so.

149

(3)

12- After my above referenced failure to provide the urine sample and the infraction that was issued based on it, I remained clean, free of any incident report until Aug. 2018, when the ADX-BOP staff, once more maliciously assaulted me...IN other words, I maintained clean conduct for 16-17 years, straight.

13- On Aug. 23, 2018, and about a week after that I was issued with my third and fourth incident reports; both of which maliciously and with no justifiable base. As I've detailed in Mohamed v. Jones, et al No. 1:20-cv-02516-RBJ-MDB Doc. 64 (amended complaint) the ADX-staff maliciously assaulted, and seriously injured me on Aug. 23, 2018. They also confiscated and destroyed large number of my personal materials including journals (with entries from 2001 to Aug. 2018) manuscripts...etc.Id. To cover up these serious crimes, the staff, via the same officer who initiated these abuses, issued me with infraction that I attempted to assault him...Id. As I've stated above, supra at 8; this's how the BOP staff, those I've experienced, cover up their daily crimes against prisoners... First, sadistically abuse prisoners, and then falsely issue the prisoners serious infractions to justf the first crime.

14- About a week or so after the ADX's attack on me cited above, a Lt. issued me another incident report (my fourth). This one was also purely malicious and retaliatory. It was based on my failure to drink a Nutritiram resource as he demanded when I was in my, by then, long declared hunger strike. It was my first infraction to be issued to me and to be aware of based on the failure to drink that resource. I've done and saw other prisoners doing, many hunger strikes before. But there's no time we've ever punished for such failure. The relevant BOP regulation doesn't authorizes such punishment. See Program statement, No. P5562.65 (Hunger strike, 7.29.2005).

15- Those are four and all infractions I've received in my past 25-years under BOP. Some BOP records show that they're five. That's wrong, however. I am familiar with one incident report of late 2001 or early 2002 issued to me but the DHO cleared me of the alleged misconduct. (Based on "destruction of government's property/equipment" following a clogging of a pipe that was connected to my cell's sink or toilet, along with my next door neighbor's.) Otherwise, I've stayed incident free since 2018.

16- As it's obvious; if it was not for BOP's staff repeated physical abuses against me and their disregard of the law and BOP's own regulations, I would've maintained absolutely clear and clean discipilinary record. The above facts show that three out of the four infractions were malicious and otherwise baseless. The fourth one; for failure to produce urine sample, had at least some rationale. But even that one, had the staff been flexable to permit me provide the urine after breaking my fast, as I've requested, then the infraction wouldn't be necessary...That's especially true for person who's not even a suspect of using illegal drugs.

(4)

## The Medical Records, Conditions & Medications

17- I have diligently tried but then failed to obtain my medical and psychological records; I originally wanted these records for their uses in my two civil suits. Apart from few pages concerning the fracturing of my ankle... and others related to my participation and completion of the "Resolve" psychology program, my other requests were denied or not responded to. I've even filed A Remedy against the denial of providing the medical records, but as the BOP does with virtually, and for the past 16-years or so, every A. Remedy, denied my appeals. Additionally, I've filed for a request asking for all relevant records; medical and otherwise, related to the 2018 and 2020 physical abuses. But the BOP failed to provide a single page of any record, even: after the passage of four to five years, now.

18- It's my personal experience that while the BOP staff sometimes provide some medical and other records, they do not do so when they know or believe that the requesting prisoner will use the records in his filing with the courts.

19- I've several serious medical conditions. For some of these conditions, I did receive some treatments in the past but I am no longer receiving them even though those conditions persist. These conditions include my constipation and Alopecia. (detailed in my motion, p.16, 19). There're other conditions for which I never received any treatments despite of my complaints and requests to the relevant staff, and in some cases, filing law suits over them. These conditions include; pain on my wrists and jaws... (detailed in the Motion p.18), and passing the urine uncontrollably. (motion at p.19). Then, there're other conditions for which I am currently receiving some type of medications, even though in many instances fail to help or do so partially.

20- Here're the medications I'am on currently along with conditions intended for:
▷ Meloxicam 15 mg tab. (initially issued in 2019) for my fractured ankle. Also Acetaminophen 325 mg tab. (added to help other pains that medical staff believe they causes my constant, extreme headache; see the Motion at p.18)
▷ Lisinopril 40 mg tab. Amlodipine 10 mg tab. & Terazosin HCl 1 mg. cap. for the hypertension & blood pressure. (see motion at p.18)
▷ Buspirone 15 mg tab. Escitalopram Oxale 10 mg. tab. & Mirtazapine 15 mg tab. for depression and other related psycho. conditions.
▷ Hydrochlorothiazide 25 mg cap. & Compression german/socks, for my painful and swelling legs. (motion p.17)
▷ Lidocaine 5% Patch; for my back pain. (motion, p.17)
▷ Knee Brace for my left, painful leg. (motion, p.17)

151

(5)

21. Eyes Problem (see the motion at p-15) I started using eye glasses after my being incarcerated. But the need of the eye glasses was much increased by the damaged caused by the BOP staff's assault mentioned earlier in 2000. See supra at 1-5.

22. Sometime in early 2000's the eye doctor at Adx-told me that I needed the necessary surgery to remove the cataracts from my eyes. And over the years that followed, the doctor designed my glasses in a way they could help me see from close or near (reading, writing with etc) and from a distance. I needed both.

23. In early 2023, I was taken to outside prison hospital for cataract removal from my right eye. I was told, the left eye will also be getting the same treatment after the right eye is healed. I agreed.

24. After my right cataract was removed my distant view improved but I could no longer see close (like reading, writing) with my right eye. I could only do so through my left eye which had not yet to receive its cataract removed.

25. The doctor told me that I'll be able to see near again with my right eye (as well as with the left one) after a new pair of glasses is been made for me. However that glasses can only be ordered after my left eye is also been operated.

26. Few Months after the right eye's operation, I was told that I'll be soon taken for the left eye cataract removal. I indicated that I agree. But since I can only now see close with my left eye, that's not yet operated on, I needed a new glass that would help me in my daily readings and my writings... Besides my daily reading of my religious book the Qur'aan and other spiritual materials, I explained to the staff that at the time I had three civil cases that I must continue working on... If my left eye is operated on, I'll lose my ability to read and that which would result in to loosing of all of my cases.

27. Per my own experience; the BOP (at least at Adx) takes about 8 to 10 months to deliver a new eye glasses. In this particular case it might've longer. That's, as the doctor told me, it takes perhaps two months or more following the second eye surgery before he could properly exame me and get a settled necessary measurement that my new glasses would be in.

28. Because I couldn't do without been able writing and reading, I had to decline receiving the second eye cataract removal. Mean while without the needed surgery, I can feel and experience that my left eye vision is getting worse while my right eye close vision, is virtually no longer exists.

29. High Blood Pressure (Motion p.16) I was diagnosed with this problem for the first in 2014 or 2015. My B.P. often gets high to 145 and isn't unusual to be found at over 150 even with taking multiple medication and avoiding of certain items. Many times the medical staff told me that the B.P. may result in to heart attack, stroke, and other conditions that may cause death.

