

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 20, 2024

**BY ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Khalfan Khamis Mohamed*, 98 Cr. 1023 (LAK)

Dear Judge Kaplan:

      The Government respectfully submits this letter in opposition to defendant Khalfan Khamis Mohamed's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. 2240).[1] Khalfan Khamis Mohamed ("Mohamed") was convicted on May 29, 2001, following a six-month jury trial, for his participation in an al Qaeda-led conspiracy to bomb the U.S. Embassy in Dar es Salaam, Tanzania, causing the death of 11 innocent people. On October 18, 2001, U.S. District Judge Leonard B. Sand sentenced Mohamed to life imprisonment followed by 40 years' imprisonment.

      As set forth below, Mohamed has failed to satisfy his burden to show "extraordinary and compelling" reasons for a sentence reduction, and the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh heavily against early release. The motion should be denied.

## I. BACKGROUND

### A. Offense Conduct

      On August 7, 1998, al Qaeda operatives simultaneously detonated explosives at the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. *See generally United States v. Ghailani*, 733 F.3d 29, 37-38 (2d Cir. 2013); *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008). In Nairobi, the bombs killed 213 people and injured approximately 4,500 more. (PSR ¶ 105). In Dar es Salaam, 11 died and 85 were injured. (PSR ¶ 107). Mohamed was directly involved in the bombing of the Embassy in Dar es Salaam. (PSR ¶¶ 78-88, 116-17).

---

[1] "Dkt." refers to an entry on this Court's docket in this case. "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation") in connection with Mohamed's sentencing. Unless otherwise noted, citations omit internal quotation marks, case and record citations, footnotes, and previous alterations. "A" refers to the appendix filed with Mohamed's motion for compassionate release.

Mohamed began receiving explosives and weapons training at a camp in Afghanistan as early as 1994. (PSR ¶¶ 61, 141). At some point in 1996 or 1997, Mohamed and three other men were recruited by al Qaeda to serve as its "East Africa crew," including serving as the logistics team for the bombings of the two Embassies. *See Ghailani*, 733 F.3d at 38.

In the summer of 1998, Mohamed lived in Dar es Salaam, Tanzania to do work in preparation for the bombing. Mohamed purchased a Suzuki Samurai to transport bomb components (PSR ¶ 79), participated in the grinding of TNT (PSR ¶ 87), and loaded boxes of TNT, cylinder tanks, batteries, detonators, fertilizers, and sandbags into the back of a truck that had been purchased to execute the bombings (the "Bomb Truck") (PSR ¶ 88).

Mohamed was also involved in the execution of the bombing. On August 7, 1998, the day of the bombing, Mohamed personally accompanied "Ahmed the German," an Egyptian national, in the Bomb Truck during a portion of the ride to the Embassy. (PSR ¶ 106). After arriving in the vicinity of the Embassy, "Ahmed the German" detonated an explosive device along with oxygen and acetylene tanks and truck batteries, which were located inside the Bomb Truck. (PSR ¶ 107). Eleven people were killed, including two U.S. employees, and at least 85 people were injured. (PSR ¶ 107).

Immediately following the bombing, Mohamed planned his escape. He cleaned the premises of an apartment he had rented in Dar es Salaam earlier that summer and made arrangements to clean and discard the grinder used to prepare the TNT. (PSR ¶ 116). The day after the bombing, August 8, 1998, Mohamed left Dar es Salaam for Cape Town, South Africa, and applied for political asylum using fraudulent documents bearing a false name. (PSR ¶ 116).

More than a year later, on October 5, 1999, Mohamed was apprehended in Cape Town, pursuant to charges related to the false documents that he had submitted when he had applied for political asylum. (PSR ¶ 141). He was subsequently questioned, advised of his rights, waived those rights, and admitted his involvement in the bombing of the Embassy in Dar es Salaam. (PSR ¶ 141).