(6)

__30- Constipation__: I started to experience the constipation problem some time in early 2000s. Like virtually all other medical problems I'm having, I never had this one before my incarceration.

__31-__ Before 2015, I was provided with different types of medications, some of which helped initially and some never helped me. I was also for a short period of time given some food supplement, namely prunes and raisin that partially helped, before the staff stopped giving them to me. Moreover, I used to purchase from the commissary a fiber in powdery shape, that I used with or without supplement when I had them and benefitted from it. However, the commissary stopped selling that powdery fiber in 2014 or so. It was later replaced by tablets fiber.... that I've tried to used but never helped. The tablets, actually, increase the problem. I filed A.R. against the BOP's decision to stop selling the fibery powder. But without any success.

__32-__ In 2016 I was finally taken to an outside hospital for colonoscopy, so to check my stomach. The result failed to provide conclusive outcome. That's, as the doctor told me, my stomach wasn't sufficiently clean to allow clear viewing. After learning on when I was provided with the laxative materials intended to clean my system, and the time I was told to stop eating, the doctor told me that to get my system clean, I should've been given the laxative long before was given it to me and at the same time, I should've been informed much earlier so to stop eating or drinking any thing other than water.

__33-__ So, based on the doctor's judgement, it was that Adx-staff's failure to provide me with the cleansing laxative much earlier, and inform me then not to eat ... that caused the failure to get the necessary, conclusive result... My effort to ask another test and treament all were denied.

__34-__ Due to my constipation, some times I go 6 days without using restroom. Four days, is normal. As a result, my stomach is constantly full of bad gasses and waste, while always I am full of fatigues, and when I go bathroom, always will be with blood.

__35- The Swelling and pain on My Legs:__ (see the motio at p. 17) The BOP staff have not told me the medical name of this problem. When I asked about the problem an outside prison medical source, I was told that the condition's called "Edema" or fluid retention... It's caused, per that source's response, by blood pressure, or kidney and liver desease... Among its impacts is frequent peeing, the source said. I do peer too much my self.

(7)

36- Headache (motion at p. 18) My ongoing, extreme and continuing headache originated in 2022 as a result of a serious covid-19 that infected me and almost every one at my range; c Range, upper D-unit, ADX-Florence. For two weeks or more I was seriously ill, and so for many other prisoners in the range. The staff only took our temprature. There's No any medical help given.

37- Besides the extreme headache that remained long after, I lost to the covid-19 something like 90% of my ability to smell and 50% to taste. The medical staff told me that these and other conditions I was complaining about at the time, may be Connected with "Long-Covid".

38- Some time in 2023, the staff took me to the MRI to check whether some was wrong in my brean. But they then told me the result were normal. The extreame headache continue, however.

39- Then, several months ago, a medical staff told me, following my renewed complaint, that the extreme headache may be the one called "tentional headache", which he explained as; one caused by other pains and medical conditions person have. He told my other ongoing pain and medical issues such as the pain on my back, legs, jaws, ankle..., might be the cause of the headache. The staff prescribed me with Acetaminophen 325 mg tab. for pain. The medication to some extent reduce the pain of other areas of my body. But the headache remain, two years since it's enitial appearance. The BOP staff beside the above MRI and the resent issued "Acetaminophen" haven't done nothing else.

40- Pain on my Back, Legs, wrists and Jaws (motion at p. ) All of these conditions originated from the staff's physical abuses on me in Aug. 23. 2018. As I've stated earlier I was provided with Lidocaine 5% Patch for my back pain, and a knee brace for my left leg. Supra p. 4 at 20. This only happened this year, 2024, six years after the attack. There's no specific medication provided for the wrists or jaws.

41- The wrists and Jaws were x-rayed almost two months after I was attacked, as I've alleged in my Complaint. Mohamed V. Jones No. 1:20-cv-02616-RBJ-MDB Doc. 64 at. 114-118. However there's no x-ray provided for my back and legs despite my repeated complaints and request at the time. The knee brace makes walking little easier.

42- The pain is extreme and distruptive of my daily life. Due to the pain of my ankle primarly, and other pain after that, I've stopped from exercising for almost a year now. That's even then, after resumming my exercises previously, I was selective; only did those activities that were unlikely to worsen my many injuries and pain. Jaws and back pain often distrupt my already little sleep. The pain of my jaws also makes hard, occassionally, extremely so, chewing hard food items like nuts and some even a hard apple. The hardship increases at break-fast time, and even more so when f breakfasting after long day of fasting

(8)

**43- Allepecia** (motion p. 19). I've have this problem since some times between 2005 and 2010. From that time to the present day my head always maintains some spots without hair. The medical staff advised me to shave my head as more freequent as possible. Per my Islamic belief, shaving freed virlly and without religious reason is highly descourated. But I do shave as much as I can as a last resort, even though, with tremendous level of disconfort and sinful feelings... The staff twice or three times, all before 2016, injected me with steroid on the empty spots on my head. They helped. The hair grew but after empty spaces then appeared and some of the old ones later reappeared. Besides the unusual, unpleasant appearence the condition brings on my head, because of which, I've always to cover and hide my head, it also comes with aggresive itching in those effected areas... All these impacts result in emotional emotional hardship.

**44-** The BOP staff since before 2016 declined to do any thing after those few steroid enjections. I've filed A.R. All were denied. My request to be assessed by dermatologist or any other relevant professional was also denied. The BOP said the problem is not medical one. It's simply a cosmetic condition.

**45- Passing Urine** (motion p. 19). The condition of been unable to control my urine (drops, small size) started in 2020 as a result of staff's recklessness toward my medical needs during hunger strike as I've explained in Mohamed v. v. States. See the motion p. 19. The amount of the urine is very little, and cause no physical pain. However, the impact is huge. Islamically, urine (as well as feces, blood...) is unclean thing that must be avoided all the times. If a little drop of urine, as little as it might be, comes out while I am praying, then my prayer is unvalid. I've to wash my self, change the effected cloth or wash it, and remake my prayer. Now, I pray five times, obligatorly, daily. Besides I pray perhaps as three times as that number optionally but highly recommendably... The problem often disrupts my prayers. Beside prayers... Islamic retivals such as reciting the Qur'an, remembering and mentioning of God's names... etc. All these require a total avoidence of the urine. In sum, the problem even though appears to be harmless, for me as practicing, sincere muslim, causes substantial amount of spiritual pressure as well as emotional one. The staff refused to offer any help in this issue. And it's highly embracissing even to explain for a staff who really cares, let alone who doesn't. But I did, however, to no avail.

**46-** The Impacts of My Physical and Emotional Circumstances on Me: See the motion at p. 20. Besides my many physical conditions, I am suffering from many emotional and mental conditions. See the motion Id. The existance of these physical and emotional conditions makes my life very hard in a way, based on my personal experience, the resulted

155

(a)

hardship is but out of ordinary, in prison setting. I've no reason to believe that this court, or any court in this country would sentenced me or any other defendant, to an imprisonment term of such extra ordinary hardship.