B.  **Procedural History**

On May 29, 2001, following a six-month jury trial and many months of pre-trial proceedings, a jury sitting in the Southern District of New York convicted Mohamed of (i) one count of conspiring to kill United States nationals, in violation of 18 U.S.C. § 2332(b) (Count 1); (ii) one count of conspiring to murder United States government employees, in violation of 18 U.S.C. §§ 1114, 1116, and 1117 (Count 3); (iii) one count of conspiring to use weapons of mass destruction against nationals of the United States, in violation of 18 U.S.C. § 2332 (Count 4); (iv) one count of conspiring to damage or destroy United States property, in violation of 18 U.S.C. § 844 (Count 5); (v) one count of bombing of the U.S. Embassy in Dar es Salaam, Tanzania, resulting in at least 11 deaths, in violation of 18 U.S.C. § 844 (Count 8); (vi) one count of use and attempted use of weapons of mass destruction against nationals of the United States in Dar es Salaam Tanzania, in violation of 18 U.S.C. § 2332a(a)(1) (Count 10); (vii) thirteen counts of murder in Dar es Salaam, Tanzania, in violation of 18 U.S.C. §§ 930, 1111, and 2 (Counts 224-34, 277-78); (viii) one count of attempted murder of employees of the United States in Dar es Salaam, Tanzania, in violation of 18 U.S.C. §§ 1111, 1116, and 2 (Count 279); (ix) one count of attempted murder of internationally protected persons in Dar es Salaam, Tanzania, in violation of 18 U.S.C.

§§ 1111, 1116, and 2 (Count 283); (x) one count of using and carrying an explosive device during the commission of a felony, in violation of 18 U.S.C. §§ 844 and 2 (Count 284); and (xi) one count of using and carrying a dangerous device during the bombing of the U.S. Embassy in Dar es Salaam, Tanzania, in violation of 18 U.S.C. §§ 924(c) and 2 (Count 286).

On October 18, 2001, Judge Sand, who presided over the trial, sentenced Mohamed to life imprisonment on Counts 1, 3, 4, 5, 8, 10, 224-34, 277, 278, 279, and 283,[2] followed by a mandatory ten years' imprisonment on Count 284, and a mandatory 30 years' imprisonment on Count 286, each to be served consecutively to all other counts.[3]

The case was reassigned to this Court on June 15, 2009.

### C. The Motion

On May 30, 2024, Mohamed filed an administrative request for compassionate release, which was denied on June 14, 2024. (*See* A. at 1, 5).

On October 10, 2024, Mohamed filed a motion seeking a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. 2240, the "Motion" or "Mot."). He argues there are a litany of extraordinary and compelling reasons for his early release, principally that: (i) he has been a victim of abuse in custody (Mot. at 3-13); (ii) he suffers from numerous medical conditions (Mot. at 14-22); (iii) his sentence is disproportionate to sentences imposed on three of his co-defendants (Mot. at 23-32); and (iv) he has been rehabilitated (Mot. at 33-37).

On October 15, 2024, this Court directed the Government to respond to the Motion. (Dkt. 2242).

## II. APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the court "may not modify a term of imprisonment once it has been imposed except," as relevant here:

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . .

---

[2] On Counts 4, 8, and 10, a penalty phase was conducted in which the jury could not unanimously find that the death sentence was appropriate. As a result of that finding, a sentence of life imprisonment was required to be imposed. (PSR ¶ 207).

[3] Mohamed appealed his conviction, but later withdrew his appeal. (Dkt. 689). Mohamed has not filed Section 2255 motions challenging his conviction, and the instant motion is his first motion for compassionate release.

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.*

Where a defendant has exhausted his administrative remedies,[4] a court may reduce the defendant's sentence if it finds that (1) "extraordinary and compelling reasons warrant such a reduction"; (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and (3) the Section 3553(a) factors weigh in favor of a reduction in sentence. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (recognizing that both "extraordinary and compelling reasons" and support of the Section 3553(a) factors are necessary to grant relief). "Application of the § 3553(a) factors requires an assessment of whether the relevant factors outweigh the extraordinary and compelling reasons warranting compassionate release . . . and whether compassionate release would undermine the goals of the original sentence." *United States v. Daugerdas*, 613 F. Supp. 3d 807, 812 (S.D.N.Y. 2020).