47 - As a way of an example in a regular bases, several of my physical pains like those on my ankle, back, legs, headache..., play a huge part in increasing my depression and other related conditions. Moreover when I decide to stay in my cell because of these physical pains and some times with my extreme fears from the staff... that reduces my physical activities. The lack of physical activities consequently increases my other conditions such as constipation and so the depression... as the relevant staff have informed me, and as I've for so many years personally experienced over the years. I've found that whenever I am physically active, my moods and mental status improve. And when my moods are better, I am in a better chance to achieve an active, better day. But for me to be physically active, I need to be without pain which is almost impossible. And to have positive moods I need not only to be better physically, but also to be free from such conditions such as anxiety, and depression during the day, and terrifying nightmares and lack of sufficient sleep, at night, which's again, rarely happens.

48- Ever since I was maliciously attacked in August 2018 a single day of my prison life is not far off from but an excruciating torture. If I go to bed for example at 8:00 P.M, I typically needs between two and three hours to be able to fall a sleep. I would then have to be waken up by any of my ongoing pains such of my jaws or back, or by the virtually nightly nightmares... In this last case, my waking up is always even more unpleasant. These nightmare usually resemble the past violent attacks carried out by the BOP staff against me... I would often see some staff who previously attacked me or other staff that I might or might not know... My wake up is a terrifying experience... Occassionaly I will be yelling or even crying full of fears. These episodes of up and off, typically occure every 25-40 minutes or so. And I usually wouldn't sleep more than five hours per night. Very rarely will be five. When I have it enough, and now "officially awake" often for my first prayer of the day, I will be physically tired and emotionally, extreamdy fearful and terrified. This fear that has just been renewed by those nightmares often overwhelmed me, and because of that, I would decide to avoid enteraction with staff, and so remain in my cell which I consider the saffer spot for me. In sum, sleeping is no longer a pleasant thing to me. I've come to even deslike the act of sleeping itself. That's because, to me is just a method of torture.

49- During the day, and to a lower extent at night as well, I cannot relaxe, mentally. Everything that I hear or see from the staff and even the mere structural appearance of the housing units... to me are all triggering events and tools of my trauma. The officers' and staff's appearances, uniforms, noise made by their working boots, by their kees, their conversations..., all take me back right to the violent traumatic events that

156

years ago, other staff maliciously committed against me.

**50-** I've to constantly to remain elert, believing that these officers may be coming after me to once again assault me or even to murder. When the BOP's staff subjected me to those violence they repeatedly told me that they will kill me. Even though I donot believe that every staff is plotting on killing or harming me, yet that reality, cannot stopp me believing otherwise especially when those traumatic triggers are in their fullest display.

**51-** Apart from those daily physical and emotional conditions whose combination effects rendered my daily life as a torturous experience: other negative feelings such as the feelings of extreme shame, lack of accomplishment...any viewing the world negatively... these and similar feeling, all of which related to my PTSD connected circumstances...are realistic part of my daily life. because of all these conditions from which I've tried hard to detache; I've seriously considered to option of ending my own life. I've failed to locate a reliable religious ruling that would justify such an act.

**52-** I successfully completed the Resolve Program which is, primarily or partly, concerned with trauma. I've tried hard to benefit as much as I could from the program. And I believe I did. That benefit however, was better felt within the time period right after the completion. Moreover while I'am trying hard to use the tools I received from the program, such as how to interact with the staff and to challeng various perceptions toward or about them that I might have, these skills, per my experience, appear to lose their momentum and strengthth either due to the passage of time or because of lack of other adequate psychological tools... Beside that, there're some issues that the Resolve program didn't, and perhaps couldn't resolve. For example the nightly nightmares and their horrors, an anxiety..., these conditions continues beyond Resolve.

**53-** I completed Resolve in early August 2023. While I was participating, and even before and after I had reasonably regular access to psychology staff and related sessions. That was at the Adx- Florence. In late september 2023, then, I was transferred to Unit B/A, U.S.P. Flounce (High) where this declaration and the motion are written. Here, the psychology staff and treatment are inadequate, if not worse. One example may clarif this. From early may 2024 I started to request meeting with the psychology staff or any relevant staff to discuss my worsening depressive conditions and if possible, get my medication adjusted. It took over two months before I was allowed to see a psychologist and explain my conditions. It then took another month or so before my medication were adjusted. That's atleast three months.

**54-** The government never extended the plea deal offer to me. (see the Motion at p. 31 ) Soon after I arrived to the U.S. from S-Africa from where I was deported, I learned from my court-appointed attorneys that the government will likely seek death penalty against me. Not long after they told me that the government has decided as such. Because partly of my mother and my family who     were so concerned and worried that I'll be executed, I asked my attorneys

(11)

whether there was anything I could do to get leniency in the sentence or at least the death sentence off the table? My attorneys, however, told me No. The government wanted nothing other then sending me to death... or similar statement. I was told. My inquiry occurred on several occasions. And i believe that My attorneys gave me the answers that they learned from the government. In sum, there's not a single time that My attorneys or any one else informed me that the government was interested in offering me a plea deal under whatever condition. Never happened.

## Rehabilitation Efforts:

**55-Remorse:** I fully accepts responsibility of my actions in connection to the bombing of the U.S. Embassy at Daresalam Tanzania, in 1998. Moreover, I am sincerely remorseful and regretful of such actions that have caused loss, pain, and suffering for so many people. I further recognize my past mistakes and have been working hard to religiously and otherwise learn so to be a better Muslim and person so not to repeat my mistakes. I've no intention whatsoever to commit the same mistakes or otherwise to violate any law, any where.

**56-** Ever since I've been incarcerated a quarter century ago. I've never supported or advocated any form of violence any where, against any one, and through whatever means.

**57-(Learning for Betterment)(motion p. 36)** Beside of those courses and programs that I've been doing through various institutional departments (psychology, Education, Religious, Recreation...) and from an outside schools (like the college Guild; see Appx at , I've also spent years learning better about my religion through getting assistance from those who know better than myself, as well as through educating my self. I've also spent good amount of time to learn other subjects including certain areas of civil law and relevant BOP/government policies and regulations. As a result of achieving these essential knowledge, I've been able for the best part, avoiding violating the BOP regulations, as well as helping other fellow prisoners to do the same. I've also, via that knowledge, defended my rights through the BOP relevant, A.R.P. and the court system, and helped many others to seek and obtain their own rights. I am also participating in the GED program. For some time now, even before I was transfer from the Adx last year, 2023, I've been ready to take the exams... i am told that I am in the waiting list. I may complete the program in the near future.

## A Brief of My Experience in the Solitary Confinement (see the motion, p. 41)

**58-** From 1999, the beginning of my incarceration to April 2023. I've been held under solitary confinement, mostly at the Adx Florence (2001 through sept. 2023); while also under the

158

Special Administrative Measures ("SAMs" 1999-2015).

59- The solitary confinement is defined as: "separate confinement that gives a prisoner extremely limited access to other people, esp. the complete isolation of a prisoner." See Black's Law Dictionary "solitary confinement".

60- The SAMs restrictions are imposed by the U.S. Attorney General. See 28 CFR 501.3. Their main, declared, objective is to extremely limit a prisoner's communication. That's every kind of communication: between the prisoner and other fellow prisoners; between him and his own attorney and legal team along with all attorneys, legal entities, legal activists, courts... etc; between him and his own family members, relatives... and the rest of people of the world; between him and the media... that include televisions, newspapers... as well as publications.