The relevant Sentencing Guidelines policy statement in U.S.S.G. § 1B1.13 sets forth binding requirements that must be met before a court can reduce a sentence. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission").[5] Section 1B1.13 both defines "extraordinary and compelling reasons" and imposes an additional requirement that the defendant not be "a danger to the safety of any other person or to the community" as determined under 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(a)(2), (b).

As relevant here, the current version of Section 1B1.13 provides that "[e]xtraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:"

- *Victim of Abuse.* Where "[t]he defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of . . . sexual abuse . . . or physical abuse resulting in 'serious bodily injury' . . . that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant," and the misconduct was "established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an

---

[4] Mohamed appears to have satisfied that requirement.

[5] A prior version of Section 1B1.13 was held to be outdated and therefore non-binding on district courts after passage of the First Step Act of 2018. *See United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). Section 1B1.13 was amended as of November 1, 2023, however, so as to fix the issue identified in *Brooker*, among other changes. Accordingly, *Brooker* has been abrogated, and the policy statement is once again binding on district courts considering reduction in sentence motions. *See United States v. Corbett*, No. 10 Cr. 184 (PAE), 2023 WL 8073638, at *3 (S.D.N.Y. Nov. 21, 2023) ("The amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated.").

administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger." U.S.S.G. § 1B1.13(b)(4).

- *Medical Circumstances of the Defendant.* Where the defendant is suffering from a terminal illness or serious physical or medical condition, *see* U.S.S.G. § 1B1.13(b)(1)(A)-(B), or from "a medical condition that requires long-term or specialized medical care" that is not being provided in prison and without which the defendant is at risk of serious deterioration in health or death, U.S.S.G. § 1B1.13(b)(1)(C), or is held at a facility affected by or at imminent risk of being affected by an outbreak of infectious disease or other "ongoing public health emergency declared by the appropriate federal, state, or local authority," where "due to personal health risk factors and custodial status," the defendant is at a greater risk of severe complications upon exposure, and where "such risk cannot be adequately mitigated in a timely manner." U.S.S.G. § 1B1.13(b)(1)(D).

The policy statement also permits a finding of extraordinary and compelling reasons where the defendant "presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described [above], are similar in gravity to those described [above]." U.S.S.G. § 1B1.13(b)(5). The rehabilitation of a defendant, by itself, is not an extraordinary and compelling reason under the policy statement. *Id.* § 1B1.13(d); *see also* 28 U.S.C. § 994(t). Rehabilitation can, however, be considered together with other circumstances to determine whether and to what extent a reduction is warranted. U.S.S.G. § 1B1.13(d).

As the proponent of the motion, the defendant bears the burden of proving the requirements for relief: extraordinary and compelling reasons, lack of danger to the community, and support of the Section 3553(a) factors. *See United States v. Jones*, 17 F.4th 371, 375 (2d Cir. 2021) ("'If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.'") (quoting *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)); *United States v. Sellick*, No. 21-2328, 2022 WL 16936829, at *1 (2d Cir. Nov. 15, 2022) (summary order) ("The defendant bears the burden of showing that the circumstances warrant a sentence reduction.").

Thus, a court's finding of extraordinary and compelling reasons is necessary but not sufficient, for the court must still consider the Section 3553(a) factors. *United States v. Monsanto*, No. 87 Cr. 555 (LAP), 2021 WL 355049, at *2 (S.D.N.Y. Feb. 2, 2021). Where the court determines "that the Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances," the motion for compassionate release should be denied. *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding compelling reasons warranting defendant's release but nevertheless denying motion for compassionate release because Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [defendant's] sentence").

### III. DISCUSSION

Mohamed has not demonstrated extraordinary and compelling reasons justifying a sentence reduction of any kind. Even if he had, he remains a danger to the community and his crimes are so severe that the Section 3553(a) factors overwhelmingly weigh against release.