61- Thus, while it's true that "the solitary confinement" is generally, separation of a prisoner from others like him within his given setting; say he's not allowed to associate, congregate, interact... physically with his fellow prisoners... Yet that regular or "conventional" definition can hardly catch the actual "solitary confinement" that most prisoners held under SAMs like my self have experienced... SAMs brought about a whole new set of draconian restrictions whose proper definition appears yet to be captured by the relevant dictionaries. So, both : solitary & confinement (s.c.) share that "conventional" meaning shown above, as the Black's Law Dictionary" indicated. But the one imposed by the SAMs has much more, for worse, restrictions, as the previous paragraph alluded, and as I further elaborate below.

## The solitary confinement under the H-Unit (SAMs) Vs. The ADX-Florence General Population Units'

62- As I've stated above, since my first day in the U.S. prison until: April, 2023, I was held under the S.C. within those 24-years (1999-2023), I spent the first 15-years or so under s.c. whose terms were governed by SAMs. After I was transferred to the ADX in late 2001, I was held at the H-unit. H-unit, for the all-time I remained their, only housed SAMs prisoners, most of them Muslims with terrorism related cases, but some aren't. Once my SAMs expired (i.e., when the U.S. Attorney General decided not to renew them) in Nov. 2015, I was immediately removed from the H-unit to F-unit, which's one of ADX-General Population ("G.P.") units. I was then moved through different ADX-GPs units until Sept. 2023, when I was transfer to the neighboring building, at the U.S.P. High Florence.

63- It's the government's and the BOP's practice, as stated, to concentrate all SAMs prisoners housed in the ADX, separately from the rest, within the H-unit. Once the SAMs of a particular prisoner expired the government then immediately removes such prisoner from the H- to another G.P. unit. That's due, as the SAMs document provided; prisoner under SAMs can only be housed with those who're similarly, severely, restricted. All of those at the time, found in the H-unit,

159

(13)

Besides that "housing" reason, the prisoner must be rushed out because he's now entitled to the same accomodations and privileges allowed to the GP's prisoner. And these privileges, majority of which concerned with prisoners' communications, are the most important factor that differentiate between H-units (SAM's) s.c., and that of the ADX-GP's.

6A- The H-units s.c., and the GP's share few similarities. These include:

► All prisoners are individually, solitarily, housed in their cells for between 22-24 hours daily. That means whatever outside cell activities they may have; the time period of such activities (which is the recreation time) is the same.

► When they're out of their cells and are at areas such as recreation yards (in individual cages), legal, or social visits (where they've to converse through telephone, (in a social visit, or talking loudly between a glass wall seperates between the two sides (legal visit, usually; but the wall is there regardless it's a legal or social visit) and at the psychology or other group classes (where everyone is caged in his own little cage within the class room); their conditions in these areas are the same.

► Since about 2011 or 2012 or so; they all share the same television chanells (previously, H-unit prisoners were not allowed to access any primary, main news chanell. As it'll be detailed later.

► Shortly before I was removed from H-unit, Nov. 2015, prisoners there have been allowed for the first time to access the ADX-Commissary using the same commissary list. (previously, H-unit list was much shorter and with less and fewer options).

► For all prisoners who've been housed at the H-unit, per my knowledge, and many of an ADX GP's; are so housed for indifinite period of time. I spent about 14-years in the H-unit. I know other who've been there for 20 or more years. The same is true in the GP-units. I remained there for almost nine years. However, I met many who've been there for 20 or more years. In both H- and GP-units, prisoners only know their entrence dates of s.c. but almost all of them do not know when and even how to satisfy the relevant authority so to come out of that s.c.

Those are important similarities, according to my knowledge and recollection. Of course, all prisoners are under the same warden and administration, and they may and may not share other lower rank administrative staff such as the unit teams and their respective members... The same is true with the regular prison offices or guards. As for these staff' performance and treatment toward prisoners as I've experienced and witnessed, that will be coming below

(14)

### The Uniqueness of the H-Unit SAMs solitary Confinement

65- As stated above, supra at 60-61; SAMs created S.C. are so different from the regular S.C. found in the ADX and else where in this country; largely because SAMs extremely restrict the prisoner's communication. The mere word "Communication" may sound light, trivial, and insignificant for one who's not informed or unconcerned of the relevant application of SAMs restrictions and their implications on those whom they target. Below are six main areas of these restrictions and their impacts as I've personally experienced them and saw others doing the same.

66- Inmate Communications: Per SAMs (the last one that was issued to me, dated Dec. 8, 2014, p. 5) a prisoner cannot communicate with any other person, but those few allowed by SAMs; and with no prisoner but fellow SAMs prisoners... and that's only "oral" communication, subject to the monitoring and recording, to be analyzed by the FBI. See Appx. 133 (ii)

67- Attorney/Client Communications: Per SAMs, a prisoner attorney, and if there're numerous, each of them "must sign an affirmation acknowledging receipt of SAM restrictions document. By signing the affirmation, the attorney acknowledges his ... awareness ... of the SAM ... and his agreement to abide by these provisions." Id. App. 34. There're too many provisions deal with attorney/client communications restrictions. One of those is about "legal mail" between a prisoner and his attorney. Id. p. 10. The "relevant" attorney here is the same who've met the above conditions; namely, agree to sign the affirmation. Now, that also may sound easy. But not for those who've experienced it.

68- The requirement of the signing of the SAMs "affirmation" perhaps wouldn't be as bad thing as it's actually is; per my experience, if all what it takes is to get the attorney to agree with the conditions set forth in the SAMs document. I've seen numerous attorneys who are prepared to do that even though without some worries and hesitation. But I've seen repeatedly the government using the above requirement to deny SAMs prisoner the necessary legal assistance from those attorneys who're fully prepared to sign the affirmation but the government not willing to let them do so. Any new attorney who need to initiate correspondence with SAMs prisoner, must first sign that piece of paper... And a SAMs prisoner cannot send a legal mail to an attorney who's not "attorney of record"; i.e. who signed the affirmation. But how can an attorney get the affirmation?

69- Many years ago I initiated a civil suit, primarily, against the SAMs restrictions concerning my social communication. See Mohammed v. Holder et al. No. 07-cv-02697-MSK-BNB (Dist. Colo.). After the Court decided on the Summary Judgment Motion; I need an attorney... The Court agree to appoint one, and there was one interested in helping. The government however needed about six months or so before allowing the attorney to actually start communicate and represent me. That was coupled with many intentional inconveniences by the government and its law enforcement to that attorney

(15)

The attorney was forced to know that it was not a good thing to help me in my civil suit. He was, perhaps emphatically, discouraged from doing so.

70- In several occassions while still under SAMs, several attorneys, some repeatedly, try to communicate with me, possibly to offer their assistance, but their legal mail were returned. I only knew of their attempts to communicate with me upon receiving the "rejection notice" which indicate such attempt and government refusal to allow the legal mail come through.

71- I know several prisoners from H-unit who filed lawsuits in defense of their constitutional rights and then end up losing their cases because of their failure to have an affective legal representation, mostly because they couldn't get an attorney who could successfully overcome so many inconveniencies and often harassment, placed by the government sorrounding the SAM affirmation.