#### A. No Extraordinary and Compelling Circumstances Exist

Mohamed claims there are four primary "extraordinary and compelling" reasons to reduce his sentence: (1) he is a victim of abuse in custody; (2) his medical conditions; (3) his sentence is disproportionate to the sentences of three co-defendants; and (4) he has been rehabilitated. Mohamed also claims numerous "additional" reasons (described below) that he alleges support his early release from custody. None of these circumstances, whether considered independently or together, constitutes an extraordinary and compelling reason for a sentence reduction, and his motion should therefore be denied on this basis alone.

*First*, Mohamed claims that he has been a "victim of abuse" in custody on four occasions—in 2000, 2008, 2018, and 2020. (Mot. at 3-10).[6] For all four incidents, Mohamed fails to satisfy the Guidelines' requirement that misconduct "be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger." U.S.S.G. § 1B1.13(b)(4). No criminal, civil, or administrative proceedings were initiated in connection with the alleged abuse of Mohamed in 2000 or 2008. And for the alleged misconduct in 2018 and 2020, Mohamed's administrative claims have been denied, (*see* A. at 17 (2018 incident); A. at 38 (2020 incident)), and his civil claims are still pending, *see Khalfan Khamis Mohamed v. Jones*, 20-cv-2516-RBJ-MDB (Aug. 20, 2020 D. Colo.) (2018 incident); *Khalfan Khamis Mohamed v. United States*, 21-cv-2676-NYW-MDB (Sept. 30, 2021 D. Colo.) (2020 incident). To the extent Mohamed attempts to argue that the civil proceedings are "unduly delayed" or he is at "imminent risk of danger," U.S.S.G. § 1B1.13(b)(4), this argument fails, because he waited years to file the civil suits, which are actively being litigated, and waited more than six years after the 2018 incident and more than four years after the 2020 incident to file this Motion.[7]

*United States v. Matta*, Cr. 21-22 (D. Mont. Mar. 22, 2024), cited by Mohamed (Mot. at 11) and attached as Exhibit A, is not to the contrary. While in *Matta*, there was no conviction or finding of liability in connection with the defendant's claim of abuse, *id.* at 5, the defendant filed

---

[6] Several of Mohamed's "additional" arguments stem from BOP's alleged mistreatment of Mohamed while he has been in custody. For example, Mohamed argues that BOP has failed to treat his injuries following his purported physical abuse (Mot. at 38) and that BOP has destroyed his personal materials (Mot. at 38-39). These arguments should be rejected for the same reasons that his claim that he is a "victim of abuse" fail.

[7] As an "additional" argument for early release, Mohamed argues that he will not receive monetary damages for the alleged harms he has incurred in custody. (Mot. at 39-40). This is not an extraordinary and compelling reason to release the defendant. In addition, as noted, Mohamed has failed to establish that he has actually suffered abuse while in custody. And in any event, this argument is premature because Mohamed's civil claims are, in fact, still pending in the District of Colorado.

his claim the same year the abuse occurred and, significantly, the Government did not dispute the defendant's account of events—namely, that BOP officers incited violence against the defendant by informing other inmates that he was an informant and by also beating the defendant unconscious. *Id.* at 4. In addition, the defendant in *Matta* was serving a 36-month drug sentence and was due to be released the same year. *Id.* at 1, 6. Here, Mohamed is serving a life sentence plus 40 years for bombing a U.S. embassy and killing eleven people and injuring at least 85 more.

Moreover, the "abuse" Mohamed alleges on two such occasions—in 2008, when BOP allegedly used overly tight handcuffs that caused his wrists to bleed, and in 2020, when BOP again allegedly used overly tight handcuffs and also "dropp[ed] him on a bed" (Mot. at 7)—are not "serious bodily injur[ies]," as is defined for purposes of constituting an "extraordinary and compelling" reason for reduced sentence. U.S.S.G. § 1B1.13(b)(4) (stating abuse must result in "serious bodily injury" as defined in the Commentary to § 1B1.1); § 1B1.1, App. Note M ("'Serious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.").