72- I've also saw in H-unit prisoners who're in need of legal assistance for their post-sentencing appeals, but they had no way not only to obtain a volunteer attorney, but even how to initiate such effort... That's because, as stated above, in order to have legal communication the attorney needs to sign the affirmation. And the government always uses that to deprive prisoners of their constitutional rights for legal assistance. I've also heard of attorneys who gave up their intention and preparation to help SAMs prisoners because of the prolonged process to investigate them and the extraordinary hardship attached with such process before the FBI and the relevant U.S. Attorney office "approve" those Attorney.

73- In sum; the SAMs restrictions in most cases take away prisoners' constitutional rights for legal assistance and access to court... The government purposefully uses the requirements such the signing of the SAMs affirmation as pretext to commit the above deprivation.

74- Now, the rest of ADX-GP's who're otherwise solitarily confined as the H-unit's do not subjected to any restriction... close to the above elaborated. None whatsoever. Shortly after my SAMs were removed and myself from the H-unit, I sent a legal mail to an attorney whom for many years wanted to request legal assistance from but I couldn't ask due to my knowledge that the process for the approval would discourage the attorney. In about two weeks later, I receive a response from the attorney. I've ever since written to and receive from many different attorneys, law firms, law schools... And the good thing out of it, the world didn't end. The SAMs restrictions had no rationale behind them... They were not imposed because without them I would've otherwise do illegal missions with those legal professionals. They were, like the rest of restrictions in H-unit, under SAMs, merely punitive.

75- The GP prisoners can, generally, write to any attorney or legal entity... without prior approval. And they do so. They're also allowed to communicate via legal calls and legal visits... All what's required is the BOP's confirmation that the attorney is actually an attorney. No such privilege allowed in H-unit without the above described unnecessary hardship.

(16)

76- Non-legal/social communication: Telephone calls, visits, and Mail: Per SAMs, a prisoner could only use these means of communication with his "immediate family members", which're defined as prisoner's "spouse, children, parents, and siblings". Id, p. 11, N.9 (App. 139). while, per SAMs' terms, Id, an "additional non-legal contact" may be requested, the approval of any additional contact almost never happen. It never happened in my case that's, until the federal court found in my favor. See Mohamed v. Holder Id (Court's judgment following the four-days-long trial), and I never seen happened with any of the many prisoners in H-unit who frequently requested such additional contacts correspondence.

77- The phone calls would be always live-monitored. The BOP staff, with the FBI's coordination and approval, would always process the phone call. He would dial, say my mother's number, and then give the SAMs instruction and requirement attached with the phone. See SAMs p. 11, in English, and confirm if the person is actually my mother... My mother, sisters, and my brother I used to call most of the time know no English. Out of goodness of the BOP's staff, would simply insist the person to repeat his or her name... if that happen, the staff would pass the phone to me to further confirm whether he/she's really "immediate family member" or not... On many occasions my aunts, uncles, in-laws, nephews, nieces, cousins... and in one occasion, my grandmother, would pick the phone but I had to hung-up or tell the staff so, so he cut the line... because, I wasn't allowed to talk to them.

78- On two different occasions, my grandmother, the last remaining alive then, and my uncle, had visited my mother. Both were sick. Not long after that each passed away. In both occasions I had to struggle explaining to my Mother as to why I couldn't speak to her mother who did so much in terms of helping me growing up, and her brother, my uncle.

79- Over the years, the whole family had become traumatized; elderly family members, little nephews and nieces... couldn't understand why there was no communication allowed with me. They started to believe that they, not me, might have committed some serious crimes against the U.S-government.

80- The much younger children would often cry when my sisters and brothers refused them opportunity to speak with me; their uncle. I couldn't stop myself from doing the same, but I'd try to suppress my grief until we finish our conversation.

81- Among the many impacts of this and other restrictions targeting family and social ties, is the virtual total distruction of that important element of humanity: while I cannot undermine nor disregard other people and their respective cultures; our culture as Muslim, Arab-Africans, highly emphasise the family ties. Per our religion; my brothers' and sisters' children, are merely one degree below of my own... Similarly, my father's, and my mother's siblings are almost my fathers and mothers... what SAMs do is to destroy that family structure... And for most part, they have... As I said, even when my close relatives were in their last breath, I couldn't even say "I love you", to them.

**82- Visits:** The visitation related restrictions under SAMs also required that "immediate family member" component. Back in year 2001, when my family and few friends came to attend my trial as defense witnesses my mother and four siblings were allowed to have short visits with me. However, my inlaws who came with them with a friend and former employer, were not. That was because; they weren't "immediate family members", regardless of the fact that their visits would've been also monitored as the ones with my mother and siblings were. Years later, when one of my brother inlaw was in this country before he left to another, he couldn't visit with me for the same reason.

**83-** When I was housed in H-unit I learned of several occassions on which prisoners would visit with their "immediate family members" while the rest of the family stay outside because they couldn't fit into the government's definition of the word. I knew prisoners who couldn't visit with their son inlaws who escorted their daughters to the visit, but visited with the daughters. Others, visited with their sisters, but not with their brothers inlaw who brought the sister to the visit, nor with the little nieces; sister's children ... etc.

**84- Mail:** Social mail also required same conditions of the social calls and visit, under SAMs; immediate family member. However, prior to 2004 or so I was allowed to write with non-immediate family members and few friends. But after that, the SAMs reduced the world population of several billions people, to a mere "immediate family".

**85-** The mail restrictions were highly effective. Under the SAMs restrictions, on so many occassions the FBI and BOP would reject whole mail simply because one of my siblings would allow her or his little child to insert few lines long childish letter. Whole letters, often after several months of FBI's reviewal would be rejected. The rejection notice would often cite "National security" pretext for such and almost every other rejection and restriction.

**86-** For about three or four first years on H-unit we didn't have access to the phone calls. The government simply decided not to do it. At that period of time the mail was the only thing connected me and my family. But the connection was barely achieved.

**87-** Soon after we arrived at the ADX, late 2001, which meant the completion of our trial, thus far from court's view and review, the government started to with hold or otherwise excessively delay our social mail. A few page long mail would take any time between three to seven months to be approved and released by the FBI. Previously such mail would've taken a week or two at most.

**88-** By 2003 or 2004, the government made official such a delay. Per SAMs, our social mail took 60-90 days. But realistically, the government continued to with hold the mail often to six or more months. All this happen while for the first few years we entirely relied on the mail to connect with our families.

88- It often required a whole year or more to exchange a letter between the two sides. The restrictions effected both sides.

89- I still remember that some of Muslim prisoners on H-unit learned of their parents' and relative deaths almost a year later. The government saw no need even to prioritize those mail with the massages of death.

90- I still remember that some times I would spent a half year or so without news from home. To my self, and many other Muslim prisoners many of whom came from countries torn up by then ongoing civil wars, was not unusual to literally cry, longing for some news from home.

91- **Publications:** SAMs did allow H-unit prisoners to access publications, but not without the regular severe conditions empositions. The institutionally provided U.S.A.Today newspaper, per SAMs, required at least 30-days delay. During that time, the FBI would remove from the paper whatever part they deemed fit. We often received the 30-days old newspaper remaining containing a mere few pages, especially from the section "A".