As for the other two allegations of abuse, in 2000 and 2018, Mohamed has not provided any records substantiating his claims and has misrepresented the circumstances surrounding both incidents of purported misconduct. With respect to the alleged abused in 2018, Mohamed provides no evidentiary support for his claim that he was physically abused (*see* Mot. at 4), and BOP records indicate that Mohamed incurred an incidental injury, a minor fracture to his ankle, when a BOP staff member inadvertently fell on Mohamed while trying to prevent Mohamed from pulling away from other corrections officers. (*See* Ex. B at 1 (BOP Report of Incident)). With respect to the alleged misconduct in 2000, Mohamed alleges that he suffered serious injuries in connection with his cellmate and co-defendant's brutal attack on a Metropolitan Corrections Center ("MCC") corrections officer, in which the officer sustained permanent bodily injury after being stabbed in the eye and brain. *See United States v. Salim*, 287 F. Supp. 2d 250, 355 (S.D.N.Y. 2003). But Mohamed provides no evidence to support his claim that he was tied naked, tortured, or incurred injuries as a result of an assault by corrections officers. (*See* Mot. at 3). Moreover, while Mohamed claims he had "no involvement whatsoever" in this horrific assault on the MCC officer (Mot. at 3 n.1), a federal judge in this District found after an evidentiary hearing that Mohamed was, in fact, involved in the assault—namely by covering a video camera in the cell where the corrections officer was stabbed and grabbing the corrections officer's walkie-talkie, *see Salim*, 287 F. Supp. at 297,[8] actions that would have prevented others from knowing of the attack and the MCC officer from calling for help.

*Second*, Mohamed, who is 51 years old, claims to suffer from, among other things, vision problems, hypertension, constipation, urinary issues, alopecia, and body pain. (Mot. at 14-22). These alleged conditions do not constitute extraordinary and compelling circumstances justifying a reduced sentence. First and foremost, none of these conditions are terminal, Mohamed does not

---

[8] Mohamed was not charged in connection with this incident. His cellmate and co-defendant in the underlying terrorism case, who was primarily responsible for the attack on the MCC corrections officer, was charged for the assault and Mohamed's role in the attack was discussed during the *Fatico* hearing in that case. *See generally Salim*, 287 F. Supp. 2d 250.

even allege that any of these conditions "substantially diminishes the ability of the defendant to provide self-care," and he does not allege that any of these conditions requires specialized medical care that the facility is not providing. U.S.S.G. § 1B1.13(b)(1).[9] To the contrary, Mohamed acknowledges that BOP has taken measures to address all or almost all of his ailments, including by providing cataract surgery for his eyes (Mot. at 15), medication for his hypertension (Mot. at 16), a colonoscopy for his constipation (Mot. at 16-17), compression socks for swollen legs (Mot. at 17), an MRI and medication for headaches (Mot. at 18), and even steroids for his hair loss (Mot. at 19). And beyond stating that he could receive "adequate treatment" if released, Mohamed does not identify any medical treatments he would actually obtain. (*See* Mot. 14-22). In addition, medical staff at Mohamed's facility completed a medical evaluation for Mohamed's compassionate release request, and denied it because he did not have a qualifying medical condition. (A. at 5).[10]

    *Third*, Mohamed argues that his sentence is disproportionate to the sentences of three of his co-defendants—Adel Abdel Bary ("Bary"), Ali Mohamed, and Mohamed Suleiman al Nalfi ("al Nalfi")—who he claims had more significant roles in the 1998 conspiracy to bomb the Embassies in Kenya and Tanzania. (*See* Mot. at 23-32).[11] As a threshold matter, Section 3553(a)(6) requires a district court to consider nationwide sentencing disparities, but does not require a district court to consider disparities between co-defendants. *United States v. Gahagen*, 44 F.4th 99, 113 (2d Cir. 2022). In any event, the conduct of at least two of Mohamed's co-defendants was not nearly as significant as that of Mohamed. As this Court found in sentencing Bary to 25 years' imprisonment, Bary "spread[] propaganda in coordination with the individuals who authorized the

---

[9] Mohamed also claims that his "emotional circumstances" qualify as a medical condition that merits a reduction in sentence. (Mot. at 20). But "emotional circumstances," of course, are not an "extraordinary and compelling" reason that justifies a sentence reduction.