92- Religious, legal and other books required any time from a month to six months for approval, which was often eventually denied. As the government did with the social visits, calls, and mail; it used the "national security" pretext on denying any book. And that's any book.

93- I know of more than a Muslim prisoner including one of my Code fendant's whose books that included such former presidents J. Carter's "Palestine: Peace or Apartheid", B. Obama's "The Dream of My Father" and professor H. Zinn's "People's History of the United States", were denied due to the National Security Concerns. This same reason was used to deny countless of books, magazines, and all kinds of publications including purely legal manuals and other legal resources.

94- In my case: Mohamed v. Holder et al. Id. I've alleged many of these and other restrictions committed under SAMs through the 'National Security" pretext.

95- **Access to the Media:** From early 2000s to about 2011 or 2012, H-unit prisoners under SAMs were not allowed to access any news Television or Radio channel... Thus, while the rest of ADX would access such channels as Fox News, CNN,...etc we were merely limited to so called "local channels" from, probably, Colorado region. In sum, we were not allowed to learn what was going on in the world. And for the most part, we stayed ignorants. As stated above; whatever news papers or magazines we were allowed to access were both: excessively delayed, and often redual to a mere few pages.

96- Now, again, the rest of ADX-GP's who're otherwise solitarily confined as the H-unit's, aren't subjected to such restrictions targeting H-unit prisoners' social communications. Those are elaborated supra 76-95. The rest of ADX prisoners are not as nearly restricted.

97- After my SAMs were allowed to expire in late 2015 and my immediate removal from the H-unit to ADX-G.P. unit I was allowed to talk in the phone, visit, and write with virtually every one, just like all prisoners were rightly allowed to do so in the G.P. There were no such restrictions that the H-unit, Mostly Muslim, prisoners were subjected to. Once more, I accessed these privileges. Naturally, with no incident.

98- My crucial effort was to try reestablished the then almost dead family ties... I had first to appologize to every one I spoken with at the first time... and make every one know the previous restrictions were not caused by no fault in his or her part... But I couldn't talk no appologize to several family members who were no longer alive.

99- Moreover, Not every previously live relationship could be saved. I tried on several occassions to write to my former friends and employees in Cape Town, South Africa, but I never received no response to this day. These're among few people whom I communicated in with via letters up to every early 2000s, see supra at 84. After the additional restrictions that limited the letters with immediate family were imposed, not aware of the new restrictions, these friends including their young children, Kept sending me letters perhaps up to 2007 or so. I learned that from the rejection notices that the BoP issues to prisoners once a correspondence is been denied, rejected, and otherwise sent back to the sender.

100- It may be appropriate to indicate here that the BoP relevant regulations incourage prisoners to maintain strong relation with family and friends. Moreover, the court owes to know that the above briefly described restrictions were not imposed on me, my family, and every one whom I had relation with because of a privous violation of any regulation on our part. The restriction were imposed with neither previously committed violation, Nor reasonable need to do so. Further more held under SAMs and after their removal; in my past 25-years in prison I've never been desciplined based on a violation of any regulation concerning my visits, mail, calls, publications, access to the news, and media... etc.

101- The government always justified the above SAMs restrictions on me and other Muslim prisoners either by useing our pre conviction criminal history or by other reasons that realistically cannot and should not withstand any level of judicial review. See for example SAMs document dated Dec-8, 2014 (the government spending first four pages repeating criminal charges against me, citing an assault against an officer in Nov-2000, claiming my sending a letter to my sister asking about news of bombing I heard from radio or tv..., mentioning alleged instruction to my sister on how to sent a book... etc).

102- The removal of SAMs from me in Nov-2015 along with my 25-years incident free (regarding my communication) should prove that the SAMs in any case, were entirely unnecessary to manage my communications. Moreover, beside my conviction of the cited crimes in the SAMs documents, the rest of allegations aren't true or true but of no fault from my and my family's part.

(20)

103- Other Hardships Unique to the H-unit under SAMs: There're other conditions and restrictions unique to that unit. Again, this's according to my personal knowledge and experience based on my best recollection. The dates given, as the previously mentioned, are my best estimation... Briefly these conditions are or used to be in these four areas:

▷ The tinted or Other Wise covered Windows: Shortly after me and my codefendants, soon to be followed by other Muslims and later, other prisoners; the authority in ADX-Florence tinted or otherwise completely blocked the view through all cell windows within H-unit. That meant, the approximately the 3 fts. by 0.5 fts. windows were dark and black. No sun would come in. And one couldn't determine through windows whether it was a day or night outside. The staff told us it was for security reasons. The windows remained so completely blocked for a total of six or seven years, at which time, even the already little sun previously allowed to penetrates the cells, was totally blocked.

▷ Excessive and perpetual use of Restraints: In H-unit, that's under SAMs, at every move and escort from prisoner's cell; Necessarily required the application of restraints on prisoner at least on his hands and legs. Some cells are barely several feets from shower, for example, but that short distance does nothing to reduce the uses of the hand and leg cuffs. Moreover, when a prisoner is escorted out of the unit, say, to medical unit or any where else, here in addition to the hand and leg cuffs, the chains around his waist, and black box, some time with a big lock are added. In 2014(?) when the colorado district court held five days trial; the staff had to escort me every morning from H-unit to another location in ADX-to "attend the trial proceeding". The trip took about six to seven minutes of walking to and from the "court room". But I had to be escorted in full restraints as described above. Moreover, during the six to eight hour long proceedings, while the handcuffs had to be removed to allow me writing... etc, the leg cuffs remained on me. By the third day of the trial, my both feets had been lacerated by the cuffs and I was in pain. After five days of the trial, I was sick, and severely injured on my feet.

▷ Lack of recreation time and shower, Initially: In the first seven or eight years or so; we were hardly afforded recreation opportunity outside our cells. A week would passed with perhaps an hour or two of recreation opportunity. Some times we would go a week or more with no recreation time whatsoever... Because at that time our windows were completely blocked; that means we may go two weeks without getting a sun light. H-unit has about 30-36 cells, only four of those cells have showers inside. For the period of time provided above, it was a regular thing that prisoners get a single shower opportunity in a week. I remember the authority usually blamed the shortage in staff at the time.

▷ Excessive and perpetual Noises: Either one of the H-unit's two side (A & B) has 10-12 doors and grilles made of heavy metal. Each of them if operated carelessly or with ill intention produce considerable amount of noise and discomfort for those who're housed there.

167

(21)

many officers used these doors to constantly harass prisoners; day and night. Some of them they simply didn't care. In any case, however, most people in the unit could hardly sleep at night. I couldn't sleep during the day, and knows no Muslim prisoner who could. During the day, the unit is busy as almost every unit; recreation movement, medical call ups, meal delivering...etc. At night, there're counts at 8:00 P.m, 9:45 (or 9:00) Pm, 12:00 Am, and 5: Am. At any given count, usually two officers seperately would round the ranges, between them perhaps 10-15 minutes. Besides, many officers would perform counts or check-ups every 30 or 45 minutes...whole night. The noises are almost un-stop. My self and other prisoners did complain over these noises. After filing my remedies, I tried to get an injunction from the Court to get the noise under control. But I wasn't and no other prisoner ever was successful.