[10] Mohamed also argues that the "combination of physical and emotional conditions" he alleges also render his incarceration more punitive than the Court had anticipated while sentencing him. (Mot. 20-21). But this Court has rejected arguments by one of Mohamed's co-defendants that conditions at ADX-Florence, *i.e.*, where Mohamed is imprisoned, are extraordinary and compelling reasons for a sentence reduction. *See United States v. El-Hage*, 98 Cr. 1023 (LAK) (Dkt. 2236); *see also United States v. Shabazz*, No. CR12-0033JLR, 2022 WL 5247196, at *3-4 (W.D. Wash. Oct. 6, 2022) (rejecting argument that conditions of confinement at ADX Florence are extraordinary and compelling reasons for a sentence reduction), *appeal dismissed*, No. 22-30174, 2023 WL 245005 (9th Cir. Jan. 11, 2023).

[11] Mohamed argues that the alleged sentencing disparities constitute extraordinary and compelling circumstance under U.S.S.G. § 1B1.13(b)(6), which provides that "a change in the law . . . may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed." *See* U.S.S.G. § 1B1.13(b)(6). Mohamed has not identified any "change in the law" that would have changed his sentence had it been enacted at the time he was sentenced—nor have there been any such changes. Accordingly, even assuming that Mohamed could identify significant sentencing disparities between similarly situated defendants, which he cannot, that would not constitute an extraordinary and compelling reason to reduce his sentence under § 1B1.13(b)(6).

attacks," a crime that "was not nearly as serious as the crimes of his co-conspirators."[12] *Id.* at *3. And al Nalfi was sentenced to 121 months' imprisonment after pleading guilty to conspiring to injure and destroy U.S. defense utilities, in violation of 18 U.S.C. § 2551, which carried a statutory maximum term of imprisonment of 120 months at the time.[13] (Dkt. 681). In contrast to these defendants, Mohamed directly participated in the bombings. The "varying degrees of culpability" between Mohamed and these other defendants is therefore a "reasonable explanation" for sentencing disparity. *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006).

Moreover, as Mohamed himself recognizes, these three co-defendants all pleaded guilty. Mohamed, by contrast, went to trial. The Supreme Court has recognized that "our system of pleas . . . often results in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial." *Missouri v. Frye*, 566 U.S. 134, 43-44 (2012); *see also United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024) (reversing district court that had granted defendant compassionate release based on sentencing disparities with co-defendants who had pleaded guilty and cooperated); *see also Ebbers*, 458 F.3d at 129 (recognizing defendants who plead guilty may reasonably receive shorter sentences than defendants who go to trial), *cert. denied,* 549 U.S. 1274, (2007); *see also Gahagen*, 44 F.4th at 113 (same). While Mohamed asserts that he was not offered a plea agreement (Mot. at 31), Mohamed nonetheless could have chosen to plead guilty, even without a plea agreement, and accept responsibility for his heinous crimes.

*Fourth*, Mohamed contends that the Court should take into account his "almost completely clean disciplinary record" in considering whether to grant the Motion. (Mot. at 33-37); *see Brooker*, 976 F.3d at 237–38 ("The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" (quoting 28 U.S.C. § 994(t)). This argument, however, is based on Mohamed's refusal to accept responsibility for his involvement in the violent attack on the MCC corrections officer in 2000, *see Salim*, 287 F. Supp. 2d at 297, as well as the more recent incident in 2018, where Mohamed was found to have committed assault, *see* Ex. B at 1. In light of these incidents, along with Mohamed's prolonged refusal to accept responsibility for them, Mohamed's record falls far short of the "abundant evidence of full rehabilitation" that courts have found to contribute to extraordinary and compelling reasons for relief. *United States v.*