And those are some of the conditions that make the solitary confinement imposed by the government and experienced by prisoners, mostly Muslims, under SAMs in H-unit, unique, and according to two former ADX-wardens' accounts (one telling me my self, and another testifying in my case) the s.c. here is the harshest around the country.

104- I've repeatedly mentioned above that, among many prisoners who were housed with me in the H-unit; under iSAMs are Muslim and some of my codefendants. It may be relevant to declare here that; one of the codefendants was Mohamed Suleeman AlNaffi (ALNaffi: see the motion at p.26). After he was sentenced to his much lencient prison term, (that's compared to my own) he was sent to the ADX, H-unit. I believe he remained with us in H-unit, under SAMs, until shortly before he was released to the appropriate agency for his deportation to his native country. I believe that, that was some time around 2009.

<u>Other Hardships and Mistreatments caused by Staffs Individual Acts</u>

105- Almost all of above shown conditions arise from government-approved policy. Here, briefly I declare concerning some staff's own mistreatments against me particularly, and against other prisoners in the ADX, generally. However;

106- I've to clarify first; in the ADX; there're and used to be in the past many good, fair and professional staff. That's top from the warden, to down to a regular correction officer, and all levels in between. Thus, my declaration here cannot and should not be construed as discreding every staff.

107- Over the years, first in the H-unit and then in the G.P; I've faced a high level of bias, discremination... and different acts of mistreatments. I've seen these also committed against other muslim prisoners, and others, as well.

* I've included this fact here in case the government should argue that; SAMs were imposed on me due to the nature of my crime... and sentence... As the SAMs document appear to justify the restrictions; AlNaffi was offered and pleaded guilty to lessor crimes...He was going home soon. Yet the government found reasons for SAMs.

168

(22)

108- Besides those violent attacks on me as detailed on my two cases: Mohamed v. Jones et al. and Mohamed v. v. states, ed. the staff on countless occassions, have for example, mistreated me via; pushing me around, using restraints to harass or otherwise harm me, cussing me out, calling me with racial or religious slurs, cancelling my recreation opportunities: law library access, phone call access, etc. Moreover on every unit I've been housed in the Adx, after leaving H-unit in 2015, the staff subjected me to cell-searches or "shakedowns" more than any prisoner in the units. That's especially true during the year 2021-2023 when I was housed in D-unit. During these and other shakedowns, some staff, not all, would enter my cell, ransaking it, and confiscate my legal documents including; mail with my attorneys, court's orders, legal researchs and briefs that I've been working on, food items from the commissary, stamps...etc. They did this without any existence of a valid penelogical interest.

109- Some times, it may be at the middle of night – this is especially true following the 2018 attack on me on C-unit, officers would wake me up via the the cell-intercom, cussing me and threatening me with death. Occassionally, officers would enter my sally-port and say some thing like "you stink, you nigger, terroist..." in order to provoke me so to open even the wider door for further abuses.

110- On many occassions staff would reject my appropriately purchased and sent publication, such as books. The Adx- mail room staff would simply send the package back to the book store with stamp "Refused". Staff frequently opened and red my legal mail (Adx), while some mail dissapeared whole together.

111- Occassionally, in Adx, I'd receive my food tray as if someone had aggressively stomped on it, and other time, the spitting would be still fresh on the tray. As a result, I would avoid eating any thing from such trays.

112- I've seen and heard other prisoners facing some of these or other similar mistreatments.

113- Over the years, I've filed numerous A.R. grievance against many of these and other mistreatment. I haven't file on each of them. They're too many and worst; the BoP staff who review the grievence always defend these mistreatment either by justifying them or denying them... As a result, the undisciplined officers continue their abuses.

114- Moreover, the Adx staff frequently and unnecessarily use forces against prisoners. The preferred method is via paper spray. The staff, sometimes in every few days would pepper spray a prisoner in the range and cause every one in the unit suffer from the spray. This was especially true when I was housed in F-unit (2016-18) and D-unit (2019-21 or 22; it became less used later on). In some cases, an officer may have a simple argument with a prisoner, and without warning would excessively pepper spray him... And in the process, beside unnecessarily cause suffering to that prisoner, but the whole range and sometimes unit would be on fire for an hour or two.

169

## The Impact of the Solitary Confinement.

115- For the first time in my life, I was diagnosed with depression when I was in the H-unit. See Appx at ___ (Dr. Mach's remarks on my previous history).

15 - Based on my own conditions and experience, I believe most of people in the unit were suffering from same conditions. The lack of meaningful correspond with our families, of an effective manner to access the court, due to the restrictions of recreation times... the constant noises and other harassment caused many of us to lose appetite, and then to hunger striking. We preferred hunger striking over other means especially those involved violence.

117- Hunger striking or not, virtually every muslim prisoner lost a lot of weight, due to lack of desire to eat. We didn't feel eating. Some even thought of killing themselves.

118- Occasionally, I'd hear people yelling and some crying in the middle of night. Every one appeared to be obviously tired when ever I saw him. Over time many prisoners could barely concetrate, and many became angrier and angrier as the time passed.

119- Both, in H-unit and GP. I knew people who would spend almost whole day in bed even without been able to sleep. People who cut themselves, who continuously thrown away or otherwise disorganize their stuff only then start reorganizing them again. Many people distrust almost every one, often believing that everyone, staff and fellow prisoners are perpetually conspiring against them.

120- Due to the lack of proper attention to many physical and mental conditions suffered by many prisoners; I've seen almost in every unit I was housed in the ADX, except J-unit (other units I was housed; H.F.C.D.) prisoners who appear to be like "walking dead". They interact with no one, period. Even if a toilet or sink break, some one else must request for them. They don't seem to realize the difference between day and night. Same, in addition to their apparently serious mental conditions, also have an obvious physical conditions. But I don't think they known that.

121- In ADX, the senior staff usually round each range weekely. Beside unit staff and their officers see these prisoners. But no one seem to care.

122- As I've stated, I've yet to find Islamic ruling justifying taking of my own life. That has stopped me so far. I've also for years been wondering what stops other people? The life at the ADX coupled with decades of s.c. that deprive every one of even a chance to see a real tree, shake a hand, see a private citizen, touching a bird or a cat... plus staff abuses and brutality... this life I personally don't believe worth living. But I don't encourage or ask any one to take his life. However. I had that justification.

123- As also stated earlier, in sept. 2023, I was moved from the ADX to here B/A unit, U.S.P. High. The place is far from many other regular prisons I've been told. But per my 25-years in BOP prisons, the unit staff and officers are by far the most professional and reasonable I've ever interacted with.

Family circumstances (the motion at p. 43)

124- I am from Tanzania, East Africa where almost all of my family lives. My family is big one. Besides my mother, I've seven siblings 40-50 nephews and nieces, and about 15-20 cousins, among other family members.

125- I was born in 1973 with my twin sister, who passed away on February 2022. I've one younger sister, which makes me the second youngest sibling among the eight siblings alive.