---

[12] In the midst of the COVID-19 pandemic, this Court granted Bary's motion for compassionate release. *See United States v. Adel Abdel Bary*, No. 98 Cr. 1023 (LAK), 2020 WL 5946985 (S.D.N.Y. Oct. 7, 2020). When this Court granted Bary's motion for compassionate release, Bary "was due to be released from prison before the end of the month." *Id.* at *2. Furthermore, the Government did not dispute there were extraordinary and compelling reasons for Bary's release because his obesity placed him at increased risk of severe illness from COVID-19. (Dkt. 2156 at 5). This Court concluded that "in these circumstances," which included "a significant risk of a fatal outcome" should Bary contract COVID-19, "the benefit to society of requiring defendant to serve the final few weeks of his sentence does not outweigh the serious health risks he faces." *Bary*, 2020 WL 5946985 at *3. This analysis is completely inapposite here.

[13] In 2001, Section 2155 was amended and now provides for a maximum sentence of 240 months' imprisonment. Because al Nalfi's offense occurred no later than 1994, he was not subject to the heightened penalty.

*Underwood*, 2021 WL 3204834 (SHS), at *2 (S.D.N.Y. Jan. 15, 2021) (reducing sentence of "a manifestly model inmate" who had "not received a single disciplinary infraction, which in this Court's experience is most extraordinary") *with, e.g., United States v. Pope*, 94 Cr. 631-7 (SHS), Dkt. 567 at 3 (S.D.N.Y. Dec. 14, 2022) (denying sentence-reduction motion from defendant who "had no infractions since 2016," but had prior "violations for drug use and assault").

*Fifth*, Mohamed claims that he should be released from custody because he was subject to special administrative measures ("SAMs") for approximately 23 years, until April 2023. (Mot. at 41-42). As a threshold matter, according to BOP records, Mohamed has not been subject to SAMs since 2015. In any event, Mohamed was subject to SAMs as a result of his participation in a terrorist conspiracy and in unspeakable acts of terrorism that caused the death of eleven people and injured approximately 85 more. In addition, since being in custody, Mohamed has participated in two additional assaults—one at the MCC in 2000 and one, much more recently, in 2018 at ADX-Florence. Moreover, in 2014, when the Government requested that Mohamed's SAMs be renewed, it specifically cited not only Mohamed's underlying conduct and his participation in the 2000 assault, but also that Mohamed appeared to have continued interest in bombings in Dar es Salaam—for example a 2011 letter to Mohamed's sister inquiring about recent explosions at an army base in Dar es Salaam—and that Mohamed had attempted to circumvent restrictions imposed on him as a result of the SAMs. (*See* A. at 130). Under these circumstances, it is not unusual for a defendant to be subject to SAMs for an extended period of time. *See United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) 2024 WL 4880197 (S.D.N.Y. Nov. 25, 2024) (denying compassionate release motion of terrorism defendant subject to SAMs at ADX-Florence notwithstanding his conditions of confinement). And Mohamed, like the counseled defendant in *Alimehmeti*, does not cite any authority for the proposition that an inmate's being subject to SAMs can warrant early release. *Id.* at *7.[14]

*Finally*, Mohamed argues that he has not seen his family since 2001 and would like to assist in the aide his family provides to his mother. (Mot. 43). But Mohamed's desire to be released to see his family and care for his mother is hardly extraordinary—virtually all inmates share that desire. The Sentencing Guidelines explicitly identify when "family circumstances" are extraordinary and compelling, and limit those circumstances to the death or incapacity of the caregiver of a defendant's child who is a minor or incapable of self-care, or the incapacity of a spouse, registered partner, parent or other immediate family member when the defendant would be the only available caregiver. U.S.S.G. § 1B1.13(b)(3). Mohamed does not and cannot argue that his family circumstances meet the standard.[15]

---

[14] Another condition of confinement that Mohamed claims merits his early release is his lack of a secure place to keep his belongings (Mot. at 44-45). This argument comes nowhere near the grave circumstances which could be considered extraordinary and compelling.