126- Financially, my family is poor, and for that reason, no one among them has been able to afford visiting ever since I was incarcerated a quarter century ago. The only time I've ever seen my family is during my criminal case trial in 2000 at which time, per the court's expenses, my mother and four siblings were brought at the trial as witnesses. For very short moment, I was allowed to see my mother and the siblings behind a fence, at the MCC, New York.

127- Within the appendix which includes this declaration, there're thirty-three letters of support from my family, besides other letters. Most of the family letters are from my nephews and nieces. Now, most of these children were either born after my incarceration, or I left them as little children.

128- Because I've never visited with any family member after the above short visit in 2001; the only connection between me any family from which the strong relationship arises, as evidentially obvious from the letters, is the mail, calls and since recently, email communication.

129- Per my religion's requirement, culture and custom; the family relationship is highly emphasized. As a result; even though I've never married and thus, never had children; my siblings' children are at mere one degree below of my own, if I had them. My siblings' spouses at the same times; are like my brothers and sisters... That goes with similar force to their side; my nephews and nieces hardly distinguish me from their own parents, while my in-laws view me as their brother, too.

130- Since my incarceration several of my family members have died. That include five of my uncles, an aunt, grand mother, five cousins, and my twin sister who, as stated above, died in February 2022.

## My Mother & Her Current Condition

131- When my father died I was about 6 or 7 years old. My family, been the poorest household in the village, survived mostly due to hard working of my mother helped by my two older brothers. My mother, at home and at the field, worked day at the fields and night at home, to sustain and support me and several of my siblings... My mother could only afford to sleep for three or four hours at night. And until I left her, when I was about 17, I never saw her sleeping during the

171

(25)

day time.

132- By the time my siblings were capable enough to support my mother and thus, provide her the most needed time to rest; my mother's health had already started to give up largely, I believe, due to her almost unbearable hard working previously.

133- For almost two decades now, my mother's well being and health has been in declining... My siblings have been taking care of her for almost entire of that time.

134- For the past three to four years, besides her many physical illnesses, her mental status has also been impacted. For past two years she has had time to recognize me when I call her. And for almost a year now, she's been in need of help even to answer my simple inquiries with her. Among her many conditions, is her advanced stage of demensia.

135- My incarceration hugely impacted my mother. But that impact has been even been more evident following my twin sisters' passing away in early 2022.

136- My mother would every now and then call upon all of her children to be present... When she was mentally fit, she'd understand as to why I couldn't be there. But since she lost her memory, and especially so, after the passing of my twin sister, my mother wouldn't know as to why both; me and my twin sister are always missing...

137- In early March and then early August, 2024 my mother's condition had worsen. She was hospitalized for several weeks at each time. She was released in september 2024. But now; she cannot eat or drink without been assisted (via her nose). And while she had been mostly immobilized since a year or two prior, now, since early August, she remains on bed 24/7. Moreover, occasionally, my mother needs assistance even to breath.

138- For at least two years, now; my mother has needed at least two grown persons to take care of her at any given time. Currently; my brothers and sisters are all together in doing that. They never complained.

139- Per my Religious duty, culture and for moral reasons; I, as a child to my mother, and a brother to my siblings, am required to contribut but into attending to our mother's needs... I've failed to do that for almost 20-year now.

140- That need of my contribution is so important especially because three of my older siblings themselves have been experiencing some medical conditions caused by their advancing ages and accident. (My older sister, for example; is herself immobolized after been struck by a car about two or three months ago. These siblings themselves may soon need additional care givers to assist them; including my self who, at 51, the youngest among male siblings...

172

(26)

141- My biggest wish, and therefore, request to this court is that I'll be afforded the opportunity to see and hug my mother again and help taking care of her in these what appear to be her last days on earth.

142- It's my intention, if the Court grant my Motion supported here in, to directly go to my village and join my siblings in caring for mother and remain by her side to the end.

143- About Letters of Support and Character Reference: within the Appendix there're 43 such letters/or memos... Among these; four from the members of staff; five from fellow prisoners, one from a friend, and the rest are from my family.

144- The letters from my family; beside the one letter from my cousin (Hamida H. Mohamed); all others are related to my siblings; they're from my brothers and sisters along with their spouses (my inlaws) and their children (Nephews and Nieces of Mine). The names of these Siblings involved; are; sisters; salma Kh. Mohamed, Zuhura Kh. Mohamed, and Fatma Kh. Mohamed (my twin sister, died on 2022; but there're letters from her five children and her husband (my Br. inlaw), and brothers; Mohamed Kh. Mohamed; Rubeya Kh. Mohamed, and Nassor Kh. Mohamed. (the last didn't send his own letter, but there're two letters from his daughters (my Nieces) and his wife (my inlaw, who's also my Cousin)

145- Most of my family's letters were originally written in my language, Swahili. One of my Nephew then translated, processed them through his computer, and signed them in their behalf... That's my Nephew Ammaar (also sometimes printed Amari, and Amri; it's the same person)

146- Finally I note here that; my family, just like my self, is not very sophisticated, and lives in different parts of Tanzania... The court may notice some language or style in the letters that may not be usual... But that's for the stated reasons. And for that, I appologize.

I, Khalfan Kh. Mohamed, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the above statement is true and correct.

Dated; Sept 25, 2024

Khalfan Kh. Mohamed.
U.S.P. High, Florence Box 700
Florence, Co 81226

Khalfan Kh. Mohamed
S/ Mohamed

To the Honorable Judge:

Dear Judge:

I am writing not to repeat my argument detailed in my motion. Rather, I am writing briefly and directly to express two things that I believe need be straight presented to your Honorable attention. Those two things are my sincere remorse and my mother's condition and need of meeting between a mother and her son.

I completely acknowledges the seriousness of my crimes, and fully accepts the responsibility therefrom. If I have an ability to reverse back the time and history, I would've done so. Not only I would've then avoided the crimes my self, but I would have done my best to prevent others from committing such crimes. It is unfortunate for me: I cannot reverse the time nor change the history. All I can do is to sincerely express my remorse, help others especially my family avoiding the mistakes I have made, and for myself work as hard as I can to be a better person.

Now, due to the seriousness of my crimes it perfectly make sense to penalize me and deprive me of my freedom for a quarter century. However, the Honorable Judge, the punishment here also has been more than bearable to my family in general, and to my mother in particular. My mother has already paid a severe price for her son's bad choice and decision.

It's my request, your Honor, to decide that a quarter century is a sufficient punishment. My mother, as I writes, is on her death bed. After about three weeks of hospitalization they decided that there's nothing more to be done for her recovery or even meaningful improvement. People in my culture in such circumstance, prefer having their loved ones at home rather leaving them in hospital, so when they depart from earth, they do so while sorounded by their families.

Now, your Honor, I do not want to remind of your compassionate decision on my codefendant Adel Abdel Bary. Facing a serious COVID-19 threat; per your discretion and wisdom you allowed him to be with his family. It was both, a right and compassionate decision. Your Honor, my mother's condition is a dieing one. I request for your compassionate. I don't know for how long she'll be waiting for me. But even if she depart before she meets her son, I expect you'll let me go, sharing the grieving with my family and visit her grave while is still fresh and plant thereupon a flowering little tree, as we do in our culture.

Thank you for your time and consideration.

174