[15] Mohamed also argues that he should be released because he would immediately be deported to Tanzania. (Mot. at 45). But as Mohamed himself recognizes, the crimes for which Mohamed is imprisoned, including the death of two U.S. employees, occurred in Tanzania—not the United States. Mohamed would therefore pose a danger, regardless of where he resides.

Accordingly, Mohamed has failed to meet his burden of demonstrating "extraordinary and compelling" circumstances that would justify a reduction in his sentence and his motion should therefore be denied.

### B. Mohamed Remains a Danger to the Community and the Section 3553(a) Factors Require that the Motion be Denied

Even if Mohamed had demonstrated extraordinary and compelling circumstances, which he has not, his motion should be rejected because he remains a serious danger to the safety of the community and the Section 3553(a) factors weigh overwhelmingly against his release.

Mohamed was convicted after trial of participating in a conspiracy to murder United States nationals, which resulted in the bombing of the U.S. Embassy in Dar es Salaam, Tanzania and the death of 11 individuals and the injury of at least 85 more. And the bombing of the Embassy in Dar es Salaam was part of a broader, al Qaeda-led conspiracy that also resulted in the bombing of the U.S. Embassy in Nairobi, Kenya, which led to the death of an additional 213 people and injury to approximately 4,500. While Mohamed's Motion repeatedly attempts to diminish his role in and responsibility for the bombing in Dar es Salaam (*see* Mot. 23-31), his involvement was significant and occurred over a period of years. Mohamed first became involved when he began training in the use of explosives and military tactics in at least 1994—four years prior to the bombing. Mohamed then spent months in Dar es Salaam preparing for the bombing, he directly participated in the execution of the bombing, and thereafter escaped using false identity papers the day after the bombing.

The victim impact in this case cannot be measured. At trial, many victims testified about the unspeakable losses they have experienced as a direct result of Mohamed's conduct. (PSR ¶¶ 143-49). And when one of Mohamed's co-defendants, Wadis Elias El Hage, sought compassionate release last year (a request this Court denied), the Government received approximately 95 communications from victims that took a position on that motion—all but one of them asked that the motion be denied, and that Mohamed's co-defendant continues to serve his life sentence. (Dkt. 2233 at 13-14).[16]

---

[16] The Government respectfully submits that, if the Court is inclined to grant Mohamed's motion, it should first provide an opportunity for any victims of Mohamed's crimes to be heard. Under the Crime Victims' Rights Act, victims have "[t]he right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C. § 3771(a)(4); *see also* Fed. R. Crim. P. 60(a)(3). Although the Court may decide this motion without holding a "public proceeding," the Government submits that, at least in this circumstance, effectuating fully the purpose of the statute—particularly in light of its references to "release," "sentencing," and "parole proceedings"—counsels in favor of affording victims the ability to be heard. Furthermore, Section 3582(c) appears to contemplate considering the view of victims, because it authorizes the Court to reduce a sentence only "after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(1)(A) and (2). As the Court knows, § 3553(a) lists among sentencing factors: "the nature and circumstances of the offense," which often involve harm to victims, as well as "the need to provide restitution to any victims of the offense." *Id.* § 3553(a)(1), (7). Unless victims are permitted to make their views known, the Court will not have as full an

A sentence of life imprisonment is the only sentence that adequately reflects the seriousness of Mohamed's many offenses and it is the only sentence that provides just punishment for crimes of this magnitude.

## IV. CONCLUSION

The Motion should be denied because no extraordinary and compelling reasons warrant a sentence reduction, because Mohamed remains a danger to the community, and because a reduction would be inconsistent with the Section 3553(a) factors.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

by: *[signature]*
Remy Grosbard
Assistant United States Attorney
(212) 637-2446

cc:     Khalfan Khamis Mohamed, Reg. No 44623-054, *pro se* (by U.S. mail)
        USP Florence - High
        U.S. Penitentiary
        P.O. Box 7000
        Florence, CO 81226

---

understanding of the nature of the offense, the injury it caused to other people, and whether those people have been made whole. If the Court so requests, the Government will endeavor to contact any victims promptly and advise them that they may be heard on this motion.